Kevin E. Gilbert, Esq. (SBN: 209236)
kgilbert@ohhlegal.com
Nicholas D. Fine, Esq. (SBN: 285017)
nfine@ohhlegal.com
**ORBACH HUFF & HENDERSON LLP**
6200 Stoneridge Mall Road, Suite 225
Pleasanton, CA 94588
Telephone: (510) 999-7908/Facsimile: (510) 999-7918

David J. Aleshire, City Attorney (SBN: 65022)
**CITY OF RICHMOND/CITY ATTORNEY'S OFFICE**
450 Civic Center Plaza
Richmond, CA 94804-1630
Telephone: (510) 620-6509/Facsimile: (510) 620-6518

Attorneys for Defendants
CITY OF RICHMOND, CHIEF OF POLICE BISA FRENCH,
OFFICERS TOM TRAN, MARK HALL and CEDRIC TAGORDA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IVAN GUTZALENKO, Deceased, through his Co-Successors in Interest, N.G. and N.I.G., minors through their mother and Next Friend, Honey Gutzalenko, individually and as Co-successors in Interest for IVAN GUTZALENKO, Deceased,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF RICHMOND, et al.,<br><br>Defendants. | Case No. 22-cv-02130-EMC<br><br>**DECLARATION OF NICHOLAS FINE IN SUPPORT OF DEFENDANTS CITY OF RICHMOND, CHIEF OF POLICE BISA FRENCH, OFFICERS TOM TRAN, MARK HALL AND CEDRIC TAGORDA'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>DATE: March 6, 2025<br>TIME: 1:30 p.m.<br>DEPT: Courtroom 5, 17th Floor<br>JUDGE: Hon. Edward M. Chen |

ORBACH HUFF & HENDERSON LLP

I, Nicholas D. Fine, if called upon to testify will competently testify as follows:

1. I am an attorney at law duly licensed to practice before all the courts in the State of California and the United States District Court – Northern District of California. I am an attorney with the law firm of Orbach Huff + Henderson LLP, and one of the attorneys of record for Defendants CITY OF RICHMOND ("City"), CHIEF OF POLICE BISA FRENCH ("Chief French"), and OFFICERS TOM TRAN, MARK HALL and CEDRIC TAGORDA ("Officers") (collectively, "City Defendants") in the above-referenced matter. If called and sworn as a witness to testify, I am competent to testify and would testify from my own personal knowledge as to the facts set forth in this declaration, except as to those matters that are stated on information and belief herein.

2. I submit this declaration for the purpose of submitting evidence in support of City Defendants' Motion for Summary Judgment or, in the alternative, Partial Summary Judgment.

3. Attached hereto as **Exhibit 1** is a true and correct copy of the operative Second Amended Complaint, filed by Plaintiffs IVAN GUTZALENKO, Deceased ("Decedent"), through his Co-Successors in Interest, N.G. and N.I.G., minors through their mother and Next Friend, Honey Gutzalenko, individually and as Co-successors in Interest for IVAN GUTZALENKO, Deceased ("Plaintiffs"), on August 9, 2023.

4. Attached hereto as **Exhibit 2** is a true and correct copy of the deposition transcript of Defendant Officer Tom Tran, with relevant portions highlighted, taken remotely on September 5, 2024.

5. Attached hereto as **Exhibit 3** is a true and correct copy of the deposition transcript of Defendant Officer Cedric Tagorda, with relevant portions highlighted, taken remotely on October 30, 2024.

6. Attached hereto as **Exhibit 4** is a true and correct copy of the deposition transcript of Defendant Officer Mark Hall, with relevant portions highlighted, taken remotely on September 5, 2024.

7. Attached hereto as **Exhibit 5** is a true and correct redacted copy of "Officer Tran [Conf City_840]" which is Defendant Officer Tran's body-worn camera video from the incident underlying this litigation, and which the City produced in discovery in this action on or about October 7, 2022, in response to Plaintiffs' First Set of Requests for Production of Documents to City Defendants.

///

///

8.      Attached hereto as **Exhibit 6** is a true and correct redacted copy of "Officer Tagorda [Conf City_839]" which is Defendant Officer Tagorda's body-worn camera video from the incident underlying this litigation, and which the City produced in discovery in this action on or about October 7, 2022, in response to Plaintiffs' First Set of Requests for Production of Documents to City Defendants.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of the deposition transcript of Defendant and American Medical Response West Paramedic, Damon Richardson, with relevant portions highlighted, taken remotely on November 20, 2024.

10.      Attached hereto as **Exhibit 8** is a true and correct copy of the deposition transcript of the City's Person Most Knowledgeable, Lieutenant Daniel Reina, with relevant portions highlighted, taken remotely on September 11, 2024.

11.      Attached hereto as **Exhibit 9** is a true and correct redacted copy of "Officer Hall [Conf City_838]" which is Defendant Officer Hall's body-worn camera video from the incident underlying this litigation, and which the City produced in discovery in this action on or about October 7, 2022, in response to Plaintiffs' First Set of Requests for Production of Documents to City Defendants.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 29th day of January, 2025, in Pleasanton, California.


    _____/s/ Nicholas D. Fine_____
    Nicholas D. Fine

# EXHIBIT 1

JOHN L. BURRIS Esq., SBN 69888
BENJAMIN NISENBAUM, Esq., SBN 222173
JAMES COOK Esq., SBN 300212
**BURRIS, NISENBAUM, CURRY & LACY, LLP**
Airport Corporate Centre
7677 Oakport Street, Suite 1120
Oakland, California 94621
Telephone: (510) 839-5200
Facsimile: (510) 839-3882
John.Burris@johnburrislaw.com
James.Cook@johnburrislaw.com
Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

IVAN GUTZALENKO, Deceased, through his
Co-Successors in Interest, N.G. and N.I.G.,
minors through their mother and Next Friend,
Honey Gutzalenko, individually and as Co-
successors in Interest for IVAN
GUTZALENKO, Deceased,

            Plaintiffs,

vs.

CITY OF RICHMOND, a public entity;
RICHMOND CHIEF OF POLICE BISA
FRENCH, in her individual and official
capacities; TOM TRAN, individually and in his
official capacity as a police officer for the City
of Richmond; MARK HALL, individually and
in his official capacity as a police officer for the
City of Richmond; CEDRIC TAGORDA
individually and in his official capacity as a
police officer for the City of Richmond;
AMERICAN MEDICAL RESPONSE WEST, a
corporate entity; DAMON RICHARDSON; and
DOES 1-10, Jointly and Severally,

            Defendants.

CASE NO.: 3:22-cv-02130-CRB

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1.      This is an action for damages brought pursuant to Title 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution, under California Civil Code Section § 52.1, and under the common law of California, for the defendants' use of force against Decedent IVAN GUTZALENKO.

## JURISDICTION

2.      This action arises under Title 42 of the United States Code, § 1983. Title 28 of the United States Code, §§ 1331 and 1343 confers jurisdiction upon this Court. The unlawful acts and practices alleged herein occurred in the City of Richmond, California, which is within the judicial district of this Court. This Court also has supplemental jurisdiction over Plaintiffs' state law causes of action under 28 U.S.C. § 1367.

## PARTIES

3.      Plaintiff N.G., a minor, is the son of IVAN GUTZALENKO, Deceased, and a resident of the State of California. Plaintiff, by and through their mother and Guardian ad Litem, Honey Gutzalenko, brings these claims individually for wrongful death and violation of their personal rights, and as co-successors in interest for their father, Decedent IVAN GUTZALENKO, asserting survival claims for IVAN GUTZALENKO, Deceased.  They bring these claims under state and federal law.

4.      Plaintiff N.I.G., a minor, is the daughter of IVAN GUTZALENKO, Deceased, and a resident of the State of California. Plaintiff, by and through their mother and Guardian ad Litem, Honey Gutzalenko, brings these claims individually for wrongful death and violation of their personal rights, and as co-successors in interest for their father, Decedent IVAN GUTZALENKO, asserting survival claims for IVAN GUTZALENKO, Deceased.  They bring these claims under state and federal law.

5.      Defendant CITY OF RICHMOND ("CITY") is a public entity established by the laws and Constitution of the State of California, and owns, operates, manages, directs, and controls the Richmond Police Department ("RPD") which employs defendants in this action.

6.      Defendant Richmond Chief of Police BISA FRENCH, at all material times, was employed as Chief of Police of the RPD by Defendant CITY, and she was acting within the course and scope of that employment.  As Chief of Police of the RPD, Defendant FRENCH was a policy-making official for Defendant CITY with the power to make official and final policy for the RPD.  Defendant FRENCH is being sued in her individual and official capacities.

7.      Defendant TOM TRAN, at all material times, was employed as a police officer at RPD and was acting within the course and scope of that employment.  He is being sued in his individual, and official capacities.

8.      Defendant MARK HALL, at all material times, was employed as a police officer at RPD and was acting within the course and scope of that employment.  He is being sued in his individual, and official capacities.

9.      Defendant CEDRIC TAGORDA, at all material times, was employed as a police officer at RPD and was acting within the course and scope of that employment.  He is being sued in his individual, and official capacities.

10.     Defendant AMERICAN MEDICAL RESPONSE WEST (Hereinafter "AMRW"), is a corporate entity, that employed paramedics, including Damon Richardson, who assisted City of Richmond police officers in detaining and arresting Gutzalenko. AMRW was also in charge of company policies and rules regarding their paramedics and technicians.

11.     Defendant DAMON RICHARDSON, at all material times, was employed as a paramedic for AMERICAN MEDICAL RESPONSE WEST, and was acting within the course and scope of that employment to assist the CITY OF RICHMOND police officers in detaining and arresting IVAN GUTZALENKO. He is being sued in his individual and official capacities.

12.     Plaintiffs are ignorant of the true names and capacities of Defendants DOES 1-50, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs are informed and believe and thereon allege that each Defendant so named is responsible in some manner for the injuries and damages sustained by Plaintiffs as set forth herein. Plaintiffs will

amend this Complaint to state the names and capacities of DOES 1-50, inclusive, when they have been ascertained.

13.   Plaintiffs are informed and believe, and thereon allege that each of the Defendants sued herein was negligently, wrongfully, and otherwise responsible in some manner for the events and happenings as hereinafter described, and proximately caused injuries and damages to Plaintiffs and Decedent.  Further, one or more DOE defendants was at all material times responsible for the hiring, training, supervision, and discipline of other defendants, including DOES 1-10.

14.   Plaintiffs are informed and believe, and thereon allege, that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship.  Plaintiffs are further informed and believe, and thereon allege, that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter otherwise specifically alleged.

15.   At all material times, each Defendant was jointly engaged in tortious activity, and was fundamentally involved in, and an integral participant to, the events and violations of rights described herein, resulting in the deprivation of Plaintiffs' and Decedent's constitutional rights and other harm.

16.   The acts and omissions of all Defendants as set forth herein were at all material times pursuant to the actual customs, policies, practices, and procedures of Defendant CITY.

17.   At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of California.

18.   Plaintiffs timely and properly filed a tort claim pursuant to Cal. Gov. Code § 910 et seq., and this action is timely filed within all applicable statutes of limitation.

19.   This complaint may be pled in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2).

**GENERAL ALLEGATIONS**

20.    Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

21.    On March 10, 2021, the Richmond Police Department received a call for service about a man causing a disturbance in a local furniture store on the 12600 block of San Pablo Avenue.  The man was described as a white man in a black hoodie and jeans.  Defendant RPD Officer Tom Tran arrived at the scene first and, from his patrol car, saw a man matching that description walking down San Pablo Avenue.  That man was IVAN GUTZALENKO.  Defendant TRAN requested via radio that an ambulance stage nearby, then approached IVAN GUTZALENKO on foot.  Immediately upon making verbal contact with IVAN GUTZALENKO, Defendant TRAN realized that IVAN GUTZALENKO was in need of medical aid and was possibly intoxicated and/or experiencing a medical or mental health crisis.  IVAN GUTZALENKO had a dark purple mark on his forehead, was bleeding profusely from one of his hands, and had difficulty focusing on and communicating with Defendant TRAN.  As IVAN GUTZALENKO began to walk southbound down San Pablo Avenue, Defendant TRAN followed behind.  IVAN GUTZALENKO was visibly in physical distress and appeared to be having difficulty breathing.  Defendant TRAN questioned IVAN GUTZLENKO about what was wrong, and IVAN GUTZALENKO responded "I can't breathe."  Before making it to the end of the block, MR. GUTZALENKO collapsed and began writhing around on the ground, still breathing in a distressed manner.  As MR. GUTZALENKO shifted around on the ground, Defendant TRAN used his hand to attempt to keep IVAN GUTZALENKO positioned on his side, and verbally encouraged IVAN GUTZALENKO to remain on his side to better effectuate his breathing.

22.    Shortly after IVAN GUTZALENKO fell to the ground, Defendant RPD Officer MARK HALL arrived on the scene.  Defendant HALL joined Defendant TRAN in questioning MR. GUTZALENKO about his identity, what was wrong with him, if he had taken any drugs or

other substances that they should be aware of in order to help him, and other questions.  During this time, IVAN GUTZALENKO continued his labored breathing and Defendant TRAN continued trying to keep IVAN GUTZALENKO on his side in a "recovery" position.  Minutes later, an AMRW ambulance arrived.  As the AMRW responders began to bandage IVAN GUZTALENKO's hands, he became agitated and attempted to keep his hands away from them by moving his hands and body.  Defendants TRAN and HALL then attempted to handcuff IVAN GUTZALENKO in order to gain his compliance with AMRW responders.  As Defendant HALL held IVAN GUTZALENKO's left arm, Defendant TRAN used his body weight to pin IVAN GUTZALENKO to the ground face down in a prone position, by placing his knee into IVAN GUTZALENKO's back and leaning forward onto that knee.  Defendant TRAN placed handcuffs around IVAN GUTZALENKO's right wrist, then handed them off to Defendant HALL, who attempted to place the other end of the handcuffs around IVAN GUTZALENKO's left wrist.  As Defendant HALL tried to complete the handcuffing, Defendant TRAN continued applying his body weight onto IVAN GUTZALENKO's back to keep him pinned in a prone position, and forcibly kept IVAN GUTZALENKO's right arm positioned behind his back.  Around this time, Defendant RPD Officer CEDRIC TAGORDA joined in and held IVAN GUTZALENKO's legs down while Defendants TRAN and HALL tried to handcuff him.  As IVAN GUTZALENKO struggled to breathe in that prone, asphyxiating position, and under Defendants' body weight, he told Defendants "I can't breathe!"  Defendant TRAN continued using his knee to keep IVAN GUTZALENKO pinned down in a prone position, despite understanding that IVAN GUTZALENKO appeared to be experiencing a medical emergency and was struggling to breathe.  Defendant HALL threatened to use a Taser and pepper spray on IVAN GUTZALENKO, despite understanding the same.  Defendants finally handcuffed IVAN GUTZALENKO when he suddenly ceased struggling and went limp, after roughly 2 to 3 minutes.  During that time, IVAN GUTZALENKO was in a prone or modified prone position on the ground and compressed by Defendants' body weight and force.

23.     After handcuffing IVAN GUTZALENKO, the Officers put him into the recovery position. GUTZALENKO was still breathing. He was not resisting, thrashing, or moving in any way. He did not pose any threats to the officers, the paramedics, himself, or the public. While GUTZALENKO was handcuffed, and remaining still on the ground, AMRW paramedic RICHARDSON made the decision to use "Versed," a chemical restraint, on GUTZALENKO. RICHARDSON then injected Gutzalenko with the drug Versed, which is also known as "Midazolam." Contrary to proper medical use, RICHARDSON used Versed on GUTZALENKO while Gutzalenko showed no signs of any behavioral issue or agitation. RICHARDSON also failed to "aspirate" the syringe prior to administering the medication, meaning he did not check to see if the needle had penetrated a vein, which is a critical step since the Midazolam doses permitted to be administered by AMRW depend on whether the dosage is administered intramuscularly (which is taken up of the body much more slowly and in lesser concentration) as opposed to intravenous administration (which is taken up by the body much faster and in much greater concentration, and is much more dangerous to the patient than intramuscular administration). Aspiration is the simple action of pulling the plunger back after the needle is placed in the skin, to determine whether blood flows back into the syringe. If blood flows back in, then the needle is in a blood vessel.  For intramuscular administration, the needle must be withdrawn, re-inserted, and re-aspirated.  All of RICHARDSON's action in administering the Versed are clearly visible on the video, and it is clear from the video that he did not aspirate the syringe. RICHARDSON then administered a dose of versed that was meant for the muscle directly into GUTZALENKO's vein instead. GUTZALENKO stopped breathing with 90 seconds of the dose of Versed, consistent with intravenous administration of an overdose of Versed. The AMRW technicians then took IVAN GUTZALENKO to Summit Hospital in Oakland, where he was pronounced dead.

24.     After an autopsy conducted on March 11, 2021, the Contra Costa County Coroner's Division determined that IVAN GUTZLANEKO's cause of death was prone restraint asphyxia and cardiac arrest while under the influence of methamphetamine.

25.     Despite being disoriented and in a medical emergency, IVAN GUTZALENKO remained non-threatening throughout his encounter with Defendants TRAN, HALL, and TAGORDA, and reasonable officers would have understood that IVAN GUTZALENKO posed no threat to them or others. Similarly, RICHARDSON, as an AMRW paramedic, should have known that it was excessive and unreasonable force to use the chemical restrain Versed to restrain GUTZALENKO while Mr. GUTZALENO was cuffed, in the recovery position, and not resisting in any way. At the time of this death, IVAN GUTZALENKO had a recreational amount of methamphetamine in his system – in an amount too low to cause his death.  Defendants had no knowledge of IVAN GUTZALENKO's use of methamphetamine at the time of this incident.

26.     During substantial periods of time, Defendants TRAN, HALL, and TAGORDA each kept their own body weight on IVAN GUTZALENKO's back, arms, and legs to keep him in a prone position on the ground without objectively reasonable justification.  Reasonable officers would have clearly known that such conduct constituted excessive force under these circumstances, and posed a substantial risk of death or serious injury to IVAN GUTZALENKO as the Ninth Circuit explained in *Drummond v. City of Anaheim*, 343 F.3d 1062 (9th Cir. 2003), *cert. denied*, 542 U.S. 918 (2004).  During those times, reasonable officers, post-*Drummond*, would have understood that they were using deadly force.  Defendants gave no warning that they might use deadly force.  Defendants TRAN, HALL, TAGORDA, and RICHARDSON acting as integral participants, and under the totality of the circumstances, used, caused the use of, and tolerated the use of a high level of excessive and injurious force against IVAN GUTZALENKO that in fact caused his death.  The totality of the force used and tolerated by Defendants TRAN, HALL, TAGORDA, and RICHARDSON was unnecessary, excessive, and deadly.  Further, none of the defendant officers intervened to stop other officers, or RICHARDSON, from using the excessive and illegal force that was evident in front of them.

27.     Defendants TRAN, HALL, TAGORDA, and RICHARDSON chose to restrain IVAN GUTZALENKO in the manner they did ostensibly in order to facilitate medical care.  Yet, Defendants used a level of force so that their restraint of IVAN GUTZALENKO constituted

an arrest.  Defendants lacked probable cause to believe IVAN GUTZALENKO had committed any arrestable crime, and they lacked reasonable suspicion to lawfully detain IVAN GUTZALENKO to investigate any crime.

28.    At all material times, and alternatively, the actions and omissions of each defendant were intentional, wanton and/or willful, conscience shocking, reckless, malicious, purposely harmful and/or deliberately indifferent to IVAN GUTZALENKO's and Plaintiffs' rights, done with actual malice, grossly negligent, negligent, and objectively unreasonable.

29.    Each Defendant's acts and/or omissions as set forth above proximately caused Plaintiffs to sustain the following injuries and damages, past and future, among others:

a.    Wrongful death of IVAN GUTZALENKO;

b.    Hospital and medical expenses (Survival claims);

c.    Coroner's fees, funeral, and burial expenses (Survival claims);

d.    Loss of familial relationships, including loss of love, companionship, comfort, affection, consortium, society, services, solace, and moral support (based on wrongful death and loss of familial association);

e.    Violation of constitutional rights;

f.    Pain and Suffering, including emotional distress (based on individual §1983 claims for loss of familial association);

g.    IVAN GUTZALENKO's loss of life, pursuant to federal civil rights law (based on Survival claims and Decedent's federal §1983 claims);

h.    IVAN GUTZALENKO's conscious pain and suffering, pursuant to federal civil rights law (based on Survival claims and Decedent's federal §1983 claims);

i.    All damages, penalties, and attorneys' fees and costs recoverable under 42 USC §§ 1983, 1988, California Civil Code §§ 52, and 52.1, California Code of Civil Procedure § 1021.5, and as otherwise allowed under California and United States statutes, codes, and common law.

**COUNT ONE**
**42 USC § 1983**
**PLAINTIFFS AGAINST DEFENDANTS TRAN, HALL, TAGORDA, RICHARDSON, and DOES 1-10**

30.     Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

31.     By the actions and omissions described above, Defendants TRAN, HALL, TAGORDA, RICHARDSON, and DOES 1-10 violated 42 USC § 1983, depriving Plaintiffs N.G., N.I.G., and/or Decedent IVAN GUTZALENKO of the following clearly established and well-settled constitutional rights protected by the First, Fourth, and Fourteenth Amendments to U.S. Constitution:

      a.  IVAN GUTZALENKO's right to be free from unreasonable searches and seizures as secured by the Fourth Amendment (survival and wrongful death claims);

      b.  IVAN GUTZALENKO's right to be free from excessive and unreasonable force in the course of a seizure, including the use of unlawful deadly force, as secured by the Fourth Amendment (survival and wrongful death claims);

      c.  The right to be free from wrongful government interference with familial relationships and Plaintiffs' and Decedent's right to companionship, society, and support of each other, through the use of deadly force that shocks the conscience and that is used without a legitimate law enforcement purpose, and by otherwise interfering with their familial associational rights as secured by the First and Fourteenth Amendments (Plaintiffs' individual Familial Association claims).

32.     Defendants TRAN, HALL, TAGORDA, RICHARDSON, and DOES 1-10 subjected Plaintiffs and Decedent to their wrongful conduct, depriving Plaintiffs and Decedent of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Plaintiffs (individually and on behalf of IVAN GUTZALENKO, Deceased) and others would be violated by their acts and/or omissions.

33.     As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiffs sustained injuries and damages as set forth at paragraph 26, above.

34.     The conduct of Defendants TRAN, HALL, TAGORDA, RICHARDSON, and DOES 1-10 entitles Plaintiffs to punitive damages and penalties allowable under 42 USC § 1983 and California law.  Plaintiffs do not seek punitive damages against Defendants FRENCH in her official capacity or against Defendant CITY.

35.    Plaintiffs are also entitled to reasonable costs and attorneys' fees under 42 USC § 1988 and applicable federal and California codes and laws.

**COUNT TWO**
**42 USC § 1983 (*Monell* - Municipal and Supervisory Liability)**
**PLAINTIFFS AGAINST DEFENDANTS CITY OF RICHMOND; RICHMOND CHIEF OF POLICE BISA FRENCH, AMRW and DOES 1-10**

36.    Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

37.    On April 27, 2008, Richmond police officers killed a mentally ill man named Alan Arce, who was having a mental health/medical crisis, again by restraint asphyxia effectuated by officers holding Mr. Arce down in a prone position with force and weight on his back until he became unresponsive.  Mr. Arce's family brought a civil rights case against Richmond police officers and the City, and on information and belief, that case was settled for approximately $250,000.  (*Arce v. City of Richmond, et al.*, CAND No. C-09-01168 JCS).

38.    On April 22, 2008, four Richmond police officers including now Assistant Chief of Police Louis Tirona brutally pepper sprayed, beat, kicked, and asphyxiated 26-year-old Uriah Dach, who was mentally ill and in crisis.  In that incident, then-Sergeant Tirona also tased Mr. Dach for 95 out of 99 seconds, including for 72 seconds straight.  Then, all four officers held Mr. Dach down in a prone position with weight on his back until he became unresponsive and died.  Mr. Dach's parents were represented in a civil rights case against those officers and the City of Richmond by Plaintiffs' counsel, HADDAD & SHERWIN LLP.  That case settled for $1.5 million in 2011.  (*Dach v. City of Richmond, et al.*, CAND No. C-09-00171 JSC).

39.    In the *Dach* case, Sergeant James Jenkins, the Richmond Police Department's Fed. R. Civ. Proc 30(b)(6) "Person Most Knowledgeable" concerning the RPD's training and procedures relating to use of force and positional asphyxia, testified on August 24, 2011 that the Richmond Police Department, for at least the previous ten years, had been aware of the hazards of restraint-associated asphyxia, or positional asphyxia, which Mr. Jenkins defined as "because of their position, it would inhibit their ability to breathe properly which could result in death."

(Jenkins dep. 69, 70-71).  Despite that, then Richmond Police Chief Christopher Magnus testified on October 3, 2011 that although he was ultimately responsible for the RPD's policies, procedures, and training, he was not familiar with the RPD's training and procedures concerning restraint asphyxia and he did not know whether the RPD had any policies concerning the issue of positional or restraint-associated asphyxia.  (Magnus dep. 22, 24).  In fact, the RPD had no written policy concerning positional or restraint-associated asphyxia.

40.     On information and belief, despite these RPD-caused deaths by restraint asphyxia, and despite *Drummond v. City of Anaheim, supra.,* at the time of IVAN GUTZALENKO's death on March 10, 2021, Defendant RPD still had no written policy or procedure concerning the issue of positional or restraint-associated asphyxia.

41.     In fact, in the year before IVAN GUTZALENKO's death, there is evidence that the RPD was attempting to cover up investigation into its officers' involvement in restraint-associated asphyxia deaths.  On March 19, 2020, an emotionally disturbed man named Jose Luis Lopez Rodriguez died during prolonged prone, weighted restraint by Richmond police officers. Despite this being a clearly law-enforcement related death, the City of Richmond and Contra Costa County Sheriff's Office prevented that matter from going to a Coroner's Inquest as required by law.  Jimmy Lee, a spokesman for the sheriff's office, told the San Jose Mercury News that the responsibility for that decision lies with the Richmond police: "While this case was law enforcement related, RPD declined to invoke protocol, which meant there would be no inquest into the death."  Without the required Coroner's Inquest, the Sheriff-Coroner determined that that in-custody death was the result of "excited delirium," a disputed medical concept that at least three physician groups, including the American Medical Association and Physicians for Human Rights have rejected as an improper means of writing off deaths caused by police violence.  (Nate Gartrell, *A Richmond man died after violent struggle with officers.  Police ruled it an "excited delirium" accident without following protocol*, San Jose Mercury News, March 7, 2022, at https://www.mercurynews.com/2022/03/06/a-richmond-man-died-after-violent-struggle-with-officers-police-ruled-it-an-excited-delirium-accident-without-following-protocol/).

42.     The unconstitutional actions and/or omissions of Defendants TRAN, HALL,
TAGORDA, and DOES 1-10, and other officers employed by or acting on behalf of Defendant
CITY, on information and belief, were pursuant to the following customs, practices, and/or
procedures of Defendant CITY, stated in the alternative, which were directed, encouraged,
allowed, and/or ratified by policymaking officials for Defendant CITY, including Defendants
FRENCH and DOES 1-10:

a.     To use or tolerate the use of unlawful deadly force including permitting and training officers (i) to use deadly force when faced with less than an immediate threat of death or serious bodily injury, (ii) to use deadly force prematurely, or as a 'first resort,' or when facing a mere potential threat; and (iii) to use deadly force without giving a proper warning when one would be feasible;

b.     To use or tolerate the use of improper prone restraint of non-threatening individuals, increasing the risk of injury and death by restraint-associated asphyxia;

c.     To fail to follow generally accepted law enforcement procedures and standards concerning handling mentally ill and/or emotionally disturbed persons;

d.     To tolerate and/or encourage officers to unlawfully seize, detain, and arrest individuals for non-criminal behavior, including mental illness or emotional disturbance;

e.     To tolerate and/or encourage officers to fail to intervene when they should be aware that another officer is violating a person's rights;

f.     To cover-up violations of constitutional rights by any or all of the following:

i.     by failing to properly investigate and/or evaluate complaints or incidents of excessive and unreasonable force, unlawful seizures, and/or handling of mentally ill or emotionally disturbed persons;

ii.     by ignoring and/or failing to properly and adequately investigate and discipline unconstitutional or unlawful police activity; and

iii.     by allowing, tolerating, and/or encouraging police officers to: fail to file complete and accurate police reports; file false police reports; make false statements; intimidate, bias and/or "coach" witnesses to give false information and/or to attempt to bolster officers' stories; and/or

obstruct or interfere with investigations of unconstitutional or unlawful law enforcement conduct, by withholding and/or concealing material information;

g.    To allow, tolerate, and/or encourage a "code of silence" among law enforcement officers and RPD personnel, whereby an officer or member of the department does not provide adverse information against a fellow officer or member of the department;

h.    To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and the customs and practices described in subparagraphs (a) through (g) above, with deliberate indifference to the rights and safety of Plaintiffs and the public, and in the face of an obvious need for such policies, procedures, and training programs.

43.    Defendant CITY'S training programs for its officers, including Defendants DOES 1-10 were clearly inadequate to address the obvious need for training concerning the customs and practices in the preceding paragraph that were likely to result in injuries, deaths, and serious violations of rights.

44.    Defendant CITY, through its employees and agents, and through its policymaking supervisors including Defendants FRENCH and DOES 1-10, failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline Defendants DOES 1-10, and other RPD personnel, with deliberate indifference to Plaintiffs' constitutional rights, which were thereby violated as described above.

45.    During all material times, AMERICAN MEDICAL RESPONSE WEST employed Defendant RICHARDSON as a paramedic. AMRW controlled company policy, training, and disciplining of AMRW paramedics and technicians. On the date of the incident, AMRW dispatched Defendant RICHARDSON to assist the Richmond Police Department in detaining and arresting IVAN GUTZALENKO. As such, AMRW and RICHARDSON were acting in a law enforcement manner by administering Versed to IVAN GUTZALENKO as a form of chemical restraint.

46.     AMRW failed to properly train RICHARDSON, and failed to follow an approved procedure for the use of Versed, as set forth below:

    a.   AMRW failed to create a physician approved policy for the use of Versed. During the course of the incident, Contra Costa County maintained a mere outline of a flowchart for the use of Versed. However, this outline was not signed and approved by a physician. Further, while the County of Contra Costa maintained this flowchart, AMRW failed to create policy and training around Contra Costa's recommendations for the use of versed.

    b.   AMRW did not properly train RICHARDSON in the proper use of Versed. Per Contra Costa County's unapproved medical flowchart outline, Versed should not be administered in situations where a person is calm and not resisting. Further, if a person is resisting, the paramedic should re-evaluate the person immediately before administering Versed. However, due to failed training, or improper practice, RICHARDSON administered Versed to GUTZALENKO after Gutzalenko had already been handcuffed, and while GUTZALENKO was resting in a "recovery" position on his side. Additionally, RICHARDSON, due to a failure to be properly trained, unintentionally administered a high dose of Versed directly into GUTZALENKO'S vein, instead of into GUTZALENKO'S muscle, as he should have done. RICHARDSON's failure to properly aspirate the syringe in part caused him to improperly administer the dose of Versed to GUTZALENKO's vein.

47.     Due to AMRW's failure to properly train their paramedics in the use of Versed, AMRW paramedic RICHARDSON used excessively unreasonable force in the form of a chemical restraint, that was a major contributing factor in GUTZALENKO's death. Versed should not have been administered to GUTZALENKO while he was in handcuffs, and not resisting in any manner. Further, the dose of Versed for an intravenous application should be no

more than 1-3mg per dose, with a maximum administration of 5 mg. However, RICHARDSON applied the maximum administration of Versed all in one dose to GUTZALENKO's vein. This was excessive, and unreasonable, in violation of GUTZALENKO's fourth and fourteenth amendment rights, and was a direct result of the failed training and policies of AMRW.

48.     The unconstitutional actions and/or omissions of Defendants DOES 1-10, as described above, were approved, tolerated, and/or ratified by policymaking officers for Defendant CITY and the RPD, including Defendants FRENCH and DOES 1-10.  Plaintiffs are informed and believe, and thereupon allege, the details of this incident have been revealed to policymakers within Defendant CITY, including through videos, Defendants' statement(s), physical evidence, the Coroner's Inquest, and other information and investigation, and that such policymakers have direct knowledge of the fact that the seizure, uses of force, and killing of IVAN GUTZALENKO were not justified, but represented an unconstitutional use of unreasonable, excessive and deadly force.  Notwithstanding this knowledge, on information and belief, policymakers of Defendant CITY have approved of the actions and/or omissions of Defendants DOES 1-10 that resulted in the death of IVAN GUTZALENKO, and have made a deliberate choice to endorse the actions of those Defendants, and the bases for those actions, that resulted in the death of IVAN GUTZALENKO.  By so doing, policymakers of Defendant CITY have shown affirmative agreement with the individual defendant officer's actions, and have ratified the unconstitutional acts of Defendants DOES 1-10.

49.     Furthermore, on information and belief, after its own administrative investigation the RPD determined that the unlawful conduct of Defendants TRAN, HALL, TAGORDA, RICHARDSON, and DOES 1-10, was consistent with the RPD's actual policies and procedures. On information and belief, that finding was approved and ratified by policymaking supervisors including Defendants FRENCH and DOES 1-10.

50.     Furthermore, Plaintiffs are informed and believe, and thereupon allege, that Defendants FRENCH, DOES 1-10 and other policy-making officers for Defendant CITY including Assistant Chief of Police Louis Tirona were and are aware of a custom and pattern of

misconduct and injury caused by Defendant CITY law enforcement officers similar to the

conduct of Defendants DOES 1-10 described herein, but failed to discipline culpable law

enforcement officers and employees and failed to institute and enforce lawful and proper

training, procedures and policy within the CITY.

51.     Defendant CITY's failure to properly and adequately hire, train, instruct, monitor,

supervise, evaluate, investigate, and discipline, as well as their unconstitutional customs,

practices, orders, approvals, ratification and toleration of wrongful conduct of Defendants DOES

1-10, was a moving force and/or a proximate cause of the deprivations of Plaintiffs' and

Decedent's clearly-established and well-settled constitutional rights in violation of 42 USC §

1983, as more fully set forth above.

52.     As a direct and proximate result of the unconstitutional customs, practices,

deficient training programs, actions, omissions, and deliberately indifferent supervision of

Defendants CITY and FRENCH, as described above, Plaintiffs sustained serious and permanent

injuries and are entitled to damages, costs and attorneys' fees as set forth in paragraphs 29-32

above.

## COUNT THREE
## VIOLATION OF CIVIL CODE § 52.1
## PLAINTIFFS AGAINST DEFENDANTS TRAN, HALL, TAGORDA, RICHARDSON, DOES 1-10, AMRW, AND CITY OF RICHMOND

53.     Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth

here.

54.     By their acts, omissions, customs, and policies, Defendants TRAN, HALL,

TAGORDA, RICHARDSON and DOES 1-10, acting as integral participants as described above,

interfered with, attempted to interfere with, and violated Plaintiffs' and Decedent's rights under

California Civil Code § 52.1, and the following clearly-established rights under the United States

Constitution and the California Constitution (where Decedent's rights were violated, this count is

brought as a survival claim; where Plaintiffs' rights were violated, this count is brought by

Plaintiffs individually):

a.  IVAN GUTZALENKO's right to be free from unreasonable searches
    and seizures as secured by the Fourth Amendment to the United States
    Constitution and California Constitution, Article 1, Section 13;

b.  IVAN GUTZALENKO's right to be free from excessive and
    unreasonable force in the course of a seizure, including the use of
    unlawful deadly force, as secured by the Fourth Amendment to the
    United States Constitution and California Constitution, Article 1,
    Section 13;

c.  IVAN GUTZALENKO's right to be free from the use of force,
    including deadly force, that shocks the conscience or that is used
    without a legitimate law enforcement purpose as secured by the
    Fourteenth Amendment;

d.  IVAN GUTZALENKO's and Plaintiffs' right to be free from wrongful
    government interference with familial relationships, and Plaintiffs' and
    Decedent's right to companionship and society with each other, as
    secured by the First and Fourteenth Amendments;

e.  IVAN GUTZALENKO's right to protection from bodily restraint,
    harm, or personal insult, as secured by Cal. Civil Code § 43.

55.     Unlawful deadly force which violates the Fourth Amendment with reckless
disregard for rights violates the Bane Act.[1]  Defendants' reckless use of unlawful deadly force
against IVAN GUTZALENKO in and of itself constitutes threat, intimidation, or coercion.
Additionally, separate from, and above and beyond, Defendants' attempted interference,
interference with, and violation of Plaintiffs' and IVAN GUTZALENKO's rights, Defendants
violated Plaintiffs' and IVAN GUTZALENKO's rights by the following conduct constituting
threat, intimidation, or coercion:

a.  Threatening IVAN GUTZALENKO in the absence of any threat presented
    by IVAN GUTZALENKO, or any justification whatsoever;

b.  Using deliberately reckless and provocative tactics to apprehend IVAN
    GUTZALENKO in violation of generally accepted law enforcement
    training and standards, and in violation of IVAN GUTZALENKO's rights;

---

[1] *See Cornell v. City and County of San Francisco*, 17 Cal.App.5ᵗʰ 766 (2017) (review denied); *Reese v. County of Sacramento*, 888 F.3d 1030, 1043-44 (9ᵗʰ Cir. 2018); *Rodriguez v. County of L.A.*, 891 F.3d 776, 802 (9ᵗʰ Cir. 2018); *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105–06 (9th Cir. 2014) (citing *Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013)).

    c. Causing IVAN GUTZALENKO to be asphyxiated, without warning and without justification;

    d. Causing the use of conscience-shocking force against IVAN GUTZALENKO, without a legitimate law enforcement purpose, thereby violating his and Plaintiffs' rights to familial association;

    e. Threatening violence against IVAN GUTZALENKO, with the apparent ability to carry out such threats, in violation of Civ. Code § 52.1(j);

    f. Causing and permitting the infliction of repeated and sustained applications of unnecessary force on IVAN GUTZALENKO, by multiple officers, using force that was severe and/or deadly, over several minutes;

    g. Violating IVAN GUTZALENKO's rights to be free from unlawful seizures by both wrongful arrest and excessive force.

    h. Using chemical restraints against IVAN GUTZALENKO while GUTZALENKO showed no signs of resistance, and without proper authority to do so.

56. The threat, intimidation, and coercion described herein were not necessary or inherent to any legitimate and lawful law enforcement activity.

57. Further, the violations of duties and rights by Defendants TRAN, HALL, TAGORDA, RICHARDSON, and DOES 1-10, and coercive conduct described herein, were volitional acts; none was accidental or merely negligent.

58. Defendant CITY is vicariously liable for the conduct of its employees and agents described in this Count, pursuant to California Government Code § 815.2.

59. As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of Plaintiffs' and Decedent's rights under the United States and California Constitutions, Plaintiffs (individually and for Decedent) sustained injuries and damages, and against each and every Defendant is entitled to relief as set forth above at paragraphs 29-32, including punitive damages against Defendants TRAN, HALL, TAGORDA, RICHARDSON, and DOES 1-10, and including all damages and penalties allowed by California Civil Code §§ 52, 52.1 and California law, not limited to costs, attorneys' fees, three times actual damages, and civil penalties. Plaintiffs do not seek punitive damages against Defendant CITY.

## COUNT FOUR
## NEGLIGENCE; PERSONAL INJURIES
## PLAINTIFFS AGAINST ALL DEFENDANTS

60.     Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

61.     At all times, Defendants TRAN, HALL, TAGORDA, and DOES 1-10 owed Plaintiffs and Decedent the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

62.     At all times, Defendants TRAN, HALL, TAGORDA, RICHARDSON, and DOES 1-10 owed Plaintiffs and Decedent the duty to act with reasonable care.

63.     These general duties of reasonable and due care owed to Plaintiffs and Decedent by Defendants TRAN, HALL, TAGORDA, RICHARDSON, and DOES 1-10 include but are not limited to the following specific obligations:

a.     to refrain from unlawfully seizing, detaining, and/or arresting IVAN GUTZALENKO;

b.     to refrain from using excessive and/or unreasonable force against IVAN GUTZALENKO;

c.     to refrain from unreasonably creating and escalating the situation where force, including but not limited to deadly force, was used;

d.     to refrain from using unreasonable tactics that escalated the situation, created perceived danger, and led to the use of deadly force;

e.     to refrain from abusing their authority granted them by law;

f.     to refrain from violating Plaintiffs' rights guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protected by law.

64.     Additionally, these general duties of reasonable care and due care owed to Plaintiffs by Defendants FRENCH and DOES 1-10, include but are not limited to the following specific obligations:

a.     to properly and adequately hire, investigate, train, supervise, monitor, evaluate, and discipline RPD officers under their supervision (including

DOES 1-10) to ensure that those employees/agents/officers act at all times in the public interest and in conformance with law;

b.    to make, enforce, and at all times act in conformance with policies, training, and customs that are lawful, consistent with generally accepted law enforcement standards, and protective of individual rights, including Plaintiffs' and Decedent's rights;

c.    After being informed of officers' conduct causing Decedent's death in this situation, to take proper action to discipline and/or retrain involved officers, and to not ratify such officers' misconduct and violations of generally accepted standards and law;

d.    to refrain from making, enforcing, and/or tolerating the wrongful practices, customs, and deficient training programs set forth in COUNT TWO, above.

65.    Defendants, through their acts and omissions, breached each and every one of the aforementioned duties owed to Plaintiffs.

66.    Defendant CITY is vicariously liable for the conduct of its employees and agents described in this Count, pursuant to California Government Code § 815.2.

67.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Decedent sustained injuries and damages, and against each and every Defendant are entitled to relief as set forth above at paragraphs 29-31, including punitive damages against Defendants TRAN, HALL, TAGORDA, RICHARDSON, and DOES 1-10.  Plaintiffs do not seek punitive damages against Defendant CITY or Defendant FRENCH in her official capacity.

## COUNT FIVE
## ASSAULT AND BATTERY
## PLAINTIFFS AGAINST DEFENDANTS TRAN, HALL, TAGORDA, RICHARDSON, DOES 1-10 AND CITY OF RICHMOND

68.    Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

69.    The actions and omissions of Defendants TRAN, HALL, TAGORDA, RICHARDSON, and DOES 1-10 as set forth above constitute assault and battery.

70.    Defendant CITY is vicariously liable for the conduct of its employees and agents described in this Count, pursuant to California Government Code § 815.2.

71.     As a direct and proximate result of the assault and battery of by Defendants TRAN, HALL, TAGORDA, RICHARDSON, and DOES 1-10, Plaintiffs sustained injuries and damages, and are entitled to relief as set forth above at paragraphs 29-31, including punitive damages against Defendants TRAN, HALL, TAGORDA, RICHARDSON, and DOES 1-10. Plaintiffs do not seek punitive damages against Defendant CITY.

**COUNT SIX**
**FALSE ARREST AND IMPRISONMENT**
**PLAINTIFF AGAINST DEFENDANTS TRAN, HALL, TAGORDA, RICHARDSON,**
**DOES 1-10, AMRW, AND CITY OF RICHMOND**

72.     Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

73.     At no time during the events described above, and at all other pertinent times, did Defendants TRAN, HALL, TAGORDA, RICHARDSON, or DOES 1-10 have a warrant for the arrest of IVAN GUTZALENKO, nor did Defendants have any facts or information that constituted probable cause that IVAN GUTZALENKO had committed or was about to commit a crime.  Defendants also lacked reasonable suspicion to detain IVAN GUTZALENKO once confirming that he had not stolen anything from nearby stores, and Defendants were not engaged in any lawful investigative detention of IVAN GUTZALENKO.

74.     Defendants, and each of them, intentionally and unlawfully exercised force to restrain, detain, and confine IVAN GUTZALENKO, putting restraint on IVAN GUTZALENKO's freedom of movement, and compelled IVAN GUTZALENKO to remain and/or move against his will.  Defendants authorized, directed, and assisted in procuring, without process, IVAN GUTZALENKO's unlawful arrest and imprisonment.

75.     Defendant CITY is vicariously liable for the conduct of its employees and agents described in this Count, pursuant to California Government Code § 815.2.

76.     As a direct and proximate result of IVAN GUTZALENKO'S unlawful arrest and imprisonment by Defendants TRAN, HALL, TAGORDA, RICHARDSON, and DOES 1-10, Plaintiffs sustained injuries and damages, and are entitled to relief as set forth above at paragraphs 29-31, including punitive damages against Defendants TRAN, HALL, TAGORDA, RICHARDSON, and DOES 1–10.  Plaintiffs do not seek punitive damages against Defendant CITY.

WHEREFORE, Plaintiffs respectfully request the following relief against each and every Defendant herein, jointly, and severally:

   a.     Declaratory relief, finding that Defendants violated Plaintiffs' and Decedent's rights, to serve the purposes of 42 U.S.C. § 1983, Cal. Code of Civ. Proc. § 1021.5, and Cal. Civil Code §§ 52 and 52.1, including for vindication of Constitutional and other rights as "Private Attorney General," elucidation of those rights for the courts, the public, and government officials, and to deter similar wronging by the Defendants and other officials;

   b.     compensatory and exemplary damages in an amount according to proof and which is fair, just, and reasonable;

   c.     punitive damages under 42 USC § 1983 and California law in an amount according to proof and which is fair, just, and reasonable (punitive damages are not sought against Defendants CITY or FRENCH in his official capacity);

   d.     all other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 USC §§ 1983, 1988, Cal. Code of Civ. Proc. §§ 377.20 et seq., 377.60 et seq., and 1021.5, Cal. Civil Code §§ 52 et seq., 52.1, and as otherwise may be allowed by California and/or federal law;

   e.     Injunctive relief, including but not limited to the following:

      i.     an order prohibiting Defendants from engaging in the unconstitutional or unlawful customs, policies, practices, procedures, training, and supervision as may be determined and/or adjudged by this case;

      ii.     an order requiring Defendants to institute and enforce appropriate and lawful policies and procedures for the use of restraints and deadly force;

        iii.    an order prohibiting Defendants and their police officers from engaging in a "code of silence" as may be supported by the evidence in this case;

        iv.    an order requiring Defendants to train all RPD officers concerning generally accepted and proper tactics and procedures and this Court's orders concerning the issues raised in Count 2 and injunctive relief requests i-iii, above;

    f.    such other and further relief as this Court may deem appropriate.

## JURY DEMAND

Plaintiffs hereby demand a jury trial in this action.

## PRAYER

WHEREFORE, Plaintiffs pray for relief, as follows:

1.    For general damages according to proof;

2.    For special damages, including but not limited to, past, present and/or future wage loss, income and support, medical expenses, and other special damages in a sum to be determined according to proof;

3.    For punitive damages and exemplary damages in amounts to be determined according to proof as to defendants CITY AND COUNTY OF SAN FRANCISCO, and DOES 1-50 and/or each of them;

4.    Any and all permissible statutory damages;

5.    For reasonable attorney's fees pursuant to 42 U.S.C. §1988;

6.    For cost of suit herein incurred; and

7.    For such other and further relief as the Court deems just and proper.

Dated: August 9, 2023        **BURRIS, NISENBAUM, CURRY & LACY, LLP**

        /s/ *John L. Burris*
        John L. Burris
        Benjamin Nisenbaum

James Cook
Attorneys for Plaintiff

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--o0o--

IVAN GUTZALENKO, Deceased, )
through his Co-Successors )
in Interest, N.G. and N.I.G,) **CERTIFIED COPY**
minors through their mother )
and Next Friend, Honey )
Gutzalenko, individually )
and as Co-successors in )
Interest for IVAN )
GUTZALENKO, Deceased, )CASE NO.: 3:22-cv-02130-EMC
)
        Plaintiffs, )
)
     vs. )
)
CITY OF RICHMOND, et al., )
)
       Defendants. )
_____)

VIDEOCONFERENCE DEPOSITION OF

OFFICER TOM TRAN

THURSDAY, SEPTEMBER 5, 2024

1:46 P.M. - 3:31 P.M.

REPORTED BY:  Liliana Rodriguez, CSR No. 13783

1

```
1                          INDEX OF EXAMINATION

2

    WITNESS: OFFICER TOM TRAN
3

4   EXAMINATION                                          PAGE

5   By Mr. Nisenbaum                                     6,73

6   By Mr. Kanter                                          69

7   By Mr. Fine                                            70

8   By Mr. Cook                                            75

9

10
                              --o0o--
11

12

    Appearance Page                                         3
13
    Exhibit Page                                            4
14
    Location                                                5
15
    Declaration Under Penalty of Perjury                   79
16
    Reporter's Certificate                                 80
17
    Disposition                                            81
18
    Witness Letter                                         82
19
    Deposition Errata Sheet                                83
20
    Attorney's Notes                                       84
21

22

23                            --o0o--

24

25

                                                             2
```

```
1    REMOTE APPEARANCES

2

3    For Plaintiffs:

4         LAW OFFICES OF JOHN L. BURRIS
          BY: BEN NISENBAUM, ATTORNEY AT LAW
5              JAMES COOK, ATTORNEY AT LAW
          Airport Corporate Center
6         7677 Oakport Street, Suite 1120
          Oakland, California 94621
7         (510) 839-5200
          Ben.Nisenbaum@johnburrislaw.com
8

9    For Defendants:

10        ORBACH HUFF & HENDERSON LLP
          NICHOLAS FINE, ATTORNEY AT LAW
11        6200 Stoneridge Mall Road, Suite 225
          Pleasanton, California 94588
12        510.999.7908
          Nfine@ohhlegal.com
13

14   For Defendants:

15        HINSHAW, MARSH, STILL & HINSHAW, LLP
          SCOTT R. KANTER, ATTORNEY AT LAW
16        12901 Saratoga Avenue
          Saratoga, California 95070
17        408.861.6500
          Skanter@hinshaw-law.com
18

19   Also Present:

20        Crystal Mackey,
          Law Offices of John L. Burris
21

22                  --o0o--

23

24

25
```

3

1    INDEX TO EXHIBITS

2

3    WITNESS:  OFFICER TOM TRAN

4    MARKED            DESCRIPTION                    PAGE

5

6                    (NONE MARKED)

7

8                      --o0o--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          Zoom videoconference deposition of

2                OFFICER TOM TRAN,

3    taken on behalf of Plaintiffs, beginning at 1:46 p.m.

4    and ending at 3:31 p.m. on Thursday, September 5, 2024,

5    before Liliana Rodriguez, Certified Shorthand Reporter

6    No. 13783

7

8                    --o0o--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1        REPORTED REMOTELY FROM FRESNO COUNTY, CALIFORNIA;

2        THURSDAY, SEPTEMBER 5, 2024, 1:46 P.M.

3        -oOo-

4        OFFICER TOM TRAN,

5        having been first duly sworn,

6        testified as follows:

7        EXAMINATION

8  BY MR. NISENBAUM:

9    Q.  Can you state and spell your name, please.

10    A.  First name Tom, T-O-M.  Last name is Tran,

11  T-R-A-N.

12    Q.  Okay.  You were present during the previous

13  deposition, correct?

14    A.  I don't recall.  Like, the last deposition?

15    Q.  Yes.  The one we just did this morning.

16    A.  Oh, yeah.  Yes, I was.

17    Q.  Okay.  And you heard the admonitions that I gave

18  the officer upfront, correct?

19    A.  Correct.

20    Q.  Okay.  Do I need to go over that with you as

21  well?

22    A.  Summary, just be honest and truthful from what I

23  recollect.

24    Q.  Okay.  Just real quick, when did you attend the

25  police academy?

6

1    A.   2019.

2    Q.   Okay.  How many times have you testified in

3  court?

4    A.   Multitude of times.

5    Q.   Multitude being 10 times, 20 times?

6    A.   Over 20.

7    Q.   Okay.  You received training in providing

8  courtroom testimony at the police academy, correct?

9    A.   Correct.

10    Q.   Okay.  All right.  And again, if you make changes

11  to your deposition that are substantive in nature, that

12  can and will be held against you.

13         Do you understand?

14    A.   Yes, sir.

15    Q.   Okay.  When you gave your interview following

16  this incident, were you truthful?

17    A.   Absolutely.

18         MR. FINE:  Vague as to interview.

19  BY MR. NISENBAUM:

20    Q.   You were interviewed after this incident by

21  Contra Costa County DA, correct?

22    A.   Yes.

23    Q.   In that interview were you truthful?

24    A.   Yes.

25    Q.   Have you reviewed that interview prior in

                                                          7

1    preparation for today's deposition?

2        A.  Yes.

3        Q.  Did you listen to it or read the transcript?

4        A.  I read it.

5        Q.  Okay.  Did you notice anything that was

6    inaccurate in it?

7        A.  Not to my recollection.

8        Q.  Okay.  Was there anything where you realized that

9    an answer you gave was incorrect?

10       A.  No.

11       Q.  Okay.  All right.  I went over the training

12   regarding avoiding asphyxiation during restraint.

13   Obviously you haven't been an officer nearly as long as

14   Officer Hall, but I'm sure you've had that training too,

15   correct?

16       A.  Correct.

17           MR. FINE:  Vague and ambiguous.

18   BY MR. NISENBAUM:

19       Q.  The training I'm referring to is training that

20   says that when a person is prone during a restraint, he

21   should avoid -- if it's reasonable under the

22   circumstances, he should avoid putting weight on their

23   back for an extended period of time.

24           MR. FINE:  Vague and ambiguous.  Calls for

25   speculation.

1    BY MR. NISENBAUM:

2        Q.  Have you had that training?

3            MR. FINE:  Same objection.

4            THE WITNESS:  During the academy they did state

5    that we are not to put significant force on anybody's

6    torso or back that would obstruct their breathing.

7    BY MR. NISENBAUM:

8        Q.  Okay.  And did you have an understanding as to

9    why that is the case?

10       A.  Yes.

11       Q.  What is your understanding?

12       A.  To prevent from obstructing their breathing

13   capabilities.

14       Q.  Because that can be deadly.  People die from

15   that.  Do you understand that?

16       A.  Yes.

17       Q.  Okay.  In particular -- well, let me ask you

18   this:  How well do you recall this incident?

19       A.  Just based off memory, partial.  With the AVR

20   cameras I was assisted with recalling more things but

21   not everything.

22       Q.  What else did you review?  You reviewed your

23   interview.  What else did you review to prepare for

24   deposition?

25       A.  Coroner's inquest, the county interview and the

                                                        9

1  body-worn camera.

2      Q.  Okay.  Just yours or others?

3      A.  Just mine.

4      Q.  I'm going to skip past a lot of kind basics since

5  you were here at the last deposition, but you were --

6  you were responding to a call in which a person who was

7  later identified as Ivan Gutzalenko was potentially

8  shoplifting at a gas station and subsequently was

9  potentially vandalizing a store; is that right?

10     A.  Correct.

11     Q.  Okay.  There was no report that anyone had been

12 threatened in any of those incidents, correct?

13         MR. FINE:  Vague.

14         THE WITNESS:  Not to my knowledge.

15 BY MR. NISENBAUM:

16     Q.  Right.  Okay.  And how long after you got the

17 call did it take you before you actually saw

18 Mr. Gutzalenko?

19     A.  I don't really recall, but I was not that far

20 from where the incident occurred, so I think several

21 minutes, but I'm not exactly sure.

22     Q.  And you were the first officer to encounter him,

23 correct?

24     A.  I'm sorry, can you restate that again?

25     Q.  You were the first officer to encounter

                                                          10

1  Mr. Gutzalenko?

2     A.  Yes, sir.

3     Q.  Okay.  And when you encountered Mr. Gutzalenko,

4  is it fair to say that he did not appear to be all there

5  mentally?

6        MR. FINE:  Vague.

7        THE WITNESS:  I wouldn't say exactly that.

8  BY MR. NISENBAUM:

9     Q.  What would you say?

10    A.  I noticed that his health was not of a normal and

11  healthy person.  I know that his face was blueish

12  purple.

13    Q.  Right.

14    A.  The bridge of his nose was cut.  There was a

15  bruise -- a rather large, fairly large bruise in the

16  middle of his head, cuts bleeding and stumbling, dilated

17  eyes.  Just from the dilated eyes I suspected that it

18  could be some influence of a controlled substance.

19    Q.  Okay.  When I said not all there, I mean it

20  appeared -- so he appeared physically injured and having

21  some difficulty physically; is that right?

22    A.  Yes, sir.

23    Q.  Okay.  And how was his mentality?  Were you able

24  to ascertain that at some point in time?

25        MR. FINE:  Vague as to mentality.

11

1  BY MR. NISENBAUM:

2      Q.   Was he oriented to time and place, for example?

3  Did he appear to be?

4          MR. FINE:   Lacks foundation.

5          THE WITNESS:   Altered state of being.

6  BY MR. NISENBAUM:

7      Q.   Okay.   Did it appear to you that he was

8  intoxicated?

9      A.   Of some sort.

10     Q.   Okay.   It appeared -- did it appear to you that

11  he was capable of caring for himself?

12     A.   No.

13     Q.   Can you explain why not?

14     A.   Just from earlier statement, some of the

15  conditions did not point towards someone that was

16  healthy.   It was based off the stumbling, injuries,

17  discolored face, and at one point he tried walking

18  into -- I don't know if he tried but he stumbled towards

19  the roadway, and I had to step into the road to kind of

20  cut him off if he had walked into the roadway.   Just

21  some of those things right there led me to believe that

22  he was not in a state to take care of himself.

23     Q.   And of course people can be arrested for public

24  intoxication, right?

25     A.   Correct.

12

1    Q.   And that's when you're intoxicated to the point
2  where you can't care for yourself, right?
3    A.   Correct.
4    Q.   Okay.   And 5150s can be issued when a person
5  meets one of three -- essentially three criteria, either
6  danger to one's self, danger to others or unable to care
7  for themselves all by way of some sort of mental health
8  emergency, right?
9    A.   Yes.
10   Q.   Okay.   At some point in time were you involved in
11 attempting to make an assessment of a 5150 on
12 Mr. Gutzalenko?
13   A.   Yes.   But limited.
14   Q.   What do you mean by limited?
15   A.   I wasn't able to go through the full process,
16 things were going through my mind considering it.
17   Q.   Well, you were considering it and you're not the
18 only one.   Other officers were saying 5150 or at least
19 5-1-5-O at the scene, right?
20   A.   Are you saying that other people recommended it
21 as well?
22   Q.   Officers, yes.
23   A.   Correct.
24   Q.   Okay.   And ultimately Mr. Gutzalenko was not
25 actually 5150'd because he died, right?

13

1    A.  Correct.

2    Q.  Okay.  All right.  We've talked -- you heard me

3  ask about the training regarding de-escalation.  Have

4  you had similar trainings as Officer Hall in

5  de-escalation?

6        MR. FINE:  Vague and ambiguous as to similar

7  trainings.

8        THE WITNESS:  Similar trainings, yes.

9  BY MR. NISENBAUM:

10   Q.  Okay.  And you understand the concept that when

11 you're dealing with a person who presents as being

12 mentally impaired, emotionally disturbed, having a

13 mental health emergency, that if the circumstances allow

14 for it, you should try to slow the incident down and

15 employ de-escalation tactics, correct?

16       MR. FINE:  Incomplete hypothetical.  Calls for

17 speculation.

18       THE WITNESS:  Yes.

19 BY MR. NISENBAUM:

20   Q.  Okay.  And in this situation you did try to talk

21 to Mr. Gutzalenko, correct?

22   A.  Yes.

23   Q.  You tried to ask him what was wrong and what he

24 had taken, right?

25   A.  Yes.

                                                    14

1    Q.   And you were asking him what he had taken in part
2    to determine not only whether he was intoxicated but if
3    potentially he was overdosing or something, right?
4    A.   That was a thought, yes.
5    Q.   Okay.  And I know someone talked about Narcan.
6    Ultimately that, to your knowledge based on your
7    training, that's applicable when an opiate is at issue
8    but not effective for stimulant drugs like meth or
9    cocaine.  Is that your training?
10        MR. FINE:  Calls for speculation.  Calls for
11   expert opinion.
12        THE WITNESS:  I know from my training experience,
13   opiates, yes.  But with meth, I mean, I'm not sure if it
14   was like full meth or it was diluted with something else
15   but Narcan has also helped with that.
16   BY MR. NISENBAUM:
17        Q.   Oh, it can?  Okay.  I didn't know that.
18        Well, let's just cut to the chase.  I'm going to
19   share Officer Tagorda's video, and I'm going to ask you
20   questions.
21        A.   Yes, sir.
22        Q.   So -- and I know that you've already encountered
23   him.  Before I start asking you these questions let me
24   ask you this:  When -- Mr. Gutzalenko, he initially told
25   you that he was having breathing difficulties when you

                                                        15

1   first encountered him, correct?

2       A.  Yes.

3       Q.  Okay.  And he had a blueish tint to his face?

4       A.  Yes.

5       Q.  And is that something that you've been trained is

6   consistent with a person who is having breathing

7   difficulties?

8           MR. FINE:  Calls for speculation.  Incomplete

9   hypothetical.

10  BY MR. NISENBAUM:

11      Q.  Based on your training.

12          MR. FINE:  Same objections.

13          THE WITNESS:  Yes.

14  BY MR. NISENBAUM:

15      Q.  Okay.  It indicates a lack of oxygen, right?

16          MR. FINE:  Same objections.

17          THE WITNESS:  It could indicate a multitude of

18  things but yes, sir, generally.

19  BY MR. NISENBAUM:

20      Q.  All right.  Now let me ask you, next question:

21  During the restraint of Mr. Gutzalenko, what steps did

22  you take to make sure that your knee did not apply

23  pressure to his back in a manner that would interfere

24  with his breathing?  What did you do to prevent that

25  from happening?

                                                        16

1    A.  Several things, sir.  I guess from sequential

2  order, placed down my right knee, balanced my weight

3  between my right knee and the ball of my left foot.  I

4  also posted both of my hands on Mr. Gutzalenko, and at

5  some periodical points it shifted from his shoulders to

6  his hands to my hands on the ground or split between

7  Mr. Gutzalenko and my hands on the floor at the same

8  time.  But at all times I balanced my weight off from

9  him.  I did not place any significant pressure or

10  contact on him.

11    Q.  Okay.  I know there was a reference to you

12  sprawling in your interview.  You were a wrestler?

13    A.  No, sir.

14    Q.  Okay.  Was that just a term that you associated

15  with wrestling?

16    A.  With martial arts.

17    Q.  Martial arts.  Do you do MMA?

18       MR. FINE:  Objection.  Relevance.

19       THE WITNESS:  Used to.

20  BY MR. NISENBAUM:

21    Q.  What -- and what did you do?  Muay Thai?

22       MR. FINE:  Same objection.

23       THE WITNESS:  Several arts, sir.

24  BY MR. NISENBAUM:

25    Q.  What were they?

17

1          MR. FINE:  Same objection.

2          THE WITNESS:  Muay Thai would be one of them.

3     Sanda Sanshou, Brazilian and Japanese jiujitsu, Japanese

4     judo and some -- very lightly in Hapkido and Aikido.

5     BY MR. NISENBAUM:

6          Q.  Did you do any of this professionally?

7          A.  No, sir.

8          MR. FINE:  Vague.

9     BY MR. NISENBAUM:

10         Q.  Okay.  And when did you practice mixed martial

11    arts?

12         A.  When you say practice, does that mean academy

13    study as well?

14         Q.  Sure.

15         A.  At a young age, sir.  Maybe about six or seven.

16         Q.  That's when you started?

17         A.  Actually studying, yes.

18         Q.  Okay.  And how about physically doing?

19         MR. FINE:  Same objection.

20         Go ahead.

21         THE WITNESS:  Eight, nine or ten.  At a young age

22    is all I recall.

23    BY MR. NISENBAUM:

24         Q.  Until what age did you practice mixed martial

25    arts?

                                                        18

1           MR. FINE:  Same objections.

2           THE WITNESS:  Fifteen or sixteen.

3    BY MR. NISENBAUM:

4       Q.  Until you were 15 or 16 years old?

5       A.  Yes.

6       Q.  How old are you now?

7       A.  Twenty-nine, sir.

8       Q.  Okay.  And you -- have you trained in mixed

9    martial arts since you were 16?

10          MR. FINE:  Vague as to trained.

11          THE WITNESS:  I have studied it and physically

12   practiced it, sir.

13   BY MR. NISENBAUM:

14      Q.  Since age 16?

15          MR. FINE:  Same objection.

16          THE WITNESS:  Relatively, sir.

17   BY MR. NISENBAUM:

18      Q.  I mean, from age 16 to the present have you

19   continued studying and practicing mixed martial arts?

20      A.  Yes, sir.

21      Q.  Okay.  And is it the same mixed martial arts that

22   you identified?

23      A.  Could you repeat that?

24      Q.  Is it the same types of mixed martial arts that

25   you previously identified Muay Thai, Brazilian

                                                          19

1    something, Japanese judo?

2        A.   In regards to my background with martial arts?

3        Q.   I mean since age 16 up to current, what have you

4    been studying and practicing with regard to mixed

5    martial arts.  What types?

6        A.   Just mixed martial arts in general.

7        Q.   Which different types?

8        A.   Mixed martial arts.

9        Q.   I get it but is that -- is mixed --

10       A.   That is the style.

11       Q.   I see.

12       A.   Yes, sir.

13       Q.   There's not a substyle, for example, obviously

14   Muay Thai is a martial art, Brazilian whatever is a

15   martial art, Japanese judo is a martial art.  So you're

16   saying that since age 16 you studied a kind of

17   conglomeration of all types of martial arts?

18           MR. FINE:  Misstates testimony.

19           THE WITNESS:  Mixed martial arts is the same

20   style separate from everything else.

21   BY MR. NISENBAUM:

22       Q.   Okay.  So tell me about mixed martial arts.  What

23   is that style?

24           MR. FINE:  Relevance.

25           THE WITNESS:  In a nutshell, nitpicks of every

20

1    different style and mixes it together so it's not
2    strictly a ground, stand up, grappling, et cetera.
3    BY MR. NISENBAUM:
4        Q.  Have you ever done any of it professionally?
5            MR. FINE:  Vague as to professionally.
6    BY MR. NISENBAUM:
7        Q.  Where you get paid.
8            MR. FINE:  Same objection.
9            THE WITNESS:  No, sir.
10   BY MR. NISENBAUM:
11       Q.  Okay.  Have you participated in competitions in
12   mixed martial arts?
13       A.  Yes, sir.
14       Q.  Okay.  When was the last time you participated in
15   a mixed martial arts competition?
16       A.  Maybe high school, college.
17       Q.  Okay.  And I would say that's a while back, but
18   it seems like you are fairly young.  How old are you?
19           MR. FINE:  Asked and answered.
20   BY MR. NISENBAUM:
21       Q.  Twenty-nine years old.  So you're 29, so that was
22   about seven years ago would have been when you last did
23   it?
24       A.  Sounds about right, sir.
25       Q.  Okay.  And were you good?  Did you, like, win

                                                    21

1    competitions?

2          MR. FINE:  Compound.  Vague and ambiguous.

3          THE WITNESS:  I would personally say that I was.

4    BY MR. NISENBAUM:

5       Q.  So did you win competitions?

6       A.  Yes.

7       Q.  What weight class?

8       A.  Really changed but I'm not that tall, so

9    competing at --

10          THE REPORTER:  I'm sorry, I'm having a really

11   hard time understanding him.  It sounds very muffled.

12          (Off-the-record discussion.)

13   BY MR. NISENBAUM:

14      Q.  What was your height and weight?  What is your

15   height and weight?

16      A.  5-7, 220 as of today.

17      Q.  And how about at the time of this incident?

18      A.  5-7, 200.

19      Q.  And is the weight gain, is it a fat/muscle

20   combination?

21          MR. FINE:  Calls for speculation.

22          MR. NISENBAUM:  He knows.

23          THE WITNESS:  I sincerely don't know.

24   BY MR. NISENBAUM:

25      Q.  Come on.

                                                    22

1      A.   Combination, I believe.

2      Q.   You've been working out and you've been eating

3   like crap; is that right?  When you say it's a

4   combination?

5           MR. FINE:  Calls for speculation.  Vague and

6   ambiguous.  It's also just generally not always true

7   that's the case.  Go ahead.

8           MR. NISENBAUM:  It's 99 percent true.  It's true

9   for me.

10          THE WITNESS:  I don't know.

11   BY MR. NISENBAUM:

12     Q.   Okay.  Fair enough.

13          At the time of this incident, did you have any

14   injuries that -- whether chronic injuries or acute

15   injuries that would have affected your performance in

16   the field?

17     A.   No, sir.

18     Q.   And did you have -- do you have any issues with

19   your memory?

20     A.   Not to my recollection, sir.

21     Q.   So you've seen the video, I played it, and I

22   think that is the best view of your knee, and it looks

23   like for a good period of time it is dead in the center

24   of Mr. Gutzalenko's back.  Why is that?

25          MR. FINE:  Misstates the video.  Assumes facts.

                                                            23

1      THE WITNESS:  Upon review of the AVR footage that

2   you showed me of Officer Tagorda's body-worn camera it

3   showed that my left knee made contact with

4   Mr. Gutzalenko's back or torso and upper right shoulder.

5   I will admit at some points of the video my right knee

6   has made contact or did make contact with

7   Mr. Gutzalenko's middle of the back, but I definitely

8   did not place significant force on his back or torso to

9   where it could have obstructed his breathing.

10  BY MR. NISENBAUM:

11      Q.  How do we know?  How do you know that?

12      A.  Because I did not place significant force on the

13  middle of his back.

14      Q.  So earlier you heard the discussion from Officer

15  Hall where he said that because your right knee was on

16  the ground while you're left knee or left lower leg,

17  some part of your left leg, knee and/or shin, was

18  against Mr. Gutzalenko's back, he said in his view that

19  wasn't significant pressure being applied because you

20  had weight that would have been on the ground on your

21  right knee.  But then at a certain point it changed.

22  You picked your -- your right knee up off the ground.

23  You had that right leg stretched out and it looks like

24  you're leveraging your weight onto your left -- onto

25  your left knee ultimately into the middle of his back.

24

1  That's what it looks like on the video.  Why did you do
2  that?
3          MR. FINE:  Misstates the video.
4          THE WITNESS:  That's incorrect, sir.  I did not
5  lift up my right knee and place all of my force or
6  weight onto my left knee onto Mr. Gutzalenko's body.  If
7  you look at my left ball of my foot you could see that
8  the pressure is majority there and also distributed
9  across both posted hands that I've place on the ground
10 and/or Mr. Gutzalenko away from his torso.
11     Q.  The balls of your feet are pressing against the
12 ground.  That indicates that all the force is going that
13 direction away from you into him.  That's what that
14 shows when you have your -- when you're up on the balls
15 of your feet, that's leveraging your weight forward.
16 You understand that, right?
17         MR. FINE:  Calls for speculation.  Calls for
18 expert opinion.  Misstates the video.
19 BY MR. NISENBAUM:
20     Q.  When you're pushing against something and you get
21 on balls of your toes, that is in order to leverage your
22 weight even more in that direction.  You know that,
23 right?
24         MR. FINE:  Same objections.  Misstates the video.
25 Calls for speculation.  Calls for expert opinion.

25

1          MR. NISENBAUM:  I mean, try to push -- try to
2    push a car flat footed.  You can't do it flat footed.
3    You have to get up on the balls of your toes to do it.
4    You know this.  I'm sure.
5          MR. FINE:  Same objections.  Relevance.
6    BY MR. NISENBAUM:
7      Q.  Do you know that?
8          MR. FINE:  Same objections.
9          THE WITNESS:  You can push something flat foot.
10   I have done it.
11   BY MR. NISENBAUM:
12     Q.  You can but it's very hard.  It's a lot easier if
13   you get on the balls of your feet, right?
14         MR. FINE:  Same objections.
15         THE WITNESS:  I would agree if you get on the
16   balls of your foot to push something --
17   BY MR. NISENBAUM:
18     Q.  It's easier to push when you're on the balls of
19   your feet because it creates more leverage in the
20   direction that you're pushing, correct?
21         MR. FINE:  Same objections.
22         MR. TRAN:  Not necessarily, sir.
23   BY MR. NISENBAUM:
24     Q.  How is it incorrect?  When you say "not
25   necessarily," how is that possibly incorrect?  Give me

                                                          26

1  an example.

2     A.  I could stand on the ball of my foot without

3  having to push on anything.

4     Q.  Okay.  You mean like a ballerina?

5        MR. FINE:  Argumentative.  Vague and ambiguous.

6  BY MR. NISENBAUM:

7     Q.  Sure.  If you're just standing still, but if you

8  are pushing on something and you're on the balls of your

9  feet, you would agree that creates -- getting on the

10  balls of your feet creates more leverage than if you

11  were flat footed, correct?

12        MR. FINE:  Incomplete hypothetical.  Vague and

13  ambiguous.  Calls for speculation.

14  BY MR. NISENBAUM:

15     Q.  In everyone's experience?

16        MR. FINE:  Same objections.

17        THE WITNESS:  I would disagree still, sir.

18  BY MR. NISENBAUM:

19     Q.  Why?

20     A.  In specific, when watching the video and from my

21  recollection, I was on the ball of my left foot, and

22  because I was on the ball of my left foot, majority of

23  my weight was on -- I was posted on my left ball of my

24  foot.  Yes, my knee did obstruct Mr. Gutzalenko's

25  ability to roll backwards for multiple reasons.  I

27

1  didn't want him to get back up to place himself in
2  danger, I didn't want him to roll onto his back to where
3  his health could be put at risk additionally such as
4  vomiting, and at some point he was expelling some blood
5  from his mouth, and I didn't want that -- him to choke
6  on that.  But just because I was on the ball of my foot
7  does not mean that I was putting pressure on him.
8      Q.  Okay.  Let me actually go to your video.  I'm
9  going to start this at 11:20 or 11:22 on the screen.
10         Is it sharing my screen yet or no?
11         MR. FINE:  Not yet.  There we go.
12  BY MR. NISENBAUM:
13      Q.  So this is at 11:22.  I'm going to pause and ask
14  you some questions.  You saw how I do that, right?
15      A.  Yes, sir.
16      Q.  Okay.  Playing at 11:22, which is the 18:51:04
17  Axon time stamp.
18         Okay.  This is -- we're paused at 11:44.  The
19  Axon time stamp is 18:51:26.  That's your knee, correct?
20         MR. FINE:  Calls for speculation.
21         THE WITNESS:  I believe so, sir.
22  BY MR. NISENBAUM:
23      Q.  You believe so.  Okay.  And where would you
24  describe your knee being positioned relative to
25  Mr. Gutzalenko's back?

28

1      A.   Lower right hip.

2      Q.   That's the hip?

3           MR. FINE:  Asked and answered.

4   BY MR. NISENBAUM:

5      Q.   The hip is down here.  This is your knee right

6   here.  You see that skin, that skin above his hips?

7   You're directly behind the diaphragm is where your knee

8   is.

9           MR. FINE:  Is that a question?

10  BY MR. NISENBAUM:

11     Q.   Isn't that correct?  Your knee is directly behind

12  his diaphragm?

13          MR. FINE:  Asked and answered.  Calls for expert

14  opinion.

15  BY MR. NISENBAUM:

16     Q.   Correct?

17     A.   Kind of hard to tell, sir.

18     Q.   Well, it's not hard for me to tell.  I don't know

19  that your body cam shows much more in terms of where it

20  is, but -- and it's fairly obvious.  And you can tell

21  your knee is pressed against him.  In part you can see

22  the fabric is stretched where your knee is pushing down.

23  You see how all the stretch marks on the fabric go

24  towards where your knee is pressing into?  Do you see

25  that?

29

1          MR. FINE:  Calls for speculation.

2          THE WITNESS:  I don't know exactly if it's being

3     stretched, but I can see the shirt as well.

4     BY MR. NISENBAUM:

5        Q.  I guess you don't understand that either.

6          Continuing at 11:44.

7          Okay.  Pausing again at 11:51.  Mr. Gutzalenko is

8     saying "I can't breathe.  Stop.  Please.  I can't

9     breathe."  Your knee remains in the same position, and

10    you could tell if the camera came back a little more

11    that you're definitely -- sorry, I'm moving forward -- I

12    mean, you're right kind of at the base of the rib cage,

13    right, with your knee?

14         MR. FINE:  Calls for expert opinion.  Calls for

15    speculation.  Misstates the video.  Misstates prior

16    testimony.

17    BY MR. NISENBAUM:

18       Q.  Can you see that?

19         MR. FINE:  Same objections.

20         THE WITNESS:  It's hard from that angle to tell,

21    sir.

22    BY MR. NISENBAUM:

23       Q.  Okay.  11:51, I'm going to hit play.

24         All right.  You got off him there.  All right.

25         How long did you have your knee in his back?

                                                         30

1          MR. FINE:  Vague and ambiguous.

2     BY MR. NISENBAUM:

3          Q.  On Mr. Gutzalenko.  Throughout the entire

4     incident, can you estimate how long your knee was on his

5     back cumulatively?

6          MR. FINE:  Vague and ambiguous and misstates the

7     video.

8          THE WITNESS:  My knee wasn't in his back, but my

9     knee was obstructing his back, and at some points my

10    knee did make contact with his back but it wasn't in it.

11    BY MR. NISENBAUM:

12         Q.  The picture I just showed you, the part I just

13    showed you, your knee was in his back there, right?

14    There was one point in time when your knee was in his

15    back, correct?

16         MR. FINE:  Vague and ambiguous as to "in his

17    back."  Asked and answered.  Calls for -- excuse me.

18    Misstates testimony.  Misstates the video.

19         Go ahead.

20    BY MR. NISENBAUM:

21         Q.  Against his back?

22         MR. FINE:  Same objections.

23    BY MR. NISENBAUM:

24         Q.  Against and into his back?

25         MR. FINE:  Vague and ambiguous as to "into his

                                                              31

1  back."  Misstates the video.  Misstates testimony.

2          Go ahead.

3          THE WITNESS:  No, sir, my knee was not in his

4  back.  My knee was on -- making contact with his back

5  and obstructing his -- his back for a little bit.

6  BY MR. NISENBAUM:

7      Q.  So the video I just showed you does not refresh

8  your recollection that your knee was actually pressing

9  against his back applying force against his back with

10  your knee?

11         MR. FINE:  Argumentative.  Asked and answered.

12         THE WITNESS:  At some time at points during that

13  contact my knee did apply some pressure to his torso but

14  not of significant pressure.

15  BY MR. NISENBAUM:

16     Q.  I'm going to scroll back a little bit.

17         MR. FINE:  Your screen is no longer shared, Ben.

18  Just a reminder.

19         MR. NISENBAUM:  Hold on.  Trying to get a time

20  stamp.  Okay.  Now I'm going to go back to Tagorda's

21  video.  So the timing that I just showed you, let me

22  share the screen.  This is not Tagorda's video yet.

23  This is still your video.  You have a time stamp, so

24  it's 18:51:28 that we're talking about.  You can see

25  that time stamp up here where it says Axon, Axon body 2

                                                        32

1    and next to T.  You see that?

2          THE WITNESS:  Yes, sir.

3          MR. NISENBAUM:  Okay.

4          MR. FINE:  Your screen is not shared anymore.

5          MR. NISENBAUM:  I have to change the video out.

6          MR. FINE:  I'm sorry.

7          MR. NISENBAUM:  Working on it.

8          MR. FINE:  I heard the sound going.  I just

9    wanted to make sure.

10         MR. NISENBAUM:  Well, that's what happens when

11   you switch the video.  It's playing automatically and

12   you know.

13   BY MR. NISENBAUM:

14     Q.  All right.  So let me -- no it's -- so this is --

15   I'll share.  Can you see this, Officer?

16     A.  Yes, sir.

17     Q.  Okay.  So this is from Officer Tagorda's video

18   with time stamp 18:51:19.  So the other one was

19   18:51:28.  Now, you testified just now that your knee

20   was not in Mr. Gutzalenko's back in the clip that I

21   showed you, which was 18:51:28.  So this is a different

22   camera, different view.  This is earlier.  This starts

23   nine seconds earlier.  I can even go back further but

24   your knee right there, it's right in the center of

25   Mr. Gutzalenko's back.  You can see it right here,

                                                        33

1  correct?

2         MR. FINE:  Misstates the video.  Vague and

3  ambiguous as to "in his back."

4         THE WITNESS:  My left knee is making contact with

5  his back.

6  BY MR. NISENBAUM:

7     Q.  Yes.  With the center, roughly the center of

8  Mr. Gutzalenko's back?

9         MR. FINE:  Misstates the video.

10        MR. NISENBAUM:  It does not misstate the video.

11  It's a totally accurate description of the video.

12        MR. FINE:  I disagree that your description of

13  the video is accurate.

14        MR. NISENBAUM:  Well, let's see.  There's the

15  butt crack right around there.  You see the cursor?

16        MR. FINE:  I'm not being deposed today.

17        MR. NISENBAUM:  I know.  I know, but making these

18  objections is frankly coaching the witness and improper.

19        MR. FINE:  I haven't made a single speaking

20  objection.  I'm stating that in my opinion you're

21  misstating video, and I'm going to keep stating it if I

22  think you're doing it.

23        MR. NISENBAUM:  But I'm not misstating the video.

24        MR. FINE:  I believe you are.

25        MR. NISENBAUM:  No one can make that claim.

                                                    34

1        MR. FINE:  Well, there's no judge here to decide
2   on it, is there?
3        MR. NISENBAUM:  Well, that's the point.
4        MR. FINE:  Right.  And I'm going to keep making
5   it because I disagree with you.
6        MR. NISENBAUM:  Exactly.  At some point it will
7   become a problem.  Now, look --
8        MR. FINE:  We'll deal with it then, I guess.
9   BY MR. NISENBAUM:
10    Q.  Where -- where is your knee relative to
11  Mr. Gutzalenko in this picture?  We're 18:51:19 in the
12  time stamp, the Axon, time stamp of Tagorda's video.
13    A.  My left knee is making contact with the upper
14  right side of his torso.
15    Q.  By upper right side, you mean up around the
16  shoulder blade?
17    A.  I would say around the shoulder blade yes, sir.
18    Q.  Okay.  So I'm going to play.
19        By the way, I'm pausing it at 18:51:23?
20        Your right knee is not on the ground, correct?
21    A.  Correct, sir.
22    Q.  So your right knee is not on the ground.  The
23  only appendage of yours that is on the ground, you have
24  your right foot on the ground, you have the left ball of
25  your toes on the ground, ball of your feet and your toes

                                                        35

1   on the ground, you have your knee, and then you have

2   your left hand on Mr. Gutzalenko's left shoulder,

3   correct?

4       A.   Not necessarily, sir.   My right -- I apologize.

5   My left knee is making contact with Mr. Gutzalenko's

6   upper right side of the torso, and my weight is

7   distributed across both of my feet, specifically on the

8   left ball of my foot and on both of my hands which are

9   posted on Mr. Gutzalenko's, I believe, left shoulder and

10  right -- my right hand is on the floor or/and

11  Mr. Gutzalenko's arm.

12      Q.   Are you trying to say that your weight is

13  distributed evenly between your feet, your left and

14  right feet?

15          MR. FINE:  Misstates testimony.

16          THE WITNESS:  No, sir.

17  BY MR. NISENBAUM:

18      Q.   Is that what you're saying?

19      A.   No, sir.  I'm stating that my weight is

20  distributed across all of my limbs.

21      Q.   Equally?

22          MR. FINE:  Calls for speculation.

23          THE WITNESS:  No, sir.  I mean it's -- I could

24  tell you that most of my weights are distributed on both

25  my hands and on the left on the ball of my feet.

                                                        36

1  BY MR. NISENBAUM:

2      Q.  So you're saying that your knee is in contact

3  with Mr. Gutzalenko -- strike that.

4          Your knee is in contact with Mr. Gutzalenko's

5  back in this picture, correct?

6          MR. FINE:  Vague and ambiguous.

7          THE WITNESS:  Depicted in this paused frame on

8  the body-worn camera, my left knee is touching

9  Mr. Gutzalenko's upper right section of his torso.

10  However, my weight is distributed across the left ball

11  of my foot, both of my hands, and very very slightly on

12  my right foot.

13  BY MR. NISENBAUM:

14      Q.  Right.  Very slightly on your right foot.  Most

15  of it is --

16      A.  On the ball of my left foot.

17      Q.  Well, and your knee.

18          MR. FINE:  Misstates testimony.

19  BY MR. NISENBAUM:

20      Q.  So I'm going to hit play.

21          All right.  Pausing at 51:29.  Let me go back to

22  51:28.

23          Okay.  So we can see where -- from this angle we

24  can see where your knee is.  Now, if we go back to your

25  body cam.  That's 26.  In any event, you can see --

                                                           37

1          MR. FINE:  We didn't see the video.

2          MR. NISENBAUM:  Oh.  Okay.

3    BY MR. NISENBAUM:

4       Q.  So you can see the distance from the top of the

5    shirt collar where the neck is all the way down to where

6    your knee is, right?

7       A.  Yes, sir.

8       Q.  Okay.  Is it your testimony that's what -- that

9    what is depicted here, and this is actually 51:26 on

10   Officer Tagorda's cam, is it your testimony that what is

11   depicted here is your knee on Mr. Gutzalenko's shoulder

12   blade?

13      A.  From this freeze frame here, sir, looks like my

14   left foot -- sorry -- my left knee is placed and making

15   contact with Mr. Gutzalenko's lower right torso.

16      Q.  Lower right torso.  Okay.  And then again we're

17   now at -- there we are, 28:00.  So you can tell -- you

18   see your knee right then, the very top of your knee.

19   We're paused at 18:51:28.  You can see your knee really

20   hasn't changed position from where it was at 18:51:26,

21   correct?

22      A.  Looks like it's in the relatively same vicinity.

23      Q.  Okay.  So again, are you able to see the video

24   now?  This is Tagorda's video.  Is that on your screen?

25      A.  Yes, sir.

                                                          38

1       Q.  Okay.  All right.  So we're at 18:51:26.

2           Now we're at 18:51:28.  So here your knee is in

3   his lower back.

4       A.  It looks like.

5           MR. FINE:  This is belated.  Vague as to lower

6   back.

7   BY MR. NISENBAUM:

8       Q.  Pressed against his lower back?  I thought you

9   said before it was at the shoulder blade, but which

10  one --

11      A.  From this perspective it looks like my left knee

12  is making contact with Mr. Gutzalenko's upper right

13  torso.

14      Q.  It's the same -- same -- right.  You said upper

15  right torso, shoulder blade I think you said.  This is

16  the same time, same shot.  So you're saying from the

17  other shot it looks like it's the lower back.  From this

18  shot it looks like it's the upper back or upper torso.

19  In reality it was the middle of his back, correct?

20          MR. FINE:  Misstates testimony.  Misstates the

21  video.  Asked and answered repeatedly.  You can answer

22  again, Officer Tran.

23          THE WITNESS:  No, sir.

24  BY MR. NISENBAUM:

25      Q.  Okay.  Actually, let me continue to share.  All

                                                         39

1　right.　When Mr. Gutzalenko was saying "I can't

2　breathe," while you were restraining him, what steps did

3　you take to make sure that he could breathe?　And I'm

4　talking about while you were restraining him.

5　　　A.　I was keeping significant of my weight off of

6　him.

7　　　Q.　And how did you do that?

8　　　　　MR. FINE:　Asked and answered.

9　BY MR. NISENBAUM:

10　　　Q.　By doing -- let me just ask you this:　Is what is

11　depicted on the screen right now, 18:51:28, is that an

12　example of you keeping your weight off of

13　Mr. Gutzalenko?

14　　　A.　In this video here, this freeze frame, it shows

15　me distributing my weight across both my hands and both

16　my feet while my left knee is making contact with

17　Mr. Gutzalenko's back.

18　　　Q.　So this is an example and this is 1- -- 18:51:28

19　on Tagorda's body cam, it's 6:44 on the actual file time

20　stamp, depicts an example of you keeping your body

21　weight off of Mr. Gutzalenko, correct?

22　　　　　MR. FINE:　Misstates testimony.

23　　　　　THE WITNESS:　Could you repeat that, sir?　I

24　apologize.

25　///

40

1    BY MR. NISENBAUM:

2      Q.   Sure.   What is depicted on the frame that is in

3    front of us which is a pause of Tagorda's video, body

4    cam video, Axon time stamp 18:51:28, file time stamp

5    06:44, is an example of you keeping your body weight off

6    of Mr. Gutzalenko, correct?

7          MR. FINE:   Same objection.

8          THE WITNESS:   No, sir.   That's incorrect.

9    BY MR. NISENBAUM:

10     Q.   Okay.   Well, then tell me.

11     A.   I am making contact with him and if I'm making

12   contact with Mr. Gutzalenko's person, I will be adding

13   some pressure.   But majority and significant of my

14   weight is on the ball of my left foot distributed also

15   along both of my hands and my right leg, sir.

16     Q.   Okay.   And you understand, I'm sure -- you've had

17   to testify in trials before?

18     A.   Yes, sir.

19     Q.   Okay.   So you understand -- and have you

20   testified in jury trials?

21     A.   Yes, sir.

22     Q.   And so you understand that, you know, some

23   assertions made by a witness are subject to assessment

24   by a jury, right, in terms of whether it's true?

25         MR. FINE:   Vague.   Ambiguous.

41

1          THE WITNESS:  Could you rephrase that, sir?

2     BY MR. NISENBAUM:

3        Q.  You understand that assessments, that you can

4     make statements, you can say things, but whether or not

5     they're true, that a jury determines what's true and

6     what's false, right?

7          MR. FINE:  Incomplete hypothetical.

8          THE WITNESS:  I guess, sir.

9     BY MR. NISENBAUM:

10       Q.  Okay.  So there were a couple times where your

11    camera fell off.  Do you know why or how it fell off?

12       A.  The body-worn camera against Mr. Gutzalenko's

13    person knocked off my body-worn camera.

14       Q.  Okay.  And was it a hand that knocked it off?

15    What knocked it off?

16       A.  (Inaudible.)

17          THE REPORTER:  I'm sorry, could you repeat that?

18          MR. FINE:  You're getting really low, Officer

19    Tran.

20          THE WITNESS:  My apologies.

21          I don't know, sir.

22    BY MR. NISENBAUM:

23       Q.  Okay.  So it might have just been your body

24    bumping against his that knocked it off, correct?

25          MR. FINE:  Misstates testimony.

                                                      42

1    THE WITNESS:  I don't know, sir.

2  BY MR. NISENBAUM:

3    Q.  Okay.  Well, you testified that he knocked it

4  off, but if you can't tell me what he did that knocked

5  it off, then you don't really know what knocked it off,

6  correct?

7    A.  During this incident his body was moving around a

8  lot, my body was moving around a lot.  I mean, I can

9  tell you that from my interaction with Mr. Gutzalenko,

10  my body worn was knocked off and I believe that it was

11  knocked off by Mr. Gutzalenko.

12    Q.  So I have a question for you.  You believe that,

13  but in any event -- now let me stop the share here.

14  I'll come back to it.

15    You actually assisted in the injection of the

16  Versed into Mr. Gutzalenko, correct?

17    MR. FINE:  Vague and ambiguous as to assisted.

18    MR. KANTER:  Join.

19    THE WITNESS:  No, sir.

20  BY MR. NISENBAUM:

21    Q.  Okay.  You facilitated the injection, right?

22    MR. FINE:  Vague and ambiguous as to facilitated.

23    MR. KANTER:  Join.

24    THE WITNESS:  What do you mean by facilitated,

25  sir?

43

1  BY MR. NISENBAUM:

2      Q.  Let me give you the dictionary definition.  I

3  could tell you directly, but I feel more comfortable.

4  You made the injection easy or easier, correct?

5          MR. FINE:  Vague and ambiguous.  Calls for expert

6  opinion.

7          MR. KANTER:  Join.  Overly broad.

8          MR. FINE:  Join.

9          THE WITNESS:  I don't -- I don't know, sir.  I

10  think you're trying to refer to the shirt pulling side.

11  BY MR. NISENBAUM:

12      Q.  You moved the shirt so the injection so the -- to

13  make it easier for the injection to happen, correct?

14      A.  Yeah.

15      Q.  Okay.  Now, you told -- I know you told -- you

16  testified at the coroner's inquest and you testified

17  that you didn't even see the injection.

18      A.  Correct.

19      Q.  Do you recall that?  Okay.  You reviewed your

20  coroner's inquest testimony, I assume?

21      A.  Yes, sir.

22      Q.  Okay.  But you did see it.  You were there.  You

23  knew when it happened.  You pulled the shirt aside for

24  it to happen, correct?

25          MR. FINE:  Which one of those questions do you

                                                        44

1   want him to answer?

2   BY MR. NISENBAUM:

3       Q.  You pulled the shirt aside for it to happen,

4   correct?  For the injection to happen?

5           MR. FINE:  Asked and answered.

6           You can tell him again.

7           THE WITNESS:  I pulled the shirt.

8   BY MR. NISENBAUM:

9       Q.  For -- so the injection could happen, correct?

10      A.  Yes, sir.  But --

11      Q.  But what?

12      A.  Things were happening so quickly.  I -- I

13  honestly don't recall at some points.  I don't remember

14  everything of the interaction.

15      Q.  Did you only remember that after I showed it to

16  Officer Hall?

17      A.  No, sir.

18      Q.  Okay.  So you knew that you pulled the shirt

19  aside when he was -- when you testified at the coroner's

20  inquest, correct?

21      A.  I knew it from the AVR footage.  I was able to

22  recall.

23      Q.  In preparation for the deposition and you

24  reviewed the AVR footage and then you -- before I

25  deposed Officer Hall?

45

1     A.  Even before then, sir.

2     Q.  Right.  But, I guess, you recall that after the

3  coroner's inquest testimony.  You didn't remember it at

4  the time of the coroner's inquest; is that right?

5     A.  Yes, sir.

6     Q.  Did you have any discussion with Officer

7  Richardson of -- regarding this incident?

8          MR. FINE:  Did you say Officer Richardson?

9          MR. NISENBAUM:  I said officer.  I'm sorry.  You

10  know.

11         MR. FINE:  I know, it's late.

12  BY MR. NISENBAUM:

13    Q.  Did you have any discussion with a paramedic

14  whose last name was Richardson, first name Damon, about

15  this incident ever?

16    A.  (Inaudible.)

17    Q.  I couldn't hear you.

18    A.  I don't know who he is.

19    Q.  Okay.  Well, he's the guy who injected him.

20    A.  Oh, no.  Not from my recollection, sir.

21    Q.  Did you -- was there ever a time when you

22  believed that that Mr. Gutzalenko, and I'm talking about

23  from the time this happened through today, was there

24  ever a time when you believed that Mr. Gutzalenko only

25  became unresponsive after he'd been loaded into the

                                                        46

1    ambulance?

2         MR. KANTER:  Objection.  Calls for speculation.

3    Lacks foundation.  Calls for an expert opinion.

4         MR. FINE:  Join.

5         THE WITNESS:  Sorry, sir.  Could you repeat that

6    question, sir?

7    BY MR. NISENBAUM:

8         Q.  Sure.  From the time the event happened to today,

9    did you ever have the belief that Mr. Gutzalenko only

10   became nonresponsive after he had been put into the

11   ambulance?

12        MR. FINE:  Same objections.

13        MR. KANTER:  Join.

14        THE WITNESS:  No, sir.

15   BY MR. NISENBAUM:

16        Q.  Right.  You knew that he became nonresponsive and

17   got CPR, you know, minutes before he was put into the

18   ambulance, right?

19        MR. FINE:  Same objections.

20        MR. KANTER:  Join.

21        THE WITNESS:  I think he got CPR once he got into

22   the ambulance.

23   BY MR. NISENBAUM:

24        Q.  Do you recall that he was -- he was noted to be

25   unresponsive before he was even put on the gurney?

                                                        47

1    MR. FINE:  Vague and ambiguous.  Same objections.

2    MR. KANTER:  Join.  Lacks foundation.

3    THE WITNESS:  Yes, sir.  I recall him being

4  unresponsive before being placed on the gurney.

5  BY MR. NISENBAUM:

6    Q.  And pretty quickly after he was -- strike that.

7    We're going to go back to the video, to Tagorda's

8  video.  I find it's actually a lot easier to see, you

9  know, when you have a little bit of distance.  It's on

10  your screen?

11    A.  Yes, sir.

12    Q.  Okay.  I'm going to hit play.  We're at 6:44.

13    When do you first recall Mr. Gutzalenko's hand

14  going limp?

15    A.  When I was trying to pry it from under him.

16    Q.  Was that before he was actually handcuffed?

17    A.  Yes, sir.

18    Q.  And was he still alive at that point?

19    MR. FINE:  Calls for expert testimony.  Calls for

20  speculation.  Lacks foundation.

21  BY MR. NISENBAUM:

22    Q.  Did you notice signs of life at that point?

23    A.  Yes.

24    Q.  Okay.  What were those signs of life?

25    A.  Him resisting when I try to put his arm or right

48

1    hand behind his back.  He was very tense and he was

2    resisting against it.

3        Q.  Okay.  Well, I was reading from your interview.

4    This is from page 9 of your interview Bates stamped

5    city_01455, and I'll start.

6            "As I was trying to get the subject's right hand

7    to his back he was very resistant against it.  I believe

8    I told him to put his right hand behind his back

9    multiple times, but he didn't comply, so I just kept

10   trying to pull his right hand back to his backside so we

11   can handcuff him to prevent anything further from

12   escalating the situation.  We struggled for maybe about

13   a minute or two trying to handcuff the suspect.  After

14   that I pulled the suspect's hand to his backside again,

15   but this time it wasn't tense.  It was very, lack of

16   term, limp.

17           "Question:  Uh-huh.

18           "Answer:  And that's when Officer Hall handcuffed

19   both hands behind his back and rolled the suspect onto

20   his right side and I noticed he was -- looks like he was

21   jerking.  Looks like he's trying to breathe.

22           "Question:  Uh-huh.

23           "Answer:  So I applied some sternum rubs to get a

24   response to him."

25           So what I didn't see in your interview was any

                                                            49

1    discussion about when the Versed shot was injected, but

2    now that we know when it was injected and you've seen

3    it, did his hand go limp before the Versed shot or

4    after?

5        A.  I'm not too sure, sir.  Could you play the video

6    again?

7        Q.  Sure.  This is Tagorda.  So we're at 7:09.  The

8    handcuffing is beginning.  I know it takes a little

9    while.

10           I'll go 7:15, I'll hit play.  The injection is

11   about at eight minutes.

12           So that's the injection.  Had his -- had he gone

13   limp?  Had you already noticed the hand going limp prior

14   to that?

15       A.  Yes, sir.

16       Q.  Okay.  About how long prior to that in what we've

17   watched did you notice the hand go limp?

18       A.  Probably seconds.

19       Q.  Seconds before the injection?

20       A.  I would estimate it was not too long.

21       Q.  Then you applied some sternum rubs to get a

22   response to him, correct?

23       A.  After he became nonresponsive, yes, sir.

24           MR. FINE:  You're getting a little low again.

25           Sorry, Ben.

1          THE WITNESS:  After he became unresponsive, yes,
2     sir.
3     BY MR. NISENBAUM:
4        Q.  Let me ask you this:  Did you see whether the --
5     whether Paramedic Richardson checked his pulse before he
6     injected him?
7        A.  No.
8        Q.  I'm going to hit -- we're at 7:36.  I'm going to
9     hit play.
10          It looks like you can see the belly breathing in
11    and out.  Did you see that?
12          MR. KANTER:  Objection.  Calls for speculation.
13    Lacks foundation.  Calls for expert opinion.
14          MR. NISENBAUM:  I don't think it does.
15    BY MR. NISENBAUM:
16       Q.  Did you see the belly breathing in and out?
17          MR. FINE:  Same objection.
18    BY MR. NISENBAUM:
19       Q.  Let me go back.  I'll go back to --
20          MR. FINE:  Did the court reporter get that
21    answer?
22          THE REPORTER:  No.  If he did answer, I did not
23    get the answer.
24          Did you answer to the last question?
25          (Record read.)

51

1          THE WITNESS:  I answered I saw his stomach

2    moving.

3    BY MR. NISENBAUM:

4      Q.  Okay.  In a manner that as a lay person you would

5    be -- think it's consistent with breathing?

6          MR. KANTER:  Same objections.

7          THE WITNESS:  Yes, sir.

8    BY MR. NISENBAUM:

9      Q.  Okay.  So I'm going to hit play at 07:28.

10   Pausing it at 7:43.  I know I asked you about this

11   already, but you were in holding the -- the collar back,

12   you were attempting to facilitate the injection by the

13   paramedic, correct?

14         MR. FINE:  Vague and ambiguous as to facilitate.

15         MR. KANTER:  Join.

16         THE WITNESS:  I was pulling the shirt, sir, yes.

17   BY MR. NISENBAUM:

18     Q.  In order to keep it clear for the paramedic to

19   give the injection, correct?

20     A.  Yes, sir.

21     Q.  I'm sorry, I didn't hear you.

22     A.  Yes, sir.

23     Q.  Thank you.  Play at 7:43.

24         Okay.  Next question.  We're at 7:56.  You reach

25   over.  This is after the injection has been given.  You

                                                          52

1    reach over and I think you're padding Mr. Gutzalenko's
2    chest.  Do you know what you were doing there?
3        A.  My recollection, I think I was patting his chest.
4    I don't really remember, but from the footage it looked
5    like I was patting is his chest.
6        Q.  Were you -- were you just basically saying "All
7    right.  We're good to go here," something like that in
8    your own mind and that's what the patting was or was it
9    something else?
10       A.  I was trying to comfort him.
11       Q.  Okay.  You were trying to say like "You're going
12   to be all right"?
13       A.  Yes, sir.  Because in my mind I thought that shot
14   was going to help him.
15       Q.  All right.  Well, we're at 7:56.
16           You don't actually have a personal
17   recollection -- now that we've watched all this, do you
18   have a personal recollection of seeing the paramedic put
19   the needle into him?
20       A.  Just based off my recollection.
21       Q.  What's that?
22       A.  Sorry, sir.  Could you state that question again?
23       Q.  Sure.  I know before you didn't remember this
24   part of it, right, pulling the shirt?  But now that
25   we've watched this video several times and you saw it in

                                                           53

1  the last deposition and we've had all this discussion,

2  has it jogged your recollection at all as to whether or

3  not you actually saw the needle go into him or saw the

4  syringe in the -- in the paramedic's hands?

5        MR. FINE:  Compound.

6        THE WITNESS:  From the AVR footage, yes, I do

7  recall, but from my personal recollection of it from

8  that incident, no, sir.

9  BY MR. NISENBAUM:

10     Q.  Okay.  And that's what I'm asking, your personal

11  recollection.

12     A.  Oh.  No, sir.

13     Q.  So you don't have a better recollection than what

14  is shown on the video; is that right?

15     A.  Correct, sir.

16     Q.  Okay.  So you were trying -- up to the point when

17  the -- when the injection was given, you were trying to

18  control Mr. Gutzalenko to the best of your ability and

19  to assist AMR with rendering aid; is that right?

20        MR. FINE:  Vague and ambiguous as to assist with

21  rendering aid.

22        MR. KANTER:  Join.  And misstates prior

23  testimony.

24        MR. FINE:  Join.

25        THE WITNESS:  Sorry, sir.  Could you say that

                                                        54

1    again?

2    BY MR. NISENBAUM:

3        Q.  While AMR was on scene, you were trying to

4    control Mr. Gutzalenko to the best of your ability and

5    assist AMR to render aid, correct?

6            MR. FINE:  Same objections.

7            MR. KANTER:  Compound.  Join.

8            THE WITNESS:  I was trying to help AMR help

9    Mr. Gutzalenko.

10   BY MR. NISENBAUM:

11       Q.  All right.  And I'll read from your interview.

12   This is from Bates-stamped city_01454.  This is starting

13   on line 42:  "That's when I applied my left knee to the

14   right side of his shoulder blade, um, to prevent from

15   getting up.  If he's intoxicated under the influence of

16   drugs and he's acting aggressively and combatively -- I

17   don't -- if he gets back on his feet, I don't know.  I'm

18   not sure whether he was going to be combative with us,

19   so I didn't want to risk that.  So I was trying to

20   control him the best of my -- to the best of my ability

21   and assist AMR render aid."

22           So those are your words.  I take it they mean

23   what they say?

24       A.  To help Mr. Gutzalenko.

25       Q.  And you were trying to help assist AMR to render

                                                              55

1  aid, correct?

2       MR. FINE:  Vague as to assist to render aid.

3       MR. KANTER:  Join.

4       THE WITNESS:  In totality the circumstances I

5  was trying to get Mr. Gutzalenko and to make the scene

6  safe for AMR to come in to do their job to help

7  Mr. Gutzalenko.

8  BY MR. NISENBAUM:

9    Q.  Right.  You were trying to -- and as indicated,

10  you facilitated the injection too, correct?

11       MR. FINE:  Vague and ambiguous as to facilitated.

12       MR. KANTER:  Join.  Misstates testimony.

13       MR. FINE:  Join.

14       THE WITNESS:  Holding on to the shirt.

15  BY MR. NISENBAUM:

16    Q.  Yes.  So the injection could take place, right?

17       MR. FINE:  Objection.

18       MR. KANTER:  Objection.  Argumentative.

19  Misstates testimony.

20       MR. FINE:  Join.

21       MR. NISENBAUM:  I think the proper objection

22  might be asked and answered.

23       MR. KANTER:  All right.  Then I'll assert that

24  one.

25       MR. NISENBAUM:  He answered multiple times, so I

                                                    56

1  don't need another time I don't think.

2  BY MR. NISENBAUM:

3      Q.  Okay.  You told interviewers that you were

4  trained to avoid putting your weight on a person's back

5  with your knee especially with the environment now.

6          What did you mean when you told interviewers

7  "especially with the environment now"?

8      A.  During this incident it was around the George

9  Floyd incident.

10     Q.  Right.  And what's significant about George

11 Floyd?

12         MR. FINE:  Calls for speculation.  Relevance.

13 BY MR. NISENBAUM:

14     Q.  Or what's significant about the George Floyd

15 incident?

16         MR. FINE:  Same objections.

17         THE WITNESS:  That he stated he couldn't breathe.

18 That he stated he couldn't breathe.

19 BY MR. NISENBAUM:

20     Q.  And that you had an officer applying pressure

21 against his neck with his knee?

22         MR. FINE:  Calls for speculation.

23         THE WITNESS:  To be honest, sir, I don't know.  I

24 just know that an officer was using excessive force and

25 Mr. Floyd succumbed to his injuries from it.

1  BY MR. NISENBAUM:

2     Q.  Okay.  Well, I'm trying to understand what you

3  were saying.  So you're the one who referenced the

4  environment now.

5     A.  Yeah.

6     Q.  And you said, "So I did apply my knee to the

7  right shoulder blade of the suspect's back, but I didn't

8  apply much force."

9         So one -- I mean, when you say shoulder blade,

10  tell me where the shoulder blade is on the body.

11     A.  Upper right or left of -- sorry, Mr. Fine.

12         MR. FINE:  No.  You go ahead.

13         THE WITNESS:  Upper right or left of the back

14  torso.

15  BY MR. NISENBAUM:

16     Q.  Okay.  I take it you knew at the time of this

17  incident that applying compressive force in the middle

18  of someone's back while they're prone with your knee

19  could cause asphyxiation?

20         MR. FINE:  Incomplete hypothetical.  Go ahead.

21         THE WITNESS:  It could, sir.

22  BY MR. NISENBAUM:

23     Q.  And you knew that at the time of this incident?

24         MR. FINE:  Same objection.

25  ///

                                                        58

1   BY MR. NISENBAUM:

2       Q.  I'm talking about the incident with

3   Mr. Gutzalenko.  You knew it then, correct?

4           MR. FINE:  Same objection.

5           THE WITNESS:  Yes, sir.

6   BY MR. NISENBAUM:

7       Q.  Okay.  Were you required to sign off on any sort

8   of internal review that happened, acknowledge that you

9   received it?

10          MR. FINE:  Vague and ambiguous.

11  BY MR. NISENBAUM:

12      Q.  The Office of Professional Standards prepared a

13  review, right?

14      A.  Yes, sir.

15      Q.  Okay.  Were you required to read it?

16      A.  I remember reading a document.  I'm not sure if

17  it was from the PA.

18      Q.  I guess what I'm asking is were you required to

19  receive some report of this of an evaluation of this

20  incident and acknowledge that you had read it by signoff

21  or click something on a computer or make an affirmative

22  representation in any manner that you had read that --

23  that review?

24          MR. FINE:  Vague and ambiguous and compound.

25          THE WITNESS:  To be honest, sir, I don't know.

                                                        59

1    BY MR. NISENBAUM:

2       Q.  Okay.  Was there a separate interview that was

3    done with internal investigators?

4            MR. FINE:  Vague as to internal investigators.

5            THE WITNESS:  I just remember giving the

6    sequestered interview and then the coroner's

7    inquisition.

8    BY MR. NISENBAUM:

9       Q.  The coroner's inquisition.  You know, there's a

10   novel, it's not quite the coroner's inquisition.

11           All right.  Well, you agreed with Officer Hall

12   that this was a 5150 that was trying to be effected,

13   correct?

14           MR. KANTER:  Objection.  Misstates testimony.

15           MR. NISENBAUM:  Terrible question.

16   BY MR. NISENBAUM:

17      Q.  You agreed with Officer Hall that you needed to

18   put Mr. Ivan on a psychiatric hold, correct?

19           MR. KANTER:  Lacks foundation and it misstates

20   prior testimony.

21           MR. FINE:  Join.

22           THE WITNESS:  It was a consideration.

23   BY MR. NISENBAUM:

24      Q.  You say it was a consideration.  I'm going to

25   read from your coroner's inquest testimony, and this is

                                                          60

1    with respect to the point in time that after AMR

2    arrived, even at that point in time you agreed -- you

3    believed that this was a psychiatric 5150 hold that had

4    to be put into effect, correct?

5           MR. FINE:  Same objections.

6           MR. KANTER:  Join.

7           THE WITNESS:  At some point I did -- thought

8    that.

9    BY MR. NISENBAUM:

10       Q.  Well, let me -- let me read from your coroner's

11   inquest testimony starting at page 46 line 15:

12           "Question:  Did you indicate at some point, you

13   or Officer Hall, that you would 5150 him?

14           "Answer:  During that point, no.  When AMR got

15   there and he -- I thought he was being cooperative, so

16   there's no point to place him on a mandatory psychiatric

17   hold if he's willing to get the help that he needs.

18           "Question:  All right.

19           "Answer:  Once AMR got there and he was

20   uncooperative, and it was very obvious that he was not

21   cooperative with receiving the aid that he needed, I was

22   not comfortable with letting Mr. Ivan just walk away in

23   the condition that he is.  And my belief when your skin

24   is blue and purple, when your eyes are bloodshot red,

25   when you have cuts on your body and you're bleeding

61

1  profusely, you need medical help.  And if you are unable

2  to care for yourself, my duty is to care for you.  At

3  that point when Mr. Ivan decided not to cooperate with

4  AMR, I agreed with Officer Hall that we needed to place

5  Mr. Ivan on a psychiatric hold."

6         Does that refresh your recollection that after

7  AMR arrived and Mr. Gutzalenko was becoming

8  uncooperative and didn't want to deal with the

9  paramedics, that he needed to be placed on a 5150 psych

10  hold?

11         MR. KANTER:  I'll just object that it calls for

12  speculation and also would mischaracterize the video we

13  just watched.

14         MR. FINE:  Join.

15         THE WITNESS:  During this time, sir, there was a

16  lot of things going through my mind.  It -- there was

17  crimes involved, there was 5150 considerations involved,

18  things evolved very rapidly.  My mind was racing very

19  fast, a lot of things went through my mind.  But

20  eventually when Mr. Gutzalenko did not want to receive

21  the help from AMR, at that point I did decide to, yes,

22  sir, he -- he needed medical assistance whether if he

23  wanted it or not, and I was going to place him on a

24  psychiatric hold if necessary.

25  ///

62

1    BY MR. NISENBAUM:

2      Q.  Okay.  So when you said -- when you testified at

3    the coroner's inquest, "I agreed with Officer Hall that

4    we needed to place Mr. Ivan on a psychiatric hold," you

5    were referring to a 5150, correct?

6          Sorry, I spoke over you.  Go ahead.

7      A.  Yes, sir.

8      Q.  Okay.  And was there a time after AMR arrived and

9    you decided that he needed to be put on 5150 psychiatric

10   hold to when he collapsed that you decided he no longer

11   needed to be 5150'd?

12         MR. KANTER:  Object.  It's vague and ambiguous.

13   Overly broad.

14         MR. FINE:  I may have misheard you, but to the

15   extent you said collapsed, I would just say misstates

16   the video.

17         MR. NISENBAUM:  Became unresponsive.

18         THE WITNESS:  Sir, could you rephrase that?

19   BY MR. NISENBAUM:

20     Q.  There was an echo that was throwing me off and

21   maybe others.

22         Was there ever -- there it goes.

23         (Zoom audio disruption.)

24   BY MR. NISENBAUM:

25     Q.  Was there ever a time after you decided he

                                                           63

1   need -- Mr. Gutzalenko needed to be 5150'd to a point in
2   time when he started getting CPR that you thought this
3   was no longer a 5150 situation?
4           MR. KANTER:  Object.  It lacks foundation.  I
5   think it misstates his prior testimony.
6           MR. FINE:  Join.
7           THE WITNESS:  At that point I thought he was
8   unresponsive.  Regardless, I didn't think much of it.
9   The only thing I was concerned about was Mr. Gutzalenko.
10  BY MR. NISENBAUM:
11     Q.  But you were -- strike that.
12          The answer is you were not -- up to the point
13  when he became unresponsive, it was going to be a 5150,
14  correct?
15          MR. KANTER:  Objection.  Lacks foundation.
16  Misstates testimony.  Calls for speculation.
17          MR. FINE:  Same objection.  Sorry.  Join.  It's
18  late.
19          THE WITNESS:  If I'm understanding -- well, could
20  you restate that question, sir?
21  BY MR. NISENBAUM:
22     Q.  Sure.  I'm just asking once AMR arrived and he
23  wasn't cooperative, then you were clear -- you and
24  Officer Hall were clear this is going to be a 5150,
    correct?

                                                        64

1          MR. KANTER:  Same objections.

2          MR. FINE:  Join.

3          THE WITNESS:  It was likely.

4    BY MR. NISENBAUM:

5       Q.  Okay.  He would be further evaluated for 5150,

6    correct?

7       A.  Yes, sir.

8       Q.  Okay.  And I think -- when you testified at the

9    inquest, "I agreed with Officer Hall that we needed to

10   place Mr. Ivan on a psychiatric hold."

11          "Needed to" means that you had already decided

12   that he had met the criteria for 5150, correct?

13          MR. KANTER:  Objection.  Argumentative.  Lacks

14   foundation.  We've gone over this.  It's asked and

15   answered and it mischaracterizes the video we watched.

16          MR. FINE:  Join.

17          THE WITNESS:  Sir, can you ask the question

18   again?

19   BY MR. NISENBAUM:

20      Q.  When you testified at the coroner's inquest that

21   at the point when Mr. Ivan decided not to cooperate with

22   AMR, you agreed with Officer Hall that we needed to

23   place Mr. Ivan on a psychiatric hold?

24      A.  Yes, sir.

25      Q.  It was necessary to put him on a psychiatric

                                                        65

1    hold, you believed, correct?
2          MR. FINE:  Same objections.
3          THE WITNESS:  Correct.
4          MR. KANTER:  Vague and ambiguous as to time in
5    addition.
6          MR. FINE:  Join.
7          THE WITNESS:  Things were rapidly evolving and
8    changing, but generally yes, sir.  That was a serious
9    and likely consideration.
10   BY MR. NISENBAUM:
11     Q.  It wasn't just a consideration.  You thought it
12   needed to happen, right?
13         MR. KANTER:  Same objections and argumentative.
14         MR. FINE:  Join.  Misstates testimony.
15         MR. KANTER:  Join.
16         THE WITNESS:  He was not going to cooperate, yes,
17   sir.
18   BY MR. NISENBAUM:
19     Q.  Which he wasn't, right?
20     A.  Correct, sir.
21     Q.  Okay.  And that was the case all the way until he
22   lost a heartbeat, right?
23     A.  No, sir.
24     Q.  Okay.  When did that stop being the case?
25     A.  He was cooperative at first, but then when AMR

                                                         66

1    got there --

2    Q.  I meant from the point AMR got there and you

3    decided he needs to be put on a psychiatric hold, that

4    remained the same from that point until he lost a

5    heartbeat, correct?

6         MR. KANTER:  Objection.  Argumentative, lacks

7    foundation.  Mischaracterizes prior testimony.

8         MR. FINE:  Join.

9         THE WITNESS:  Mr. Gutzalenko was combative and

10   resisting towards AMR.

11   BY MR. NISENBAUM:

12   Q.  Okay.  And you thought he needed to be 5150'd up

13   until the point when he became unresponsive, correct?

14        MR. FINE:  Same objections.

15        MR. KANTER:  Join.

16        THE WITNESS:  Correct.

17   BY MR. NISENBAUM:

18   Q.  Okay.  And a 5150 is something that you are

19   authorized to put in place, correct?  You can do a 5150

20   evaluation?

21   A.  Yes, sir.

22   Q.  Okay.  So -- and you could -- you could do a 5150

23   yourself and if he was -- didn't require an ambulance,

24   you could actually drive him to the hospital yourself,

25   right?

67

1          MR. FINE:  Incomplete hypothetical.  Calls for
2    speculation.
3          THE WITNESS:  No, sir.
4    BY MR. NISENBAUM:
5       Q.  Okay.  Do you always have to call an ambulance
6    when there's a 5150?
7          MR. FINE:  Same objections.
8          THE WITNESS:  Yes, sir.
9    BY MR. NISENBAUM:
10      Q.  Okay.  And then -- and again, the 5150 -- a 5150
11   is a law enforcement detention, correct?
12         MR. FINE:  Calls for a legal conclusion.
13         MR. NISENBAUM:  Strike that.
14   BY MR. NISENBAUM:
15      Q.  Based on your training, a person is not -- does
16   not have the right to leave a 5150, to voluntarily a
17   5150 investigation, correct?
18         THE WITNESS:  Once an officer has elected to
19   place someone on a 5150 hold, a psychiatric hold, they
20   are no longer free to leave.
21   BY MR. NISENBAUM:
22      Q.  Okay.  And that was true prior to -- strike that.
23         Mr. Gutzalenko was not free to leave prior to
24   being injected with Versed by Paramedic Richardson,
25   correct?

                                                    68

1    A.  Correct, sir.

2          MR. NISENBAUM:  Okay.  I think that's all the

3    questions I have.  Give me one moment.  Give me like

4    five minutes.  Let me confer with my team.  I'm going to

5    mute.

6          MR. FINE:  So back at 3:22.

7          (Off the record.)

8          MR. KANTER:  I have a couple of questions.

9                        EXAMINATION

10   BY MR. KANTER:

11       Q.  Officer Tran, Mr. Gutzalenko was not formally

12   placed on a 5150 hold in this case, correct?

13       A.  Correct, sir.

14       Q.  It was just something that was under

15   consideration at all times during your presence at the

16   scene?

17       A.  Yes, sir.

18       Q.  And although that consideration was thought

19   about, it wasn't expressed verbally to anyone, was it?

20       A.  No, sir, it wasn't.

21       Q.  You didn't tell the AMR medics that you were

22   considering 5150 hold, correct?

23       A.  No, sir.

24       Q.  And I want to make sure I understand, if a 5150

25   hold is placed on a subject by the police, the police

69

1   are within their rights to simply take that person to a

2   psych facility, are they not?

3       A.  Yes, sir.

4       Q.  Thank you.  I don't have anything further.

5           MR. FINE:  I have just a few.

6                          EXAMINATION

7   BY MR. FINE:

8       Q.  You talked a little bit, Officer Tran, about when

9   you were much younger, mixed martial arts training that

10  you went through.  Do you recall testifying about that?

11      A.  Yes.

12      Q.  Sorry, was that a yes?  I couldn't hear you.

13      A.  Yes, sir.

14      Q.  In your law enforcement career, have you ever

15  employed any tactics or training that you learned

16  independently in your MMA training?

17      A.  No, sir.

18      Q.  And so if there's a need to physically restrain

19  someone as part of your duties as a law enforcement

20  officer, what tactics do you use?

21      A.  Only the ones that have been taught to me and

22  approved by the police department and/or the police

23  academy.

24      Q.  Okay.  You said a couple of times that you were

25  using your left knee.  I think the word you used was to

                                                          70

1  obstruct Mr. Gutzalenko's back.  What did you mean by

2  that?

3      A.  To obstruct Mr. -- well, I used my knee to

4  obstruct his back.  He was trying to roll back a lot,

5  and I didn't want him to roll back, just be on his back,

6  to where he could choke on his vomit or the blood that

7  he was spitting up.  But additionally, my knees were

8  hovering over his back and at time I did make contact

9  but not a lot of pressure was put on his back.  I didn't

10  want him to stand up, and before that he was stumbling

11  around.  I didn't want him to fall, hit his head, hit a

12  car, he was stumbling towards the roadway.  I didn't

13  want him to get hit by a car.  He was combative.  I

14  didn't want him to hurt himself, officers or AMR or put

15  the community at risk.

16          There was a lot of things going through my mind.

17  He vandalized a shop, he stole some things, he had

18  visible injuries already.  It was many things going

19  through my mind, but my primary thing was if I can keep

20  him here in a safe condition, I wouldn't have to worry

21  about him running to the street and the environment

22  hurting him or him hurt other people.

23      Q.  Did Mr. Gutzalenko -- you might have just said

24  this but just so I'm clear -- did he try to flip over

25  onto his back while you were trying to hold him in that

71

1  recovery position?

2      A.  Yes, sir, multiple times.  I at least counted

3  five or six times, sir.

4      Q.  And you thought -- well, strike that.

5      Why did you think it was important again for him

6  to be in that sort of recovery position on his side?

7      A.  So he wouldn't choke on his vomit or the blood

8  that he was spitting up.  But as well from my training,

9  if you lay on your side you breathe a lot better than

10  having to lay on your back and the weight push -- your

11  own weight is pushing down on yourself.

12      Q.  Okay.  And Mr. Gutzalenko also while you, I

13  guess, had your hands on him in the recovery position,

14  he tried to get up too; is that correct?

15      A.  Yes, sir, multiple times.

16      Q.  How many times?

17      A.  At least three times.

18      Q.  And when you first encountered Mr. Gutzalenko,

19  was he able to stay upright on his feet under his own

20  power?

21      A.  No, sir.  He actually collapsed twice if I recall

22  correctly.

23      Q.  Okay.  Were you concerned about him potentially

24  hurting himself if he collapsed again?

25      A.  Absolutely.

72

1          MR. NISENBAUM:  Objection.  There's been a ton of

2     leading questions.

3          MR. FINE:  Okay.  That was the last one.  I'm

4     done.  Good to go.

5          MR. NISENBAUM:  Quick question.  Maybe two.

6                         EXAMINATION

7     BY MR. NISENBAUM:

8          Q.  What does the phrase 5-1-5-O mean?

9          A.  Just top of my head, it sounds like 5150.  That

10    was the first time I heard of it, but I know officers

11    have used different lingo so that subjects don't --

12    because people hear 5150, they, you know, it's a

13    reaction that I don't want, that officers don't want.

14    So I think that's what the 5-1-5-O was intended.

15         Q.  And that was said in the presence of the

16    paramedics, correct, the 5-1-5-O?

17         MR. KANTER:  Calls for speculation.  Lacks

18    foundation.

19         MR. FINE:  Join.

20    BY MR. NISENBAUM:

21         Q.  Correct?

22         A.  I don't want to go off the top of my mind, but if

23    I watch video again I could tell you, sir.

24         Q.  I don't need to show to you.  I know it's there.

25              So you're not saying that you were trying to

73

1   conceal that this was a 5150 situation from the

2   paramedics, right?

3        MR. KANTER:  Object.  The question lacks

4   foundation and mischaracterizes the video as someone

5   saying 5150 means he's under a 5150.  I think you're

6   trying to confuse the witness.

7        MR. NISENBAUM:  No.  I mean, not at all.  Did --

8   I'll strike the question.  I'll ask a different

9   question.

10  BY MR. NISENBAUM:

11    Q.  Did you have a sense that the paramedics were

12  aware that this was a 5150 situation?

13        MR. KANTER:  Objection.  Calls for speculation.

14  Lacks foundation.

15        MR. NISENBAUM:  Based on your experience.

16        MR. KANTER:  Same objections.

17        THE WITNESS:  To be honest with you, no, sir.

18  Because a 5150 is not official until the paper is handed

19  to him, so until then they treat it as a medical

20  response.

21  BY MR. NISENBAUM:

22    Q.  If you're detaining a person pursuant to a 5150,

23  that's not a 5150?

24        MR. FINE:  Vague and ambiguous.  Legal

25  conclusion.

1          MR. KANTER:  Join.  Lacks foundation and

2    argumentative.

3          MR. FINE:  Lacks foundation and argumentative.

4          MR. KANTER:  Join.

5          THE WITNESS:  Sorry, can you ask that again, sir?

6          MR. NISENBAUM:  All right.  I was being -- I

7    don't need to ask that question but James has a question

8    to ask.

9                        EXAMINATION

10   BY MR. COOK:

11     Q.  Yeah.  Okay.  So James Cook with the plaintiffs.

12         So, yeah, Officer Tran, how long did you train

13   MMA?

14         MR. FINE:  Asked and answered.

15         THE WITNESS:  Since I was a young age.  I don't

16   have a definite answer for it, like a set number but

17   since --

18   BY MR. COOK:

19     Q.  Okay.  Did you do jiujitsu as well?

20         MR. FINE:  Asked and answered.

21         THE WITNESS:  Yes, sir.

22   BY MR. COOK:

23     Q.  Okay.  What belt are you in jujitsu?

24         MR. FINE:  Vague and ambiguous as to jujitsu.

25         THE WITNESS:  I trained with an MMA gym, so we

                                                          75

1    didn't do belts.

2    BY MR. COOK:

3        Q.  How many years did you do jujitsu?

4            MR. FINE:  Vague and ambiguous as to jujitsu.

5    BY MR. COOK:

6        Q.  Approximately?

7        A.  On and off I'd say maybe six, seven years.

8        Q.  Okay.  Did you ever compete jujitsu or mixed

9    martial arts?

10           MR. FINE:  Asked and answered.

11           THE WITNESS:  Tournament, yes.  But not sponsored

12   ones.  It could be a community one, a college one, stuff

13   like that.

14   BY MR. COOK:

15       Q.  Okay.  And you know that knee-on-belly technique,

16   right, for jujitsu, to hold someone as side control or

17   on their back?

18           MR. FINE:  Vague and ambiguous.

19           THE WITNESS:  I'm not familiar with that term,

20   sir.

21   BY MR. COOK:

22       Q.  When you got your knee -- you're using your knee

23   to sort of restrain the person either on their -- on

24   their back or on their -- on their side?

25           MR. FINE:  Asked and answered.  Vague and

                                                           76

1    ambiguous.  Calls for speculation.  Lacks foundation.

2          MR. COOK:  Well, he said he trained for several

3    years since he was young, so he does have some

4    expertise.

5          MR. FINE:  He's also just told you he doesn't

6    know what that technique is that you just said.

7    MR. COOK:

8      Q.  Are you familiar with the technique when you use

9    your knee to restrain someone?

10          MR. FINE:  Vague and ambiguous.

11    BY MR. COOK:

12      Q.  In order to -- go ahead.

13      A.  A figure four lock around the belly?

14      Q.  Exactly.  Like you can restrain someone before

15    you set up a figure four lock.

16      A.  Yeah.  It's a couple different ones.  I'm just

17    not too familiar with the knee on belly.

18      Q.  All right.  This is a technique that also

19    overlaps with law enforcement; is that correct?

20          MR. FINE:  Vague and ambiguous as to overlaps.

21    Misstates prior testimony.

22          THE WITNESS:  I've never been taught that.

23          MR. COOK:  Okay.  I'll leave it at that.

24          MR. FINE:  Anything else anybody?

25          MR. NISENBAUM:  No.

                                                    77

1        THE REPORTER:  Mr. Fine and Mr. Kanter, do you

2    want to order a copy of this transcript as well?

3        MR. FINE:  Yes, please.

4        MR. KANTER:  Yes.  I'll take an electronic copy.

5            (Deposition concluded at 3:31 p.m.)

6                    --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

78

1      STATE OF CALIFORNIA )

                      )

2      COUNTY OF FRESNO    )

3

4         I, LILIANA RODRIGUEZ, Certified Shorthand Reporter,

5      in and for the State of California, do hereby certify:

6         That the foregoing proceedings were taken before me

7      remotely at the time and place herein set forth; that

8      any witnesses in the foregoing proceedings, prior to

9      testifying, were duly sworn; that a record of the

10     proceedings was made by me using machine shorthand which

11     was thereafter transcribed under my direction; that the

12     foregoing is a true record of the testimony given.

13         Pursuant to Federal Rule 30(e), transcript review

14     was requested.

15         I further certify that I am neither financially

16     interested in the action, nor a relative or employee of

17     any attorney or party to this action.

18         IN WITNESS WHEREOF, I have this date subscribed my

19     name.

20

21     DATED:  _9_/_19_/_24_

22        Fresno, California

23

24         __/s/Liliana Rodriguez_____

             LILIANA RODRIGUEZ, CSR No. 13783

25

                             80

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

IVAN GUTZALENKO, Deceased,　　)
through his Co-Successors　　　)
in Interest, N.G. and N.I.G,)
minors through their mother )
and Next Friend, Honey　　　　)
Gutzalenko, individually　　　)
and as Co-successors in　　　　)
Interest for IVAN　　　　　　　 )
GUTZALENKO, Deceased,　　　　　)CASE NO.: 3:22-cv-02130-EMC
　　　　　　　　　　　　　　　　 )
　　　　Plaintiffs,　　　　　　　)
　　　　　　　　　　　　　　　　 )
　　vs.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　 )
CITY OF RICHMOND, et al.,　　　)
　　　　　　　　　　　　　　　　 )
　　　　Defendants.　　　　　　　)
_____)

**CERTIFIED COPY**

VIDEOCONFERENCE DEPOSITION OF

OFFICER CEDRIC TAGORDA

WEDNESDAY, OCTOBER 30, 2024

10:00 A.M. - 12:29 P.M.

REPORTED BY:  Liliana Rodriguez, CSR No. 13783

1

1                    INDEX OF EXAMINATION

2

WITNESS: OFFICER CEDRIC TAGORDA

3

4    EXAMINATION                                    PAGE

5    By Mr. Nisenbaum                                  6

6    By Mr. Kanter                                   105

7    By Mr. Fine                                     106

8                         --o0o--

9

10

Appearance Page                                    3

11

Exhibit Page                                       4

12

Location                                           5

13

Declaration Under Penalty of Perjury             109

14

Reporter's Certificate                           110

15

Disposition                                      111

16

Witness Letter                                   112

17

Deposition Errata Sheet                          113

18

Attorney's Notes                                 114

19

20

21                         --o0o--

22

23

24

25

                                                     2

```
 1   REMOTE APPEARANCES

 2

 3   For Plaintiffs:

 4        LAW OFFICES OF JOHN L. BURRIS
          BY: BEN NISENBAUM, ATTORNEY AT LAW
 5            JAMES COOK, ATTORNEY AT LAW
          Airport Corporate Center
 6        7677 Oakport Street, Suite 1120
          Oakland, California 94621
 7        (510) 839-5200
          Ben.Nisenbaum@johnburrislaw.com
 8

 9   For Defendants:

10        ORBACH HUFF & HENDERSON LLP
          NICHOLAS FINE, ATTORNEY AT LAW
11        6200 Stoneridge Mall Road, Suite 225
          Pleasanton, California 94588
12        510.999.7908
          Nfine@ohhlegal.com
13

14   For Defendants:

15        HINSHAW, MARSH, STILL & HINSHAW, LLP
          SCOTT R. KANTER, ATTORNEY AT LAW
16        12901 Saratoga Avenue
          Saratoga, California 95070
17        408.861.6500
          Skanter@hinshaw-law.com
18

19                      --oOo--

20

21

22

23

24

25

                                                    3
```

WITNESS:  OFFICER CEDRIC TAGORDA

MARKED                 DESCRIPTION                 PAGE

Exhibit A    Interview of Officer Cedric Tagorda      63
             (Confidential exhibit)

Exhibit B    Officer Tagorda Body Cam Video           65
             [Conf City_839].confidential.mp4
             (Confidential exhibit)

--o0o--

4

1          Zoom videoconference deposition of

2              OFFICER CEDRIC TAGORDA,

3   taken on behalf of Plaintiffs, beginning at 10:00

4   a.m. and ending at 12:29 p.m. on Wednesday,

5   October 30, 2024, before Liliana Rodriguez, Certified

6   Shorthand Reporter No. 13783

7

8                      --o0o--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1          REPORTED REMOTELY FROM FRESNO COUNTY, CALIFORNIA;

2             WEDNESDAY, OCTOBER 30, 2024, 10:00 A.M.

3                            -oOo-

4                  OFFICER CEDRIC TAGORDA,

5                 having been first duly sworn,

6                  testified as follows:

7                         EXAMINATION

8    BY MR. NISENBAUM:

9        Q.  Good morning, Officer.

10       A.  Good morning.

11       Q.  It looks like you have an injury to your right

12   wrist or arm?

13       A.  Right wrist, sir.

14       Q.  Okay.  Broken wrist?

15       A.  Torn ligament, reconstructive surgery, pins.

16       Q.  Wow.

17       A.  Nothing too major.

18       Q.  Okay.  Obviously, you did not have that injury at

19   the time of this incident with Mr. Gutzalenko, right?

20       A.  That's correct.

21       Q.  Okay.  All right.  Can you state and spell your

22   name, please?

23       A.  Yes.  Cedric Tagorda.  Cedric is spelled

24   C-E-D-R-I-C; last is Tagorda, T-A-G-O-R-D-A.

25       Q.  Okay.  And your current occupation?

6

1     A.  Police officer at the city of Richmond.

2     Q.  Thank you.

3         And how long have you been a police officer for

4  Richmond?

5     A.  Over 18 years now.

6     Q.  Okay.  Do you have any other law enforcement

7  experience?

8     A.  I do.

9     Q.  Where?

10    A.  Berkeley PD.  And I was a federal officer in

11 San Francisco.

12    Q.  Were you at the federal courthouse?

13    A.  I was at the -- the Federal Reserve.

14    Q.  Federal Reserve.  Okay.

15        All right.  When were you at the Federal Reserve?

16    A.  I believe in '01.

17    Q.  Okay.  And then when did you become a Berkeley

18 police officer?

19    A.  Back in 2006.

20    Q.  And let's see.  '24.  So 18 years.

21        So you weren't at Berkeley very long, then?

22    A.  No.

23    Q.  Okay.  And you became a -- you would have been a

24 Richmond police officer.  You would have become that in

25 2006 too, also?

7

1      A.   '07.  Beginning of '07.

2      Q.   All right.  And where did you attend the police

3   academy?

4      A.   Napa.

5      Q.   Did Berkeley put you through that?

6      A.   No.

7      Q.   Did you sponsor yourself?

8      A.   I did.

9      Q.   Okay.  I take it you've testified in court

10  before?

11     A.   I have.

12     Q.   How many times would you estimate?

13     A.   I know well over a hundred times, I believe,

14  throughout my career.

15     Q.   And when you were at the police academy, did you

16  receive training in providing courtroom testimony?

17     A.   I did.

18     Q.   Can you briefly describe for me the training you

19  received?

20          MR. FINE:  Overbroad.

21          THE WITNESS:  Well, we went over vehicle codes,

22  penal codes, driving.

23  BY MR. NISENBAUM:

24     Q.   I'm sorry, let me back up.

25          I'm talking about the training you received to

                                                          8

1    provide courtroom testimony.

2        A.   Well, about report writing.  We went over

3    courtroom testimony.  Actually had me go to the court

4    and do mock trials, mock testimonies.

5        Q.   Okay.  So you actually had to get up on the stand

6    and pretend to be a witness --

7        A.   Correct.

8        Q.   -- and get cross-examined by a vicious defense

9    lawyer?

10       A.   I wouldn't call him vicious, but yes.

11       Q.   Okay.  Aggressive?

12       A.   At times.

13       Q.   Okay.  All right.  Have you had your deposition

14   taken before?

15       A.   Yes.

16       Q.   How many times?

17       A.   I would say at least a dozen times.

18       Q.   Your deposition?

19       A.   Depositions?

20       Q.   Yeah.

21       A.   Like total throughout my career?

22       Q.   Yeah.  We're in a civil lawsuit.

23       A.   Maybe a handful of times.

24       Q.   Okay.  And what types of cases?

25       A.   In-custody deaths, shootings.

9

1    Q.  Okay.  Were you a defendant in any of those

2  cases?

3    A.  No.  Well, one, I guess you would call me a

4  defendant.  For an in-custody death or a shooting, yes.

5    Q.  Okay.  Was it a shooting or an in-custody death?

6    A.  Both.

7    Q.  Okay.  What was the name of the decedent?

8        MR. FINE:  Relevance.

9        THE WITNESS:  I don't recall.

10  BY MR. NISENBAUM:

11    Q.  What's that?

12    A.  I don't recall.

13    Q.  And when did that happen?

14        MR. FINE:  Same objection.

15        Go ahead.

16        THE WITNESS:  That happened, I think, a year

17  prior to this case, Gutzalenko's case.

18  BY MR. NISENBAUM:

19    Q.  Okay.  So obviously, you were with Richmond

20  Police Department?

21    A.  That's correct.

22    Q.  And has that case been tried yet?

23    A.  Yes.

24    Q.  Okay.  And what was the result of the trial?

25        MR. FINE:  Same objection.  Relevance.

                                                    10

1    BY MR. NISENBAUM:

2        Q.  Go ahead.

3        A.  We were cleared of that.

4        Q.  Okay.  Meaning, a civil jury came back and found

5    that you were not liable?

6        A.  Correct.

7        Q.  Okay.  All right.  I started down this road just

8    to get a sense of your understanding of the process.

9    I'll give you some admonitions.  By the way, I assume

10   you've had a chance to confer with your attorney to

11   prepare for this deposition, correct?

12       A.  Correct.

13       Q.  Okay.  Can you tell me what documents you've

14   reviewed in preparation for your deposition?

15       A.  My report and the transcripts from the last

16   deposition.

17       Q.  When you say your report, does that include your

18   interview?

19           MR. FINE:  Vague.

20           And, Officer Tagorda, just so we're clear, so

21   unless I instruct you not to answer a question, then

22   after I state my objection, go ahead and answer the

23   question.

24           THE WITNESS:  Okay.

25           MR. NISENBAUM:  I was going to get to that,

                                                        11

1    but --

2         THE WITNESS:  I wasn't sure if we had a judge

3    to --

4         MR. FINE:  No judge today.

5         THE WITNESS:  Okay.  That's what I was waiting

6    for.

7         Sorry, can you repeat the question?

8    BY MR. NISENBAUM:

9      Q.  So you said you reviewed your report.

10         Did you review your interview?

11         MR. FINE:  Vague.

12         THE WITNESS:  I just read -- read over my

13    transcript from the last time I testified.

14    BY MR. NISENBAUM:

15      Q.  Okay.  Are you talking about at the

16    coroner's inquest?

17      A.  Correct.

18      Q.  Okay.  You were interviewed after this incident,

19    correct?

20      A.  Yes.

21      Q.  Okay.  Did you listen to or review a transcript

22    of that interview?

23      A.  Not the interview, no.

24      Q.  Okay.  So I will give you some admonitions.

25    Since you ought to be pretty familiar with the process,

                                                        12

1    I won't go through all of them.

2          The most basic is your testimony today, although

3    we're not in court, has the same force and effect as if

4    you were testifying live in court and is under the same

5    penalty of perjury.

6          Do you understand that?

7    A.  I do.

8    Q.  Okay.  I'm here to ask you questions.  Your job

9    today is to answer those questions to the best of your

10   ability.  If you don't understand a question, just say

11   so.

12         Do you understand that?

13   A.  Yes.

14   Q.  If you don't know the answer to a question, just

15   say so.  Don't guess.  Don't speculate.

16         Do you understand that?

17   A.  I do.

18   Q.  Okay.  And sometimes people will have only a

19   partial recollection.  I'm entitled to as much as you do

20   recall and as much as you do know.

21         Do you understand that?

22   A.  I do.

23   Q.  Okay.  So again, if the answer -- if you don't

24   know, just say so.  Don't try to be helpful.  As I'm

25   asking a question and you feel like you want to -- like

                                                           13

1   you want to answer or you should know the answer, you

2   know, if you don't know, again, it's very important to

3   say so.

4        I actually am trying to move this deposition

5   along pretty quickly today.  I do have to pick up my

6   daughter from school.

7        A.  I understand.

8        Q.  We won't be here very long.  I've already taken

9   the other depositions, which I think you're aware of,

10  although there's another deposition to be taken later.

11  But I've deposed your fellow officers.  You know that,

12  correct?

13       A.  Correct.

14       Q.  And you've reviewed their deposition transcripts,

15  correct?

16       A.  I have not reviewed their -- their transcripts,

17  no.

18       Q.  Okay.  Did you review their coroner's inquest

19  testimony?

20       A.  I did not.

21       Q.  Okay.  Did you review their interviews?

22       A.  I did not.

23       Q.  Okay.  Have you talked to them outside with your

24  counsel, outside of being in the presence of your

25  counsel, have you talked to them about this incident?

                                                          14

1    A.  I have not.

2    Q.  Okay.  And there was nothing wrong with your body

3  cam on the day of this incident, right?

4    A.  To my knowledge, no, there was nothing wrong with

5  it.

6    Q.  Okay.  So having reviewed -- I think it was your

7  coroner's inquest testimony, did you notice any

8  inaccuracies in it?

9    A.  No.

10   Q.  Okay.  As you sit here, how would you rate your

11 recollection of the incident?  Do you have a good

12 recollection or hazy, in between?

13   A.  I'd say it's -- it's fairly good.

14   Q.  Okay.  And when did you interview -- when --

15 sorry.  When did you review your coroner's inquest

16 transcript?

17   A.  Last week, I believe.

18   Q.  Okay.  All right.  When you were at the police

19 academy, did you receive testimony regarding avoiding

20 asphyxiation during restraint?

21       MR. FINE:  Vague and ambiguous as to "testimony."

22       THE WITNESS:  I -- we vaguely went during -- I

23 believe, during first aid training.  I believe we did

24 touch bases on that.

25 ///

15

1    BY MR. NISENBAUM:

2        Q.  Okay.  What was discussed?

3        A.  Basically a standard first aid.  Keeping people

4    in the recovery position to prevent -- keep their

5    airways open, elevating their feet, trying to, you know,

6    prevent people from going into shock, things of that

7    nature.

8        Q.  Okay.  As a police officer, have you received any

9    training throughout the course of your career whether

10   with the Federal -- at the Federal Reserve or at

11   Berkeley or with Richmond regarding avoiding

12   asphyxiation during restraint?

13           MR. FINE:  Vague.  Overbroad.

14           THE WITNESS:  Again, it's basic first aid, is

15   what we -- we went over.

16   BY MR. NISENBAUM:

17       Q.  And that's true through today?

18       A.  Yes.

19       Q.  Okay.  Have you ever had any training that says

20   you should avoid putting weight on a person's back when

21   they're being restrained in a prone position for an

22   extended period of time?

23           MR. FINE:  Vague.  Overbroad.  Incomplete

24   hypothetical.

25           THE WITNESS:  Well, we would never place our

                                                        16

1  weight or any weight on any parts of the body that would

2  restrict airflow or cause further duress to any of the

3  subjects that we would encounter.

4  BY MR. NISENBAUM:

5      Q.  Okay.  Is that training that you received in

6  standard first aid?

7      A.  Well, it's -- it's pretty -- it's touched base

8  on.  I mean, when you're going over first aid and you're

9  going over restraining individuals you come in contact,

10  that's pretty standard, is you don't want to restrict a

11  subject's airflow or cause them any further duress.

12      Q.  What have you been trained restricts a person's

13  airflow?

14          MR. FINE:  Vague.  Overbroad.

15          THE WITNESS:  Could you go into detail exactly

16  what you're asking?

17  BY MR. NISENBAUM:

18      Q.  Well, you indicated that your training is that

19  you don't want to do things that restrict a person's

20  airflow.

21          Do I have that right?

22      A.  Correct.

23      Q.  Okay.  So what types of things restrict a

24  person's airflow --

25          MR. FINE:  Vague.  Overbroad.  Incomplete

                                                              17

1    hypothetical.

2    BY MR. NISENBAUM:

3        Q.  -- based on your training?

4        A.  Well, I think I -- lately, with all the media

5    attention in -- in the past several years -- we can go

6    back to George Floyd.  I mean, you know, that brought a

7    lot of media attention.  And after that incident, I

8    think a lot of police departments and agencies alike

9    have, you know, touched bases on that and, you know,

10   reiterated that, you know, when encountering individuals

11   on the street or whatnot, you don't want to put yourself

12   in a situation where it's going to draw media attention.

13       So obviously, you know, a lot of agencies such as

14   the Richmond Police Department touched bases on that

15   when we're going over the defensive tactics or anything

16   like that, not just for first aid.  It's just standard

17   defensive tactics and -- and things that, you know,

18   would -- would look bad, I guess, on the outside.  So,

19   yeah, we are taught not to place weight on people's

20   necks or -- or any areas of the body that's going to

21   cause duress.

22       Q.  Well, there's a difference between causing duress

23   and impairing a person's ability to breathe, right?

24       A.  True.

25       Q.  Okay.  So I'm asking a question specifically

                                                    18

1  about avoiding -- doing things that would obstruct or

2  interfere with a person's ability to breathe.

3       What training have you had in that regard?

4  A.  Well, again --

5       MR. FINE:  Vague.  Overbroad.

6       Go ahead.

7       THE WITNESS:  Well, again, we're not going to --

8  you know, obviously, we do everything that we can to use

9  a minimum amount of force necessary to compel

10  compliance.  If you have a combative person, obviously,

11  you know, it's -- it's different circumstances.  You're

12  doing everything you can to try to control that subject,

13  but we're not purposely trying to place any weight or

14  pressure on -- again, on somebody's neck or any parts of

15  their body that's injured that's going to cause them

16  further duress.  And I understand that you're talking

17  about airways, so --

18  BY MR. NISENBAUM:

19  Q.  I'm not.  I'm not.  I'm talking about impairing a

20  person's ability to breathe generally.

21  A.  All right.  Well --

22  Q.  Is there a training specific to avoiding putting

23  pressure or weight on a person's neck?

24  A.  We don't train to put any pressure on people's

25  necks.

19

1    Q.  I understand that.

2        You're trained to avoid doing that, right?

3    A.  Absolutely.

4    Q.  Okay.  Is there any other part of the body that

5    you're trained to avoid putting pressure or weight or

6    force against, that you're trained if you do apply

7    pressure, weight, force could impair a person's ability

8    to breathe?

9        MR. FINE:  Vague.  Overbroad.  Incomplete

10   hypothetical.

11       THE WITNESS:  Well, again, it -- it all depends

12   on the circumstances again.  You know, we're not

13   purposely trying to prevent someone from breathing or

14   restricting their airflow.  There are times, yeah, that

15   we have to place, you know, weight or body weight on

16   their chest or on their back.  It's not our intention to

17   restrict that airflow, but we are trained, you know, to

18   use a minimum amount of force necessary to control that

19   subject and get that particular scene under control.

20   BY MR. NISENBAUM:

21   Q.  Okay.  Are you trained that you're to use the

22   minimum amount of force necessary?

23   A.  Yeah.  It just depends on the circumstances, yes.

24   Q.  Okay.  My next question, have you been trained

25   that if you put weight on a person's back when they're

                                                    20

1  in a prone position, that it can compress their rib

2  cage?

3          MR. FINE:  Vague.  Overbroad.  Incomplete

4  hypothetical.  Calls for expert opinion.

5          THE WITNESS:  Well, I think I -- people that we

6  come in contact, everybody, we don't know, you know,

7  what type of medical -- what their medical history is

8  or handicaps or whatnot.  You know, when we come in

9  contact with a subject, we do what's necessary to get

10  that subject under control.  There are times that, yeah,

11  we have to put our body weight on their back or on their

12  chest, but it's not our intentions to restrict their

13  airflow.  And we do not know what their handicaps or

14  limitations or their medical history is.

15          MR. NISENBAUM:  Sorry, can you read back the

16  question, please?

17          (Record read.)

18  BY MR. NISENBAUM:

19    Q.  That's the question.

20          Do you have that question in mind?

21          MR. FINE:  Same objections.

22          THE WITNESS:  Well, again, I'm not a medical

23  professional, so I can't really answer that.  We try --

24  like I said, when we train, we train to control the

25  subject and do what is necessary at the time.  We go

                                                    21

1   over that.  But as far as training and saying, "Hey, if

2   you put your body weight on that, it's going to," you

3   know, "restrict their airflow," I think it's kind of --

4   I mean, a lot of things can restrict someone's airflow

5   or -- or whatnot.  So I'm kind of -- I understand the

6   question, but I don't know exactly how I can explain

7   that to you.

8   BY MR. NISENBAUM:

9       Q.  I'm just asking, have you had training that says

10  directly in a succinct way that if you -- while a

11  person's in a prone position, that if you compress their

12  chest, that -- that by pressing down on their backs,

13  that that can compress their chest and thereby interfere

14  with their ability to breathe --

15      MR. FINE:  Vague.  Overbroad.  Calls for expert

16  opinion.  Incomplete hypothetical.

17  BY MR. NISENBAUM:

18      Q.  -- to the best of your recollection?

19      MR. FINE:  Same objections.

20      THE WITNESS:  Well, again, in this case, you

21  know, that's not what happened here.

22  BY MR. NISENBAUM:

23      Q.  I don't think that was an answer to my question.

24      A.  Well, the question -- your question is, have I

25  been trained?  And again, a -- you know, that's how they

                                                        22

1    train us, right?  But as far as training says, "Hey,
2    this is what could happen," I'm sure they touch bases on
3    that.  Could it happen?  Sure.
4        Q.  Okay.  So you have been trained that putting
5    weight on a person's back while they're in a prone
6    position can compress their rib cage and thereby
7    interfere with their ability to breathe; is that
8    correct?
9            MR. FINE:  Misstates testimony.  Asked and
10   answered.
11           THE WITNESS:  Yes.  Sure.
12   BY MR. NISENBAUM:
13       Q.  Thank you.
14           All right.  And have you also been trained that
15   the same is true -- do you know where the diaphragm is
16   in a person's body?  Have you had any training on that,
17   or do you have an understanding?
18       A.  A diaphragm is located right underneath the rib
19   cage.
20       Q.  Right.
21           And do you have an understanding that the --
22           MR. FINE:  Calls for expert opinion.  Overbroad.
23           (Reporter clarification.)
24           MR. NISENBAUM:  Sure.  No problem.
25   ///

                                                          23

1  BY MR. NISENBAUM:

2     Q.  Do you have an understanding that the diaphragm

3  is also involved in respiration?

4        MR. FINE:  Calls for expert opinion.  Overbroad.

5        THE WITNESS:  Yes.

6  BY MR. NISENBAUM:

7     Q.  All right.  I'm sure you've had the hiccups

8  before?

9     A.  Yes.

10    Q.  Okay.  You know that that is where the diaphragm

11 gets out of shape with the rest of the lungs, et cetera,

12 right?

13    A.  Yes.

14    Q.  Okay.  So you know that the diaphragm is an

15 integral part of breathing, correct?

16    A.  Yes.

17       MR. FINE:  Calls for expert opinion.

18 BY MR. NISENBAUM:

19    Q.  And have you been -- do you have any training

20 that compressing where the diaphragm is located can also

21 interfere with the person's ability to breathe?

22       MR. FINE:  Incomplete hypothetical.  Vague.

23 Calls for expert opinion.

24       THE WITNESS:  Yes.  I would assume so, yes.

25 ///

24

1    BY MR. NISENBAUM:

2       Q.  Okay.  And do you understand that as a matter of

3    your experience and common sense or your training or

4    both?

5            MR. FINE:  Compound.  Same objections.

6            THE WITNESS:  So what -- what was -- what are you

7    asking -- what are you asking again?

8    BY MR. NISENBAUM:

9       Q.  Do you understand that interfering with the

10   diaphragm can impair a person's ability to breathe?  Do

11   you understand that as a function of your experience,

12   your common sense, your training, or some combination of

13   all those?

14      A.  I do.

15           MR. FINE:  Same objections.

16           Go ahead.

17           THE WITNESS:  Yeah, I do.

18   BY MR. NISENBAUM:

19      Q.  Okay.  All three?

20      A.  Yes.

21      Q.  You've never been trained that the only way that

22   a person can asphyxiate during restraint is by having

23   someone put their knee in their neck, right?  There are

24   other ways that it can happen?

25           MR. FINE:  Vague.  Misleading.

                                                        25

1        Go ahead.

2        THE WITNESS:  Well, I'm not a -- I'm not a

3  medical expert, but I would say those are all things

4  that could happen, yes.

5  BY MR. NISENBAUM:

6     Q.  In other words, what you mean is the examples

7  that we just discussed, compressing a person's chest,

8  interfering with their diaphragm, are also ways that a

9  person can asphyxiate during restraint, correct?

10        MR. FINE:  Vague.  Overbroad.  Calls for expert

11  opinion.

12        THE WITNESS:  Correct.

13  BY MR. NISENBAUM:

14     Q.  Thank you.

15        Have you ever been involved in any other case

16  where a person asphyxiated during restraint?

17     A.  No.

18        MR. FINE:  Calls for expert opinion.

19  BY MR. NISENBAUM:

20     Q.  I'm sorry?

21     A.  No.

22     Q.  Okay.  I didn't really give you admonitions

23  because I felt like you were pretty familiar with the

24  process, but give a pause so that your lawyer can

25  interpose an objection.  It will help keep the record

                                                  26

1    clearer.  And, you know, as we already discussed, you'll

2    still have to answer the question unless he specifically

3    tells you not to.

4         Do you understand that?

5    A.  Yes.

6    Q.  And, of course, if you don't understand the

7    question, that too, then just tell me, okay?

8    A.  Okay.

9    Q.  All right.  So at the date when this incident

10   occurred, as of that date, you had the same

11   understanding regarding the multiple ways in which a

12   person can asphyxiate during restraint that we just

13   talked about, correct?

14   A.  Correct.

15   Q.  Okay.  Now, with respect to working with

16   paramedics in the field or EMTs, I assume that that's

17   something you're expected to do on a routine basis,

18   correct?

19        MR. FINE:  Vague.  Overbroad.

20        THE WITNESS:  Correct.

21   BY MR. NISENBAUM:

22   Q.  Okay.  And as part of that, do you have an

23   understanding that you're expected to help facilitate

24   any medical treatment that the paramedics provide --

25        MR. FINE:  Vague and overbroad.

27

BY MR. NISENBAUM:

Q. -- for EMTs?

MR. FINE: My apologies.

Vague and overbroad as to "facilitates."

MR. KANTER: Join. Overly broad.

BY MR. NISENBAUM:

Q. Just because it's two doesn't change it. You still have to answer.

A. Correct. If they ask for our assistance, we will assist.

Q. Okay. And are there times when you sometimes assist without being asked?

MR. FINE: Vague. Overbroad. And as to "treatment" as well in the last question.

MR. KANTER: Join. And incomplete hypothetical.

MR. FINE: Join.

THE WITNESS: If it's obvious that the paramedics are needing assistance, we'll assist.

BY MR. NISENBAUM:

Q. Okay. And that falls within your police function, correct, your police duties?

A. Correct.

Q. Thank you.

Okay. I assume you've had training with respect to responding to the subjects who are either emotionally

28

1    disturbed or mentally impaired, correct?

2       A.  Correct.

3       Q.  Okay.  And have you been trained that those are

4    factors to consider when determining the reasonableness

5    of the use of force?

6           MR. FINE:  Incomplete hypothetical.

7           THE WITNESS:  Correct.

8    BY MR. NISENBAUM:

9       Q.  There are other factors too, but those are some

10   of them, correct?

11          MR. FINE:  Same objection.

12          THE WITNESS:  Correct.

13   BY MR. NISENBAUM:

14      Q.  Okay.  And when you're dealing with a person

15   who's intoxicated and that intoxication is causing them

16   to act irrationally, you're supposed to keep that in

17   mind as well, correct?

18          MR. FINE:  Incomplete hypothetical.

19          THE WITNESS:  That's correct.

20   BY MR. NISENBAUM:

21      Q.  Okay.  All right.  And, of course, you're not a

22   doctor?

23      A.  I am not.

24      Q.  Okay.  And it's not your job to determine why a

25   person is acting the way that they're acting.  You take

                                                        29

1   them as you find them, right?

2       A.  That's correct.

3       Q.  Okay.  Thank you.

4           Okay.  So had you ever had any prior incident or

5   encounter with Mr. Gutzalenko?

6       A.  I have not.

7       Q.  Okay.  Were you familiar with his name, or had

8   you heard about him prior to this incident?

9       A.  No.

10      Q.  Okay.  What was your first notice of this

11  incident?

12          MR. FINE:  Vague as to "notice."

13  BY MR. NISENBAUM:

14      Q.  Like why did you come to the scene?

15      A.  Well, I heard a -- a radio call come in regarding

16  a -- a subject, who was Gutzalenko, going into, I

17  believe, a gas station, causing a disturbance at the gas

18  station.  Following that, he was -- there were reports

19  of him walking in the middle of the street.  He goes

20  into another -- I believe it was a furniture store

21  causing another disturbance inside the business, reports

22  of him puking in the business, and then walking down the

23  street.  And I believe that's how the call came out.

24      Q.  Okay.  Were there any indications that

25  Mr. Gutzalenko had physically threatened anyone?

30

1    A.  Not that I recall.

2    Q.  Okay.  How about any indication that he was armed

3  with any kind of weapon?

4    A.  Not that I recall.

5    Q.  Okay.  And when you heard that he was puking in

6  one of the stores, did that cause you to think anything?

7    A.  Well, different and training experience.  It

8  would -- it sounded like maybe this person was having

9  some type of a medical emergency.

10    Q.  Okay.  Based on your understanding, people having

11  medical emergencies can cause them to have a mental

12  health emergency as well or sometimes the two go

13  together?

14        MR. FINE:  Incomplete hypothetical.  Vague.

15  Calls for expert opinion.

16        MR. KANTER:  Join.

17        THE WITNESS:  That's correct.

18  BY MR. NISENBAUM:

19    Q.  Okay.  And in this situation, the person was

20  going from store to store, causing a disturbance,

21  puking.

22        Did you consider the possibility that he was in

23  the midst of a mental health emergency as well --

24        MR. FINE:  Vague as to time.

25  ///

31

1    BY MR. NISENBAUM:

2        Q.  -- at any time?

3        A.  I would say -- say so.

4        Q.  Okay.  And when did you first consider that

5    possibility, to your recollection?

6        A.  While I was en route to the call.

7        Q.  Okay.  And was it the factors that you described

8    that caused you to think that?

9        A.  Yes.

10       Q.  Okay.  All right.  And you've been trained in

11   crisis intervention?

12           MR. FINE:  Vague.

13           THE WITNESS:  I have.

14   BY MR. NISENBAUM:

15       Q.  Are you a crisis negotiator?

16       A.  I am.

17       Q.  Okay.  Is that specialized training that you

18   received outside of -- is there a special course you

19   went to for that training?

20       A.  Yes.

21       Q.  Is that CIT training?

22       A.  It is.

23       Q.  Okay.  And when did you first take CIT training?

24       A.  Probably 15 years ago.

25       Q.  Okay.  Fifteen years from now, you mean?

                                                        32

1    A.  Correct.

2    Q.  Okay.  Now, as I understand it from your

3  interview, you're a part of the crisis negotiation team

4  as part of SWAT; is that right?

5    A.  Yes.

6    Q.  Okay.  Are you on the SWAT team itself?

7    A.  I am not.

8    Q.  Okay.  Were you on the SWAT team?

9    A.  No.

10   Q.  Okay.  So what is SRT?

11   A.  It's basically -- it's just special response

12  team.  So it falls under -- under the umbrella of SWAT

13  and the CNT.

14   Q.  All right.  So the crisis negotiation team is

15  part of the SRT team that falls under SWAT; is that

16  right?

17   A.  Correct.

18   Q.  Okay.  And when did you first become a part of

19  the SRT team?

20   A.  Again, maybe 15 years ago.

21   Q.  Okay.  It was shortly after you took the crisis

22  negotiation training?

23   A.  Correct.

24   Q.  Okay.  So tell me, what was involved?  How long

25  was the training that you took, the crisis negotiation

33

1    training?

2    A.  I believe it was two weeks.

3    Q.  Okay.  And was it two weeks every day, like

4    five days a week?

5    A.  Yes.

6    Q.  All right.  And was it like a full day each of

7    those days, nine to five?

8    A.  It was a 40-hour week.

9    Q.  Okay.  So it's an 80-hour course?

10   A.  Correct.

11   Q.  And where did you take that?

12   A.  I believe that was in San Diego.

13   Q.  Okay.  And I take it you were sponsored by your

14   department, by Richmond?

15   A.  Yes.

16   Q.  Okay.  And what was the name of the group that

17   put it on?

18   A.  It was the FBI.

19   Q.  Okay.  The Federal Bureau of Investigations,

20   right?

21   A.  Yes, sir.

22   Q.  Okay.  Do you recall who the primary instructor

23   was?

24   A.  I -- I do not know.

25   Q.  Okay.  And do you recall was it simply -- you

                                                        34

1    know, there's kind of a stereotype that I think people

2    think of, like a barricaded subject who might have

3    hostages and you're outside, whatever house they're in

4    with the hostages or building with the bullhorn and

5    trying to talk to them in that manner.  I assume it was

6    far more complex and covered far more circumstances than

7    that, right?

8            MR. FINE:  Vague.  Overbroad.

9            THE WITNESS:  It's -- it's one of the scenarios,

10   yes.

11   BY MR. NISENBAUM:

12      Q.  Okay.  That's one of the scenarios, but you were

13   trained in far more scenarios than that, right?

14           MR. FINE:  Vague as to "far more."

15           THE WITNESS:  That's correct.

16   BY MR. NISENBAUM:

17      Q.  Sorry, I didn't get the answer.

18      A.  That's correct.

19      Q.  Okay.  Can you roughly -- obviously, we don't

20   have 80 hours here, but can you just tell me the primary

21   principles that you were trained in?

22           MR. FINE:  Just real quick.  Vague.  Overbroad.

23   Calls for a narrative.

24           Go ahead.

25           THE WITNESS:  Just speaking to individuals,

1   showing empathy, trying to read body language, assessing

2   the totality of the circumstances, and then using

3   different tools to complete, you know, whatever

4   objective that we're trying to complete at that time.

5   BY MR. NISENBAUM:

6       Q.  Okay.  And is it fair to say that one of the

7   things you learned in the crisis negotiation training

8   was -- one of the primary factors to consider was the

9   immediacy of threat posed by the individual that you're

10  dealing with?

11          MR. FINE:  Incomplete hypothetical.  Vague and

12  overbroad.

13          THE WITNESS:  Yes.

14  BY MR. NISENBAUM:

15      Q.  And were you trained to try to do things like

16  create time, slow a situation down when you're dealing

17  with a person who is in crisis?

18          MR. FINE:  Same objections.

19          THE WITNESS:  Yes, we are.

20  BY MR. NISENBAUM:

21      Q.  Okay.  All right.  And if they don't have a gun

22  to somebody's head or a weapon to their -- you know,

23  that can be used immediately against them, then you want

24  to do what you can to slow the situation down; is that

25  right?

                                                        36

1          MR. FINE:  Same objections.

2          THE WITNESS:  That's correct.

3    BY MR. NISENBAUM:

4      Q.  Okay.  And what is the reason that you've been

5    trained in why you want to slow it down?

6          MR. FINE:  Same objections.

7          THE WITNESS:  Well, if time was on our side, then

8    obviously, depending on the circumstances, you know, you

9    want to slow things down and try to speak with the

10   individual and provide aid if necessary.

11   BY MR. NISENBAUM:

12     Q.  Right.

13         And part of the reason -- I mean, I've heard the

14   term "use time as an ally."

15         Have you heard that term?

16     A.  I have.

17     Q.  Okay.  What does that mean to you?

18     A.  Time is on our side.  You know, there's no need

19   to rush into something if you don't need to rush into a

20   situation.  Assessing the -- the totality of the

21   circumstances that -- that are given to you at that

22   time.  Again --

23     Q.  Go ahead.  I didn't mean to cut you off.

24     A.  No.  Again, it all depends on the situation and

25   what's going on.  So, yeah, if we -- if time is on our

                                                      37

1  side, then we try to utilize as much time as we can to,

2  you know, get this situation under control and make sure

3  everybody is safe.

4      Q.  Okay.  I take it one of the considerations of

5  that is that when you use force, the outcome of it can

6  be unpredictable and it can be more dangerous both for

7  the subject as well as for yourself; is that right?

8          MR. FINE:  Incomplete hypothetical.  Vague and

9  ambiguous.  Overbroad.

10         THE WITNESS:  That's correct.

11 BY MR. NISENBAUM:

12     Q.  Okay.  Whereas if you keep a situation static

13 using time, then you don't have to deal with --

14 necessarily with the outcomes -- the unpredictable

15 outcomes of the use of force, correct?

16         MR. FINE:  Same objections.

17         THE WITNESS:  Correct.

18 BY MR. NISENBAUM:

19     Q.  Okay.  Did you have a regular assignment at the

20 time of this incident as a crisis negotiator?

21     A.  Yes.  I was assigned a patrol.

22     Q.  Okay.  So in your specific assignment, did it --

23 your specific duties, did it include a crisis

24 negotiation component?

25     A.  When called for, yes.

38

1    Q.   Okay.  Would you get special calls for it?

2    A.   At times, yes.

3    Q.   Okay.  Were you called out to this scene as a

4    crisis negotiator?

5    A.   I was not.

6    Q.   Okay.  In this incident, you were simply trying

7    to utilize your skills as a crisis negotiator during

8    parts of the incident, correct?

9    A.   Not -- no, not initially.  I responded to the

10   call because I heard my -- my partners were responding

11   to this call.  So I responded but not as a crisis

12   negotiator.

13   Q.   All right.  I understand that.

14        My question was -- as I -- and I've watched all

15   the videos, so I know that you were trying to talk to

16   him and, you know, you were trying to utilize some of

17   your skills as a crisis negotiator during the incident.

18        Do I understand that correctly?

19        MR. FINE:  Vague and ambiguous.  Overbroad.

20        THE WITNESS:  That is correct.

21   BY MR. NISENBAUM:

22   Q.   Okay.  You weren't called there specifically as a

23   crisis negotiator, though, right?

24   A.   That is correct.

25   Q.   Okay.  That's what I thought.  Thank you.

39

1          You were in full uniform?

2     A.  I was.

3     Q.  Okay.  Well, in your training, do you have any

4  obligation -- when you observe an officer do something

5  that you think might be wrong under the circumstances,

6  do you have any obligation to intervene --

7          MR. FINE:  Vague and ambiguous.  Overbroad.

8  BY MR. NISENBAUM:

9     Q.  -- either verbally or physically?

10         MR. FINE:  My apologies.

11         Vague and ambiguous.  Overbroad.  Incomplete

12  hypothetical.

13         THE WITNESS:  Yes.

14  BY MR. NISENBAUM:

15    Q.  Okay.  What obligations do you have?  What's your

16  understanding?

17         MR. FINE:  Same objections.

18         THE WITNESS:  Well, if I see my partners doing

19  something egregious or would cause harm to a subject

20  that is unnecessary, it's -- it's my obligation to

21  prevent that officer or that individual from -- from

22  doing that or doing something that's egregious in -- in

23  my mind.

24  BY MR. NISENBAUM:

25    Q.  In the course of your career, have you ever

40

1   actually done that?

2      A.  No.

3         MR. FINE:  Vague as to "done that."

4   BY MR. NISENBAUM:

5      Q.  I'm sorry, I didn't get the answer.

6      A.  No.

7      Q.  Okay.  Do you recall the time of day that this

8   happened with Mr. Gutzalenko?

9      A.  I don't recall the exact time, but I -- I believe

10  it was early in the morning.

11     Q.  Okay.  How long had you been at work on your

12  shift?

13     A.  I recall it was early in the morning, so not too

14  long.

15     Q.  Okay.  Were you assigned to work with a partner?

16     A.  No.

17     Q.  At that time, were any Richmond police officers

18  assigned to work with partners?

19     A.  Not that I recall.

20     Q.  Okay.  You were each assigned a beat?

21     A.  Yes.

22     Q.  Okay.  And you would patrol that beat.  And if

23  there was a call for help, you would -- from another

24  officer, then you would respond to that; is that right?

25     A.  Yes.

41

1    Q.  Okay.  All right.  So you had a description of
2    who you later learned was Mr. Gutzalenko, right?

3    A.  Yes.

4    Q.  Okay.  Do you recall whether or not there was any

5    description of him being incredibly sweaty or

6    excessively sweating?

7    A.  I don't recall.

8    Q.  When you observed him, did you notice whether he

9    was excessively sweating?

10    A.  I don't recall if he was or not.

11    Q.  At some point, I know you were hands-on with him.

12    I think you were at his legs; is that right?

13    A.  Yes.

14    Q.  Okay.  Did you ever feel his skin?

15    A.  I did not.

16    Q.  Okay.  Did you have any reason to believe that he

17    was -- that his skin temperature was excessively hot?

18    A.  I -- I did not feel his skin.

19    Q.  Okay.  So you had no reason to believe, from your

20    observations, that his skin temperature was excessively

21    hot, correct?

22        MR. FINE:  Asked and answered.  Lacks foundation.

23        THE WITNESS:  That's correct.

24    BY MR. NISENBAUM:

25    Q.  Thank you.  And I do appreciate you following the

                                                    42

1    question and answering.

2        A.  Yeah.  I'm sorry, this is the first time using

3    Zoom, so --

4        Q.  Yeah.  You know, sadly, we've all been doing it a

5    lot.  It's very frustrating, but, you know, it's got to

6    be Zoom.  It's better than nothing.

7        A.  I understand.

8        Q.  Yeah.

9            Okay.  Did you have a sense of what you thought

10   you were responding to?

11           MR. FINE:  Vague and ambiguous.  Overbroad.

12           THE WITNESS:  I did.

13   BY MR. NISENBAUM:

14       Q.  Okay.  What was that sense?

15       A.  Subject having a medical emergency.  Possibly

16   5150 or having a -- a mental health crisis.  So that was

17   my understanding while I was en route to that call.

18       Q.  Okay.  Is it fair to say that your understanding

19   of that never changed once you observed him?  It was

20   consistent with that understanding?

21       A.  I would say safe to say so, yes.

22       Q.  Okay.  All right.  Were you present when he was

23   saying that he was having difficulty breathing?

24       A.  I don't necessarily recall him saying that he was

25   having difficulty breathing.

                                                        43

1    Q.  Do you recall anyone at the scene telling you

2  that he had been saying that?

3    A.  No.

4    Q.  Is that something that, as a Richmond police

5  officer, you're trained to consider in how you respond

6  to and use force against the person?

7         MR. FINE:  Incomplete hypothetical.  Overbroad.

8         THE WITNESS:  Yes.

9  BY MR. NISENBAUM:

10   Q.  Okay.  All right.  So about how long did it take

11 you after you got the call to actually arrive at the

12 scene?

13   A.  I would say maybe five, maybe ten minutes.

14   Q.  Okay.  And were you keeping track of the updates

15 on the incident on the CAD?

16   A.  I was keeping track just by radio traffic.

17   Q.  Okay.  Just by listening?

18   A.  That's correct, yes.

19   Q.  Okay.  And I know you gave me some of the updates

20 that you heard.

21        Was there anything else that you recall that was

22 significant?

23   A.  Not that I recall, no.

24   Q.  Okay.  It all just kind of confirmed to you that

25 this was a person who was having either a mental health

                                                    44

1    crisis compounded potentially by some physical condition

2    based on the puking.

3            Is that fair to say?

4    A.  Yes.

5    Q.  Okay.  And I assume you thought that you had some

6    good skills you could bring to the situation as a crisis

7    negotiator?

8            MR. FINE:  Asked and answered.  Vague and

9    ambiguous.

10           THE WITNESS:  Yes, that's correct.

11   BY MR. NISENBAUM:

12   Q.  Okay.  Was there a senior officer at the scene,

13   like somebody that would have been the, for lack of a

14   better term, incident commander, incident leader?

15   A.  Well, there was a more senior officer than me

16   that was on scene, yes.

17   Q.  Okay.  Who was that?

18   A.  That would have been Officer Hall.

19   Q.  Okay.  And how it works at Richmond Police

20   Department, is that the first responding officer who has

21   control of the scene, or is it the most senior officer?

22           MR. FINE:  Assumes facts.  Vague as to "control

23   of the scene."  Overbroad.

24           THE WITNESS:  So the primary officer would be

25   the -- whichever beat the incident occurred.  In this

45

1  case, it occurred in beat 7, which Officer Tran was

2  assigned to beat 7.  So he would have been the person in

3  charge of handling that call.  He would have been the

4  primary officer.

5  BY MR. NISENBAUM:

6      Q.  Okay.  So as you're responding to the scene,

7  what's your first observation of Mr. Gutzalenko?

8      A.  My first observation upon arriving to the scene

9  is I observed Officer Tran trying to speak to

10  Mr. Gutzalenko.

11      Q.  And how was Mr. Gutzalenko positioned at that

12  time?

13      A.  He was standing, and he was in front of Officer

14  Tran.

15      Q.  Okay.  Now, I know in your interview, you

16  referred to Officer Tran as, I think, kind of a big boy?

17      A.  Officer Tran is pretty big for -- for his

18  stature, yes.

19      Q.  Do you have an estimate of height and weight?

20      MR. FINE:  Calls for speculation.  Lacks

21  foundation.

22      THE WITNESS:  I believe Officer Tran is maybe

23  five-eight, probably close to 200 pounds.

24  BY MR. NISENBAUM:

25      Q.  And is that a strong 200 pounds, a chubby

46

1    200-pound, or some of both?

2         MR. FINE:  Vague.  Overbroad.  Lacks foundation.

3    Calls for speculation.

4         THE WITNESS:  I would say both.

5    BY MR. NISENBAUM:

6    Q.  Okay.  And Officer Hall was there too?

7    A.  Yes.

8    Q.  And what was Officer Hall doing?

9    A.  Officer Hall was standing next to, I believe,

10   Officer Tran.

11   Q.  Okay.  Did it seem like there was one person who

12   was one officer who was talking to Mr. Gutzalenko?

13   A.  Yes.

14   Q.  Okay.  And that would have been Tran?

15   A.  That's correct.

16   Q.  Okay.  And did it appear that Mr. Gutzalenko was

17   armed in any way?

18   A.  No, it -- it didn't appear so.

19   Q.  Okay.  Now, the term "5150," what does that mean?

20   A.  Somebody who's having a mental crisis.

21   Q.  Okay.  In your training, when a 5150 is being

22   conducted, is the person -- is the subject of the 5150

23   free to leave?  Can they just walk away from it?

24   A.  No.

25         MR. FINE:  Vague as -- sorry.  Vague as to "5150

47

1    being conducted."

2           Go ahead.

3           THE WITNESS:  No.

4    BY MR. NISENBAUM:

5       Q.  Okay.  And a 5150, can you tell me what the

6    definition is?

7       A.  Somebody who is a danger to himself or others.

8       Q.  And that's Welfare and Institutions Code 5150?

9       A.  Yes.

10      Q.  And if it is determined by the officers, you

11   know, by their investigation -- well, strike that.

12          A 5150 is a law enforcement detention, correct --

13          MR. FINE:  Calls for expert testimony.

14   BY MR. NISENBAUM:

15      Q.  -- based on your training?

16      A.  Based on my training, correct.

17      Q.  Right.

18          And that's true because they're not free to

19   leave, right?

20      A.  Correct.

21      Q.  Okay.  And then when a person -- if an officer

22   decides that the person is a danger to themselves or

23   others or otherwise unable to care for themselves due to

24   a mental disability, then what happens?

25          MR. FINE:  Incomplete hypothetical.

48

1          MR. KANTER:  Join.

2          THE WITNESS:  Well, they're not free to leave.

3    And obviously, we need to render aid.

4    BY MR. NISENBAUM:

5       Q.  Okay.  Does that mean that you take them to,

6    like, a psychiatric hospital?

7          MR. FINE:  Same objection.

8          MR. KANTER:  Join.

9    BY MR. NISENBAUM:

10      Q.  Do they go to an ER?  What happens?

11         MR. FINE:  Same objection.

12         MR. KANTER:  Join.

13         THE WITNESS:  Well, we would call medical, we'll

14   call for an ambulance, and then we would fill out the

15   necessary paperwork so they can be admitted to a psych

16   ward or, again, to a county hospital.

17   BY MR. NISENBAUM:

18      Q.  Okay.  If they don't have any apparent physical

19   problems, then would they go typically to a psych ward?

20         MR. FINE:  Incomplete hypothetical.

21         THE WITNESS:  Yes.  Correct.

22   BY MR. NISENBAUM:

23      Q.  Okay.  And if they do have physical medical

24   problems or apparent physical medical problems, then

25   would they go to an ER before they go to a psych ward,

                                                      49

1    typically?

2         MR. FINE:  Same objection.

3         MR. KANTER:  Join.

4         THE WITNESS:  Yes.  Typically, yes.

5    BY MR. NISENBAUM:

6       Q.  Okay.  And who's in charge of the transportation?

7         MR. FINE:  Vague.  Overbroad.  Incomplete

8    hypothetical.

9         MR. KANTER:  Join.

10        THE WITNESS:  That would be the ambulance, AMR.

11   BY MR. NISENBAUM:

12      Q.  And is an officer required to be present?  Like,

13   if they go to the hospital, does an officer have to be

14   there?

15        MR. FINE:  Same objections.

16        MR. KANTER:  Join.  Calls for expert opinion.

17   Incomplete hypothetical.  Overly broad.  Vague and

18   ambiguous.

19        MR. FINE:  Join.

20   BY MR. NISENBAUM:

21      Q.  I'm asking you based on your understanding of

22   Richmond Police Department policy and training and your

23   experience.

24        MR. FINE:  Same objections.

25        MR. KANTER:  Join.

                                                      50

1          THE WITNESS:  Yes, at times.

2    BY MR. NISENBAUM:

3      Q.  Okay.  What's the criteria?  When wouldn't the

4    officer have to be there?

5          MR. FINE:  Same objections.

6          MR. KANTER:  Join.

7          THE WITNESS:  I'm sorry, repeat the question.

8    BY MR. NISENBAUM:

9      Q.  When wouldn't an officer have to be there?

10         MR. FINE:  Same objections.

11         MR. KANTER:  Join.

12         THE WITNESS:  Well, if a medical personnel

13   doesn't request us accompany them or if it's a situation

14   where medical personnel has everything under control.

15   BY MR. NISENBAUM:

16     Q.  Okay.  All right.  So if it's felt by the officer

17   that it appears like the person would -- still would

18   require some sort of physical control, then the officer

19   would accompany them; is that right?

20         MR. FINE:  Same objections.

21         MR. KANTER:  Join.

22         THE WITNESS:  That's correct.

23   BY MR. NISENBAUM:

24     Q.  Okay.  All right.  I assume you've had experience

25   in the field where paramedics have given subjects who

                                                        51

1    are being detained or 5150s medication in the field; is

2    that correct?

3        A.  That's correct.

4        Q.  Okay.  How many times has that happened when

5    you've been present by estimation?

6        A.  I'd say numerous times.  I don't know if I could

7    put a number on it, but I would say over 50, maybe over

8    a hundred times throughout my career.

9        Q.  All right.  And have you assisted in restraining

10   subjects while the paramedics give an injection to calm

11   them down?

12           MR. FINE:  Vague.  Overbroad.

13           THE WITNESS:  If necessary, yes.

14   BY MR. NISENBAUM:

15       Q.  Okay.  And I think it was you who called it a

16   calm-me-down -- a calm-me-down med or a calm-down med.

17           Is that the term that you use for it?

18       A.  Yes, because I didn't know the exact medical term

19   or what they gave them at the time.

20       Q.  Is that a common vernacular at Richmond Police

21   Department when you talk amongst other officers, you

22   know, the calm-down drug or the calm-me-down?

23       A.  I wouldn't say it's something that most officers

24   use.  It's just what I use because I don't know the

25   medical term -- terminology for the medication.

                                                        52

1    Q.  All right.  And, of course, I take it you're not

2    trained to actually give the medication yourself, right?

3    A.  That -- that's correct.  We would never

4    administer any type of a medication to a subject.

5    Q.  So prior to this lawsuit, had you ever heard the

6    word "Versed"?

7    A.  Yes.

8    Q.  Okay.  You knew that Versed is a sedative drug

9    that is administered in the hospital, I take it?

10        MR. FINE:  Calls for expert testimony.

11        MR. KANTER:  Join.

12        THE WITNESS:  Yes.

13   BY MR. NISENBAUM:

14   Q.  Okay.  And did you know that Versed was being

15   administered in this case with Mr. Gutzalenko?

16        MR. FINE:  Vague as to time.

17        THE WITNESS:  No.  I didn't know what they were

18   giving Mr. Gutzalenko.

19   BY MR. NISENBAUM:

20   Q.  All right.  And we'll go through your body cam

21   video, but at some point, you know, the paramedic does

22   say that he's going to draw up some Versed.  So I take

23   it you didn't hear that; or if you heard it, it didn't

24   register.

25        Is that fair to say?

                                                            53

1      A.   Yes.

2           MR. FINE:  Compound.

3    BY MR. NISENBAUM:

4      Q.   Have you ever been given Versed?

5           MR. FINE:  Vague.

6           THE WITNESS:  I believe I -- I was given that

7    when I had my surgery.

8    BY MR. NISENBAUM:

9      Q.   It's nasty.

10          (Reporter clarification.)

11          MR. FINE:  Just vague.

12   BY MR. NISENBAUM:

13     Q.   I've had it too.  It is not pleasant.

14          The other one, Diprivan, is much easier in my

15   experience.

16     A.   Yeah.  Well, whatever they gave me, I didn't feel

17   any pain, so it worked for me.

18     Q.   Did you have a horrible hangover afterwards?

19          MR. FINE:  Relevance.  It's invading his privacy

20   as to medical stuff that has no relevance to this case.

21          THE WITNESS:  Not that I recall.

22   BY MR. NISENBAUM:

23     Q.   Okay.  I did.  And I was also awake through the

24   procedure.  It didn't even put me all the way out.  It

25   was not pleasant.  Anyway.

                                                        54

1          All right.  I take it you were not aware of any

2     of the warnings that come with Versed, like the FDA

3     warnings?

4          MR. FINE:  Calls for expert opinion.  Vague and

5     ambiguous.  Overbroad.

6     BY MR. NISENBAUM:

7        Q.  I'm just asking your familiarity.

8          MR. FINE:  Same objections.

9          THE WITNESS:  I am not familiar with any of the

10    warnings that come along with the -- the administration

11    of the Versed.

12    BY MR. NISENBAUM:

13       Q.  And I take it you are familiar that when you get

14    a medication that is typically by prescription, if there

15    are warning labels on them, you are supposed to read

16    them, right?

17         MR. FINE:  Relevance.  Overbroad.  Vague and

18    ambiguous.

19         THE WITNESS:  Again, I'm -- I'm not a medical

20    professional, so --

21    BY MR. NISENBAUM:

22       Q.  I'm asking a matter of common sense.

23       A.  Well, common sense, I mean, I'm not administering

24    that stuff to myself, so --

25       Q.  Right.

55

1    A.  -- you know --

2    Q.  You relied on the medical professional who

3  administered it to know what they're doing, right?

4    A.  Correct.

5    Q.  Okay.  And if you thought that what was being

6  done was something that was, in fact, under these

7  circumstances, highly dangerous, you would have had a

8  duty to intervene, correct?

9        MR. FINE:  Misstates prior testimony.  Vague and

10  ambiguous.  Overbroad.  Incomplete hypothetical.  Calls

11  for expert opinion.

12        THE WITNESS:  Again, I'm not a medical

13  professional, so I -- again, I don't know how to answer

14  that question.  That's not in my job description to

15  administer those types of drugs or -- or whatnot.

16  BY MR. NISENBAUM:

17    Q.  Okay.  Now, at some point, you obtained

18  Mr. Gutzalenko's identification, correct?

19    A.  I don't recall if I actually had his physical ID.

20    Q.  Do you recall Officer Hall handing you the

21  identification to run?

22    A.  I believe -- yeah.  Now that you talk about it, I

23  believe that Officer Hall did eventually give me his ID,

24  and that's something that I probably would have done,

25  yes.

                                                        56

1    Q.  And you then handed that identification to AMR

2  personnel at the scene -- or AMR West, the paramedics at

3  the scene, right?

4    A.  Correct.

5    Q.  Okay.  Did you actually run his identification?

6       MR. FINE:  Vague.

7       THE WITNESS:  I -- I don't recall.

8  BY MR. NISENBAUM:

9    Q.  Okay.  So I'm going to read from your interview.

10  I can pull it up if you want, but that will take more

11  time than I think is needed.  I'm just going to read.

12  And let me know if this refreshes your recollection.

13  And this is from Bates stamp City_01436.  It's page 7 of

14  your interviews, starting at the top, line 1.  I'm

15  starting with your answer.

16       The answer, "So at that time, when I get up

17  there, Officer," in parenthesis, "Hall," close

18  parenthesis, "gives me his ID, asked me to run the guy

19  out in our record system --

20       "Q.  Uh-huh.

21       "A.  -- which he comes back clear.  He also says,

22  'Be careful because there's blood' -- 'there's probably

23  blood on there' because he was describing that the guy

24  had blood on his hands and he was spitting blood."

25       Does that refresh your recollection that you

1   actually ran his ID and he came back clear?

2       A.  Yes.  Now that you read it, yes.

3       Q.  Okay.  And your information was that he was

4   spitting blood.  Officer Hall told you that?

5       A.  I believe so.

6       Q.  Okay.  Did you actually see blood coming out of

7   Mr. Gutzalenko's mouth?

8       A.  I -- I believe there was evidence of, like, dry

9   blood or something.  There was evidence that he had

10  puke, and there was, I believe, dry blood on the side of

11  his mouth.

12      Q.  Okay.  I'm going to continue.  This is at line 10

13  of the same page.

14          "Q.  Okay."

15          Answer by you, "Um and something about having

16  dried up on it or something like that.  At that time,

17  AMR shows up, and I go over to AMR.  I say, 'Hey, you

18  might want to get a spit hood or something like that

19  because this guy is spitting or coughing up blood.'  And

20  I asked.  I hand them the ID."

21          Does that refresh your recollection that you did

22  hand AMR the ID?

23          MR. FINE:  Asked and answered.

24          THE WITNESS:  Yes.

25  ///

                                                        58

1    BY MR. NISENBAUM:

2        Q.   Okay.   And that -- do you recall now telling AMR

3    that they might want to get a spit hood because the

4    person, the subject, was spitting or coughing up blood?

5        A.   Yes.

6        Q.   Okay.  Do you know which paramedic or which AMR

7    personnel -- it's the paramedic, the EMT, might be the

8    right word.  I don't know.

9            Do you know which person you said that to, "This

10   guy is spitting or coughing up blood"?

11       A.   I don't recall.  I -- I think I just made a

12   general statement to whoever was sitting in the back of

13   AMR.

14       Q.   Did you recognize any of the AMR personnel at the

15   scene as people you had dealt with before?

16       A.   I don't recall, but usually, I always run into

17   the same ones.

18       Q.   Okay.  Do you know who Damon Richardson is?

19       A.   I do not.

20       Q.   Okay.  All right.  Now, after you gave AMR the

21   ID, do you recall what happened next?

22       A.   I believe AMR personnel, EMTs walked over to

23   Mr. Gutzalenko.

24       Q.   Okay.  And do you know what -- did you see what

25   they did?

                                                        59

1     A.   As far as what -- what you are asking, sir?

2     Q.   Well, did you see them administer any treatment

3  to Mr. Gutzalenko at that time when they walked over to

4  him?

5          MR. FINE:  Vague.  Overbroad.

6          THE WITNESS:  Yes.

7  BY MR. NISENBAUM:

8     Q.   Okay.  What did you see?

9     A.   They gave him the medication.

10    Q.   Okay.  Are you talking about -- well, let me --

11 let's take this blow by blow, frame by frame in

12 sequence.  And I can refresh your recollection with your

13 interview.  Let me start with that.

14         This is reading from the same page, City_01436.

15 Picking up where I left off after you said, "I hand them

16 the ID."  So it's line 15.

17         "So as I go back over to assist Hall and Tran, I

18 noticed that there's" -- "now the" -- "the guy is

19 struggling a little more and Hall is trying to control

20 his arm, his left arm.  Tran is trying to control him on

21 the right side and trying to tell the guy to calm down.

22 I come over to his feet because the subject was kicking.

23 Right.  So" --

24         "Q.  Uh-huh.

25         "A.  Obviously, I control his feet by just

                                                        60

1  putting -- pushing some weight on his -- on his ankles

2  and calves to prevent him kicking.  I see Officer Hall

3  at this time who I have holding the subject's left

4  hand --

5       "Q.  Uh-huh.

6       "A.  -- and trying to put cuffs on his -- on his

7  hand just so now that we have more leverage to control

8  him.  Officer Tran, again, is trying to control him

9  because he's kind of flailing around.  He is trying to

10 grab his right hand.  The subject is still being

11 actively resisting, trying to keep his hand underneath

12 them.  We're all trying to say, 'Hey, calm down.  Calm

13 down.  Calm down.  You know, they've got the medic' --

14 'medics here.  They're going to help you' -- 'help you

15 out and whatnot.'  Medics show up to bring this -- the

16 gurney.  You know, at the time, he's still trying to be

17 a little combative.  I noticed that the paramedics

18 use -- they injected him with some calm-me-down serum.

19 I don't know exactly what it's called."

20      Does that refresh your recollection as to the

21 sequence of events?

22   A.  It does.

23   Q.  Okay.  Do you recall if a paramedic initially

24 went to -- or EMT initially went to check on

25 Mr. Gutzalenko then left and then came back with

                                                    61

1   medication?

2       A.  I don't necessarily recall exactly what they --

3   they did while we were trying to control Mr. Gutzalenko.

4       Q.  Okay.  I take it you were focused on controlling

5   Mr. Gutzalenko, and you were focused on his legs

6   primarily; is that right?

7       A.  That's correct.

8       Q.  Okay.  Did you see the actual injection?

9       A.  I believe I did, yes.

10      Q.  Okay.  All right.  And we actually have it on

11  your body cam.  We have a good view of it, and we'll get

12  to it.

13          Now, I know from your body cam, the only thing

14  you were doing, it looked like, was just controlling the

15  legs at the time that the injection was given, correct?

16      A.  Correct.

17      Q.  You didn't move any part of Mr. Gutzalenko's

18  clothing to facilitate the injection, did you?

19      A.  I did not.

20      Q.  Okay.  Did you see Officer Tran do that?

21      A.  I -- I don't recall.  I was focused more on the

22  legs.

23      Q.  Did you see anyone do that?

24      A.  Again, I -- I don't recall.

25      Q.  Okay.

                                                        62

1          THE REPORTER:  Mr. Nisenbaum, are you marking

2    that document as an exhibit?  This was on your --

3          MR. NISENBAUM:  Might as well.  I did submit it.

4    We'll mark it as Exhibit A.

5          I did submit it to the court reporter, so we'll

6    make that Exhibit A.

7          THE REPORTER:  Okay.

8          MR. NISENBAUM:  Thank you.

9          (Exhibit A marked.)

10   BY MR. NISENBAUM:

11     Q.  All right.  Now, as I understand your statement,

12   you noticed that Mr. Gutzalenko started to turn blue

13   shortly after the paramedic gave him the calm-me-down

14   serum; is that correct?

15     A.  That's correct.

16     Q.  Okay.  About how long after the serum was given

17   did you notice that Mr. Gutzalenko was starting to turn

18   blue?

19     A.  It was shortly after they administered the

20   injection.

21     Q.  Okay.  In your statement, it says -- and I'm just

22   picking up where I left off.  Let's get the question,

23   which was -- so the -- you pick up at line 43 of the

24   same page.

25          "A.  Um, I notice that after that, as we're

63

1  trying to get him on the gurney or whatnot, his face is

2  blue.  And I say, 'Hey, man.'  I go, 'Is this man coding

3  out?  Right?  Because his face is blue.'  And that --

4  that time, I think they realized that this guy is having

5  some type of medical issue.  And they immediately

6  started, um, doing lifesaving measures and CPR on the

7  guy.

8          "Q.  Okay.  And they get him into the ambulance?

9          "A.  Yes."

10         That goes on to the next page, ending at line 6.

11         Is that your recollection of the sequence of

12  events?

13     A.  It is.

14     Q.  Okay.  So you noticed that he was turning blue

15  and you thought he was coding before he was put in the

16  ambulance?

17     A.  That's correct.

18     Q.  Okay.  And you saw them start doing CPR before he

19  was put in the ambulance?

20     A.  I believe so.

21     Q.  Okay.  Do you recall what the paramedics told you

22  at the scene about why they were doing CPR or what

23  happened?

24     A.  I -- I don't recall what they -- they stated.

25     Q.  Do you recall if they told you what had happened?

                                                        64

1    A.  I -- I do not recall.

2    Q.  Okay.  Do you recall any conversation you had

3    with them?

4    A.  I -- I don't recall having a conversation.  I

5    know they were focused on trying to revive

6    Mr. Gutzalenko at that time.

7    Q.  Right.

8        Okay.  I'm going to share my screen, and I'm

9    sharing your body cam video.  This is a file titled

10   "Officer Tagorda confidential city

11   839.confidential.MP4."

12       MR. NISENBAUM:  Counsel, do I need to go under

13   seal when asking questions about this?  The exhibit

14   itself will remain confidential, but I think I could ask

15   him questions without going under seal.

16       Fair enough?

17       MR. FINE:  I mean, until I hear the questions,

18   it's kind of hard to give an answer.  I think it's

19   probably fine.  If I have an issue with a question, then

20   I'll raise it.

21       MR. NISENBAUM:  Okay.  Thank you.

22       THE REPORTER:  And this is Exhibit B?

23       MR. NISENBAUM:  Yes.

24       (Exhibit B marked.)

25   ///

65

1   BY MR. NISENBAUM:

2       Q.  Okay.  Can you see the screen?

3       A.  I can, yes.

4       Q.  Okay.  Let me go back to zero.

5           I take it that's your hand we're looking at?

6       A.  I would assume so, yes.

7       Q.  Okay.  I'm going to hit play, and I'll pause

8   where I have questions and then resume.

9           Okay.  Pausing at 24 seconds.  That's you putting

10  your gloves on and then taking Mr. Gutzalenko's

11  identification, correct?

12      A.  Correct.

13      Q.  Okay.  And that's Mr. Gutzalenko who's on the

14  ground?

15      A.  It is.

16      Q.  Okay.  And that's Officer Tran who's standing

17  over him, correct?

18      A.  Correct.

19      Q.  Okay.  And at this point, this is a 5150,

20  correct?

21          MR. FINE:  Vague and ambiguous.  Overbroad.

22  Calls for expert testimony.

23          MR. KANTER:  Join.  Lacks foundation.

24          MR. FINE:  Join.

25          THE WITNESS:  Well, I -- I can't really say

                                                      66

1  exactly if he was 5150, but that was the assumption at

2  the time.

3  BY MR. NISENBAUM:

4      Q.  Okay.  Picking up at 24 seconds.

5          Then at 41 seconds, someone said, "Hey, we'll

6  deal with you in a minute."

7          Do you know who that was?

8      A.  It sounded like it was me.

9      Q.  I thought so.

10         Do you know who you were talking to?

11     A.  I -- I believe it was just a -- a bystander who

12  was trying to walk by.

13     Q.  Okay.  All right.  Continuing at 41 seconds.

14         Pausing at 1:03.  That was your voice relaying

15  Mr. Gutzalenko's name and other information to dispatch,

16  correct?

17     A.  That's correct.

18     Q.  Okay.  Continuing at 1:03.

19         Pausing at 1:22.  You asked a question, "Where is

20  he bleeding from, his hand?"

21         And the other officer -- I think it was Hall who

22  said, "He was" -- "it was coming out of his mouth.  It's

23  bleeding when he spits," something like that?

24     A.  That's correct.

25     Q.  Okay.  Continue at 1:22.  Let me pause at 1:24.

                                                        67

1    It's pretty clear at that time that this was a medical

2    emergency then; is that right?

3        A.  I would say it's safe to say so, yes.

4        Q.  Okay.  And that's because a person who's spitting

5    up blood is -- got to be -- that indicates a medical

6    emergency, correct?

7            MR. FINE:  Calls for expert opinion.  Vague and

8    ambiguous.  Incomplete hypothetical.

9            THE WITNESS:  That's correct.

10   BY MR. NISENBAUM:

11       Q.  Okay.  Continuing at 1:24.

12           We're at 1:34.  Mr. Gutzalenko is moving a bit.

13   Someone is telling him to relax.

14           Is that you?

15       A.  It sounded like me, yes.

16       Q.  Okay.  And obviously, the concern right now is

17   for his medical condition, correct?

18       A.  Correct.

19       Q.  Okay.  Continuing at 1:34.

20           We're pausing at 1:58 now.  The paramedic has

21   arrived.  The ambulance has arrived.  And I think that's

22   an ambulance.

23           Is that an ambulance?

24       A.  Yes.

25       Q.  Okay.  And the passenger got out.  And you were

                                                              68

1    kind of updating him on the fact that Mr. Gutzalenko is

2    spitting up blood and they might need a spit hood,

3    correct?

4        A.   Correct.

5        Q.   Okay.   Continuing at 1:58.

6             Pausing at 2:05.   You also gave the background

7    that he had been destroying a store and was probably

8    intoxicated as well, correct?

9        A.   Correct.

10       Q.   Okay.  Continuing at 2:05.

11            Let me pause it at 2:53.  Okay.  So we're paused

12   at 2:53.  I clicked the wrong button there.  The screen

13   went off for a moment.  It's because I clicked the wrong

14   button.

15            But in any event, whose car did you get in to

16   move?

17       A.   Looks like my car.

18       Q.   Okay.  And why were you moving your car?

19       A.   If I moved it, it's probably just to bring it

20   closer to the scene.

21       Q.   Okay.

22            MR. FINE:  Belatedly calls for speculation.

23   BY MR. NISENBAUM:

24       Q.   Mr. Gutzalenko was not struggling so badly that

25   he required at this time multiple officers restraining

                                                          69

1  him, correct?

2        MR. FINE:  Vague and ambiguous.  Overbroad.

3        THE WITNESS:  Correct.

4  BY MR. NISENBAUM:

5    Q.  Okay.  Continuing at 2:53.

6        So pausing at 3:28.  You got out of the car, and

7  you're walking back to where Mr. Gutzalenko was,

8  correct?

9    A.  That's correct.

10   Q.  And a paramedic had gotten the stretcher out of

11 the ambulance to take to where Mr. Gutzalenko was,

12 correct?

13   A.  That's correct.

14   Q.  Continuing at 3:28.

15       Again, I say paramedic, but I meant EMT.  And you

16 could see that on his back of his shirt, I think.

17       Continuing at 3:34.

18       Pausing at 4:06.  There was the sound of

19 someone's voice trying to yell in a somewhat muffled

20 way, but it sounds like, you know, they're protesting or

21 something.

22       Do you know whose voice that was?

23       MR. FINE:  Calls for speculation.

24       THE WITNESS:  I -- I don't know based on that --

25 on the video.

                                                      70

1  BY MR. NISENBAUM:

2     Q.  If based on your recollection, do you know?

3     A.  I do not.

4     Q.  Okay.  Continuing at 4:06.

5        I'm going to go back just a shade.

6        Okay.  We're paused at 4:10.

7        And were you able to tell now that's

8  Mr. Gutzalenko's voice who appears to be protesting his

9  treatment?

10       MR. FINE:  Same objection.

11       THE WITNESS:  I can't distinguish if that's his

12  voice.  It sounds like Officer Tran and Hall are --

13  were -- were trying to say something.  I -- I can't make

14  it out.

15  BY MR. NISENBAUM:

16    Q.  Okay.  All right.  And were you able to see that

17  Officer Tran had put his knee on Mr. Gutzalenko's back

18  area?

19       MR. FINE:  Misstates the video.

20       THE WITNESS:  I can't tell based on the frame of

21  the video exactly where the knee is at.

22  BY MR. NISENBAUM:

23    Q.  Right from here, we just have an inference of

24  where it's at.

25       Is that fair to say, his left knee?

71

1          MR. FINE:  Calls for speculation.  Vague and
2     ambiguous.  Misstates the video.  Lacks foundation.
3          THE WITNESS:  I would say it's in the general
4     area of his back.
5     BY MR. NISENBAUM:
6        Q.  Okay.  Thank you.
7          4:11, continuing.
8          Pausing at 4:03.  You heard a voice say, "Why are
9     you doing this to me?"  That was Mr. Gutzalenko,
10    correct?
11       A.  I believe so, yes.
12       Q.  Okay.  All right.  And Officer Hall has him in --
13    is that an arm bar?
14         MR. FINE:  Vague as to "arm bar."
15         THE WITNESS:  It appears that he's controlling
16    his -- his arm.
17    BY MR. NISENBAUM:
18       Q.  His left arm, correct?
19       A.  Appears to be his left arm, yes.
20       Q.  Okay.  And is that that you controlled in a
21    manner that you're -- that you -- are you familiar with
22    the term "arm bar"?
23       A.  I am.
24       Q.  Okay.  What is that?
25       A.  It's where you straighten out the arm and you put

                                                    72

1  it in a position where they can't move it.

2  Q.  And is that what it appears that Officer Hall is

3  doing there?  We're at 4:33.

4  A.  It appears that he is in the process or

5  attempting to put the subject or Mr. Gutzalenko in

6  that -- in that position.

7  Q.  Okay.  Continuing at 4:33.

8  I'll go back just a shade.

9  All right.  We're paused at 4:39.  You can now

10 see where Officers Tran's knee -- where Officer Tran's

11 knee is located, correct?

12 A.  Correct.

13 Q.  Okay.  And it's kind of roughly in the diaphragm

14 area of Mr. Gutzalenko's back, correct?

15 MR. FINE:  Misstates the video.  Calls for expert

16 opinion.  Lacks foundation.

17 THE WITNESS:  Well, the -- the diaphragm is

18 located in the front.  It appears his left knee is

19 upper -- upper back of Mr. Gutzalenko.

20 BY MR. NISENBAUM:

21 Q.  You call that the upper back?

22 A.  Middle of the back.

23 Q.  Middle of the back.  Okay.  Fair enough.  The

24 middle of his back.

25 Okay.  4:39, continuing.

73

1          I'm going to pause it at 5:01.  You've obviously

2   moved down to Mr. Gutzalenko's feet and legs, correct?

3      A.  Correct.

4      Q.  Okay.  And what were you doing?

5      A.  At that time, I believe I was trying to control

6   his legs.

7      Q.  Okay.  What were you doing to try to control his

8   legs?

9      A.  I believe I was holding down his ankles and the

10  calf area, lower legs just to prevent him from kicking

11  and trying to keep him in that recovery position.

12     Q.  And did you have one foot crossed over the other

13  or at the ankles?

14     A.  What I would do to try to control someone's legs.

15     Q.  Which is?

16     A.  I would cross them and -- and then try to hold

17  one of the legs down.

18     Q.  Okay.  You might have broken up there because I

19  didn't hear the first few words of that, but that's

20  fine.

21          All right.  We're at 5:01.

22          Paused at 5:08.  Someone said, "You're going to

23  get tased.  Then you better listen to us.  Now, you want

24  to get tased?"

25          Do you know who said that?

                                                        74

1    A.  That sounds like Officer Hall.

2    Q.  Okay.  Now, Mr. Gutzalenko is effectively under

3 control, right?

4        MR. FINE:  Vague and ambiguous.  Calls for expert

5 opinion.  Lacks foundation.

6        THE WITNESS:  Well, if Mr. Gutzalenko is still

7 actively resisting, I wouldn't say he was under control.

8 BY MR. NISENBAUM:

9    Q.  Well, you had an officer who has him in, you

10 know, what appears to be an arm bar with the left arm.

11 The right arm, I think, is kind of under his body.  You

12 have an officer who's got his knee in his -- in the

13 middle of his back, and you've got him at the legs.

14        Where is the lack of control?

15        MR. FINE:  Asked and answered.  Misstates the

16 video.  Vague and ambiguous.

17        THE WITNESS:  Well, as I stated, he was still

18 actively resisting, so I wouldn't say he was under

19 control.

20 BY MR. NISENBAUM:

21    Q.  What does that mean, "actively resisting"?

22    A.  Mr. Gutzalenko was still flailing around, kicking

23 his legs, preventing us from, you know, trying to render

24 aid to him.

25    Q.  Okay.  Well, you had his legs crossed over each

75

1    other.  You were holding his legs down.  It wasn't like

2    he was wildly kicking them, right?

3         MR. FINE:  Misstates testimony.  Asked and

4    answered.

5         THE WITNESS:  Again, he was still actively

6    resisting.  If I were to let go of his legs, he would

7    have continued kicking.

8    BY MR. NISENBAUM:

9         Q.  Well, I got that, but you didn't.  So he wasn't

10   kicking.  You were preventing him from doing that,

11   right?

12        A.  Correct.

13        Q.  Okay.  Did he ever try to punch anyone?

14        A.  Not that I recall.

15        Q.  Did he ever try to assault anyone or batter

16   anyone?

17        MR. FINE:  Vague and ambiguous.  Overbroad.

18   Calls for speculation as to his intent.

19   BY MR. NISENBAUM:

20        Q.  From what you could observe.

21        MR. FINE:  Same objections.

22        THE WITNESS:  Not that I recall.

23   BY MR. NISENBAUM:

24        Q.  Okay.  All right.  Continuing at 5:08.

25             Pausing at 5:11.  It looks like you can tell the

                                                          76

1  shin of Officer Tran is pressed against either the
2  mid-back or just under the rib cage and left side of
3  Mr. Gutzalenko's body, correct?
4       MR. FINE:  Misstates the video.  Vague and
5  ambiguous.
6       THE WITNESS:  It appears so.
7  BY MR. NISENBAUM:
8    Q.  Okay.  All right.  Do you know if he, during the
9  time since I showed it to you, I think, at 4:10 -- well,
10 in any event, do you know if he ever -- during the time
11 that we've talked about, if he had ever moved his knee
12 or leg off of that part of Mr. Gutzalenko's body?
13      MR. FINE:  Mischaracterizes the video.  Calls for
14 speculation.  Vague and ambiguous.
15      THE WITNESS:  I believe so.
16 BY MR. NISENBAUM:
17   Q.  Do you believe he did?
18   A.  Yes.
19   Q.  When?
20   A.  Well, as soon as we got him, we got the gurney
21 close, and we could control him, I think that's when he
22 moved from that position.
23   Q.  My question, up to this point, had he moved his
24 leg from that position, up to this point --
25      MR. FINE:  Same objection.

                                                        77

1    BY MR. NISENBAUM:

2        Q.  -- at 5:11?

3            MR. FINE:  Same objections.

4    BY MR. NISENBAUM:

5        Q.  That was my question.

6            MR. FINE:  Same objections.

7            THE WITNESS:  I don't recall based on just the

8    still frame of the video what he did after that or if it

9    moved from that position.

10   BY MR. NISENBAUM:

11       Q.  I'm talking about from the video since I've

12   started showing it to you and identified where his knee

13   was in his back and where you could see it where you

14   testified that you thought it was up to now in the video

15   up to 5:11.  So I think it was 4:10 to 5:11.

16           Were you able to -- do you recall if he had

17   gotten his leg off of his body, stopped pressing down?

18           MR. FINE:  Mischaracterizes the video.  Vague and

19   ambiguous.  Calls for speculation.

20           THE WITNESS:  Well, I think -- if I recall,

21   during this incident I think Officer Tran was trying to

22   keep him on the side, and his knee or leg or shin was in

23   different parts of his back during that time.

24   BY MR. NISENBAUM:

25       Q.  Okay.  So you think it moved a little bit?

78

1          MR. FINE:  Same objections.

2          THE WITNESS:  That's correct.

3    BY MR. NISENBAUM:

4      Q.  Okay.  But it was always in parts of his back,

5    correct?

6          MR. FINE:  Same objections.

7          THE WITNESS:  I would say correct.

8    BY MR. NISENBAUM:

9      Q.  Okay.  Continuing at 5:11.

10         Okay.  We're at 5:24.  You were saying, "I need

11   you to stay over there for now."

12         Who were you talking to?

13     A.  I believe it was some bystander trying to walk

14   by.

15     Q.  Okay.  Continuing at 5:24.

16         We're pausing at 5:40.  A voice just said, "I'm

17   going to get some Versed drawn up."

18         Did you hear that?

19     A.  I did.

20     Q.  Okay.  Was that the EMT?

21     A.  I believe so.

22     Q.  Okay.  So we're continuing at 5:40.

23         Now, let me ask you this:  Does Richmond Police

24   Department have a policy -- have any policy whatsoever

25   when it comes to the administration of sedative

                                                        79

1  medication in the field that if a -- the paramedics want

2  to do it and you don't think the circumstances justify

3  it, that you tell them no?

4         MR. FINE:  Vague and ambiguous.  Calls for expert

5  testimony.

6         Go ahead.

7         THE WITNESS:  There is no specific policy.

8  BY MR. NISENBAUM:

9    Q.  Okay.  Your training is to let the paramedics do

10  whatever they do because you assume that they know what

11  they're doing, right?

12        MR. FINE:  Vague.  Overbroad.

13        THE WITNESS:  That's correct.

14  BY MR. NISENBAUM:

15   Q.  Okay.  5:40, continuing.

16        I'll continue at 5:45.  Paused it -- sorry,

17  paused it slightly early.

18        But did you hear that, "I don't" --

19  Mr. Gutzalenko said, "I can't breathe."  And someone

20  said, "Pepper spray him"?

21   A.  I heard that, "I can't breathe."  I don't recall

22  hearing the pepper spray portion.

23   Q.  I paused it too early.  Let me go back to 6:23.

24  I'll hit play.

25        Pausing at 6:31.

                                                      80

1        Did you hear it there?

2    A.  I did.

3    Q.  Okay.  Who said, "Pepper spray him"?

4    A.  It sounds like Mark, Officer Hall.

5    Q.  Okay.  In your training, is it appropriate to

6  pepper spray someone who says that they're having

7  breathing problems and who has exhibited blood coming

8  out of their mouth and vomit?

9        MR. FINE:  Incomplete hypothetical.  Vague.

10  Overbroad.

11        THE WITNESS:  Repeat the question, sir.

12  BY MR. NISENBAUM:

13    Q.  Is it police department training and policy that

14  officers can pepper spray someone when the person is

15  saying that they can't breathe and they have had

16  physical signs consistent with that, including blood

17  coming out of their mouth and vomit?

18        MR. FINE:  Same objections.

19        THE WITNESS:  I don't think there's a specific

20  policy regarding the use of pepper spray.  In this

21  incident, I believe Officer Hall was using a scare

22  tactic in order to try to get Mr. Gutzalenko to comply.

23  BY MR. NISENBAUM:

24    Q.  Sure.

25        It was a ruse, right?

81

1    A.   It appears so, yes.

2    Q.   Okay.  But you do know that pepper spray is an

3    irritant, a respiratory irritant, correct?

4    A.   Correct.

5    Q.   And you -- generally, you're supposed to avoid

6    using it against people who have difficulty breathing,

7    who are having breathing problems, right?

8         MR. FINE:  Incomplete hypothetical.  Overbroad.

9    Vague and ambiguous.

10   BY MR. NISENBAUM:

11   Q.   It's one of the contraindications on it on the

12   can?

13        MR. FINE:  Same objections.  Calls for expert

14   testimony.

15        THE WITNESS:  Well, the use of pepper spray,

16   again, it -- it all depends on the totality of the

17   circumstances, but it's a tool, an option that we do

18   have.  And again, it would be up to the officer at the

19   time whether or not he wants to administer that or use

20   that option.

21   BY MR. NISENBAUM:

22   Q.   Well, it may be a tool that you have.  It's a

23   tool that is only permitted under certain circumstances,

24   correct?

25        MR. FINE:  Vague.  Overbroad.

82

1          THE WITNESS:  There is no specific guideline as
2    far as when to administer or use pepper spray.  Again,
3    it's up to the officer's judgment, but there's no strict
4    guidelines saying that we couldn't.  But I think it's
5    just -- it would be common sense if somebody was -- had
6    some type of respiratory issue saying, in this instance,
7    they can't breathe, that would be an option that we
8    would use.  And I don't think any reasonable officer
9    would use that.  And again, in this situation, I think
10   Officer Hall was using that as a ruse, as you put it.
11   BY MR. NISENBAUM:
12      Q.  Okay.  We're continuing at 6:31.  By the way,
13   6:33, you can see Officer Tran's knee.  Although they're
14   in slightly different positions, it's still against his
15   back, correct?
16          MR. FINE:  Misstates the video.  Vague and
17   ambiguous.
18          THE WITNESS:  I do show that Officer Tran's knee
19   is in contact with Mr. Gutzalenko's back, yes.
20   BY MR. NISENBAUM:
21      Q.  Okay.  Continuing at 6:33.
22          We're at 6:39.  You can also see that it looks
23   like Officer Tran is leveraging his weight into the knee
24   that's on Mr. Gutzalenko's back, correct?
25          MR. FINE:  Misstates the video.  Calls for

                                                        83

1    speculation.  Lacks foundation.

2         THE WITNESS:  Correct.  Sorry, that -- that's

3    correct.

4    BY MR. NISENBAUM:

5       Q.   Okay.  Thank you.

6            Continuing at 6:39.

7            We're at 6:41.  Mr. Gutzalenko just said two more

8    times, "I can't breathe.  I can't breathe," correct?

9       A.   That's correct.

10      Q.   All right.  So when a person says "I can't

11   breathe" and they're being restrained, prone restrained,

12   and the -- and an officer is leveraging their weight

13   with the knee into the person's back, aren't officers

14   supposed to take the weight off the person's back if

15   it's reasonable under the circumstances to do so?

16           MR. FINE:  Mischaracterizes the video.  Vague and

17   ambiguous.  Overbroad.  Incomplete hypothetical.

18           THE WITNESS:  If it's reasonable at the time,

19   then it looks like Officer Tran is trying to control as

20   well as Officer Hall is trying to control

21   Mr. Gutzalenko.

22   BY MR. NISENBAUM:

23      Q.   Sure.

24           Is it your understanding that when you interfere

25   with the person's breathing, that that can cause serious

                                                              84

1    bodily injury or death --

2          MR. FINE:  Incomplete hypothetical.  Overbroad.

3    Calls for expert opinion.  Vague.

4    BY MR. NISENBAUM:

5       Q.  -- based on your training and your experience?

6          MR. FINE:  Same objections.

7          THE WITNESS:  Well, there are numerous times that

8    we come in contact with subjects who claim they can't

9    breathe.  And again, during this incident, we were just

10   trying to control Mr. Gutzalenko to provide him aid.

11   Again, I don't know exactly what was going on internally

12   with Mr. Gutzalenko other than what he's -- he's

13   verbally saying at the time.

14   BY MR. NISENBAUM:

15      Q.  Well, it's not just what he's verbally saying.

16   The totality of the circumstances included what

17   proceeded this, that he had vomited in a store, that he

18   had blood and vomit coming out of his mouth before this,

19   so you knew that -- I mean, you were aware that this was

20   a medical crisis that involved the very thing that you

21   need to get air into your body, right?

22          MR. FINE:  Calls for expert opinion.  Vague and

23   ambiguous.  Calls for speculation.  Incomplete

24   hypothetical.

25          THE WITNESS:  Correct.

                                                        85

1    BY MR. NISENBAUM:

2        Q.   Okay.  So this is not just some person pretending

3    that they can't breathe.  You knew it was an issue

4    before this started and that things like putting a knee

5    on his back, leveraging weight into that knee while he's

6    in a prone position are things that can exacerbate an

7    existing respiratory problem, correct?

8            MR. FINE:  Same objections.  Mischaracterizes the

9    video.

10           THE WITNESS:  That's correct.  But again -- well,

11   again, in this -- that's not what happened here.

12   Mr. Gutzalenko was -- again, was actively trying to

13   prevent us from rendering aid to him.  From what I

14   recall -- recall, Officer Tran and Officer Hall were

15   trying to keep him -- or we were trying to keep him

16   on -- on his side, but as I stated, Mr. Gutzalenko

17   continued to resist and prevent us from trying to render

18   aid to him.  So that's not what happened here.

19   BY MR. NISENBAUM:

20       Q.   Well, I understand it's not -- I understand that,

21   in your view, there's no malicious conduct here, that

22   you're not trying to hurt him.  I get that.  But the

23   question has to do with, what actually happened

24   physically, right?  And you understand that the

25   Graham v. Connor standard is an objectively reasonable

86

1    standard not based on an officer's subjective

2    intentions, correct?

3        A.  Correct.

4        Q.  Okay.  And so this is a use of force, right?

5    We're looking at a use of force, correct?

6        A.  Correct.

7            MR. FINE:  Calls --

8    BY MR. NISENBAUM:

9        Q.  Okay.  And all force has to be reasonable, right?

10       A.  Correct.

11       Q.  Based on an objectively reasonable officer

12   standard, correct?

13       A.  That is correct.

14       Q.  Based on the totality of the circumstances,

15   correct?

16       A.  Correct.

17       Q.  I know I might be taking you back to the police

18   academy, but -- and that's very basic to your job,

19   right?

20       A.  Yes, sir.

21       Q.  Okay.  So the information -- I mean, certainly,

22   there might be circumstances where a person might be

23   faking that they can't breathe, but what you have here

24   is a person who already is exhibiting breathing

25   problems, who already appears to be in some medical

                                                    87

1    distress, who's apparently vomited, who's got blood

2    coming out of his mouth, and then they're in this

3    position where an officer has a knee in their back,

4    leveraging his weight into the back, and that knee was

5    there for a long time.  He might have changed position

6    somewhat, but the pressure was still being applied for

7    a -- many minutes.  And that's what we've seen in the

8    video.  That's all -- those are all factors that you

9    have to take into account here, especially when he says,

10   "I can't breathe," right?

11          MR. FINE:  Mischaracterizes the video.  Misstates

12   prior testimony.  Calls for speculation.  Vague and

13   ambiguous.  Overbroad.  Incomplete hypothetical.

14          THE WITNESS:  Well, when you say "a long time,"

15   I -- I don't necessarily understand what you mean by "a

16   long time."  It was merely seconds, if that, so a long

17   time -- I wouldn't characterize that as being a long

18   time.

19   BY MR. NISENBAUM:

20      Q.  Well, the knee has been in his back from what we

21   can tell for at least -- let's see -- for at least

22   two minutes and 31 seconds.

23          MR. FINE:  Is that a question?

24   BY MR. NISENBAUM:

25      Q.  I mean, that's what the video has shown, you

88

1    know.  It -- it's moved positions somewhat here and

2    there, but there's still been that pressure applied

3    to -- you know, between the back or the side -- the back

4    and the side to those areas.  It's still pressure being

5    applied there, right?

6            MR. FINE:  Mischaracterizes the video.

7            THE WITNESS:  Well, when you're saying

8    two minutes or however long, I -- I don't necessarily

9    agree with that.

10   BY MR. NISENBAUM:

11       Q.  Well --

12       A.  Again, this -- this incident happened pretty

13   rapidly.  And as you stated, Officer Tran's knee or

14   contact with the -- the back of Mr. Gutzalenko moved

15   from different positions, so as far as it -- how you're

16   characterizing, it sounds like that his knee was

17   completely in one spot for two-plus minutes.  So I -- I

18   don't think that's --

19       Q.  I didn't say that.  I didn't say that.  And I

20   don't mean to imply that.

21       A.  Okay.

22       Q.  I said specifically that while it may have moved

23   locations on his back, it was always pressed against his

24   back.

25           MR. FINE:  Mischaracterizes the video.  And calls

                                                          89

1  for speculation.  Lacks foundation.

2  BY MR. NISENBAUM:

3      Q.  Well, we haven't identified any part where --

4  during this time period where the knee wasn't on his

5  back in some part of his back, right?

6          MR. FINE:  You're asking me the question or him?

7          MR. NISENBAUM:  No.  I'm asking him.

8          MR. FINE:  Okay.  Same objections.

9          THE WITNESS:  Well, I wouldn't -- just based on

10 the video, I wouldn't say it's pressing down.  There is

11 contact with Mr. Gutzalenko's back, but as far as

12 pressing down, I don't think that's what was happening

13 here.

14 BY MR. NISENBAUM:

15     Q.  You testified maybe two minutes ago,

16 three minutes ago that you agreed it looked like he was

17 leveraging his weight into that knee, correct?

18         MR. FINE:  Misstates prior testimony.

19 Mischaracterizes the video.  Lacks foundation.  Calls

20 for speculation.

21         THE WITNESS:  Well, there was one, the video that

22 you showed me.  It did appear that Officer Tran was

23 pressing down on his back, but then, again, it moves

24 positions where it doesn't appear that he's pressing

25 down on his back.  So there is contact there, but I

90

1   don't think Officer Tran had continuously pressed his

2   knee into Mr. Gulensko's [sic] back.

3   BY MR. NISENBAUM:

4       Q.  Gutzalenko.

5       A.  Gutzalenko's.  I apologize.

6       Q.  No problem.

7           I'm going to continue at 6:41.

8           Okay.  Paused at 6:50.  About two seconds ago,

9   Officer Tran removed his knee from his back, correct?

10      A.  Correct.

11      Q.  Okay.  One cuff is on, and it looks like they're

12  bringing the other arm, the right arm, around to be

13  cuffed, correct?

14      A.  That's correct.

15      Q.  Okay.  Continuing at 6:50.

16          We're at 6:54.  Mr. Gutzalenko says again, "I

17  can't breathe," correct?

18      A.  Correct.

19      Q.  Okay.  And he's being -- and the other arm is

20  being cuffed, correct?

21      A.  That's correct.

22      Q.  Continuing at 6:54.

23          Okay.  Do you know who -- was that you asking the

24  question about leg restraints?

25      A.  I believe so.

91

1    Q.  Okay.  And you were asking, obviously, because

2  you thought he was going to kick, and so he would need

3  leg restraints, right?

4    A.  That's correct.

5    Q.  Okay.  Pausing at 7:11.  Officer Hall apparently

6  said, "Stop."

7        And then they say, "Here's the Taser," and make

8  like an electronic sound?

9        MR. FINE:  Mischaracterizes the video.

10        MR. NISENBAUM:  I think that's what happened.

11  BY MR. NISENBAUM:

12    Q.  Let me go to 7:06.  I'll play it again.

13        I heard some sound after, "Here's the Taser."  I

14  don't know what it was.  I thought it was his voice

15  mimicking the Taser, but I can be wrong.

16    A.  Right.  I don't believe it was a Taser.

17    Q.  No, it wasn't a Taser.

18        Was it his voice mimicking a Taser, is my

19  question --

20        MR. FINE:  Calls for speculation.  Lacks

21  foundation.  Vague and ambiguous.

22  BY MR. NISENBAUM:

23    Q.  -- doubling down on the ruse?

24        MR. FINE:  Same objections.

25        THE WITNESS:  Maybe that's what he was doing, but

                                                        92

1    I -- I couldn't distinguish that sound or who made that
2    sound.
3    BY MR. NISENBAUM:
4        Q.  Okay.  But you heard the sound?
5        A.  I believe I --
6            MR. FINE:  Vague as to "the sound."
7    BY MR. NISENBAUM:
8        Q.  Okay.  We're at 7:11.
9            Okay.  And whose knee is that in -- now, it looks
10   like in the lower part, right around the waistline, the
11   left waistline of Mr. Hall, if you know?
12           MR. FINE:  Mischaracterizes the video.
13           MR. NISENBAUM:  Yeah.  I'm sorry.
14   BY MR. NISENBAUM:
15       Q.  Mr. Gutzalenko.
16           MR. FINE:  Same objection.
17           THE WITNESS:  That appears to be Officer Hall.
18   BY MR. NISENBAUM:
19       Q.  Okay.  All right.  Continuing at 7:15.
20           Has he actually been handcuffed yet?  I paused at
21   7:16.
22           MR. FINE:  Vague.
23           THE WITNESS:  From what I could tell, it looks
24   like one arm is handcuffed.
25   ///

                                                          93

1  BY MR. NISENBAUM:

2  　　Q.　Okay.　So we're at 7:16.

3  　　　　We're at 7:28.　Officer Tran said, "Got it,"

4  indicating that the cuffing was completed, correct?

5  　　A.　That's correct.

6  　　Q.　Okay.　We're at 7:28.

7  　　　　We're at 7:35.　Mr. Gutzalenko was alive here,

8  correct?

9  　　A.　Yes.

10 　　Q.　Okay.　Was he still kicking?

11 　　A.　If I recall, he -- he was still kicking, but I

12 don't believe it was as much because I still -- in your

13 video that I'm seeing, it still looks like I am

14 controlling, appears to be, his left ankle.

15 　　Q.　All right.　It seemed like he was still trying to

16 kick; is that correct?　It's not --

17 　　A.　That's correct.

18 　　Q.　Okay.　So we're at 7:35.

19 　　　　Okay.　We're at 7:39.　Mr. Gutzalenko is lying on

20 his right side handcuffed.　You have Officer Tran,

21 his -- has his hands on his right shoulder -- or his

22 left shoulder and left elbow, correct?

23 　　A.　That is correct.

24 　　Q.　Okay.　Looking at this now, and I don't know if

25 you're looking elsewhere, I can tell where the body cam

94

1　is.  But it looks like you would have a view of the EMT,

2　this person here, Damon Richardson.  Like, you would

3　have a direct view of his actions.

4　　　　Do you recall that now?

5　　　　MR. FINE:  Calls for speculation.

6　　　　THE WITNESS:  I recall that the medical personnel

7　was there and this gentleman was there on scene.

8　BY MR. NISENBAUM:

9　　Q.  Okay.  Well, I understand that.

10　　　　But do you recall this part?  He's got the

11　syringe in the right hand?

12　　A.  It's hard to tell what he has in his hand.

13　　Q.  Okay.  Well, you'll see it in a moment.

14　　　　Pausing at 7:40.  You can see the syringe is in

15　his right hand now, right?

16　　A.  Yes.

17　　Q.  Okay.  All right.  Continuing at 7:40.  And

18　Mr. Gutzalenko at this point, you still felt like he was

19　still trying to kick; is that right?

20　　A.  I believe so.  I -- I believe I still had control

21　of his -- his legs.

22　　Q.  Okay.  7:40, continuing.

23　　　　All right.  We're paused at 7:45.  I'm going to

24　go back just a shade.

25　　　　7:39, you can see Officer Tran's right hand.

95

1         Do you see it?

2     A.  I do.

3     Q.  Okay.  We'll continue.

4         And one of the things that you might do without

5   communicating with the paramedic is move clothing to

6   facilitate the injection.

7         Is that fair to say?

8     A.  Yes.

9     Q.  Okay.  All right.  Paused at 7:43.  That was

10  Officer Tran's hand and in conjunction with

11  Mr. Richardson that moved the clothing, that moved the

12  shirt off Mr. Gutzalenko's left shoulder, correct?

13    A.  That's correct.

14    Q.  Okay.  And it's -- obviously, you can tell that

15  it's for the purpose of the injection, correct?

16    A.  That's correct.

17    Q.  Okay.  Continue at 7:43.

18        Pausing at 7:49.  We just saw the injection going

19  to the shoulder area.  I don't know the exact medical

20  term for that part of the shoulder, but you saw that,

21  correct?

22    A.  That's correct.

23    Q.  And that was the area that Officer Tran had

24  exposed by moving the shirt, correct?

25    A.  That's correct.

1    Q.  Okay.  Continuing at 7:49.

2         7:54, someone said, "He's unconscious, so he's

3    good."

4         Do you know who that was?

5    A.  I don't recall, or I can't distinguish exactly

6    who said that.

7    Q.  Might have been, "It looks like he's unconscious,

8    so he's good."

9         Play it back from 7:48.

10        Okay.  You don't know who said it?

11        MR. FINE:  Calls for speculation.  Asked and

12   answered.

13        THE WITNESS:  I believe that was Officer Hall in

14   the background.

15   BY MR. NISENBAUM:

16   Q.  Okay.  All right.  7:53, continuing.

17        And Officer Tran, I think he said, "Are you good,

18   buddy?"  And then -- or "You're good, buddy?"  And then

19   kind of slapped him on the chest, like, to say "okay,"

20   something like that, right?

21        MR. FINE:  Mischaracterizes the video.

22        THE WITNESS:  It appears so.

23   BY MR. NISENBAUM:

24   Q.  Okay.  I mean, it wasn't like the slap on the

25   chest you're doing when you're trying to hurt someone.

97

1    It's the slap on the chest when you're trying to say,
2    "All right.  It's over.  You're okay.  We're all okay."
3    At least that's what they thought at the moment, right?
4         MR. FINE:  Calls for speculation.  Lacks
5    foundation.
6         THE WITNESS:  I believe Officer Tran was just
7    trying to provide some reassurance.
8    BY MR. NISENBAUM:
9      Q.  Right.
10         So we're at eight minutes, continuing.
11         I'm going to pause it at 8:24.
12         Could you tell at this point whether -- is this
13   when you first noticed that Mr. Gutzalenko was turning
14   blue or it happened before this or still to come?
15     A.  I believe it's still to come.
16     Q.  Okay.  Continuing at 8:24.
17         We're at 8:45.  It looks like someone asking,
18   "Ivan, are you there, buddy?  Wake up."
19         Is that Officer Hall who said that?
20         MR. FINE:  Calls for speculation.
21         THE WITNESS:  I can't tell based on this clip.
22   I'm not sure whose hands on Mr. Gutzalenko's -- it looks
23   like his chest area.
24   BY MR. NISENBAUM:
25     Q.  Well, I know it's not the paramedics because it

                                                              98

1    has a sleeve.  That's what I can say.

2        A.  Then it might -- again, I can't tell --

3            MR. FINE:  There's no question pending, Officer.

4            THE WITNESS:  Okay.

5    BY MR. NISENBAUM:

6        Q.  Did you recognize the voice, though?  You would

7    know Officer Hall's voice.

8            So let me go back, 8:39.

9            So "Ivan, are you there?  Wake up, buddy," was

10   that Officer Hall?

11           MR. FINE:  Calls for speculation.  Asked and

12   answered.  Lacks foundation.

13           THE WITNESS:  I can't tell if that was Hall or

14   Tran.

15   BY MR. NISENBAUM:

16       Q.  Okay.  And someone said in the background, "Is he

17   breathing?"

18           Do you know who said that?

19       A.  I don't.

20           MR. FINE:  Same objection -- same objections.

21   BY MR. NISENBAUM:

22       Q.  Go back to 8:39.

23           Pausing at 8:42.  Someone just said, "Is he

24   breathing?"

25       A.  That sounded like Officer Hall.

                                                        99

1    Q.  Okay.  All right.  Continuing at 8:42.

2         8:49, "He's" -- "hey, he's getting blue in the

3    face," was that you?

4    A.  That sounds like me, sir.

5    Q.  Okay.  And I take it that's when you first

6    noticed that he was getting blue in the face, maybe a

7    couple of seconds before that?

8    A.  That's correct.

9    Q.  Okay.  All right.  He's on the gurney.  He's

10   obviously not in the ambulance, right?

11   A.  That's correct.

12   Q.  I'm not going to make you listen or go through

13   the rest of it.  I know it's a difficult experience.

14   I'm going to stop the share.

15        I do have -- actually, sorry.  One other question

16   that I have.  Back to seven -- okay.

17        I don't think I asked this, but in a few seconds,

18   you're going to hear someone say, "Oh, we're doing

19   great.  He's unconscious, so that's good."  I don't

20   think -- did I ask you about that yet?  I don't think

21   so.  Let me listen for that sentence.  And let me know

22   if you know who says it.

23        Did you hear it?

24   A.  I did.

25   Q.  Okay.  Do you know who said that?

                                                    100

1          MR. FINE:  Calls for speculation.  Lacks

2    foundation.  Asked and answered.

3          THE WITNESS:  Sounds like Officer Hall.

4    BY MR. NISENBAUM:

5      Q.  Okay.  All right.  I'll stop the share there.

6          So you testified that -- in your coroner's

7    inquest that no force was used that day.  I think we

8    discussed that.  That's not technically true, right?

9          MR. FINE:  Vague.  Overbroad.  I'd ask that you

10   show him, give him context for his testimony.

11         MR. NISENBAUM:  Okay.

12   BY MR. NISENBAUM:

13     Q.  Page 62 of the coroner's inquest.  Let me pull it

14   up here.

15         Okay.  Oh, just so we're clear here, this is your

16   testimony.  And we don't need to make this an exhibit.

17   It's too long, and I think it's unnecessary.

18         MR. FINE:  Didn't we make this Exhibit A already?

19         MR. NISENBAUM:  The transcript of the coroner's

20   inquest?

21         MR. FINE:  You had read a lot from it earlier, I

22   believe.  And the court reporter asked you if you

23   wanted --

24         MR. NISENBAUM:  That was his --

25         MR. FINE:  -- to make it a --

                                                        101

1      MR. NISENBAUM:  -- interview.

2      MR. FINE:  Okay.  Understood.

3      MR. NISENBAUM:  Okay.  That was the -- so the

4  exhibit itself is confidential.  It didn't sound like

5  you had any objections to the parts that I read not

6  being confidential.  But that was the interview.

7  BY MR. NISENBAUM:

8      Q.  So this is the coroner's inquest transcript.  So

9  we're on page 57 of the transcript.

10      You see your name, Cedric Tagorda, called as a

11  witness, being sworn and testified as follows?  Do you

12  see that?

13      A.  I do.

14      Q.  Okay.  So then going to page 62.  And it might

15  have been the context of the questioning, but at

16  page 62, line 3:

17      "Q.  All right.  At any time, did you see any

18  officer strike him with the baton, tase him, pepper

19  spray him, put a knee on his neck, do anything such as

20  that using that kind of force?

21      "A.  No, your Honor.  No force was used that

22  day."

23      Is it fair to say that your testimony was with

24  respect to force as people typically think about it as

25  opposed to a police training regarding force and what

                                                    102

1    force is?

2       A.   Yes.

3       Q.   Okay.  So it is true that there was force used

4    against Mr. Gutzalenko as under police -- Richmond

5    Police Department policy and training, correct?

6       A.   Well, when I refer to no use of force, again, no

7    force, meaning no baton, no Taser, no pepper spray.  We

8    didn't have to tackle Mr. Gutzalenko.  The only thing

9    that we did that day was trying to control

10   Mr. Gutzalenko.  And that was -- again, that's what I

11   was referring to when I said no use of force was used

12   that day.

13      Q.   I get that.  I understand that.  I'm not -- you

14   were using the term "force" colloquially, right?

15      A.   Correct.

16      Q.   But under -- you know, so with that in mind, as

17   the Richmond Police Department defines force, there was

18   force used that day and with the technical terms of

19   the -- of police -- Richmond Department policy, correct?

20      A.   I would say correct.  But again, in the

21   circumstances, I -- I don't believe any force was used

22   that day, and that's the reason why I stated that.

23      Q.   Again, you mean that the particular types of

24   force that you enumerated, what people think of when

25   they think of force being used, right?

                                                        103

1    A.   That's correct.

2    Q.   Force as you might see it on the evening news

3  but -- okay.

4         All right.  Is there anything that has jogged

5  your recollection or memory of anything I haven't asked

6  you that you think is significant?

7    A.   Nothing comes to mind.

8    Q.   Okay.  Do you feel like going through this

9  process of this deposition, you now remember what

10  happened a lot better than you did when we started the

11  deposition?

12   A.   I do.

13   Q.   Okay.

14        MR. NISENBAUM:  I'm going to stop the share.  Let

15  me just check a couple more notes.  And let's take a --

16  let's take like a ten-minute break, like a --

17        MR. KANTER:  Five.

18        MR. NISENBAUM:  Five is fine with me, whichever

19  you guys want.

20        MR. FINE:  All right.  I think five is

21  probably -- just want -- let's come back at 12:21.

22        Does that work for everybody?

23        MR. NISENBAUM:  That's fine.   Fine.

24        (Off the record.)

25        MR. NISENBAUM:  All right.  So I sent the correct

                                                          104

1    transcript for Officer Tagorda.  It is a document

2    entitled "Officer Tagorda [CONF 1430-1446].pdf" and that

3    is confidential Exhibit A.  And with that, I'm done.

4         MR. FINE:  Go ahead, Mr. Kanter.

5         MR. KANTER:  I just have a few questions.  I

6    represent American Medical Response West and

7    Damon Richardson.

8                        EXAMINATION

9    BY MR. KANTER:

10        Q.  You were aware that Mr. Gutzalenko was being

11   placed in custody to be detained while Officer Tran and

12   Officer Hall were investigating a claimed vandalism of a

13   store, right?

14        A.  Yes.  That's correct.

15        Q.  And it was your understanding that the paramedics

16   were called to the scene because Mr. Gutzalenko had a --

17   had bruised and bloody hands that -- and possible

18   injuries that needed to be medically treated, correct?

19        A.  Correct.

20        Q.  Mr. Gutzalenko was not formally placed on a 5150

21   hold in this case, was he?

22        A.  He was not.

23        Q.  And that was just something that was under

24   consideration; is that right?

25        A.  That's correct.

1    Q.  And you didn't tell the AMR paramedics about that

2    consideration in this case, correct?

3    A.  Not in this case, no.

4    Q.  And you didn't direct the AMR medics to use a

5    sedative in this case, correct?

6    A.  I did not.

7    Q.  None of the police officers did, right?

8    A.  That's correct.

9    Q.  And the use of a sedative was a decision that the

10   paramedic made for his own purposes in providing medical

11   care, right?

12   A.  Yes, sir.

13        MR. KANTER:  Those are all the questions I have.

14   Thanks.

15        MR. FINE:  Just a couple, Officer Tagorda.

16                    EXAMINATION

17   BY MR. FINE:

18   Q.  If we go back to the radio call that you received

19   to respond to this incident, can you tell me, again,

20   what you recall about that, what you heard over the

21   radio?

22   A.  It was a disturbance call regarding a subject who

23   was entering stores, vandalizing stores, as well as

24   having -- appear to have some type of medical issue.

25   Q.  And so when you were responding to this, you were

                                                    106

1   responding to a report of a crime; is that correct?

2      A.  Yes.

3      Q.  It wasn't just a medical emergency; is that

4   right?

5      A.  That's correct.

6      Q.  At any point during the officers' interactions

7   with Mr. Gutzalenko, did you see Officer Tran place any

8   significant compressive pressure in the center of

9   Mr. Gutzalenko's back?

10      A.  I did not.

11      Q.  And if at any point you had seen what you believe

12   to be Officer Tran putting significant compressive

13   pressure on any area of Mr. Gutzalenko that you believed

14   would have restricted his airflow, what would you have

15   done?

16      A.  I would have moved that body part, in this case,

17   his knee.  I would have moved it or given -- as far as

18   pushed Officer Tran off of Mr. Gutzalenko.

19      Q.  Okay.  And -- but you didn't do that here; is

20   that right?

21      A.  That's correct.

22      Q.  And why not?

23      A.  Because I did not see any of -- I didn't see that

24   action or anything that would prevent Mr. Gutzalenko's

25   airways from being restricted.

1    Q.  Okay.

2        MR. FINE:  That's all I got.

3        THE REPORTER:  Mr. Fine and Mr. Kanter, would you

4    like to order a transcript?

5        MR. FINE:  Just one second.  I want to --

6    Mr. Nisenbaum may have some follow-ups --

7        MR. NISENBAUM:  No.

8        MR. FINE:  -- or not.  That's fine too.  I just

9    didn't want to cut it short.

10       MR. KANTER:  I'd like an electronic copy.

11       THE REPORTER:  Okay.

12       MR. FINE:  I would as well, please.

13           (Deposition concluded at 12:29 p.m.)

14                      --o0o--

15

16

17

18

19

20

21

22

23

24

25

                                                        108

```
1      STATE OF CALIFORNIA )
                           )
2       COUNTY OF FRESNO   )

3

4           I, LILIANA RODRIGUEZ, Certified Shorthand Reporter,

5      in and for the State of California, do hereby certify:

6           That the foregoing proceedings were taken before me

7      remotely at the time and place herein set forth; that

8      any witnesses in the foregoing proceedings, prior to

9      testifying, were duly sworn; that a record of the

10     proceedings was made by me using machine shorthand which

11     was thereafter transcribed under my direction; that the

12     foregoing is a true record of the testimony given.

13          Pursuant to Federal Rule 30(e), transcript review

14     was requested.

15          I further certify that I am neither financially

16     interested in the action, nor a relative or employee of

17     any attorney or party to this action.

18          IN WITNESS WHEREOF, I have this date subscribed my

19     name.

20

21     DATED:  _11_/_11_/_24_

22          Fresno, California

23

24               __/s/Liliana Rodriguez_____
                 LILIANA RODRIGUEZ, CSR No. 13783
25
```

                                                        110

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

| | |
|---|---|
| IVAN GUTZALENKO, Deceased, ) <br> through his Co-Successors ) <br> in Interest, N.G. and N.I.G,) <br> minors through their mother ) <br> and Next Friend, Honey ) <br> Gutzalenko, individually ) <br> and as Co-successors in ) <br> Interest for IVAN ) <br> GUTZALENKO, Deceased, )CASE NO.: 3:22-cv-02130-EMC <br> ) <br>       Plaintiffs, ) <br> ) <br>    vs. ) <br> ) <br> CITY OF RICHMOND, et al., ) <br> ) <br>       Defendants. ) <br> _____) | **CERTIFIED COPY** |

VIDEOCONFERENCE DEPOSITION OF

OFFICER MARK HALL

THURSDAY, SEPTEMBER 5, 2024

10:00 A.M. - 1:13 P.M.

REPORTED BY:  Liliana Rodriguez, CSR No. 13783

1

1                    INDEX OF EXAMINATION

2

WITNESS: OFFICER MARK HALL

3

4    EXAMINATION                                    PAGE

5    By Mr. Nisenbaum                                  6

6    By Mr. Kanter                                   143

7    By Mr. Fine                                     145

8                        --o0o--

9

10

Appearance Page                                      3

11

Exhibit Page                                         4

12

Location                                             5

13

Declaration Under Penalty of Perjury               147

14

Reporter's Certificate                             148

15

Disposition                                        149

16

Witness Letter                                     150

17

Deposition Errata Sheet                            151

18

Attorney's Notes                                   152

19

20

21                        --o0o--

22

23

24

25

2

```
 1    REMOTE APPEARANCES

 2

 3    For Plaintiffs:

 4         LAW OFFICES OF JOHN L. BURRIS
           BY: BEN NISENBAUM, ATTORNEY AT LAW
 5             JAMES COOK, ATTORNEY AT LAW
           Airport Corporate Center
 6         7677 Oakport Street, Suite 1120
           Oakland, California 94621
 7         (510) 839-5200
           Ben.Nisenbaum@johnburrislaw.com
 8

 9    For Defendants:

10         ORBACH HUFF & HENDERSON LLP
           NICHOLAS FINE, ATTORNEY AT LAW
11         6200 Stoneridge Mall Road, Suite 225
           Pleasanton, California 94588
12         510.999.7908
           Nfine@ohhlegal.com
13

14    For Defendants:

15         HINSHAW, MARSH, STILL & HINSHAW, LLP
           SCOTT R. KANTER, ATTORNEY AT LAW
16         12901 Saratoga Avenue
           Saratoga, California 95070
17         408.861.6500
           Skanter@hinshaw-law.com
18

19    Also Present:

20         Crystal Mackey,
           Law Offices of John L. Burris
21
           Officer Tom Tran
22

23                        --oOo--

24

25
```

3

1           INDEX TO EXHIBITS

2

3        WITNESS:  OFFICER MARK HALL

4   MARKED              DESCRIPTION                PAGE

5

6                   (NONE MARKED)

7

8                      --o0o--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          Zoom videoconference deposition of

2                OFFICER MARK HALL,

3    taken on behalf of Plaintiffs, beginning at 10:00

4    a.m. and ending at 1:13 p.m. on Thursday,

5    September 5, 2024, before Liliana Rodriguez, Certified

6    Shorthand Reporter No. 13783

7

8

                        --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                      5

1    REPORTED REMOTELY FROM FRESNO COUNTY, CALIFORNIA;

2    THURSDAY, SEPTEMBER 5, 2024, 10:00 A.M.

3    -oOo-

4    OFFICER MARK HALL,

5    having been first duly sworn,

6    testified as follows:

7    EXAMINATION

8  BY MR. NISENBAUM:

9    Q.   Okay.  Can you please state and spell your name?

10   A.   Mark Hall.  M-A-R-K, H-A-L-L.

11   Q.   And what is your current occupation?

12   A.   I'm retired.

13   Q.   Okay.  What was your most recent occupation?

14   A.   Police officer with the City of Richmond Police

15  Department.

16   Q.   Okay.  What was your date of retirement?

17   A.   It was in February of 2023.

18   Q.   And was the retirement, was it a matter of time,

19  and you were eligible to retire, or was it medical

20  related or some other reason?

21   A.   Medical related.

22   Q.   Okay.  And the medical condition involved, did it

23  have anything to do with this incident involving

24  Ivan Gutzalenko?

25   A.   No.

6

1    Q.  Okay.  And what -- so you retired in February of

2    2023.

3         Were you on leave for some period of time before

4    your retirement?

5    A.  I was.  I had surgery, and so I was on leave for

6    about a year.  And then I went back to an

7    administrative -- administrative position.  It was light

8    duty to see if I could rehab myself back to return to

9    duty.

10   Q.  Okay.  Now, the date of this incident, I believe,

11   is March 10th, 2021.

12        Does that refresh -- does that sound right to

13   you?

14   A.  It was definitely in March of 2021.

15   Q.  Okay.  And I assume you were on leave for some

16   period of time after this incident, correct?

17   A.  I want to say it was probably September, October

18   of that year that I went on leave.  It's just an

19   estimation, but it was shortly -- it was -- I was back

20   in service for a while after this incident.

21   Q.  Right.

22        And then you went out on leave maybe seven months

23   after this incident, six or seven months?

24   A.  Yeah, approximately.  I can't recall exactly the

25   time frame.

7

1    Q.  Okay.  And I don't know that it's significant,

2    and it probably isn't, but I'm just trying to get a

3    sense of how long you were on leave after this incident

4    happened.  You were on administrative leave for some

5    period of time as a matter of routine, correct?

6    A.  Oh, you mean as far as my injury or as for --

7    Q.  All right.  Gutzalenko.

8    A.  Well -- so I was supposed to have three days off,

9    but the psychologist, he had an accident at home, so I

10   was off an extended amount of time waiting for the

11   clearance to return.

12   Q.  Okay.  And what was an extended amount of time?

13   How long?

14   A.  I think it was a -- it was almost a -- a week and

15   a couple of days.  I was -- he -- I was -- I was slated

16   to be -- you know, have my evaluation.  And apparently,

17   he had a -- he had a slip-and-fall accident.  He was

18   actually in the hospital for some time.

19   Q.  Okay.  All right.  Now, let me ask you, when did

20   you become licensed as a police officer?

21   A.  In December of 2021 -- correction, December of

22   2001, I graduated the police academy from Napa Police

23   Academy.

24   Q.  Okay.  All right.  And at the police academy --

25   at Napa Police Academy, you received training in

                                                        8

1    providing courtroom testimony, correct?

2        A.  Yes.

3        Q.  All right.  And you have, in fact, testified in

4    court probably way more times than you can count, right?

5        A.  That's safe to say, yes.

6        Q.  Would you estimate more than 50?

7        A.  Yes.

8        Q.  Okay.  More than a hundred?

9        A.  Yes.

10       Q.  All right.  I want to ask further.

11           Have you had your deposition taken before?

12       A.  Sometime ago, but I -- I don't recall when.

13       Q.  Was it in a civil matter in which you are a

14   defendant?

15       A.  I was a witness officer.

16       Q.  Okay.  And so is it, like, some sort of car

17   accident or something?

18       A.  No.  It was -- it was an arrest, but I don't know

19   the terms, whatever happened to -- I gave my statement.

20   I never heard whatever happened with that.

21       Q.  And when you say you gave your statement, you

22   gave your deposition like we're doing right now, right?

23       A.  Yes.  But it was in person.

24       Q.  Right.  And they used to be.  Anyway.

25           All right.  And obviously, the fact of testifying

9

1　is an experience that you're fairly comfortable with, I

2　take it?

3　　A.　Yes.

4　　Q.　All right.　I'm going to go over some basic

5　admonitions, but, you know, I'm not going to cover them

6　all.　If others become relevant, then I will discuss

7　them.　I'll raise them.

8　　　　Your testimony today is under penalty of perjury,

9　the same penalty of perjury as if you were testifying

10　live in court.

11　　　　Do you understand that?

12　　A.　Yes.

13　　Q.　Okay.　I'm entitled to your best estimate.　I'm

14　entitled to what you know and your best recollection.

15　What I don't want is for you to guess or speculate, so

16　if you don't know the answer to a question, just say so.

17　If you don't remember, just say so.　If you have a

18　partial recollection, I'm entitled to as much as you do

19　recall.　And likewise, I'm entitled to your best

20　estimate of something that you saw, but, you know, the

21　example that's commonly given -- well, there are many

22　examples, but here's one of them.　If I were to ask you

23　how big the table is or desk that you're at right now,

24　you'd be -- even though you don't have a tape measure,

25　you could estimate it, right?　It's within your personal

10

1  knowledge.

2       Now, if I were to ask you the size of my desk,

3  because you can't even see it, it would be a pure guess.

4       Do you understand that?

5    A.  Yes.

6    Q.  All right.  When the deposition is concluded, it

7  will be transcribed into a booklet, and you'll be able

8  to review it.  And you can make changes to your

9  testimony, but I will caution you that if you make a

10 change that is substantive in nature, you can be

11 impeached by that, meaning your credibility can be

12 called into question, your truthfulness and honesty.

13      Do you understand that?

14   A.  Yes.

15   Q.  Okay.  I'll give you an example that actually

16 happened.  It was a case many, many years ago where

17 police officers entered the house, and they gave that --

18 a claim that the reason they entered the house was they

19 saw a shirt that appeared to have blood on it hanging

20 over the front door.  And so I asked the officer, well,

21 you know, "Did the blood appear to be fresh blood or dry

22 blood or wet blood or dry blood?"

23      And he said, "I couldn't tell.  I don't know."

24 And same thing with fresh blood.

25      So then he submits a written change to the court

                                                          11

1 reporter that says, "Your question is confusing to me.
2 Fresh blood could be wet blood or dry blood. This was
3 very, very fresh blood," which obviously contradicted
4 his testimony, initially. And that was used in a very
5 significant manner to impeach him.
6      Do you understand that?
7   A. I do.
8   Q. Okay. So next -- well, like I said, others will
9 come up. You're doing a good job of not talking over
10 me. I'll try to do the same, not talk over you. Let me
11 finish the question, and you start your answer.
12      Oh, if you don't understand the question, please
13 tell me. Okay?
14   A. Will do.
15   Q. Your lawyer will object from time to time. Well,
16 there are a couple of lawyers here who might object from
17 time to time. And if they do, you still have to answer
18 the question after the objection, but, of course, if you
19 don't understand it, then please tell me. All right?
20      MR. FINE: Or if I instruct you not to answer,
21 Officer.
22 BY MR. NISENBAUM:
23   Q. Well, there is that too. If he tells you not to
24 answer, that's a different matter, but I don't think
25 we're going to get into that.

12

1      For example, if I asked you, "Well, you and your

2 lawyer prepared for this deposition, what did you talk

3 about?"  That would be privileged.

4      And he would tell you, "Don't answer that," so

5 I'm not entitled to that.

6      But I am entitled to ask you this:  What

7 materials did you review in preparation for your

8 deposition?

9   A.  I reviewed the district attorney investigation,

10 the bills from the callout.  And I had a chance to

11 review my body camera footage.

12   Q.  Did you review anyone else's body camera footage?

13   A.  No.

14   Q.  Okay.  I'm going to ask you some questions now

15 about your training.  Obviously, we're in a

16 post-George Floyd world.  I think everybody knows that

17 people can be restrained to death effectively.

18      Do you have that same understanding?

19   A.  I -- my --

20      MR. FINE:  Vague and ambiguous.

21      Go ahead.

22      THE WITNESS:  My understanding -- my

23 understanding is any use of force, no matter how minor,

24 could cause any kind of injury ultimately resulting to

25 death.

13

1    BY MR. NISENBAUM:

2        Q.  Okay.

3        A.  So no matter how little, it could.  Force is

4    force, and it's not pretty no matter how you look at it.

5        Q.  Okay.  But you have been trained that when a

6    person is being restrained, and they're in a prone

7    position, that you're trained to avoid putting weight on

8    their back, correct?

9            MR. FINE:  Incomplete hypothetical.  Vague and

10   ambiguous.

11           Go ahead.

12           THE WITNESS:  We are trained not to obstruct the

13   airway for asphyxiation, but there are control

14   techniques, which permit you to provide weight in

15   certain parts of different parts of the body.

16   BY MR. NISENBAUM:

17       Q.  I understand that.  My question was specific,

18   though.

19           You're trained to avoid putting weight on a

20   person's back when they're in a prone position if the

21   circumstances reasonably allow you to avoid doing that,

22   correct?

23           MR. FINE:  Same objections.

24           THE WITNESS:  But what part of the back?  I mean,

25   there's different areas of the back where you're

14

1    permitted such as the shoulder.  And it just --
2    BY MR. NISENBAUM:
3        Q.  You -- sorry, I interrupted you.
4            You tell me what areas of the back are you
5    permitted to put weight force on when the person is
6    prone and being restrained as opposed to what areas of
7    the body you're not permitted to put weight force on in
8    that situation?
9            MR. FINE:  Incomplete hypothetical.  Vague and
10   ambiguous.
11           THE WITNESS:  You definitely don't want to ever
12   put pressure on anyone's neck.  That's a given.  You --
13   you're allowed to place weight on somebody's shoulder,
14   on their gluteus maximus, on their lower back to keep
15   them prone.  There's even techniques where you can do a
16   full mount where you can press your body weight on the
17   shoulder blades of someone and maneuver and spin around
18   to take hands out from under somebody, so the airway is
19   the most -- the area that's a big no-no area.
20   BY MR. NISENBAUM:
21       Q.  You're talking about the throat area and the neck
22   area?
23       A.  Neck, throat, those are -- those are the areas
24   that are no-goes.  There's -- you know, no choke holds,
25   no pressure, no nothing.

15

1    Q.  Do you have an understanding that in order for a

2    person to be able to breathe, they have to be able to

3    expand their rib cage?

4         MR. FINE:  Incomplete hypothetical.  Calls for

5    expert opinion.  Vague and ambiguous.

6         THE WITNESS:  My understanding is you have to

7    overcome resistance, and as long as you get them in

8    handcuffs and get up, there should be no issues or

9    obstruction.  It's an extended amount of time.  It could

10   cause any issues in no matter what type of use of force

11   you use.

12   BY MR. NISENBAUM:

13   Q.  I understand that.

14        Again, my question is, do you have an

15   understanding that for a person mechanically to be able

16   to ventilate, you know what that means, right, breathe?

17   A.  Well, I also understand the lungs are protected

18   by the rib cage, so they can actually expand because the

19   ribs are very strong.  And as long as they're not broken

20   or punctured, the lungs will expand.  The rib cage

21   provides the shell of protection.

22   Q.  Where do you have that understanding from?

23   A.  Different biology classes.  The -- the skeletal

24   is what protects all of the vital organs.  It's -- it is

25   the armor of the interior organs such as kidneys, heart,

16

 1  lungs, spleen.  It all provides protection especially in
 2  the -- in the chest and rib cage area.
 3      Q.  It provides protection from trauma, but you
 4  understand that your chest expands when you breathe
 5  naturally, correct?
 6      A.  I do.
 7      Q.  Okay.  And so if I'm understanding you correctly,
 8  it is your understanding that you can breathe even if
 9  your rib cage is being compressed --
10          MR. FINE:  Misstates testimony -- oh, I'm sorry.
11  BY MR. NISENBAUM:
12      Q.  That your lungs can expand even if your rib cage
13  is being compressed.
14          Is that what you just told me?
15          MR. FINE:  Misstates testimony.  Calls for expert
16  opinion.  Vague and ambiguous.
17  BY MR. NISENBAUM:
18      Q.  Go ahead.
19      A.  So I -- I know I've had -- during training, I've
20  been -- I've had pressure on me.  My rib cage has been
21  compressed.  And I was able to breathe.  I mean, that's
22  my mechanics.  I would assume most -- everybody else's
23  mechanics, especially if they're healthy and, you know,
24  not, you know -- you know, drug induced or under the
25  influence of a substance that, you know, they should --

                                                          17

1    their breathing system should operate functionally just
2    as much as mine and yours.
3        Q.  So what training did this occur in?
4        A.  Defensive tactics.
5        Q.  Defensive tactics.
6            That's -- so describe for me the scenario in
7    which you have your rib cage compressed, but you were
8    able to breathe.
9            And I'm sorry, were you able to breathe
10   unimpeded?  Was your breathing uninhibited?
11       A.  I was able to breathe.  I was able to go with the
12   program.  I had an officer who was heavier than me with
13   a full mount on my back with his hands pressing on my
14   shoulder blades putting his weight because I was
15   instructed to keep my hands under my body, and so I was
16   able to breathe, yes.
17       Q.  So his weight, it's describe -- if you're -- if
18   I'm understanding the description correctly, by full
19   mount, I assume that's his butt on your butt, right?
20       A.  His body weight on my body weight.
21       Q.  Well --
22       A.  I'm -- I'm on the ground prone, and he's on my
23   back.
24       Q.  But would you describe more specifically, was
25   your prone -- he's on your back when you say "full

18

1    mount."  I'm asking you, was his -- what part of his

2    body was against your body?

3        A.  His -- his hands, his chest.  He was laying

4    directly on my back along my shoulder blades.  And he

5    had to maneuver around my back kind of like a helicopter

6    to try to get my -- wrestle my hands out from under my

7    body.  And he had to mount his pressure -- his body

8    weight was pressed on mine, but I was still able to

9    breathe and communicate and talk.

10       Q.  But his weight was pressed -- it sounds like, his

11   weight was pressed on your shoulder blades, correct?

12       A.  And his chest and his abdomen area was pushed on

13   my back.  He was pushed on me laying on my back.

14   That's -- that's what I've already stated.  His body --

15       Q.  Okay.

16       A.  -- weight on my back.

17       Q.  I understand.  I'm asking you details, so I'm

18   trying to understand.

19       A.  Well -- and I'm giving you the details.  His body

20   is on my back.  His whole weight is on my back.  I'm

21   feeling him against me.

22           MR. FINE:  I'm just going to object to this

23   entire line on relevance grounds.

24           MR. NISENBAUM:  Well, he brought it up, so -- and

25   I don't think relevance is a proper objection in a

                                                        19

1    deposition.

2           MR. FINE:  Go ahead, Counsel.

3    BY MR. NISENBAUM:

4       Q.  So he was lying on top of your back, right?

5       A.  Lying on top of my back, and the -- I was trying

6    to get my arm up from under me, but his weight was

7    pressed against me.

8       Q.  Okay.  And was this intended to replicate a

9    police -- a law enforcement restraint that happens in

10   the field?

11      A.  When I was taught this, my arms were instructed

12   to be under me so they can, you know, try to get my --

13   spin around and get my arm out behind me and cuff me.

14      Q.  And you were taught this.  You were being trained

15   this way so that you were supposed to resist it as much

16   as possible, and they were supposed to force it to

17   happen, right?

18      A.  Yes.  I had to pull my arm out from under me.

19      Q.  All right.  And I take it, you're a -- how old

20   were you when that happened?

21      A.  Maybe 30.  Maybe 32.  Thirty-one, 32.

22      Q.  And what kind of shape were you in?

23      A.  I wasn't in the best shape, you know, I -- I was

24   heavy set.  I was unhealthy, on blood pressure

25   medications.  I was -- I was very unhealthy.  I'm -- I'm

                                                          20

1    healthy now, but I wasn't super healthy then.

2        Q.  Okay.  All right.  And were you intoxicated?

3        A.  No.

4        Q.  Did you have a stimulant in your system?

5        A.  No.

6        Q.  Were you having difficulty breathing already?

7        A.  No.

8        Q.  Were you telling people, "I can't breathe"

9    already before the restraint began?

10       A.  No.

11       Q.  Okay.  All right.  And, of course, you were aware

12   that this was a training and not real life, right?

13       A.  Yes.

14       Q.  Okay.  Thank you.

15           So what other training have you had regarding

16   avoiding asphyxiation during restraint?

17           MR. FINE:  Vague and ambiguous.

18           THE WITNESS:  We -- we've been instructed not

19   to -- I mean, in our policy, it strictly states no -- no

20   choke holds, you know, no -- you -- you never put

21   pressure on anybody's neck.  That that's -- that's the

22   main thing, but you never want to obstruct an airway.

23   Period.  That's what we've been taught.

24   BY MR. NISENBAUM:

25       Q.  So there's no training at the Richmond Police

21

1  Department that you're aware of that instructs officers
2  to avoid prolonged weight or force against a person's
3  back while they're prone and being restrained; is that
4  correct?
5       MR. FINE:  Misstates testimony.
6       THE WITNESS:  There's training to effectively
7  place someone in handcuffs, but you're not to obstruct
8  their airway by placing weight along their neck or
9  breathing airway, so the point is you get them
10 handcuffed.  And you get them into a recovery position
11 as soon -- you don't leave them prone on their chest.
12 As soon as you get them handcuffed, you roll them over
13 for recovery so their airway can be opened.
14      MR. NISENBAUM:  Can you read the question back,
15 please?
16      THE REPORTER:  Just a moment.
17      (Record read.)
18 BY MR. NISENBAUM:
19    Q.  That's my question.
20      Is there any training that specifically is on
21 that point?
22      MR. FINE:  Same objections.  Asked and answered.
23      THE WITNESS:  So again, there's training, and so
24 you have to get the handcuffs on, so the thing is,
25 you -- yes, you don't want them -- you don't want them

                                                        22

1  prolonged, so there is training not to keep them prone

2  out.  As soon as you get them in handcuffs, you roll

3  them to a recovery position on their side.

4  BY MR. NISENBAUM:

5    Q.  What if it takes five minutes to handcuff them,

6  is that fine?

7        MR. FINE:  Same objections.

8  BY MR. NISENBAUM:

9    Q.  Is it fine -- strike that.  I'll be more

10  specific.

11        Is it fine to put weight force pressure on a

12  person who is being restrained in the prone position to

13  wait for weight force pressure on their back for up --

14  for five minutes, if that's how long it takes to get

15  them handcuffed?

16        MR. FINE:  Incomplete hypothetical.  Calls for

17  expert opinion.  Vague and ambiguous.

18        THE WITNESS:  And, well, if you're arresting

19  somebody, you don't -- you don't give up your ground.

20  You have to -- you don't know what this person is

21  capable of.  You -- you know, they're -- if they're

22  resisting arrest, or, you know, if they're -- if they're

23  overcoming resistance, they're trying to fight, so you

24  don't give up your ground, especially if you have a

25  handcuff on them.  You do not give up.  Do not give them

                                                        23

1  that as a weapon.

2  BY MR. NISENBAUM:

3      Q.  So you compress them against the ground as long

4  as you feel is necessary to get them handcuffed; is that

5  right?

6          MR. FINE:  Same objections.

7          THE WITNESS:  We -- we can't -- we will tell

8  people to stop resisting.  We will tell them we don't

9  want to do this, but the thing is, ultimately, their

10  decision on how this occurs.  We -- we can't give up

11  ground.  We are -- we are -- we are responsible for

12  ensuring public safety.

13  BY MR. NISENBAUM:

14      Q.  So the answer is, yes, you can compress them

15  against the ground as long as it takes to get them

16  handcuffed, no matter how long that time period is.

17          Is that your answer, yes or no?

18          MR. FINE:  Misstates testimony.  Incomplete

19  hypothetical.  Vague and ambiguous.  It calls for expert

20  opinion.

21  BY MR. NISENBAUM:

22      Q.  Yes or no?

23      A.  To overcome resistance, you have to get them in

24  custody.

25      Q.  You have the question in mind.  I asked very

                                                        24

1    specifically.

2         With respect to a person in a prone position on

3    the ground, you can compress them, compress their back,

4    press them against the ground as long as it takes no

5    matter how long it takes to get them into custody.

6         Is that your testimony?

7    A.  So we --

8         MR. FINE:  Misstates -- and so hold on.

9         Misstates testimony.  Vague and ambiguous.  Calls

10   for expert opinion.

11        Go ahead.

12        THE WITNESS:  And the thing is, I'm not going to

13   give up my ground, because if this person is resisting,

14   I don't know if he has a gun in his waistband, and he's

15   fighting because this happened.  People will fight the

16   police, so I'm going to get that person in custody.  I'm

17   not going to give up my ground.  I am not going to --

18   I'm not going to be killed by a subject who I don't know

19   what they're capable of, so they are going to -- you

20   know, use -- use of forces aren't pretty in any world.

21   BY MR. NISENBAUM:

22   Q.  So that's a yes?

23   A.  I will do what I have to do in order to overcome

24   resistance to complete my task.

25   Q.  Is that a yes?

                                                    25

1          MR. FINE:  Same objections.

2          THE WITNESS:  Same statement.

3    BY MR. NISENBAUM:

4       Q.  Not the same statement.

5          The question is, is that a yes?

6       A.  Yes.  I will -- I will get my person in custody.

7    I will not give up my ground.  And I will not give them

8    their handcuffed arm as a weapon to swing around and hit

9    me or anybody else with.

10      Q.  Okay.  Even if that means that you're compressing

11   the person against the ground for an indefinite period

12   of time, that can be as long as you feel it's necessary?

13         MR. FINE:  It's vague and ambiguous.  Calls for

14   expert testimony.  Asked and answered.

15         THE WITNESS:  And that's the decision the

16   arrestee has to make.  I don't -- I never want to use

17   force against anybody ever.  Nobody wants that.

18   BY MR. NISENBAUM:

19      Q.  Okay.  I'm not here for the lecture.  I'm asking

20   you questions, yes or no?

21      A.  And I'm telling you, I am not going to give up my

22   ground, so yes, I am going to arrest him.  I am not

23   going to give up my ground.

24      Q.  And that includes you will compress them into the

25   ground as long as needed for you to get that person in

                                                          26

```
 1   handcuffs; is that right?
 2         MR. FINE:  Vague and ambiguous.  Calls for expert
 3   testimony.  Calls for speculation.
 4         THE WITNESS:  And I've never been in this
 5   situation before because all of my arrests have been
 6   quick and swift.
 7   BY MR. NISENBAUM:
 8      Q.  Well, when you say "this situation," you're
 9   referring to the one with Mr. Gutzalenko?
10      A.  Yes.
11      Q.  Okay.  Right.
12          But that's why you received training, isn't it?
13      A.  Yes, but I provided no pressure on except his
14   glute.
15      Q.  You were present, right?
16      A.  I was present.
17      Q.  And you were present.
18          You were present while Officer Tran had his knee
19   in the middle of his back and was pressing down, right?
20         MR. FINE:  Misstates the evidence.
21   BY MR. NISENBAUM:
22      Q.  I guess we'll see.
23          But weren't you there when Officer Tran was doing
24   that?
25         MR. FINE:  Misstates the evidence.
```

27

1        THE WITNESS:  Officer Tran had his arm on his

2   shoulder blade area, right shoulder blade area.  I never

3   saw any knee on his back.

4   BY MR. NISENBAUM:

5      Q.  You didn't see any knee on his back, right?

6      A.  I saw the shoulder blade area.

7      Q.  Okay.  How's your vision?

8      A.  It's pretty good.

9      Q.  Okay.  No problems in your vision, and your

10  recollection, you don't have any problems there either,

11  right?

12        MR. FINE:  It's argumentative.

13        THE WITNESS:  He -- I saw on the -- over here

14  underneath the armpit area, near the shoulder blade area

15  where I didn't see him pushing any weight on his back.

16  BY MR. NISENBAUM:

17      Q.  Okay.  If you had seen that, is that something

18  you would have been obligated to tell him to back off or

19  not apply so much pressure?

20        MR. FINE:  Incomplete hypothetical.  Calls for

21  speculation.

22  BY MR. NISENBAUM:

23      Q.  As you understand your training?

24      A.  If you see any officer using an excessive amount

25  of force or wrong force, you have to correct them.  You

                                                        28

1  have the duty to intercede to stop that.

2      Q.  And in this situation, would that have been

3  unreasonable to do, to put a knee in the middle of

4  Mr. Gutzalenko's back, press down with it while he's in

5  prone position?

6         MR. FINE:  Incomplete hypothetical.  Calls for

7  speculation.  Misstates the evidence.

8  BY MR. NISENBAUM:

9      Q.  Would that have violated your department's

10  policy?

11         MR. FINE:  I didn't know you weren't done.  My

12  apologies.  Same objections.

13  BY MR. NISENBAUM:

14      Q.  Go ahead.

15      A.  I -- if I would have seen him putting pressure on

16  his back, I would have either told him to move, or I

17  would have grabbed his knee and pushed him -- pushed his

18  knee over out of the airway, but from what I saw, it was

19  not in an obstructive position.  He -- the arrestee was

20  still able to move around.  And that's why my knee went

21  to his gluteus maximus.

22      Q.  Okay.  And again, if his knee were in the middle

23  of Mr. Gutzalenko's back pressing down, you do

24  understand, based on your training, that that's to be

25  avoided, correct, because it can interfere with

          29

1  breathing?

2       MR. FINE:  Misstates testimony.  Misstates

3  evidence.  Incomplete hypothetical.  Vague and

4  ambiguous.

5       THE WITNESS:  If he was applying pressure on his

6  back, it could obstruct the airway, but I did not see

7  his knee on his back.  It was near his shoulder area.

8  And he was still moving and pulling and flailing around.

9  BY MR. NISENBAUM:

10     Q.  And let me ask you this:  Did you review anyone

11  else's interviews?

12     A.  No.  Just mine.

13     Q.  You said you reviewed the DA's report.  All of

14  it?

15     A.  No.  Just my statement.

16     Q.  Okay.  All right.  So there was a witness who

17  described a chubby officer being on top of a -- being on

18  top of Mr. Gutzalenko.

19       Do you know who that chubby officer would be?

20       MR. FINE:  Calls for speculation.

21       THE WITNESS:  That would have been me, because I

22  was the -- I was the heavier set officer.

23  BY MR. NISENBAUM:

24     Q.  Okay.  So it's not Officer Tran?

25       MR. FINE:  Calls for speculation.

                                                    30

1        THE WITNESS:  No.  I was -- I was a -- I was

2   heavy set back then.  Officer Tran is shorter than I,

3   and he's stocky, so, I mean, it -- it could be either

4   him or I.  But unless they give a race or anything, I

5   can assume it's me, or I can assume it's him.  It's all

6   assumptions at this point.

7   BY MR. NISENBAUM:

8      Q.  Well, one of you described him, Officer Tran, as

9   being heavy set, a big guy.

10       Did you do that?

11     A.  I don't recall.

12     Q.  Okay.  One moment.  Okay.  So reading from --

13       MR. NISENBAUM:  And, Officer Tran, I know you're

14   listening.  I'm sure this is not news to you.  But I --

15   I'm going to read from the interview of Officer Tagorda.

16   And this is at Bates-stamped City_01445.  And this is

17   Officer Tagorda's interview.

18       Question 2, Q2, this is line 32, just one, "So

19   when Officer Tran had his knee on his back, was he on

20   his" -- "was the subject on his side?  Was he on his

21   stomach for" -- "and also, did it appear like Officer,"

22   in parenthesis, "Tran was putting all his body weight,

23   or was it more of a" -- "just a" -- "trying to keep him

24   from jumping up?"

25       "ANSWER:  It was more of just trying to keep him

                                                      31

1  from jumping up obviously," you know, "Tran is kind of

2  a" -- "a" -- "a big boy, a big, big boy.  I don't mean

3  that in a mean way or anything."

4        Is that how you would describe Officer Tran, a

5  big boy.

6     A.  I would just -- I -- not a big boy.  I would

7  describe him as -- as a stocky boy, but I also say he's

8  in shape, and he has muscular features.

9     Q.  Well, he's quite strong as well as being heavy

10 set; is that right?

11       MR. FINE:  Calls for speculation.

12       THE WITNESS:  I -- I would like to think he's

13 strong.  He's a lot younger than I am, so, I mean --

14 but --

15 BY MR. NISENBAUM:

16    Q.  What's your height and weight?

17    A.  I am six-two, and I'm 238.

18    Q.  And were you about the same weight at the time of

19 this incident?

20    A.  No.

21    Q.  What was your weight at the time of this

22 incident?

23    A.  About 285.

24    Q.  Okay.  It sounds like that would be probably not

25 all muscle that you lost?

                                                    32

```
 1      A.  No.  That was poor-shift eating.
 2      Q.  Right.
 3          So you would describe yourself as being pretty
 4   fat at the time of this incident?
 5      A.  Absolutely.
 6      Q.  Okay.  Well, congratulations.  That's a good
 7   amount of weight to lose.
 8          All right.  But nevertheless, you never saw
 9   Officer Tran's knee against Mr. Gutzalenko's back,
10   period, right?
11          MR. FINE:  Vague and ambiguous.
12          THE WITNESS:  Well, if you -- over here on the --
13   underneath.
14   BY MR. NISENBAUM:
15      Q.  Yeah, in the center of his back, the center?
16      A.  I -- I did not see center of the back.
17      Q.  Now, let me ask you another question about your
18   training.
19          You know what the diaphragm is?
20          MR. FINE:  Calls for expert opinion.
21   BY MR. NISENBAUM:
22      Q.  Not the birth control device.
23      A.  So, no, the diaphragm is like what's, you know,
24   in the -- I believe it's in the front portion of the
25   chest, and that's what helps you, you -- you know,
```

33

1  breathe.

2          MR. FINE:  Belatedly, calls for speculation.

3  BY MR. NISENBAUM:

4      Q.  And your training is that if you interfere with

5  the diaphragm, that could also impact a person's ability

6  to breathe, correct?

7      A.  Yes.  You don't want to interfere with anybody's

8  breathing at all obstructing airways.  You -- that's --

9  you try to avoid that at all costs.

10      Q.  Well, the diaphragm isn't an airway, is it?

11          MR. FINE:  Calls for speculation.  Calls for

12  expert opinion.  Calls for -- yeah, that's it.

13          THE WITNESS:  I -- my understanding, it's part of

14  the respiratory system.

15  BY MR. NISENBAUM:

16      Q.  Okay.  And where is it located, to your

17  understanding, in the body?  Is it below the lungs?

18      A.  I --

19          MR. FINE:  Same objections.

20          THE WITNESS:  Yeah.  I don't want to -- I don't

21  want to guess.  I mean, I can Google it right now, if

22  you would like me to.

23  BY MR. NISENBAUM:

24      Q.  Go ahead.

25          Just based on your best recollection, your best

                                                          34

1  understanding, is it below the lungs?

2      MR. FINE:  Calls for expert opinion.  Calls for

3  speculation.

4      THE WITNESS:  I just know it's part of the

5  respiratory system, and I would say it's somewhere in

6  the vicinity of the lungs.

7  BY MR. NISENBAUM:

8    Q.  Okay.  Is it, to your understanding, kind of

9  mid-torso?

10     MR. FINE:  Same objections.

11     THE WITNESS:  I would just say in the same area

12 as the lungs in the general area.

13 BY MR. NISENBAUM:

14   Q.  Okay.  And you're trained that you should avoid

15 putting weight where the diaphragm would be located,

16 correct, because that could interfere with the person's

17 breathing?

18   A.  Yes.  You want to avoid -- prevent anybody from

19 not breathing.  You want everybody to breathe and

20 everybody to go into jail safely.

21   Q.  Right.

22     Now, you talked about something earlier.  You

23 said it's up to the arrestee.  That your actions are

24 somehow determined by the arrestee.

25     Did I hear you correctly?

                                                      35

1     A.   Yeah.  We -- you know, if they surrender and, you

2   know, don't fight, or they don't resist, it's -- it's

3   easy.  Everybody goes home, maybe a citation.  I don't

4   know.

5     Q.   I got it.

6          But if everybody followed the law, you'd be in a

7   different line of work, right?

8     A.   And John Burris would be out of business.

9     Q.   Would he, though?

10    A.   He would be.  If everybody followed the law,

11  they --

12    Q.   Find that hard to believe.

13    A.   I was with a lot of good people, and I -- I gave

14  myself to this job.  And I never -- I've helped more

15  people than I ever hurt anybody.  I have more lifesaving

16  citations.  And this is the first time I've ever been

17  involved in something such as this.

18    Q.   And so you're saying the only time that you've

19  actually inflicted an injury on anyone was in this

20  incident involving Mr. Gutzalenko?

21         MR. FINE:  Misstates testimony.

22         THE WITNESS:  There's uses of force.  There's --

23  thing is, nothing like this has ever happened.  And

24  nobody wants to see this ever happening to anybody.

25  ///

                                                        36

1  BY MR. NISENBAUM:

2      Q.  Okay.  I get that.  You said something, so I'm

3  trying to follow up on it.

4          You said that you've never been involved in a

5  case where anything like this has ever happened, what do

6  you mean by "this"?

7      A.  No.  I -- I've had use of force where I've had to

8  use control holds, where I've never even used my baton.

9  I had to use my Taser, you know, I've -- but I've -- I

10  don't think I even had a pepper spray incident ever.

11     Q.  Okay.  So in your estimation throughout the

12  entirety -- and what was it, 22 years or something?

13     A.  I think a little less.

14     Q.  Near the 22-year career, you've only ever had to

15  use physical control holds, OC spray, and your Taser as

16  uses of force; is that right?

17     A.  I don't --

18         MR. FINE:  Misstates testimony, I believe.

19  BY MR. NISENBAUM:

20     Q.  But, I mean --

21     A.  I -- I -- I don't believe I've ever had an --

22  never used my OC spray.  I've used my Taser.  I've used

23  distraction blows.  I've been on the ground arresting

24  people and, you know, getting them in custody, but this

25  is the first time I've ever been involved in a critical

                                                        37

1    incident.

2       Q.  Okay.  How many times have you been trained on

3    how to avoid asphyxiating people during restraint to

4    your best recollection?

5          MR. FINE:  Vague and ambiguous.

6          THE WITNESS:  I -- I can't even estimate.  I

7    can't even estimate.  I mean, out of 20-plus years, I

8    mean, I can't even estimate.

9    BY MR. NISENBAUM:

10      Q.  Is that a part of your annual training?

11      A.  Part of the advanced officer school, defensive

12   tactics and, you know, get it done, you know, and you

13   don't want to -- you want people -- you want everyone to

14   go home.  We want to go home.  We want them to go home.

15      Q.  And have you been trained that the standard is --

16   of whether or not use of force is reasonable is based on

17   a reasonable officer's standard, not a subjective intent

18   standard?  Have you heard of that?

19      A.  Yeah.  Yes, I have.

20          You have to have a reasonable standard, and the

21   thing is, is, you know, my standard is -- my standard

22   was to go to work, help people out, and go home.  And,

23   you know, this was probably one of the worst days in my

24   career.

25      Q.  I could imagine.  I'm not saying otherwise.  I'm

                                                          38

1    trying to understand your training and how you -- you

2    know, how your training impacted your job, especially on

3    this day.

4         And so you have been trained that the standard

5    that -- of -- by which your use of force is measured is

6    an objectively reasonable officer standard, correct?

7    A.  Yes.

8    Q.  Okay.  And you've also been trained that an

9    officer's subjective intentions can be irrelevant to

10   that analysis, correct?

11   A.  Can you rephrase that?  I don't quite understand

12   what you just said.

13   Q.  Have you heard that term "subjective intentions,"

14   in your training -- or subjective intent?

15   A.  I've heard subjective intent, yes.

16   Q.  Okay.  And you've heard that with respect to the

17   reasonableness of the use of force, right?

18   A.  Yes.

19   Q.  From a case called Graham v. Connor, you've

20   probably heard of, right?

21   A.  Yes.

22   Q.  Okay.  And so you've heard that in training, that

23   whether your intentions are good, bad, or indifferent is

24   irrelevant to the analysis of whether your use of force

25   was reasonable, correct?

39

1    A.  Yes.

2    Q.  Okay.  Your use of force is measured by what it

3  was and what the circumstances were, period, right?

4    A.  Yes.

5    Q.  Okay.  Thank you.

6        So when you say it's the arrestee's choice with

7  respect to the force that you use, isn't it true that

8  you're trained in the level of force you can use with

9  respect to a person's actions based on the totality of

10 the circumstances?

11   A.  I'm trying to --

12       MR. FINE:  Yeah, that's vague and ambiguous.

13       THE WITNESS:  Yeah.  I --

14       MR. FINE:  You can answer, if you understand.

15       THE WITNESS:  I don't truly understand it.

16       Can you, maybe, rephrase it more simplistically?

17 BY MR. NISENBAUM:

18   Q.  Have you been trained in the term "totality of

19 the circumstances," same case, Graham v. Connor?

20   A.  Yes.

21   Q.  Okay.  What does that mean?

22   A.  Well, I -- to me, that's kind of -- you know,

23 it's kind -- it's kind of -- I don't know.  Maybe it's

24 vague to me.  I'm not sure, because the totality of the

25 circumstances, you know, they don't matter if you break

                                                        40

1  the law, if you got to go to jail, you got to go to
2  jail, you know, so -- but you don't give up your ground.
3  You don't -- you don't -- you know, okay.  You're going
4  to -- you're going to resist me.  I'm going to step back
5  now.
6      Q.  But you've also been trained in something called
7  Tennessee v. Garner, right?  So if a person is fleeing
8  from you, and they do not present an imminent threat of
9  serious bodily harm or death to anyone and they're
10 fleeing from you, you can't shoot them, right?
11     A.  Absolutely not.
12     Q.  Right.
13         Even though they might have to go to jail, right?
14     A.  Correct.
15     Q.  So whether or not a person is going to get
16 arrested doesn't justify every single use of force,
17 correct?
18     A.  That's -- you know, the thing is, there's been
19 many times where people got away from me, and they got
20 away from me.
21     Q.  I understand.
22     A.  You know, the thing is --
23     Q.  Okay.  But let me ask you this:  Just because a
24 person has to go to jail because you believe a person
25 has to go to jail, that doesn't mean you can use

                                                        41

1    whatever force you feel like against them, correct?

2        A.   That is correct.

3        Q.   Okay.  It is still an objectively reasonable

4    amount of force based on the totality of the

5    circumstances, correct?

6        A.   Correct.

7        Q.   All right.  And so when you say an arrestee's

8    choice, and it's their decision, with respect to the

9    amount of force you use, isn't it true that you've been

10   trained in responding to people who are emotionally

11   disturbed?

12       A.   Yes.

13       Q.   There's a whole learning domain, post-learning

14   domain on the subject, correct?

15       A.   Yes.

16       Q.   And you've been trained in something called

17   "de-escalation," correct?

18       A.   Yes.

19       Q.   What is de-escalation?

20       A.   De-escalation is, you know, you could use ruses

21   to get compliance, you -- talking to people, but ruses

22   are part of the de-escalation, and it's -- you're

23   allowed to use a ruse in order to overcome resistance.

24       Q.   That wasn't my question.  I asked you what -- I

25   understand with respect to this incident, believe me, I

                                                          42

1  have read your interview.  I've read them all, so I know

2  what you're referring to specifically, but I'm asking

3  you about your training.

4        What is de-escalation?

5     A.  It's to try to gain compliance by, you know,

6  verbally trying to talk, you know, speak to somebody,

7  you know, if they're on a level 10, just try to talk

8  them down to a level 5 and keep trying to build a

9  rapport with them.

10    Q.  And this is particular -- particularly true when

11 you're dealing with an emotionally disturbed person,

12 correct?

13        MR. FINE:  Incomplete hypothetical.  Calls for

14 speculation.  Vague and ambiguous.

15        THE WITNESS:  You have to -- you have to know

16 that the person is emotionally disturbed at the time.

17 BY MR. NISENBAUM:

18    Q.  Sometimes it's just obvious, isn't it?

19        MR. FINE:  Same objections.

20        THE WITNESS:  It can be sometimes.

21 BY MR. NISENBAUM:

22    Q.  Wasn't it obvious with Mr. Gutzalenko that he was

23 in a -- in an impaired state of mind?

24    A.  I did not know initially what was going on with

25 him.  I saw his bruised head.  I saw the dried vomit.  I

                                                        43

1  saw the blood on -- the blood on his hands.

2      Q.  And did you think -- did you form an opinion or

3  belief that he was intoxicated?

4      A.  Well, the first opinion I formed is I already

5  knew we had two callers.  He had done something at a gas

6  station.  And then he had -- was vandalizing a furniture

7  store --

8      Q.  Okay.

9      A.  -- you know, and I didn't have initial contact

10 with him.  I was secondary contact.  And Officer Tran

11 was already speaking to him, but Officer Tran was trying

12 to get him to comply and having him sit up and, you

13 know --

14     Q.  All right.

15     A.  So the thing is -- but as it came along, that's

16 why I said we're going to probably have to 5150 him,

17 because, you know, I could see his injuries and, you

18 know, he could -- I felt like he couldn't care for

19 himself at that moment.

20     Q.  Are you reading my notes?  I don't think they're

21 visible.

22         My next question, you said 5150, so what is a

23 5150?

24     A.  That's Welfare and Institution Code for a 72-hour

25 detainment, which requires a police report and a triple

44

1    K form explaining why the person is danger to self and

2    others or gravely disabled.

3        Q.  Okay.  So there are three categories for a 5150,

4    right?

5        A.  Oh, it's been a while since I filled one of those

6    out.  Those are the ones I can remember.  I also know

7    there's a -- you know, and basically some danger to

8    self, danger to others, unable to care for each other,

9    or they used to have a dependent adult, but I don't know

10   if they took that one off or not anymore.

11       Q.  Yeah.

12           But -- and that is typically by reason of

13   basically a mental health emergency, right?

14       A.  Yes.

15       Q.  Okay.  In this case, you formed an opinion that

16   Mr. Gutzalenko was suffering from a mental health

17   emergency, correct?

18       A.  Yes.

19       Q.  Okay.  When did you form that opinion?

20       A.  Well, whenever I started to get to know him,

21   yeah, talked to him more, and the way he was talking, I

22   thought he was under the influence of drugs because I

23   wanted to maybe get Narcan to -- in case he needed it,

24   but the thing is, with his cuts, his behaviors, you

25   know, spending more time with him, you could see there

                                                         45

1  was definitely a mental health issue, but he was

2  actually -- he couldn't be turned loose because his

3  actions were showing he was a danger to others.

4      Q.  Okay.  But that's by a reason of a mental

5  disability, correct?

6      A.  Yes.  But we can't turn somebody like that out to

7  the public.

8      Q.  I didn't say -- when did I say that you could?

9      A.  Well, I'm just saying, but, you know, he had --

10  he had a mental health issue, but, you know, the thing

11  is, is he's already demonstrated a propensity for

12  destruction and violence.

13      Q.  So you've been trained that a person's mental

14  health emergency or their mental disability is a factor

15  to consider in the use of force against them, correct,

16  in terms of the reasonableness of the use of force,

17  correct?

18      MR. FINE:  Incomplete hypothetical.  Sorry, Ben.

19  Incomplete hypothetical.

20      (Reporter clarification.)

21      THE WITNESS:  You -- so you have to -- so you try

22  to not use force against certain people, elderly,

23  disabled people like, you know, physical disabilities,

24  elderly physical disabilities, young children.

25  ///

BY MR. NISENBAUM:

Q.   Well, again, my question is this:  You had been trained that the use of force under what you understand to be the standard of Graham v. Connor, the reasonableness of the use of force based on the totality of the circumstances, one of those circumstances where it exists is a person's mental impairment, their emotional disturbance, their mental health emergency, whatever you want to call it, that's a part of the totality of circumstances, correct?

A.   Yes.

MR. FINE:  Incomplete hypothetical.

BY MR. NISENBAUM:

Q.   And so it's one thing if you're talking to someone who's totally sober, totally acting normal, and you give them an order as compared to a person who might be heavily intoxicated, who might be having a mental health emergency, who appears to be having one and maybe hallucinating, maybe fearful, maybe paranoid, all those things.  You're trained that they react differently than a totally sober person or at least to expect a different reaction and not expect a reasonable reaction from them, correct?

MR. FINE:  Incomplete hypothetical.  Vague and ambiguous.

47

1        THE WITNESS:  Yes.

2   BY MR. NISENBAUM:

3     Q.  Okay.  And that is part of what informs the

4   de-escalation analysis, "Take the time to make the

5   time," you've heard that, right?

6        MR. FINE:  Same objections.

7        THE WITNESS:  Yes.

8   BY MR. NISENBAUM:

9     Q.  Want to slow the situation down, right, if you

10  can?

11    A.  Yes.

12    Q.  Create time and distance if it's reasonable,

13  right?

14        MR. FINE:  Same objections.

15        THE WITNESS:  So can I answer that question, or

16  do you want to use one -- or one part?  Because I think

17  I need to answer that question.

18  BY MR. NISENBAUM:

19    Q.  Well, you can give me an answer and then say

20  whatever else you have to say.

21    A.  Yes, but once you gain ground, you don't give up

22  ground.

23    Q.  Where did you learn that?

24    A.  You -- you don't -- if -- you know, if you have a

25  handcuff on somebody, you don't let go of the handcuffs.

                                                        48

1  You -- you -- you -- you got to keep control of that

2  handcuff.  Yes, so --

3     Q.  Where did you learn this is my question.

4     A.  In the -- in the academy.  You don't give up your

5  ground.  You -- if you already -- if you're already in

6  the situation and already hands on, you don't, you know,

7  call a time-out like you time-out and then, you know,

8  you have to -- you -- where -- wherever you gain ground,

9  you stay on course.

10    Q.  Okay.  Even if creating time and distance would

11  be reasonable under the circumstances, you don't do that

12  if you've already gone hands on; is that correct?

13    A.  You don't --

14       MR. FINE:  Incomplete hypothetical.  Misstates

15  testimony.

16       THE WITNESS:  If -- if you're already hands on,

17  you -- you have -- you have to complete it.  You don't

18  let go and then cause somebody that's already agitated.

19  You're just going to give them more ground to be more

20  agitated and fight even more.  You -- you can't give it

21  up.  That's a danger to every officer on scene and even

22  members of the public.

23  BY MR. NISENBAUM:

24    Q.  Okay.  You mentioned previously, you know, he

25  could have a gun.  There could be a gun in -- in

49

 1    someone's belt.  There could be anything, right?  You're

 2    trained not to speculate, though, correct?

 3         MR. FINE:  Vague and ambiguous.  Incomplete

 4    hypothetical.

 5         THE WITNESS:  You're trained to not speculate,

 6    but you're also trained that hands can kill you, because

 7    they can reach for a weapon or anything on the street.

 8    BY MR. NISENBAUM:

 9       Q.  Sure.

10         But I assume you did not see a gun on the street

11    apart from what was in officers' holsters, right?

12       A.  Right.  But I also didn't get a full search on

13    his front waistband.

14       Q.  Okay.  Was there a report of a gun?

15       A.  No.

16       Q.  Okay.  So you had no specific facts that

17    Mr. Gutzalenko was in possession of a gun or any other

18    weapon, correct?

19       A.  No.  You just have to assume everybody is armed.

20       Q.  A bazooka?  With what?  So you say you have to

21    assume.  It's one thing to keep in mind that, sure,

22    anything is possible.  It's another thing to

23    affirmatively assume that a person is armed with a

24    weapon.

25         Which of those are you trained to do?

                                                        50

1    A.  Until you know that the waistband is clear, then

2    that -- they can't reach for nothing, you just have to

3    assume that you want -- you don't want anybody reaching

4    for their waistband, so you -- you want their hands

5    clear.

6    Q.  So you are trained to make affirmative

7    assumptions that a person is armed with any and every

8    type of weapon that could conceivably fit where you

9    haven't searched unless until you've actually searched

10    it, is that your testimony?

11          MR. FINE:  Misstates testimony.  Incomplete

12    hypothetical.

13          THE WITNESS:  We are trained hands are the

14    number 1 killer, and until you assure an area is safe,

15    you just have to be cautious to make sure that they're

16    not reaching for something that can harm you.

17    BY MR. NISENBAUM:

18    Q.  Well, being cautious is a different question.

19    That's why I asked the question earlier.  It's one thing

20    to keep in mind what the possibilities could be.  It's

21    another thing to make affirmative assumptions.

22          Do you understand that distinction?

23    A.  Yes.

24    Q.  Okay.  It's fair to say that your training is to

25    keep in mind what the possibilities could be as opposed

51

1  to act on affirmative assumptions without any specific

2  facts to support those assumptions, correct?

3     A.  Yes.

4     Q.  Okay.  Thank you.

5         All right.  Now, a 5150 is a seizure; is that

6  right?

7         MR. FINE:  Calls for a legal --

8         THE WITNESS:  5150 --

9         MR. FINE: -- conclusion.

10 BY MR. NISENBAUM:

11    Q.  Based on your --

12        MR. FINE:  Misstates testimony.

13        THE WITNESS:  5150 is a -- is a medical -- my --

14 a seizure or medical detainment of a person.

15 BY MR. NISENBAUM:

16    Q.  In other words, a person is not free to leave

17 when you're conducting a 5150, correct?

18    A.  Correct.  And there's a box on the 5150 form that

19 you check saying that they couldn't -- they're to be

20 notified before they are released because they could be

21 facing criminal charges.

22    Q.  Okay.  So it is -- a 5150 is a law enforcement

23 detention as you understand the definition, correct?

24    A.  Medical personnel also are -- can do 5150s.

25    Q.  Well, I'm well aware.  I'll get to the medical

                                                        52

1    part of this.  I promise you.

2          But you agree that a 5150 is, as you understand

3    the term, a seizure where the person is not free to

4    leave, correct?

5       A.  Yes.

6       Q.  And it has to be reasonable under the

7    circumstances, correct?

8       A.  Yes.

9       Q.  And it has to be conducted reasonably under the

10   circumstances, correct?

11      A.  Yes.

12      Q.  In other words, it has to conform to the

13   Fourth Amendment requirements, correct?

14      A.  Yes.

15      Q.  Okay.  Thank you.

16         That includes the use of force as well as how the

17   5150 is conducted, correct, at least your part of it?

18      A.  Yes.

19      Q.  All right.  And you are authorized and trained in

20   how to perform 5150, correct?

21      A.  Yes.

22      Q.  And that -- and you are trained to expect that --

23   well, strike that.

24         You are trained to not be surprised when you're

25   performing a 5150 of a person who appears to be in the

                                                      53

1    midst of a mental health emergency not to be surprised

2    when they are acting in a totally irrational manner,

3    right?

4            MR. FINE:  It's vague and ambiguous.

5            THE WITNESS:  That was quite a long question,

6    Counsel.

7            Can you shorten that question up a little bit?

8    BY MR. NISENBAUM:

9      Q.  When you do a 5150 of a person who appears to be

10   suffering a mental health injury, your training is to

11   not be surprised when they act in a totally

12   off-the-wall, wacky, irrational manner, right?

13           MR. FINE:  Same objection.

14           THE WITNESS:  Each person reacts differently, so

15   it's kind of hard to answer that with a yes or no.

16   BY MR. NISENBAUM:

17     Q.  Well, I'm saying, you wouldn't -- your training

18   is, don't be surprised if that happens when you're doing

19   a 5150 of a crazy person?

20           MR. FINE:  Same objection.

21           THE WITNESS:  I mean, I don't know if they really

22   say don't be surprised saying it could happen.

23   BY MR. NISENBAUM:

24     Q.  Okay.  Has it happened to you before when doing a

25   5150?

                                                      54

1      A.  It's happened a couple of times from what I

2  recall, but nothing --

3      Q.  How many -- I'm sorry, I didn't mean to cut you

4  off.

5      A.  No.  Not -- I mean, nothing like really stands

6  out, but, you know --

7      Q.  So how many 5150s have you done in your career?

8      A.  I can't -- I -- I don't even want to guesstimate.

9  I mean, there's -- you know, there's a -- there's --

10 I've done quite a few.

11     Q.  Would you say more than a hundred, less than a

12 hundred?

13     A.  I would say somewhere around a hundred or more

14 mark.

15     Q.  Okay.  All right.  And sometimes it's easy,

16 right?

17     A.  Yeah.

18         MR. FINE:  Vague.

19         THE WITNESS:  I -- can we take a break real

20 quick?  I got some background noise I need to really

21 take care of real quick.

22         MR. NISENBAUM:  Not a problem.

23         THE WITNESS:  So --

24         MR. FINE:  Okay.

25         THE WITNESS:  Five --

55

1        MR. FINE:  Is five minutes okay?

2        THE WITNESS:  Yeah, five minutes.

3        MR. FINE:  Thank you, Ben.

4        MR. NISENBAUM:  Sure.

5        (Off the record.)

6        MR. NISENBAUM:  Can I have the last question I

7   asked read back, please?

8        (Record read.)

9        MR. NISENBAUM:  And was there an answer?

10        THE REPORTER:  No.

11   BY MR. NISENBAUM:

12    Q.  Well -- and sometimes it's easy, right, when

13   dealing with a 5150?

14        MR. FINE:  Vague.

15        THE WITNESS:  Sometimes it can be, sometimes it

16   can't be.  It's just kind of --

17   BY MR. NISENBAUM:

18    Q.  Right?

19    A.  People -- people are different.  Each -- everyone

20   is different.

21    Q.  And you accepted the responsibility of your job,

22   right, the rules that came with it?

23    A.  Yes.

24    Q.  And you were compensated for it, right?

25    A.  Yes.

                                                    56

1    Q.  Okay.  Thank you.

2        So when a person refuses a 5150 that you're

3   trying to do, they're trying to resist it, you're

4   permitted to compel that 5150 to happen, correct, to

5   force it to happen?

6    A.  Yes.

7    Q.  Okay.  And if you have to use force, that force

8   has to be reasonable during the 5150, correct?

9    A.  Yes.  The force has to be reasonable.  It's

10  basically, you know, under the totality of the

11  circumstances as we've discussed earlier.

12   Q.  Right.

13       Sometimes you've had occasion to interact with

14  paramedics during a 5150, I imagine.

15       Is that fair to say?

16   A.  Yes.

17   Q.  Is it -- does -- is that normally how a 5150 goes

18  if you actually wined up investigating the 5150 and

19  determining that the person meets one of the criteria?

20   A.  Yes.  Then you call for an ambulance.

21   Q.  Okay.  And the ambulance comes, right?

22   A.  Yes.

23   Q.  It's 99 times out of a hundred.

24       And so what's the process from there?

25   A.  So after we call the ambulance?

1    Q.  Yeah.

2    A.  So ambulance gets there.  We explain to them what

3    we have.  We give them the paperwork.  And sometimes if

4    it's a cooperative person with mental health issue, they

5    will -- we'll walk over with them.  They'll give them a

6    gurney, and they'll belt them in, but if it's a

7    combative one, they will -- depending on how combative

8    they are, they will give them an injection if they're

9    super violent.  But if they're just not super violent or

10   resisting, you know, sometimes they put soft straps just

11   for their safety.

12   Q.  They put, what, soft straps?  What are those?

13   A.  It's on the gurney.  It's kind of a -- kind of a

14   padded bracelet that they have on the gurney.  And it

15   just kind of keeps, especially on 5150, that way, in

16   case they have a breakout in the back of the ambulance,

17   it just kind of keeps their -- their wrists and their

18   legs secured to the gurney so they can't kick or swing

19   or anything.

20   Q.  So the paramedics, do you -- is a police officer

21   required to go with the paramedics when the person is

22   5150'd, and they take them to the hospital?

23   A.  No.

24   Q.  Okay.  Now, the 5150 hold is a law enforcement

25   thing, right?

58

1          MR. FINE:  Asked and answered.  Vague and
2    ambiguous.
3          THE WITNESS:  It's -- it's a tool for medical and
4    such as psychiatry, ER doctors, and law enforcement to
5    put someone on a hold if they are -- meet the criteria.
6    BY MR. NISENBAUM:
7      Q.  Right.  Of course.
8          And with respect to getting a person into custody
9    who is resistive, do you work with the paramedics to do
10   that?
11         MR. FINE:  Incomplete hypothetical.  Vague and
12   ambiguous.
13         MR. KANTER:  Join.
14         THE WITNESS:  What do you mean work with them?
15   BY MR. NISENBAUM:
16     Q.  Well, there's a transfer at some point, it sounds
17   like, of -- of the person's custodial status from you to
18   the paramedics; is that right?
19         MR. FINE:  Same objections.
20         MR. KANTER:  Join.  Misstates testimony too.
21         THE WITNESS:  You -- we have interaction with
22   them because we are the first point of contact.  We
23   complete the form.  And then we explain to them and hand
24   the paperwork to them, so at that point, they take
25   custody of the individual.  They usually introduce

                                                        59

1    themselves as a paramedic.  And once they get them

2    secured on the gurney and leave, we -- we clear.

3    BY MR. NISENBAUM:

4        Q.  Okay.  But do they ask you to do things to

5    facilitate the -- the transport of the person to get

6    them ready to be transported?  Is that typical?

7            MR. FINE:  Incomplete hypothetical.  Calls for

8    speculation.  Vague and ambiguous.

9            MR. KANTER:  Join.

10   BY MR. NISENBAUM:

11       Q.  Give some directions?

12       A.  What they ask us is to make sure they don't have

13   any weapons on them and, you know, clear their -- clear

14   their contents.  If it's a large amount of contents,

15   they can only take so much, then we have to book the

16   large amount of contents into safekeeping until the

17   person is discharged from the hospital.

18       Q.  Okay.  If a person is handcuffed when the 5150 is

19   being done, are those handcuffs removed prior to them

20   being transported and custody being transferred to the

21   paramedics?

22           MR. FINE:  Incomplete hypothetical.  Calls for

23   speculation.  Vague and ambiguous.

24           MR. KANTER:  Join.

25           THE WITNESS:  The times that I was on when

                                                          60

1   they -- when they were handcuffed, we sit them on the

2   gurney, and we would -- the paramedic would instruct us

3   which handcuff to take off so they can put the hand in a

4   soft restraint.  And then we keep control of the other

5   handcuffed hand.  And then when they -- they strap the

6   legs down and then they would come over, ask us to

7   remove the other handcuff, and then they put them in the

8   other soft restraint, so our handcuffs would come back

9   to us.  And they would self-restraint them on the

10  gurney.

11  BY MR. NISENBAUM:

12      Q.  Okay.  And do paramedics in your experience in

13  any of the 5150s, have they ever directed you to, for

14  example, get the person under better control?

15          MR. KANTER:  Objection.  Incomplete hypothetical.

16  Vague and ambiguous.  Overly broad.

17          MR. FINE:  Join.

18          THE WITNESS:  Well, they -- we usually try to

19  make sure that paramedics aren't in danger and, you

20  know, they ask us before, like, "Are" -- "are you" --

21  "can you guys just hold him here for a second?  We're

22  going to go get the gurney."  And we've had those

23  situations, but nothing like where I've been told you

24  need to get them under better control.

25  ///

                                                        61

1    BY MR. NISENBAUM:

2        Q.  Do you have -- as a police officer, you've been

3    there on other occasions where a person gets sedated

4    during a 5150, right?

5        A.  I have.

6        Q.  I think you've described that that, you know,

7    sometimes they'll come and give them a shot to make them

8    calm down, right?

9        A.  Yes.

10       Q.  And it's your understanding that they're giving

11   them that shot to sedate them so that they don't become

12   resistive while they're in the paramedics control,

13   right?

14           MR. FINE:  Calls for speculation.  Incomplete

15   hypothetical.

16           MR. KANTER:  Join.  Overly broad.

17           THE WITNESS:  It's -- they usually give it to

18   people that are violent or resisting.  And they do that

19   to -- usually to calm them down for transport or sedate

20   them, yes.

21   BY MR. NISENBAUM:

22       Q.  Are you familiar with the term "the good stuff"?

23   Have you heard that?

24           MR. FINE:  Vague and ambiguous.

25           THE WITNESS:  I guess I've heard all kinds of

                                                           62

1  stuff from -- you know, if they call pain medicine the

2  good stuff, they call -- I've -- you know, I'm not sure

3  what we're talk- -- talking about as a good stuff right

4  now if it's the shot, the sedation shot, or what are we

5  talking about?

6  BY MR. NISENBAUM:

7     Q.  Well, have you heard -- in this incident, do you

8  recall someone saying right after the shot is given,

9  either right before or right after or during the shot

10  being given to Mr. Gutzalenko, someone saying, "Never

11  mind.  You got that.  That's the good stuff"?

12     A.  I --

13     Q.  Do you remember hearing that?

14     A.  I don't remember hearing that.  I don't remember

15  hearing that that day, but, I mean, I'm sure if I

16  watched my body camera footage, it was there.  I could

17  probably hear it then, but I was -- I don't remember --

18  I don't remember hearing it right now, no.

19     Q.  Okay.  Well, let me ask you this:  What role do

20  Richmond police officers in your experience and your

21  training, what role do they have in actually

22  administering medication to a subject?

23     A.  We -- we don't administer any medication to a

24  subject only -- only Narcan, if it requires Narcan.

25  That's the only thing we're allowed to administer or

63

1    CPR.

2        Q.   I -- I guess I asked what role.

3             I mean, my question is:  Do you have a role in

4    facilitating of the administration of medication by

5    paramedics in the course of a 5150 when a person has to

6    be sedated?

7        A.   No.  We don't have any -- we don't have say in

8    that.

9        Q.   I understand you don't have say in that.

10            But do you have a role physically, like holding

11   the person down while the person gets sedated or moving

12   the person's shirt so the paramedic can administer the

13   shot?

14            MR. FINE:  Incomplete hypothetical.  Calls for

15   speculation.  Vague and ambiguous.  Overbroad.

16            MR. KANTER:  Join.

17            THE WITNESS:  There -- once the paramedics get on

18   scene, they're -- they control the scene, so they make

19   the decision, so there have been times that we've

20   actually -- somebody is combative, and they injected

21   them while we have them detained.  It's not -- it's not

22   an every -- it's not always -- always the case.

23   BY MR. NISENBAUM:

24       Q.   My question, again, so you have a clear mind, is

25   there a role for police officers at City of Richmond

                                                          64

1  during a 5150 where a person gets sedated by paramedics,

2  is there a role in actively participating in the

3  injection itself?

4          MR. FINE:  Incomplete hypothetical.  Calls for

5  speculation.  Overbroad.  Vague and ambiguous.

6          MR. KANTER:  Join.  Also, expert opinion

7  testimony.

8          MR. FINE:  Join.

9  BY MR. NISENBAUM:

10     Q.  Again, I'm talking about your experience and your

11  knowledge and understanding of Richmond Police

12  Department policy.

13     A.  There's not a --

14          MR. KANTER:  Same objection.

15          THE WITNESS:  Oh, sorry.

16          MR. FINE:  Join.  Same objections.

17          THE WITNESS:  There's not a policy forbidding us

18  from standing by or holding a -- a detainee down while

19  we -- paramedics clean up wounds or inject medications.

20  There's not a policy.  There could be one now.  I don't

21  know, but as of that date, there was not one.

22  BY MR. NISENBAUM:

23     Q.  Okay.  Is it fair to say that at the time of this

24  incident, police officers were permitted in order to

25  facilitate the 5150 to assist a paramedic in the

65

1    injection of sedating medicine?

2         MR. FINE:  Same objections.

3         MR. KANTER:  Join.

4         THE WITNESS:  There's no -- at that time, there

5    was no policy preventing it, so --

6    BY MR. NISENBAUM:

7    Q.  You understood that to be allowed, correct?

8    A.  Yes.

9    Q.  Okay.  All right.  And this is -- and I'm talking

10   about a circumstance where the person was refusing

11   medical care and didn't want medical treatment and

12   appeared to not want to go along with the 5150.  You

13   understand that, correct?

14        MR. FINE:  Same objections.

15        MR. KANTER:  Join.

16        THE WITNESS:  Even if the subject would have

17   refused medical treatment, we -- he still would have had

18   to receive medical treatment because of his obvious

19   injuries on his hand and the -- you know, you can't take

20   him to jail with injuries such as that.  They have to be

21   cleaned up and inspected by medical personnel, so either

22   way, there would have been medical involved in that

23   incident.

24   BY MR. NISENBAUM:

25   Q.  My question is -- well, strike that.

                                                        66

1           MR. NISENBAUM:  Can you read the question back?

2    It's better than me rephrasing it.

3           (Record read.)

4           MR. FINE:  Same objections.

5           MR. KANTER:  Join.

6    BY MR. NISENBAUM:

7       Q.  So I'm talking about in that situation where a

8    person is being forcibly sedated, they're -- obviously,

9    they don't want it.  It's clear -- they have made it

10   clear that they -- that they're refusing medical care.

11   You're forcing the medical care to happen, correct?

12          MR. FINE:  Same objections.

13          MR. KANTER:  Join.  Argumentative.

14   BY MR. NISENBAUM:

15      Q.  That it is -- that is the very purpose of the

16   5150, right?

17          MR. FINE:  Same objections.

18          MR. KANTER:  Join.

19          THE WITNESS:  The purpose of the 5150, yes, he

20   was showing a danger to self and others, so the 5150 was

21   the decision to be made.

22   BY MR. NISENBAUM:

23      Q.  So you are compelling medical care to occur in

24   spite of the person -- well, strike that.

25          In this situation with Mr. Gutzalenko, it's fair

                                                          67

1  to say that you were compelling that he received medical

2  treatment even though he had refused it and said he

3  didn't want it, correct?

4      A.  Yes.  Because of the circumstances, danger to

5  self and others.

6      Q.  Okay.  All right.  Now, let me ask you this:  Is

7  there training or policy that you're aware of that says

8  that you should not -- I know I asked it more general

9  question, but I'll be much more specific.

10        When medical treatment is being rendered to a

11  person who's just been arrested or detained, whether

12  it's for 5150 or otherwise, and the person is getting

13  medical care, is there a line that you're trained in in

14  which officers are to avoid getting involved in the

15  actual administration of the medical treatment when the

16  paramedics are present and they're the ones doing the

17  treatment?

18        MR. FINE:  Incomplete hypothetical.  Vague and

19  ambiguous.  Overbroad.  And calls for expert opinion.

20        MR. KANTER:  Join.

21  BY MR. NISENBAUM:

22      Q.  In other words, it's one thing to simply help

23  hold a person down.  It's another thing to involve

24  yourself in the administration of the sedation, the

25  actual administration, for example, by removing clothing

            68

1    to facilitate the injection.  That's something -- is

2    that something that should be left to the paramedics

3    based on your training, or is it typical for police

4    officers at Richmond Police Department to do that?

5            MR. FINE:  Same objections.

6            MR. KANTER:  Join.

7            THE WITNESS:  Unfortunately, sometimes we have to

8    be involved.  We don't do the administering ourselves,

9    but in order to prevent the paramedic from becoming a

10   victim of a battery or some kind of assault, we have to

11   make sure they're just as safe as the person we are

12   sending to the hospital.

13   BY MR. NISENBAUM:

14      Q.  That wasn't my question.  I asked a very specific

15   question.

16           Were officers at the time of this incident at

17   Richmond Police Department, were they permitted to

18   remove clothing to expose an area for injection of

19   sedation by a paramedic?

20           MR. FINE:  Same objections.

21           MR. KANTER:  Join.

22           THE WITNESS:  And there wasn't a policy stating

23   that we cannot aid medical and removal of any kind of

24   clothing, but there's policy stating we can't administer

25   medication.

                                                      69

1    BY MR. NISENBAUM:

2        Q.  Okay.  Except for Narcan?

3        A.  Correct.

4        Q.  Okay.  Probably things like an EpiPen also, I

5    assume?

6        A.  No.

7        Q.  You can't even do an EpiPen?

8        A.  No.

9        Q.  Okay.  All right.  You know the term "integral

10   participant"?  Do you know what that means?

11       A.  I do not, actually.  I don't recall hearing that,

12   if I have, it's been some time.

13       Q.  Well, fair enough.

14           All right.  Do you recall people at the scene

15   telling Mr. Gutzalenko, "Don't worry.  You're not going

16   to go to jail"?

17       A.  Yes.

18       Q.  And you were one of those people saying that,

19   right?

20       A.  When I was trying to find out what kind of drugs

21   he was under to try to -- because I -- I didn't care if

22   he was under the influence of drugs.  I just wanted to

23   make sure we knew how to counteract it.  We have a

24   Narcan.

25       Q.  I know you were -- I know you in particular were

                                                          70

1  very concerned in asking him, had he taken any fentanyl,

2  right?

3     A.  Yes.

4     Q.  Okay.  And Narcan would be effective for opiate

5  drugs, but that's all it's effective for to your

6  knowledge, correct?

7        MR. FINE:  Calls for speculation.  Calls for

8  expert opinion.

9        THE WITNESS:  We've actually used Narcan on

10  people that have fentanyl overdoses and brought them

11  back.

12  BY MR. NISENBAUM:

13     Q.  Fentanyl is an opiate?

14     A.  Well, I --

15     Q.  Yeah.

16     A.  -- I've been out of the drug game a long time.

17     Q.  I hear you.  Well, I wasn't implying you were

18  ever in the drug game.

19     A.  I did not know -- I did narcotics and all that

20  for Richmond PD.  I was a part of the street --

21        MR. FINE:  Thank you for clarifying, Officer.

22        THE WITNESS:  Yeah, I know.

23  BY MR. NISENBAUM:

24     Q.  You did narcotics -- wait.  Wait.

25        You did narcotics?

71

 1     A.  I worked the narcotics street team.

 2     Q.  When you said you did narcotics, that could be

 3  misconstrued.

 4     A.  Yeah.  Well, I -- I worked with the narcotics

 5  street team where --

 6     Q.  I got it.

 7     A.  -- assignments.

 8     Q.  You weren't actually using drugs.  You were

 9  working narcotics?

10     A.  No.  I like my --

11     Q.  You were working, not doing narcotics?

12     A.  Right.

13     Q.  Got it.

14         And smile for me real quick.  You have all your

15  teeth?  Well, gotcha.  Fair enough.

16     A.  Some coffee stains other than that.

17     Q.  Me too.

18         All right.  So the call with the -- with

19  Mr. Gutzalenko, you became aware of it because there was

20  a report over the radio, correct?

21     A.  Yes.

22     Q.  All right.  And the report was basically someone

23  who was vandalizing the store; is that right?

24     A.  It came from a -- there was a gas station and

25  then a furniture store calling about --

                                                          72

1    Q.   Okay.

2    A.   -- the same individual.

3    Q.   And what was he doing?

4    A.   I want to say, if I -- at the gas station, he

5    stole something or, you know, at -- that one, I'm not a

6    hundred percent on, but the furniture store, that he was

7    currently in the store breaking items, and the store

8    owner or the store employee called 911 because they were

9    afraid the person was going in there basically

10   vandalizing whatever they could.

11   Q.   Right.

12        Were these crimes that would have caused you to

13   reasonably believe that Mr. Gutzalenko was a threat of

14   serious bodily harm or death?

15   A.   To the public?

16   Q.   Anyone.

17   A.   Well, if I walk -- so the gas station, that could

18   have been -- that might have been an Estes robbery, I'm

19   not sure.  I did -- I didn't deal with that one, but it

20   could --

21        (Reporter clarification.)

22        THE WITNESS:  Estes, E-S-T-E-S.

23        So it was basically shoplifting with use of force

24   that kind of validates into a robbery.  But, you know,

25   there's that, and then inside the furniture store where

73

1  he's breaking items and throwing items about.  That
2  could definitely be a danger.  It takes one flying
3  object to harm somebody.
4  BY MR. NISENBAUM:
5      Q.  Okay.  I guess -- well, was there an assault or
6  battery that had been reported?
7      A.  I don't recall.
8      Q.  You don't recall there being one reported,
9  correct?
10     A.  Well, it wasn't even my call.  I just responded
11  because I was closer.
12     Q.  I get that.
13         But I assume that you pulled up the CAD and
14  looked at what the entries for the call were when you
15  responded?
16     A.  No, actually, because I -- Officer Tran said he
17  had the subject aside, and then I couldn't get a hold of
18  him on the radio, so I -- I turned my lights and siren
19  and I responded to that.  I try not to keep my eyes on
20  the computer while I'm driving the road.
21     Q.  All right.  Well, let me ask you more clearly,
22  then.
23         You had no report that anyone had been injured or
24  that anyone had been threatened with serious bodily
25  injury or harm, correct?  No specific reports of that?

74

1      A.  I can't recall, and I've -- I don't have the CAD
2   notes.  I didn't review CAD before this either.
3      Q.  Okay.  I could pull it up, but it is what it is.
4   And --
5      A.  Okay.
6      Q.  -- the fact that you can't recall is probably a
7   good thing, you know, because there was no such
8   information.
9      A.  Okay.
10     Q.  All right.  Was there a report that he was armed
11  with any type of weapon, Mr. Gutzalenko?
12     A.  No.
13     Q.  Okay.  Was there -- well, strike that.
14         You attached yourself to the call?
15     A.  Yes.
16     Q.  And that's because of how close you were?
17     A.  Well, Officer Tagorda was initially broadcasted
18  to cover Officer Tran, but he broadcasted where he --
19  where he was coming from, which was -- I was a lot
20  closer than Officer Tagorda was, so that's why I
21  responded.
22     Q.  Right.
23         So you responded, and you didn't have to drive
24  very far to see them, right?
25     A.  I was coming from 24th and Evans, and they were

                                                          75

1  over in San Pablo and Solano, so it was -- it wasn't
2  super far, but it wasn't right next door either.
3      Q.  Right.
4          So a mile to a mile and a half?
5      A.  Could be, maybe give or take a little bit more.
6  That's what I estimated, but that's just an estimation.
7      Q.  I'm only going by your estimation.
8      A.  Yeah, right.
9      Q.  And in that time you received further updates
10  over the radio about what was happening, right?
11     A.  Yes.
12     Q.  Okay.  And what updates did you receive that you
13  recall?
14     A.  Officer Tran, he's walking away and trying to
15  catch up to him, and then I believe Officer Tran said
16  that he was out with the subject.  And I -- when I got
17  on scene, I couldn't -- I tried to find out where he was
18  and he didn't respond, and then I ended up locating him
19  standing next to -- I don't want to butcher his last
20  name, but -- so I'm just going to call him the detainee.
21     Q.  It's not that hard, Gutzalenko.
22     A.  Gutzalenko.  I just don't want to say it
23  improper, so he was -- Gutzalenko was sitting on the
24  ground.  Officer Tran was standing next to him.
25     Q.  Okay.  So I have various body cameras.  I'm going

                                                    76

1    to open Officer Tagorda's body cam.  This is the file

2    titled "Officer Tagorda," in a parenthesis, "Conf" --

3    that's C-O-N-F for confidential -- "City, underscore,

4    1040, close paren, dot MP4."

5        A.  It's a match up.

6        Q.  All right.  I know this is not your body cam, but

7    it does depict actions that I'm going to ask you

8    questions about, so let me go ahead and share this.

9            All right.  Can you see what's on my screen?

10       A.  Looks like the inside of a hand.

11       Q.  I'm sure you see that a lot with these body cams,

12   right?

13       A.  Yeah.

14       Q.  And that's because, you know, when you turn it on

15   you hit the body camera, right?

16       A.  Yes.

17       Q.  To activate it?

18       A.  Yes.

19       Q.  So like I said, this is Officer Tagorda.  I

20   believe that you're already on scene.

21       A.  Yes.

22       Q.  I'm going to start here.

23           By the way, the order of arrival of police

24   officers, as you understand it, was Officer Tran first,

25   then you, then Officer Tagorda, correct?

77

1    A.  Yes.

2    Q.  Do you have a recollection of when the ambulance

3 arrived?  Was it after Officer Tagorda arrived?

4    A.  I think it was after Officer Tagorda arrived, if

5 I remember correctly.

6    Q.  Okay.  All right.  I think you're correct.

7         Anyway, I'm going to hit play, and what I'm going

8 do is skip forward to certain points and ask you

9 questions.  I'll pause it when I do.  Okay?

10   A.  Yep.

11   Q.  All right.  We are now paused.  It is -- I'm

12 paused at four seconds which on the time stamp is

13 18:44:48 of the actual time stamp.

14        Do you see that up here?

15   A.  Yes.

16   Q.  Okay.  And this is you back in your 280-pound

17 glory, right?

18   A.  Yeah, that would be me.

19   Q.  Okay.  I mean, you've definitely lost a lot of

20 weight.  All right.

21        And do you recall -- I assume you recall this

22 scene right here, what's being depicted, right?

23   A.  Yes.

24   Q.  Okay.  And so this is Mr. Gutzalenko who's

25 facedown on the ground, right?

78

1    A.  Yes.

2    Q.  Classic prone position?

3        MR. FINE:  Misstates the video.

4        THE WITNESS:  No.  Because his head is up and his

5    arms are kind of like pulled under him like this

6    (indicating), so it's not a classic prone position.

7    BY MR. NISENBAUM:

8    Q.  All right.  It's the same prone position.

9        And who's the officer who's in contact with him?

10   A.  That is Officer Tran.

11   Q.  Okay.  And do you know what the item is on the

12   ground here?  Can you see my cursor?

13   A.  That would be his wallet where I took his ID out

14   of and a couple of cell phones and a bottle cap.

15   Q.  Okay.  All right.  Now, up to this point, he

16   hasn't been handcuffed yet, correct, Mr. Gutzalenko?

17   A.  No.

18   Q.  Is this the position he was in, he had his arms

19   underneath him?

20   A.  At what point?

21   Q.  Well, when we're -- when we see him here, where

22   his hand is underneath his body, or under his chest or

23   something.

24   A.  Kind of looks like he was kind of -- his hands

25   were kind of in front of him, and he was kind of raised

                                                        79

1  up and moved around, so his hands were -- his hands were

2  visible, if I recall.

3      Q.  Do you know about how long after you arrived on

4  the scene?  This is by estimate.

5      A.  How long he was like that?

6      Q.  Well, no.  You've arrived on scene sometime

7  before this.  How long before this did you arrive by

8  estimate?  Is it five minutes, approximately?  If you

9  don't know --

10          MR. FINE:  Calls for speculation.

11          THE WITNESS:  I don't know.  I don't want to --

12  BY MR. NISENBAUM:

13      Q.  Okay.  And you can see the back of

14  Mr. Gutzalenko's waistband.  His shirt is up somewhat,

15  correct?

16      A.  Yes.

17      Q.  And you can actually see his bare skin at the --

18  his lower back and sides, correct?

19      A.  Yes.

20      Q.  And from what we can see, there's nothing that

21  would indicate that there's anything in the part of the

22  waistband that you can see, correct?

23          MR. FINE:  Calls for speculation.

24          THE WITNESS:  Definitely can't see anything on

25  the sides or the back.

                                                    80

1  BY MR. NISENBAUM:

2      Q.  Okay --

3      A.  His abdomen on the ground.

4      Q.  Right.

5          His abdomen is on the ground, and if you were

6  conducting a search of him, you would be able to

7  actually -- if you were concerned about him having a

8  weapon in his waistband, one of either you or Officer

9  Tran would be able to reach around the front of his body

10  on either side.  Correct?

11          MR. FINE:  Calls for speculation.

12          THE WITNESS:  Not with -- not in that position

13  because he had a little bit of girth on him so that was

14  pushed against the ground.

15  BY MR. NISENBAUM:

16      Q.  Well, you can certainly reach around for most of

17  the front, if not all, right?

18          MR. FINE:  Same objection.

19  BY MR. NISENBAUM:

20      Q.  Was that a yes or no?

21      A.  We were trying to -- we weren't sure where this

22  was going to go, and so before he got in the ambulance,

23  we would have definitely searched -- we would have

24  searched his waistband and its contents to make sure

25  nobody would be harmed.

                                                        81

1    Q.  I understand that.

2         But if you were concerned at this moment that

3    there was a gun in his waistband or a knife, you

4    could've done as much of a search as permitted by his

5    positioning, correct?

6         MR. FINE:  Calls for a legal conclusion.  Calls

7    for expert testimony.  Calls for speculation.

8         THE WITNESS:  Without reaching we'd have to roll

9    him over to get into his waistband, and there was no

10   concern at the moment until he started tucking his hands

11   underneath.

12   BY MR. NISENBAUM:

13   Q.  So he hadn't started tucking his hands underneath

14   yet; is that right?

15   A.  That's correct.

16   Q.  Okay.  But there's nothing that prevented you

17   from checking as much of his waistband as you could have

18   at this time, correct?

19        MR. FINE:  Same objections.

20        THE WITNESS:  I mean, I -- I don't know.  It's --

21   BY MR. NISENBAUM:

22   Q.  Is it fair to say you just didn't think about

23   doing it at that time?

24   A.  At that time, yes.  It's safe to say I didn't

25   think about doing it at that time.  You know, his hands

                                                    82

1    were visible, so they -- you know, Officer Tran was

2    focused on him.  I was trying to get him -- run him out.

3       Q.  Okay.  All right.  I'm going to hit play.  We're

4    at four seconds.

5           Okay.  Now we're at eight seconds, and

6    Mr. Gutzalenko is kind of turned on his right side.

7           Do you see that?

8       A.  Yes.

9       Q.  Okay.  And exposing the front of his body in your

10   direction, correct?

11      A.  Yes.

12      Q.  Okay.  Again, nothing more that we can tell that

13   would be in his waistband, right?

14          MR. FINE:  Calls for speculation.

15          THE WITNESS:  Well, yes, but I think I was

16   focused on him and also Tran, and I did not look at his

17   waistband.

18   BY MR. NISENBAUM:

19      Q.  It looks like someone reached into his pocket and

20   pulled out his wallet, right?

21      A.  That was me.

22      Q.  Okay.  Was that this pocket where the -- where

23   you could see the inside of the pocket?

24      A.  That's where I saw the bloody cell phone was.

25      Q.  Okay.  All right.  But to your knowledge, there's

                                                        83

1    no search of the front of his body at this point either,

2    correct?

3        A.  Correct.

4        Q.  Okay.  I'm going to hit play.  We're at eight

5    seconds.

6            Of course, I'm pausing it at 11 seconds.

7            Someone is putting gloves on, a person whose body

8    camera -- it is -- that's Officer Tagorda, correct?

9        A.  Yes.

10       Q.  We're at 11 seconds.

11           By the way, I'm pausing at 20 seconds.  There's a

12   siren in the background.

13           Is that the ambulance approaching?

14           MR. FINE:  Calls for speculation.

15           THE WITNESS:  I'd have to see it.

16   BY MR. NISENBAUM:

17       Q.  Okay.  By my notes, the ambulance arrived at 1:42

18   or so into this.  This is about a minute and 20 seconds

19   away.

20           Would that be consistent with the sound of the

21   siren you hear?

22           MR. FINE:  Calls for speculation.

23           THE WITNESS:  Yes.  I could hear the siren, yes.

24   BY MR. NISENBAUM:

25       Q.  Okay.  We're at 20 seconds, continuing.

                                                              84

1          Pausing it at 40 seconds.

2          Someone said, "All right.  We'll deal with you in

3    a minute."

4          Do you know who said that?

5      A.   That was Officer Tagorda.

6      Q.   Do you know who he was talking to?

7      A.   I want to say it's the person raising their hand

8    near the -- my patrol car on the sidewalk.

9      Q.   Okay.  And do you know why they were raising

10   their hand?

11     A.   I -- I don't.

12         MR. FINE:  Calls for speculation.

13   BY MR. NISENBAUM:

14     Q.   Okay.  Did you ever talk with that person?

15     A.   I'd have to see because I talked to one guy

16   briefly, but I don't know if that's him or not.  I can't

17   tell.

18     Q.   Okay.  All right.  Continuing at 40 seconds.

19         Pausing at 42 seconds.

20         Mr. Gutzalenko had been on his side in the

21   recovering position, and now he's prone.

22         And you saw him either roll or be pushed or both

23   into the prone position, right?

24         MR. FINE:  Misstates the video.

25         THE WITNESS:  I -- I would need you to back it up

                                                              85

1  because I was focusing on the person by the car, seeing

2  if it was the person I was speaking to.

3  BY MR. NISENBAUM:

4    Q.  The beauty of this program is I can do it this

5  way.  Moves quite slowly.

6         All right.  I'll play it here at 37.

7         Okay.  Pausing at 43 seconds.

8         Looks like he kind of rolled, and there was a

9  little tap in the roll direction by Officer Tran, right?

10         MR. FINE:  Misstates the video.

11         THE WITNESS:  It looked like he moved on his own

12  accord without Officer Tran.  However, he's still there

13  and kind of just stayed with him.

14  BY MR. NISENBAUM:

15    Q.  Okay.  So now he's back prone, right?

16         MR. FINE:  Misstates the video.

17         THE WITNESS:  He's laying on his stomach with his

18  head up and his hands in front of him.

19  BY MR. NISENBAUM:

20    Q.  Okay.  And you have an understanding that that's

21  what prone means, you know, on your stomach?

22         MR. FINE:  Vague and ambiguous.

23         THE WITNESS:  I just call that laying on your

24  stomach.

25  ///

86

1    BY MR. NISENBAUM:

2        Q.   Okay.

3        A.   Prone to me is laying on your -- on your -- on

4    you chest, stomach, with your arms out by your side or

5    to -- or by your side.  I -- I wouldn't call that a

6    prone position.  I would call that just a laying down

7    position.

8        Q.   Laying down on your stomach is what you would

9    call it?

10       A.   Yes, the position he rolled himself to.

11       Q.   Okay.  And he's got a pretty big gut,

12   Mr. Gutzalenko does, right?

13       A.   It's notable.

14       Q.   Okay.  And you've been trained with respect to

15   prone body restraint that whether a person has a big

16   belly is one of the things that puts them at risk of

17   asphyxiating, right?

18           MR. FINE:  Calls for expert testimony.  Calls for

19   speculation.  Vague and ambiguous.

20           THE WITNESS:  I would say no because I don't

21   recall receiving instructions about somebody's girth as,

22   you know --

23   BY MR. NISENBAUM:

24       Q.   Okay.

25       A.   -- have an issue that's -- I know people, bigger,

87

 1   since I was there, you don't move as freely as, you

 2   know, somebody who's in a little better shape or

 3   thinner, but I don't recall receiving that instruction.

 4       Q.   Okay.  So we're at 43 seconds.

 5            Okay.  We're pausing at 1:29.

 6            You said he's having a reaction or something.

 7   He's got dried vomit on his face, right?

 8       A.   Yes.

 9       Q.   Okay.  And what were you noticing?

10       A.   The dry, crusty vomit in his facial hair, and

11   like I said, he was spitting blood, and he had a bloody

12   right hand, and he had a bruise on his head.

13       Q.   Okay.  And then when you said he's having a

14   reaction to something, was it your belief that he was

15   under the influence of drugs?

16       A.   Yes.  That's why I was asking him what drugs he

17   took.

18       Q.   Right.

19            And not only that, you saw that he had vomited,

20   and you thought he was having a bad reaction to whatever

21   he had taken, right?

22       A.   Yes.

23       Q.   Okay.

24            Pausing at 1:39.

25            I think that was your voice that said, "We're

                                                          88

1 going to put you in a recovery position so you can
2 breathe."
3     Is that -- are you saying that?
4     A.  I believe so.  I'd have to hear it again.
5     MR. FINE:  Calls for speculation.
6     MR. NISENBAUM:  I'll play it at 1:24.
7 BY MR. NISENBAUM:
8     Q.  So that was Officer Tran.  "The reason I'm going
9 to put you in a recovery position is so you could
10 breathe.  Okay?"
11     Telling that directly to Mr. Gutzalenko, right?
12     A.  It sounds like I -- it sounds like it could be
13 Officer Tran.  Maybe my video or his video would be a
14 lot clearer on that statement because Officer Tagorda is
15 walking away.
16     MR. FINE:  Calls for speculation.
17 BY MR. NISENBAUM:
18     Q.  Okay.  So we're at 1:37, I'll continue.  I'm
19 paused at 1:40.
20     Someone said, "So if you throw up, you don't
21 choke."
22     Do you know who said that?
23     MR. FINE:  I didn't hear that.
24     THE WITNESS:  I didn't hear that either.
25 ///

1  BY MR. NISENBAUM:

2     Q.  Okay.  Well, listen a little more closely.  My

3  volume is up as far as it can go, I believe.  Yep.

4        "In case you throw up, you don't choke."  You

5  heard that?

6     A.  I heard that, yes.

7     Q.  Okay.  Was that you?

8     A.  That sounded like me.  That did sound like my

9  voice.

10    Q.  Okay.  All right.  So you know people can

11 aspirate on their vomit and that's one of the reasons

12 you put them in the recovery position on their side,

13 right?

14    A.  Yes.

15    Q.  So vomit comes out?

16    A.  Yes.

17    Q.  Okay.  Continuing at 1:30 -- oh, here we are.

18 You see the ambulance pulling up here.  We're still

19 paused at 1:38.

20        You could see the paramedic or the ambulance

21 pulling up, correct?

22    A.  Yes.

23    Q.  Okay.  All right.  Pausing at 1:49.

24        Were you familiar with the paramedic who's

25 pictured here prior to this incident?

                                                      90

1      A.  I mean, I -- I see a lot of paramedics.  I mean,

2   it's not like a first-name basis, but I've seen him on

3   calls.

4      Q.  That's why I'm asking.  Maybe it is a first-name

5   basis.  I don't know the answer.

6      A.  Yeah.  No, I don't know this person on a

7   first-name basis.  I've just seen him on other calls and

8   car accidents, et cetera.

9      Q.  All right.  Now, once the paramedics arrived, is

10  there some rule that says that now everything that

11  happens is the paramedics' responsibility, not yours?

12      MR. FINE:  Incomplete hypothetical.  Vague and

13  ambiguous.  Calls for speculation.

14      MR. KANTER:  Join.

15      THE WITNESS:  Well, we -- we're doing the 5150,

16  so we're -- at this point we can't even get the

17  paperwork done yet, so we -- once the paramedics

18  basically takes custody of him, then at that point, you

19  know, they -- they get briefed, and then, you know, they

20  do their evaluation.  They try to talk, do their intake,

21  and then ultimately they end up -- they end up

22  controlling the scene, and once everything is said and

23  done we leave the scene.

24  BY MR. NISENBAUM:

25      Q.  Okay.  And I just -- we're still paused at 1:49.

                                                          91

1    I've just enhanced the -- expanded the -- or zoomed in,

2    I should say, the camera view.  And I'm looking at the

3    side of the van, of the ambulance, and it says "Contra

4    Costa County Fire EMS," I think; is that right?

5        A.  I --

6            MR. FINE:  Calls for speculation.

7            THE WITNESS:  Yeah, I don't know if it says "Fire

8    EMS," although I see Contra Costa County and the EMR

9    logo between the flags.

10   BY MR. NISENBAUM:

11       Q.  Right.  Okay.

12           Let me go back to regular view.

13           All right.  I'm going to hit play again.  We're

14   at 1:41.

15           I'm going to skip forward on our -- on Tagorda's

16   body cam.  I'm going to skip forward to 3:25.  I'm at

17   3:21, just pause it there.  This is 18:48:03 on the Axon

18   body cam time tag.

19           Okay.  I'm pausing it at 3:23.

20           You could see the paramedics have gotten the

21   stretcher out of the -- out of the ambulance, correct?

22       A.  Yes.

23       Q.  Okay.  Can you tell me what happened?  Why they

24   were getting the stretcher, if you know?

25           MR. FINE:  Calls for speculation.  Vague and

                                                        92

1    ambiguous.  Overbroad.

2         MR. KANTER:  Join.

3         THE WITNESS:  I -- well, I'm sure with the

4    instruction about him spitting up blood, vomiting and

5    overall condition, that I didn't hear if Officer Tagorda

6    said he's going to 5150 him or not, or if we're doing

7    the 5150.  But I'm assuming because of the described

8    medical issue that we're seeing, that's why they pulled

9    out the gurney.

10   BY MR. NISENBAUM:

11        Q.  Okay.  I don't want you to speculate.

12             My question is:  Did you hear them talking about

13   why they were getting the gurney?

14        A.  No.

15        Q.  Okay.  Continuing at 3:23.

16             I'm pausing at 4:07.

17             There was a voice saying, "I've done nothing

18   wrong."  Did you hear that?

19        A.  It was muffled from my end.

20        Q.  Okay.  I'll go back just a shade.  Go back to

21   four -- 3:59.

22             Pausing it at 4:09.

23             You heard a voice saying -- and there's a

24   different body cam.  I can play for that.

25             But in any event, other -- the prone restraint

                                                        93

1   was continuing during that time period, correct?

2          MR. FINE:  Misstates the video.

3          THE WITNESS:  The prone restraint, are you --

4   He's -- I mean, like him still on his stomach?

5   BY MR. NISENBAUM:

6      Q.  Well, he was continuing to be forcibly

7   restrained, correct?

8      A.  At this point, yes.

9      Q.  Okay.  Do you recall when the restraint -- well,

10  strike that.

11         I'll deal with that in a different video, but I'm

12  showing you this video for a reason.

13         Okay.  I'm going to continue.  We're at 4:09.

14         Obviously, we see you.  You're now physically

15  involved in the restraint, and you probably have been

16  for a period of time before this, correct?  Yourself --

17     A.  I don't want -- I don't want to speculate, so I'd

18  rather see my footage -- my body cam, so --

19     Q.  Body cam that shows you, shows what you did,

20  right?

21     A.  But I'm being blocked by Officer Tran.

22     Q.  It's okay.  It's not a trick, I promise you.

23         There is clearly a physical restraint of

24  Mr. Gutzalenko that's happening in this video, correct?

25     A.  Yes.

                                                         94

1      Q.   Thank you.

2           And that restraint is being conducted at least by

3    Officer Tran at a minimum, correct?

4      A.   Yes.

5      Q.   Okay.  We're at 4:09, continuing.

6           Okay.  Let me scroll back.  All right.

7           You could barely see it there.

8           But you could see that Officer Tran's left knee

9    was in the middle of Mr. Gutzalenko's back, right?

10          MR. FINE:  Misstates the video.

11   BY MR. NISENBAUM:

12     Q.   At 4:15.  Did you see that?

13          MR. FINE:  Same objection.

14          THE WITNESS:  What I saw was Officer Tran using

15   his knee to control and limit his movement, but I didn't

16   see -- looks like all his weight is on his right knee

17   and he's using his left knee just to control movement.

18   BY MR. NISENBAUM:

19     Q.   And where was his left knee positioned?

20          MR. FINE:  Calls for speculation.

21   BY MR. NISENBAUM:

22     Q.   In the video?

23     A.   It looked like it was along -- well, I'd have to

24   see more.  But I mean, from what I'm seeing right now, I

25   have a paramedic and Officer Tran in the far left corner

                                                        95

1    view of the body cam.

2        Q.  Let me make sure we're going backwards and not

3    forward.  That's forward.  I think actually go back.

4    There's actually a much better shot of his knee later.

5    All right.  I'll just go forward from 4:13.

6            By the way, there's a paramedic who's wrapping

7    his hand at this point in time, correct?

8    Mr. Gutzalenko's hand?

9        A.  Yes, or trying to.

10       Q.  Okay.  And that's because it was bloody, right?

11       A.  Yes.

12       Q.  Okay.  So we're continuing.  We're at 4:13.

13           All right.  We're paused at 4:33.

14           You heard Mr. Gutzalenko say, "No.  Why are you

15   doing this to me," right?

16       A.  Yes.

17       Q.  Okay.  Do you recall hearing that at the scene

18   when it happened?

19       A.  Yes.

20       Q.  Okay.  And what's the answer?

21       A.  I don't recall.  I'd have to see.  I'd have to

22   see the video more.

23       Q.  My question is, why is this being done to him?

24           MR. FINE:  Asked and answered.

25   ///

                                                          96

1    BY MR. NISENBAUM:

2       Q.  Why is he being restrained in the manner that

3    he's being restrained?

4       A.  Initially he's being detained for a crime, and

5    then we're determining if it's going to be a 5150.

6       Q.  Okay.  We're -- actually, let me go back about

7    three seconds.  We're at 4:28.  You're going to hear the

8    words "5-1-5-O" or just the numbers 5150.  I think I

9    know who says them, but you tell me.

10          Do you know whose voice that was that said

11              "5-1-5-O"?

12          MR. FINE:  Calls for speculation.

13   BY MR. NISENBAUM:

14      Q.  Go ahead.

15      A.  Sounds like my voice.

16      Q.  Okay.  And do you recall saying that?

17      A.  I know I said that because I told him we're going

18   to paper him.

19      Q.  Okay.  By saying "5-1-5-O" instead of 5150, were

20   you saying that so that he wouldn't necessarily hear the

21   term "5150"?

22      A.  Yes.

23      Q.  Okay.  And why?  Why did you say it the way you

24   said it, 5-1-5-O?

25      A.  I didn't want to agitate him anymore than he

                                                        97

1  already was.

2      Q.  All right.  And I'm going to hit play.  We're at

3  4:33.

4          And you can tell the position that Officer Tran

5  is in -- you can't see the knee right here, but you can

6  tell the general position, right?

7          MR. FINE:  Calls for speculation.  Misstates the

8  video.

9  BY MR. NISENBAUM:

10     Q.  Correct?

11     A.  I can see him on Mr. Gutzalenko's side, but the

12  way I have his arm up his chest is elevated so he has

13  airway.

14     Q.  His chest is elevated.  You think so?  Okay.

15         What about his diaphragm?  Is his diaphragm

16  elevated?

17         MR. FINE:  Calls for speculation.  Calls for

18  expert opinion.

19  BY MR. NISENBAUM:

20     Q.  Okay.  Well, let me ask you -- it's just as a

21  matter of physics.

22         When you have, let's say, a cement ground on the

23  bottom and you have pressure on the top, there's not

24  much give in the cement ground, right?

25         MR. FINE:  Incomplete hypothetical.  Assumes

                                                    98

1    facts.  Vague and ambiguous.

2    BY MR. NISENBAUM:

3        Q.  Do you agree with that?

4            MR. FINE:  Same objections.

5            THE WITNESS:  I have his arm up, and I can't see

6    what pressure's on his back because he's still kind of

7    slamming on the side right there.

8    BY MR. NISENBAUM:

9        Q.  I asked you a different question.

10       A.  Well, he's not flat on the ground, so I don't

11   know what pressure you're talking about on his back

12   right now.

13       Q.  Well, my question is:  When you have a person on

14   a cement ground and the ground is cement, and if you

15   apply vertical pressure, downward pressure on their

16   torso, then you would agree that that causes compression

17   of the torso, correct?

18           MR. FINE:  Incomplete.  Hypothetical.  Calls for

19   expert opinion.  Misstates the video.  Assumes facts.

20   BY MR. NISENBAUM:

21       Q.  A matter of common sense and basic competence.

22           MR. FINE:  Same objections.

23           THE WITNESS:  I mean, sure.  I guess there will

24   be compression.

25   ///

99

1    BY MR. NISENBAUM:

2        Q.   Okay.  We're at 4:36.

3             Okay.  Let's go back just a shade here.

4             All right.  So we're at 4:40, and the time stamp

5    is 18:49:24 on the Axon time stamp.

6             And now you can see that Officer Tran's knee and,

7    I guess, upper part of his shin is pressed against

8    Mr. Gutzalenko's back, correct?

9             MR. FINE:  Vague and ambiguous.

10            THE WITNESS:  In my opinion, it looks like he

11   uses a control device because I see all the weight on

12   his right knee on the hard cement.

13   BY MR. NISENBAUM:

14       Q.   When you say "all the weight," what do you mean?

15       A.   Looks like Officer Tran is putting the weight on

16   his right knee which is resting against the cement

17   ground and that he's using his knee as a control to

18   control the movement of Gutzalenko.

19       Q.   I see.  So if that right knee were to come up off

20   the ground and the left knee were to press towards the

21   ground while in the middle of Mr. Gutzalenko's back,

22   then that would be -- that would be what would be

23   forbidden or not acceptable as reasonable police conduct

24   in this circumstance; is that right?

25            MR. FINE:  Incomplete hypothetical.  Calls for

                                                           100

1  speculation.  Overbroad.

2  BY MR. NISENBAUM:

3      Q.  Based on your training?

4          MR. FINE:  Same objections.

5  BY MR. NISENBAUM:

6      Q.  And understanding of Richmond Police Department

7  policy.

8          MR. FINE:  Same objections.

9          THE WITNESS:  I mean, if he -- if he applied

10  pressure on his, you know -- take the pressure on his

11  right knee, put all the pressure on the left knee, then

12  you know -- that would, you know.  He would provide a

13  compression at that moment, but I'm not seeing

14  compression at this time.

15  BY MR. NISENBAUM:

16      Q.  That would be bad if he did that, right?  That

17  would be bad, meaning it would be compressive of the

18  torso, which is something you want to avoid because it

19  impairs breathing, correct?

20          MR. FINE:  Same objections.  Misstates the video.

21          THE WITNESS:  It -- the compression, the thing

22  is -- what word am I looking for?  The -- compressing

23  the airway is, you know -- and right now --

24          (Reporter clarification.)

25          THE WITNESS:  You know, you don't want to

101

1   compress the airway.  You don't want to restrict
2   somebody's airflow, but currently in this position, I'm
3   not seeing the restriction of airflow because it looked
4   like Mr. Gutzalenko is still leaning against
5   Officer Tran's knee, which he's using in controlling
6   moving and support.
7       MR. NISENBAUM:  That wasn't my question, though.
8       THE WITNESS:  All right.  Ask your question
9   again.
10      Q.  I'll have it read back.
11      (Record read.)
12      MR. NISENBAUM:  Yeah, that was the last question.
13  BY MR. NISENBAUM:
14      Q.  What I said was, if you were to start pressing
15  down, putting his weight on the left side, on his left
16  side, on his left knee, right?  Picking his right knee
17  up off the ground and putting his weight with his left
18  knee down in the middle of Mr. Gutzalenko's back, that
19  would be what is not permitted by Richmond Police
20  Department policy under these circumstances, correct?
21  Because that would, based on your training, would
22  interfere with the diaphragm and the airway, correct?
23      MR. FINE:  Same objections.
24      THE WITNESS:  I'll go by policy saying that it
25  should not restrict a person's airway.  You should not

                                                    102

1  restrict a person's airway, but I'm still not seeing a

2  restriction right now.  So maybe you got another angle

3  will show me differently.

4  BY MR. NISENBAUM:

5     Q.  Well, I'm going to 4:40.  Obviously, you're not

6  the judge here but -- or the fact finder, but the

7  question is about policy.  So I'm going to continue at

8  4:40.

9        Okay.  We're now at 4:51, and you can see that

10  the knee is pressed in the middle of the back, slightly

11  different angle, but all the way across the middle of

12  the back pretty much, correct?

13        MR. FINE:  Misstates the video.

14        THE WITNESS:  It looks like it's on the lower

15  back and he's still using it as a control movement

16  because he's not flat-proned and he's still moving

17  around somewhat freely except I have control of his left

18  arm.

19  BY MR. NISENBAUM:

20     Q.  Okay.  Continuing at 4:51.

21        All right.  We're at 5:05.

22        Mr. Gutzalenko responded to you when you said,

23  "You're going to get tased then," right?

24     A.  Yes.

25     Q.  And he responded in a manner that would suggest

1    that he recognized what you said, correct?

2       A.  Yes.

3       Q.  He said, "No, please don't do it."  Right?

4       A.  Yes.

5       Q.  Okay.  Was he sweating profusely by any chance?

6       A.  I don't recall.

7       Q.  Nothing that you can recall where it felt like he

8    was drenched in sweat, correct?

9       A.  I -- I can't -- I don't recall.

10      Q.  Okay.  We're continuing at 5:05.

11          Go back just a shade.  Okay.  We're now at 5:11,

12    and from what you can see here, you can see that the

13    shin, the whole -- from the knee to the top half of the

14    shin of Officer Tran is pressed against the area of

15    Mr. Gutzalenko's back, that is above the hip and above

16    the pelvis, correct?

17          MR. FINE:  Misstates the video.  Calls for expert

18    opinion.  Calls for speculation.

19    BY MR. NISENBAUM:

20       A.  So if you -- it was his -- it looked like it's on

21    his left side, not his back, because you can see the

22    rear pocket of his jeans are vertical to the ground and

23    he's not on his stomach.  He's literally on his side

24    right there, and that's the lower back area near the

25    left side.

**BARBARA J. BUTLER & ASSOCIATES - Certified Court Reporters**
**(510) 83-BUTLER (28853) or (408) 248-BUTLER (2885) - bbreporter.courtreporting@gmail.com**

1    Q.   Regardless, it's compression, correct?  It's

2    compression against the ground, right?

3         MR. FINE:  Calls for speculation.  Calls for

4    expert opinion.  Vague and ambiguous.

5    BY MR. NISENBAUM:

6         A.   Yeah, I -- from what I see it still looks like

7    he's controlling movement and I still see the pressure

8    on his right knee that's on hard cement.

9    Q.   We'll continue.  We're at 5:11.

10        Pausing at 5:32.  Let me go back earlier.  You

11   had Mr. Gutzalenko saying, "I can't breathe" just based

12   on your memory, correct?

13   A.   Yes.

14   Q.   Okay.  So you understood that he was having some

15   sort of respiratory issue, at least he was expressing

16   that when you first encountered him, correct?

17        MR. FINE:  Calls for speculation.

18        THE WITNESS:  You know, I -- I can't assume that

19   he had respiratory issues because every, you know --

20   seems like everybody says "I can't breathe anymore," but

21   you have to assume that they, you know, cannot.  But I'm

22   not a medical expert to say he could or not.

23   BY MR. NISENBAUM:

24   Q.   Which is -- I mean, based on what you observed,

25   he was expressing that he was having breathing

105

**BARBARA J. BUTLER & ASSOCIATES - Certified Court Reporters**
**(510) 83-BUTLER (28853) or (408) 248-BUTLER (2885) - bbreporter.courtreporting@gmail.com**

1    difficulty when you first encountered him, correct?

2        A.  If I recall, I -- I don't recall.  I recall it

3    more during the detention process.

4        Q.  Okay.  But while he was being restrained, he was

5    saying that he was having difficulty breathing, correct?

6        A.  Yes.

7        Q.  Okay.  And what was done in order to accommodate

8    that?

9            MR. FINE:  Overbroad.  Vague and ambiguous.

10           THE WITNESS:  We -- we were trying to get him to

11   comply and get him back into his recovery position.

12   BY MR. NISENBAUM:

13       Q.  When you say "get him back into recovery,"

14   while -- I -- again, the concept of the ground pressure

15   here, you know, unless you're on a trampoline or

16   something like a very soft bed, if you have hard ground

17   pressure here, it doesn't matter if you're on your back,

18   on your side, on your stomach, there's compression,

19   correct?

20           MR. FINE:  Misstates the video.  Calls for

21   speculation.  Calls for expert opinion.  Asked and

22   answered.

23   BY MR. NISENBAUM:

24       Q.  You understand that as a matter of common sense,

25   right?

                                                            106

1          MR. FINE:  Same objections.

2          THE WITNESS:  Yes.

3     BY MR. NISENBAUM:

4      Q.  Thank you.

5          All right.  Continuing at 5:32.

6          All right.  Pausing at 5:40.

7          You heard one of the paramedics say, "I'm going

8     to get some Versed drawn up," and I think you said,

9     "We're going to Versed him as opposed to sedate him."

10    But maybe you said "sedate," I don't know.  Do you

11    recall?

12     A.  Can we go back so I can --

13     Q.  It sounded like he was using Versed as a verb.

14    5:24, continuing -- I'm sorry 5:28, continues.

15          Pausing at 5:39.

16          Do you recall if -- does that jog your memory at

17    all?

18     A.  Yeah.  I heard him say he's going to get some

19    Versed drawn up.  But I thought I heard him say he was

20    going to sedate him.

21     Q.  Okay.  I'm not certain.  I'll ask him when I

22    depose him, of course.

23          All right.  Let me skip forward to six minutes.

24    We're at 5:57.  Hit play.

25          All right.  Pausing it at six minutes.  That's

                                                     107

1　still Officer Tran with one foot, one knee on the
2　ground, the other knee against him, and you saw the knee
3　move forward.  That's pressure, correct?  The left knee
4　that was on him, pushing his body forward, you saw that
5　happen?
6　　　A.  Can you go back again so I can see that happen?
7　　　Q.  I'll do it in slow motion.  So we're at
8　six minutes here on the timer.  And we're at 18:50:44 on
9　the Axon video stamp.  I'll just scroll forward.
10　　　　So you saw that the pressure moved in a forward
11　manner into his body, into Mr. Gutzalenko's body,
12　correct?
13　　　　MR. FINE:  Calls for speculation.  Misstates the
14　video.
15　　　　THE WITNESS:  It -- it shows on the lower back
16　that it moved on the lower back.
17　BY MR. NISENBAUM:
18　　　Q.  Yeah.  Where it had been the whole time, right?
19　In the same location that it had been the whole time,
20　right?
21　　　　MR. FINE:  Calls for speculation.
22　BY MR. NISENBAUM:
23　　　Q.  Above his hips and pelvis, correct?
24　　　　MR. FINE:  Same objections.
25　　　　THE WITNESS:  Yes, above his hips.

108

1  BY MR. NISENBAUM:

2      Q.  Okay.  I'm going to hit play.

3          Backwards just a shade.  All right.  Now we're at

4  6:09, and you can see Officer Tran's knee moved from

5  this position into the center of his back and then

6  pressed, correct?

7          MR. FINE:  Calls for speculation.  Misstates the

8  video.

9  BY MR. NISENBAUM:

10     Q.  He actually moves off him.  All right.  I'll

11 withdraw the question.

12         6:11, there we go.  Slow mo.  I'm going to do it

13 this way.  I'm reversing.  Okay.  So now we are at 6:15.

14 And you can see that Officer Tran's knee has moved up

15 towards the center, his -- I should say, his lower leg.

16 Officer Tran's lower leg has moved up towards the center

17 of Mr. Gutzalenko's back.  He no longer has his knee,

18 his right knee on the ground.  Instead he's using his

19 foot to -- his right foot to leverage his way forward on

20 to Mr. Gutzalenko's back with the -- his lower left leg,

21 correct?

22         MR. FINE:  Misstates the video.  Calls for

23 speculation.

24         THE WITNESS:  I would like to see the entire

25 video before I give a statement.

                                                    109

1    BY MR. NISENBAUM:

2       Q.  Well, we're not -- I'm not watching the entire

3    video with you.  If you want to see a segment, I mean --

4       A.  I want to see the segment what you're referring

5    to.  You wanted me to answer about, you know, his -- his

6    movement.

7       Q.  We're here at 6:13.  I'll hit play.

8           Now we're at 6:23.

9           The knee is dead in the center of his back,

10   right?

11          MR. FINE:  Misstates the video.

12   BY MR. NISENBAUM:

13      Q.  Falls between the shoulder blades, right?

14          MR. FINE:  Same objection.

15          THE WITNESS:  So it's up there, but it looks like

16   it's more towards the shoulder.  And it still looks like

17   he's using his control technique.  I don't see like --

18   BY MR. NISENBAUM:

19      Q.  The --

20      A.  He's on his toe, but he's not like -- Gutzalenko

21   is still able to move around, so that indicates that

22   there's not pressure.  It's still being used as just

23   control, trying to control movement.

24      Q.  Well, his other knee is off the ground.

25          Officer Tran's right knee is off the ground now,

                                                          110

1   right?

2        MR. FINE:  Objection.  You can't see that in this

3   particular frame.

4   BY MR. NISENBAUM:

5     Q.  Not in the frame, but you saw it before.

6        So you know that it's true, and there it is.  I

7   mean, 6:36.  That's the knee in the back, that's

8   everything you said it wasn't before, correct?

9        MR. FINE:  Misstates testimony.  Vague and

10  ambiguous.  Argumentative.  Misstates the video.

11  BY MR. NISENBAUM:

12    Q.  Okay.  Previously, you said earlier in the video

13  that you didn't believe that there was weight being

14  pressed on Mr. Gutzalenko's back in a significant way.

15  It was more like a control thing because his right knee,

16  Officer Tran's right knee, was on the ground and that he

17  was simply using the -- and there didn't appear to be a

18  lot of weight being put into the left knee that was at

19  his lower back.  But now we've seen the left knee has

20  moved up to the middle of the back basically.  And you

21  can tell that he straightens his right leg in a classic

22  attempt to gain leverage.  That's a term I'm sure you're

23  familiar with it.  And he's pressing down with his left

24  knee.  You can see, you can even look at the toe there,

25  at the left toe.

111

1          That's what happens when you're pressing,

2   correct?

3          MR. FINE:  Misstates the evidence, the video.

4   Misstates prior testimony.  And calls for speculation.

5          THE WITNESS:  And that still looks like the

6   shoulder area to me on his --

7   BY MR. NISENBAUM:

8     Q.   This is the shoulder area?

9     A.   You get --

10    Q.   Let me zoom in on that.

11    A.   Well, this is somebody's feet.  Look.  This is

12  recording from the feet.  So if there's a -- the angle

13  is not the best angle to testify on --

14    Q.   Oh, I've got other angles.

15    A.   Okay.

16    Q.   In any event, you agree, though, that he's doing

17  everything that you said he wasn't doing before with

18  respect to putting his weight, having most of his weight

19  on his right leg, that's no longer true, correct?

20         MR. FINE:  Calls for speculation.  Misstates the

21  video.

22         THE WITNESS:  I do not see the weight on his

23  right leg anymore, no.

24  BY MR. NISENBAUM:

25    Q.   Okay.  And he appears to be using his leverage,

                                                        112

1    his momentum, and his application of force is directed

2    through his left knee, correct?

3         MR. FINE:  Calls for speculation.  Calls for

4    expert opinion.  Misstates the video.

5         THE WITNESS:  Looks like he's using his right

6    knee -- I'm sorry, his left knee to control the movement

7    of Gutzalenko.

8    BY MR. NISENBAUM:

9      Q.  Fine.

10         He's pinning him down against the ground with his

11    left knee.

12         That's what he's doing, right?

13         MR. FINE:  Misstates the video.

14         THE WITNESS:  I still feel like he's controlling

15    movement, and I don't feel like he's applying his full

16    weight on that shoulder area.

17    BY MR. NISENBAUM:

18      Q.  You feel like, but you can see that all the

19    reasons you gave before, that's not what's happening

20    here, right?

21         MR. FINE:  Same objections.  Overbroad.

22    Misstates testimony.

23         THE WITNESS:  And I don't -- as far as -- he

24    still is moving around.  So I mean if Tran had his full

25    weight on there, Gutzalenko would not be able to move so

1   freely.

2   BY MR. NISENBAUM:

3       Q.  So he has to be dead before he can die from being

4   asphyxiated?

5           MR. FINE:  Misstates testimony.  Argumentative.

6   Calls for expert opinion.

7   BY MR. NISENBAUM:

8       Q.  I'll strike that.  I'll strike that.

9           You understand that when people's breathing is

10  interfered with, there is an involuntary, just natural

11  instinct to do whatever you can to breathe.  And that's

12  true, no matter what, unless you are comatose.

13          And you understand that as a matter of life,

14  right?

15      A.  Yes.

16          MR. FINE:  Calls for speculation.

17  BY MR. NISENBAUM:

18      Q.  If you interfere with a person's breathing, well,

19  they react against it.  They're not resisting

20  necessarily; they're trying to breathe.

21          MR. FINE:  Overbroad.

22  BY MR. NISENBAUM:

23      Q.  Are you trained in that?

24          MR. FINE:  Overbroad.  Vague and ambiguous.

25          THE WITNESS:  I'm not -- I'm not trained to

                                                            114

1  speculate when someone can or can't breathe.

2  BY MR. NISENBAUM:

3      Q.   But you are trained to not do what Officer Tran

4  is doing in this shot that we have here, which is at

5  06:36 on the timer and at 18:51:20 on the Axon time

6  stamp.

7          That's what you're not supposed to do, correct?

8          MR. FINE:   Misstates the video.   Misstates prior

9  testimony.

10         THE WITNESS:   And I can't give expert testimony

11  on that because we're on the still shot and --

12 BY MR. NISENBAUM:

13     Q.   I don't think you can give expert testimony,

14 period.

15         I'm asking you about your training based on your

16 understanding of training and policy.

17     A.   You can --

18         MR. FINE:   Same objections.

19         THE WITNESS:   And you can put it on somebody's

20 shoulder blade.   You can put it on their glute.   And

21 this looks like it's still controlling movement and is

22 not trying to be malicious or in violation of the

23 policy.

24 BY MR. NISENBAUM:

25     Q.   Well, again, it's not on his glute.   And it's

                                                        115

1   sure not on his shoulder blade.

2          That's the middle of the back.

3          MR. FINE:  Misstates the video.

4          THE WITNESS:  Again, we'll see the -- we'll see

5   the different angle then because I'm -- I'm not going to

6   say it's the middle of the back from this angle.

7          MR. NISENBAUM:  With respect to Counsel's

8   objections, there's a case called Scott v. Harris, says

9   when the video is clear, you can't fight the video.

10         MR. FINE:  I don't believe it's clear, Counsel.

11         MR. NISENBAUM:  I think it is.

12         MR. FINE:  I understand that.  We disagree.

13         MR. NISENBAUM:  All right.

14  BY MR. NISENBAUM:

15    Q.  So in any event, let me ask you this:  Actually,

16  I've already asked you.  I'll hit play.  We're at 6:36.

17         All right.  Up to this point, at any time -- I'm

18  going to play yet -- had Mr. Gutzalenko been handcuffed

19  yet?

20    A.  Not yet, no.  I was still controlling his left

21  hand.

22    Q.  Okay.  I'm going to hit play.  We're at 6:36.

23         We're at 6:41.  Mr. Gutzalenko just said, "I

24  can't breathe" twice, correct?

25    A.  Yes.

                                                      116

1    Q.  And you can see where Officer Tran's knee is on

2    Mr. Gutzalenko's back, correct?  I know they're both

3    wearing black, but it's pretty clearly dead in the

4    center of Mr. Gutzalenko's back, correct?

5         MR. FINE:  Vague and ambiguous.  Misstates the

6    video.

7         THE WITNESS:  Again, I'd like to see a different

8    angle because this is the same angle we've been talking

9    about, Counsel.

10   BY MR. NISENBAUM:

11   Q.  Okay.  So you can't tell.

12        Your eyes, they don't tell you where his -- where

13   Officer Tran's knee is on Mr. Gutzalenko's back there;

14   is that right?

15        MR. FINE:  Asked and answered.  And

16   argumentative.

17        THE WITNESS:  I think my camera will show a --

18   show better for more of a statement.

19   BY MR. NISENBAUM:

20   Q.  Again, can you tell?

21   A.  It still looks like it's on his upper extremity

22   area to control that.  It doesn't look -- it looks like

23   it's against the back to control Gutzalenko's movement.

24   Q.  And the right knee is off the ground, correct?

25   A.  Yes.

117

1    Q.  All right.  Continuing at 6:41.

2         And we heard Mr. Gutzalenko say, "I can't

3    breathe.  Please.  I can't breathe."  I paused at 6:48.

4    Correct?

5    A.  Yes.

6    Q.  Okay.  And that's 18:51:32 on the Axon time stamp

7    that it's paused at.

8         And again, the knee remains -- Officer Tran's

9    knee remains in the same positioning, correct?  The left

10   knee.

11   A.  And his right knee is going back to the ground.

12   Q.  Sure.

13        Now, we're at 6:48.

14        Officer Tran has removed his knee.  I just paused

15   it.  We're at 6:50.

16        So he's removed his knee, and now, there's a

17   handcuff on the left hand, correct?

18   A.  Yes.

19   Q.  All right.  Continuing at 6:50.

20        Okay.  Someone saying, "Ivan, stop and get the

21   Taser."

22        That's you, I assume?

23   A.  Yes.

24   Q.  And you were still bluffing him?

25   A.  Yes.  You can't Taser a handcuffed individual.

                                                    118

1    Q.   All right.  So you are telling this person in
2  these straits, basically threatening a use of force to
3  gain compliance, correct?
4    A.   No.  You can use a ruse, which is part of
5  de-escalation to get them to comply.
6    Q.   Okay.  When I say "threatening a use of force,"
7  you were threatening him with a possible use of force,
8  although you weren't intending to use that force,
9  correct?
10   A.   I was doing de-escalation techniques, trying to
11 get him to comply.
12   Q.   Well, you call it a ruse, but the reality is
13 what -- you were using a verbal threat to him in order
14 to gain compliance, a threat of force, even though you
15 had no intention of following through on the threat of
16 force, correct?
17   A.   Yes.
18   Q.   Okay.  Continuing at 7:09.
19        Okay.  Pausing at 3:19.
20        You're essentially, you're trying to complete the
21 handcuffing now, correct?
22   A.   Yes.  We're trying to -- Officer Tran is trying
23 to get his right hand into the handcuff.
24   Q.   Okay.  All right.  And was Mr. Gutzalenko, was he
25 still resisting you at this time?

119

1      A.   Yes.

2      Q.   Okay.  Continuing at 7:19.

3           All right.  Let me ask you this -- I'm paused at

4      7:23.

5           Was anyone controlling his legs at this time?

6      A.   I believe Officer Tagorda still was, but I

7      can't -- I -- I don't know if -- I can't recall.

8      Q.   I'll ask him.  But it seems difficult for --

9      unless he has the longest arms in the world to have his

10     arms -- his hands on his legs at that time, just based

11     on the body cam.  But I'll ask him when I get a chance.

12          All right.  Continuing at 7:23.

13          Okay.  Now, we're at 7:31.  He's telling him,

14     "Don't kick."  And who was that?

15     A.   That would be Officer Tagorda.

16     Q.   Okay.  All right.  And now we see that this

17     paramedic with the glasses is walking up.

18          He's got a syringe in his hand, correct?

19     A.   Yes.

20     Q.   And who's this guy here, where my cursor is?

21     A.   Officer Tran.

22     Q.   Okay.  We're at 7:37.  This is time stamp

23     18:52:21.

24          Okay.  Now, Mr. Gutzalenko, he's currently in

25     custody of the police, correct?

                                                        120

1    A.  Yes.

2    Q.  Okay.  And --

3       MR. FINE:  Belatedly.  Calls for a legal

4  conclusion, expert testimony.

5  BY MR. NISENBAUM:

6    Q.  And there is an injection that is about to be

7  given.  We're at 7:40.

8       All right.  Whose hand pulled the sweatshirt or

9  the shirt?

10   A.  It looks like both the paramedic and

11 Officer Tran's holding -- holding it.

12   Q.  Right.

13      Exposing the skin for the injection, correct?

14   A.  Yes.

15   Q.  "Never mind.  You got that.  That's the good

16 stuff."

17      That was maybe Officer Tagorda or -- who was

18 that?  Was that you?

19   A.  That was not me, no.

20   Q.  Okay.  So that's 7:48.  I don't know if it was --

21 I don't know who it was, but you got that.  It's the

22 good stuff.

23      Officer Tran is still hands on him at this time,

24 correct?

25   A.  Yes.

1      Q.   The injection's been given.  We're at 18:52:32.

2           And someone said something about unconscious,

3    7:51.

4           I don't know who that was, do you?

5           MR. FINE:  Calls for speculation.

6    BY MR. NISENBAUM:

7      Q.   What was the answer?

8      A.   I -- I did -- I didn't -- I don't record- -- I'd

9    have to hear the voice again, but I can't.

10     Q.   I couldn't tell.  I mean, I've listened to it

11   several times.  I couldn't tell.  But I'm going back to

12   7:43.

13     A.   That's -- that -- that sounds like me saying,

14   "He's acting unconscious."

15     Q.   "He's acting unconscious," is what you said?

16     A.   What I think I said, yeah.  But I definitely --

17   unconscious was in that statement.

18     Q.   I know that.  I heard the unconscious part.  I

19   was trying to figure out what exactly was said, but that

20   was 7:51 and 18:52:35 on the time stamp.

21           So it appeared to you that he was unconscious

22   immediately after the shot was given?

23     A.   Yeah, because he was still breathing before the

24   injection was given.

25     Q.   Okay.  Well, and I breathe when I'm conscious

                                              122

1    too.

2        A.  He was breathing before the injection was given.

3        Q.  I got that.

4            So you were saying -- what did you actually say?

5    "Acting unconscious," like faking unconsciousness?

6        A.  Yeah.  I believe -- I believe I said he was

7    acting unconscious.

8        Q.  And what did that mean?

9        A.  That it's common for people to act as if they're

10   not conscious or not awake during the process.

11       Q.  Why would that be good?

12       A.  I didn't say good.

13       Q.  You said, "So that's a good thing."  I mean, let

14   me go back here.  I'll play it 7:46.  One second.

15   Trying to play it.  Sorry, 7:44.

16           You said, "So that's good."  Right now, he's

17   acting like he's unconscious, so that's good?

18       A.  I -- I don't know why I would say it was good.

19   But maybe to be easier for him to get onto the gurney

20   or, you know, because sometimes when people act

21   unconscious, they act more compliant.  And you get them

22   on the gurney and get them out of the area.

23       Q.  And so that's good?

24           Right now, what I actually heard, listening very

25   closely was, I heard you say, I believe, "Ahh, we're

123

1    doing great.  He's unconscious, so we're good."  That's
2    what I actually recall hearing you say.  Listen to it
3    very closely, and I just want to confirm that that's the
4    case.  So if you could listen one more time.  We're at
5    7:45.
6           And I could be wrong, could be "So that's good?"
7           But it was, "Ahh, we're doing great.  He's
8    unconscious, so that's good"?
9        A.  I --
10          MR. FINE:  Calls for speculation.  It might
11   misstate the video.  It's hard to tell.
12          THE WITNESS:  Yeah, I -- I don't hear "we're
13   doing good," but --
14   BY MR. NISENBAUM:
15       Q.  "So we're good," that's at the end or "so that's
16   good," one or the other, right?
17          MR. FINE:  Same objections.
18   BY MR. NISENBAUM:
19       Q.  At the very beginning of that was, "Ahh, we're
20   doing great," correct?
21          MR. FINE:  Same objections.
22          THE WITNESS:  I can't -- I mean, I'll listen to
23   it again, but I don't hear --
24   BY MR. NISENBAUM:
25       Q.  I'll play it again.  We're at 7:42.

124

1      It sounded like "Ahh, we're doing great.  He's

2  unconscious, so that's good."

3      A.  Is that a --

4          MR. FINE:  Is that a question?

5  BY MR. NISENBAUM:

6      Q.  Do you agree that that's --

7          MR. FINE:  Same objections.

8          THE WITNESS:  Yeah, I -- I can't agree to that

9  because it doesn't sound that -- that is not clear to me

10  the way it seems to be clear to you.

11  BY MR. NISENBAUM:

12     Q.  Okay.  Well, I have listened to it closely.

13         But in any event, do you have a recollection as

14  you sit here now especially having listened to this to

15  refresh your recollection of what you actually said

16  there?

17     A.  It sounds like, "He's acting unconscious, so

18  that's good" is what I believe I said.

19     Q.  Okay.  So a person who's acting unconscious could

20  immediately start acting conscious, right?

21     A.  Yes.

22         MR. FINE:  Incomplete hypothetical.

23  BY MR. NISENBAUM:

24     Q.  Whereas if they're unconscious, then -- if

25  they're actually unconscious, there would be some

                                                      125

1  transition time to acting conscious, right?

2          MR. FINE:  Calls for speculation.  Calls for

3  expert opinion.

4          THE WITNESS:  Any -- anyone can play possum at

5  any time.

6  BY MR. NISENBAUM:

7      Q.  Okay.  So you thought he was playing possum?

8      A.  It -- it's happened before, so yes.

9      Q.  Okay.  So the answer is, you believe that

10  Mr. Gutzalenko was playing possum at this time, we're at

11  7:51; is that correct?

12      A.  I believe he was acting unconscious.  And it's a

13  common activity I've seen multiple times.

14      Q.  Again, you thought he was faking unconsciousness,

15  correct?

16          MR. FINE:  Asked and answered many times.

17          THE WITNESS:  And my answer is still the same,

18  yes.  I felt he was faking being unconscious.

19  BY MR. NISENBAUM:

20      Q.  Thank you.

21          So continuing at 7:51.

22          Let me ask you this:  It was obvious that

23  Mr. Gutzalenko had coded, I think the term is, that,

24  basically, he had no pulse, no heartbeat, and was not

25  breathing minutes before he was put into the ambulance,

126

```
 1   correct.
 2           MR. FINE:  Calls for speculation.
 3           MR. KANTER:  Lacks foundation.
 4           I'm sorry.  Go ahead.
 5           MR. FINE:  No, you go ahead, Scott.  My
 6   apologies.
 7           MR. KANTER:  Objection.  Lacks foundation.  Calls
 8   for speculation.  Calls for an expert opinion.
 9           MR. FINE:  Join.
10   BY MR. NISENBAUM:
11       Q.  Based on your recollection?
12       A.  When we saw him on the gurney is whenever I
13   became aware he was not breathing, not until he was
14   placed on that gurney.
15       Q.  It was before he was in the ambulance, though,
16   correct?
17       A.  Yes.
18       Q.  And it was not seconds before, but at least a
19   minute or two before, correct?
20           MR. FINE:  Calls for speculation.
21           MR. KANTER:  Join.  Lacks foundation.  Calls for
22   expert opinion.  I think the question is vague and
23   ambiguous the way you're asking it as well when we say
24   "it."
25           MR. FINE:  Join.
```

127

1  BY MR. NISENBAUM:

2     Q.  It did not seem -- meaning that he had lost a

3  heartbeat and wasn't breathing?

4        MR. KANTER:  Same objections.  It totally calls

5  for speculation.  Lacks foundation.  He even had to

6  check for a pulse.

7        MR. FINE:  Join.

8        THE WITNESS:  I can't speculate how long he was

9  before he went to the ambulance.

10  BY MR. NISENBAUM:

11     Q.  Well, who does CPR on someone who's breathing and

12  has a heartbeat?

13     A.  And once he was on the gurney, that's when it

14  started.

15     Q.  I know.  And that was before he was put in the

16  ambulance, right?

17        MR. FINE:  Asked and answered.

18  BY MR. NISENBAUM:

19     Q.  Well, it's all on here.  So I'll just play, 7:55.

20        Okay.  Pausing it at 7:58.

21        You saw Officer Tran reach over, patting the

22  front of Mr. Gutzalenko.

23        Do you know what he was doing there?

24     A.  Probably checking for anything concealed in his

25  front waistband or groin area.

                                                    128

1     Q.  Well, he didn't reach for the groin area.  He was

2  patting his chest.

3     A.  Well, people will stick stuff right below the

4  belt line into the top of their groin.

5     Q.  But he didn't reach for the groin.  Watch again.

6  7:54.

7        I mean, it seemed like he was just patting the

8  front of his torso.

9        MR. FINE:  Calls for speculation based on what

10  you can see in the video.

11  BY MR. NISENBAUM:

12     Q.  Pause at eight minutes.

13        Do you know what he was doing there?

14        MR. FINE:  Same objection.  Calls for

15  speculation.

16  BY MR. NISENBAUM:

17     Q.  If you don't know, then just say so.

18     A.  I'm assuming he was searching for any concealed

19  contraband or anything.

20     Q.  Okay.  Continuing at eight minutes.

21        I'm going to pause it at 8:17.  Let me ask you

22  another question.

23        What is the last volitional movement that you

24  recall Mr. Gutzalenko making?

25        MR. FINE:  Vague and ambiguous.  Calls for

                                                        129

1  speculation.  Calls for expert opinion.

2       MR. KANTER:  Join.

3       THE WITNESS:  What -- what was the word you used

4  or -- the last?

5  BY MR. NISENBAUM:

6    Q.  The last volitional, meaning like intentional or

7  voluntarily, a movement that he initiated himself.

8       MR. FINE:  Same objections.

9       MR. KANTER:  Join.

10      THE WITNESS:  Well, the human body involuntarily

11 moves by breathing, so it would be his breathing action

12 after he was handcuffed on the ground.

13 BY MR. NISENBAUM:

14   Q.  Okay.  Well, I guess, when was that?

15   A.  Prior to the injection.

16   Q.  Okay.  So prior to the -- by the way, what were

17 the last words that you recall him saying?

18   A.  I don't know.  We have -- we can -- we can play

19 it back, if you would like, so I can tell you for sure.

20   Q.  Is it fair to say that your best -- the last

21 words that you actually recall him saying were, "I can't

22 breathe"?

23      MR. FINE:  Calls for speculation.

24      THE WITNESS:  I mean, we can replay -- we can

25 replay it back.  And that way, I can give you --

                                                    130

1    BY MR. NISENBAUM:

2       Q.  I'm asking you your recollection.  I don't -- I

3    know what's on the tape.  I'm asking you your

4    recollection.

5       A.  Well, you've got time to review the tape more

6    than I did, Counsel.  So if you want to play it back, I

7    can give you a definitive answer.

8       Q.  I'm asking for your best recollection.

9          MR. FINE:  And if you know.

10   BY MR. NISENBAUM:

11      Q.  If you don't have one, then say so.

12      A.  No.

13      Q.  Just say so.

14      A.  I will -- I will give my recollection.  I don't

15   remember what his last words were.

16      Q.  Okay.  All right.  I'm going to continue at 8:17.

17         MR. FINE:  Ben, if you get a chance for a

18   restroom break at a good stopping point, I would

19   appreciate it.  But obviously, I won't go until you're

20   comfortable.

21         MR. NISENBAUM:  Well, I mean, I'm actually pretty

22   close to done.

23         MR. FINE:  Okay.  Fair enough.  Sorry.

24         MR. NISENBAUM:  And I've got -- if he -- we could

25   go like ten more minutes, probably.

                                                      131

1          MR. FINE:  Sure.  Yeah.

2     BY MR. NISENBAUM:

3          Q.  Okay.  Cool.  8:17.  I'm going to hit play.

4              Okay.  Pausing it at 8:22.

5              The police are assisting, in putting

6     Mr. Gutzalenko on the stretcher, correct?

7          A.  Yes.

8          Q.  Okay.  And moving back, let me go to 8:08, 8:04

9     is where we'll go.

10             All right.  Someone is saying, "If you can, just

11    get him up on the gurney, sit him up."

12             Was that the paramedic with the -- who did the

13    injection who said that?

14             MR. FINE:  Calls for speculation.

15    BY MR. NISENBAUM:

16         Q.  This guy up here?

17             MR. FINE:  Same objection.

18             THE WITNESS:  Well, it wasn't Officer Tran's

19    voice, mine or Officer Tagorda's, so I don't want to

20    assume it was him.  But I also can't see any facial

21    movement with the mask on.

22    BY MR. NISENBAUM:

23         Q.  I understand, but that would be fairly typical

24    for the paramedics to kind of give you directions about

25    what to do with respect to, you know, because you're

                                                      132

1   there, because you're strong guys, and because you're

2   the police, that, you know, put him up on the gurney,

3   right?

4       A.  Yes.

5       Q.  Okay.  So it seems to -- and I could be wrong, is

6   there teamwork, at least some sense of teamwork between

7   the paramedics and you during these 5150s?

8           MR. KANTER:  Objection.  Lacks foundation the

9   5150 was even in place.  It's lack --

10  BY MR. NISENBAUM:

11      Q.  Okay.  During an attempted 5150?

12          MR. KANTER:  It's argumentative.  Same objection.

13          MR. FINE:  Join.

14          THE WITNESS:  As first responders, we all work

15  together.  We try to help each other out.

16  BY MR. NISENBAUM:

17      Q.  Okay.  And so sometimes the, you know, the --

18  sometimes the paramedics will tell you to do certain

19  things and you'll do them, right?

20          MR. KANTER:  Objection.  Incomplete hypothetical.

21  Vague and ambiguous and overly broad.

22          MR. FINE:  Join.

23          THE WITNESS:  What do you mean?  Like, tell us to

24  do what?

25  ///

                                                        133

1    BY MR. NISENBAUM:

2        Q.  Well, like he's asking you to help put him on the

3    gurney.

4            That would -- that would be typical, right?

5        A.  They'll ask for help, yeah.

6        Q.  And it's expected that you facilitate that,

7    correct?

8            MR. FINE:  Calls for speculation.  Lacks

9    foundation.  Overbroad.  Incomplete hypothetical.

10           MR. KANTER:  Join.

11           THE WITNESS:  I'm sure we could decline helping

12   them put somebody on the gurney, but I don't really see

13   that happening.

14   BY MR. NISENBAUM:

15       Q.  You'd actually get in trouble if you did, right?

16   I would think.

17           MR. FINE:  Same objections.

18           MR. KANTER:  Join.

19   BY MR. NISENBAUM:

20       Q.  Okay.  Go ahead.  I need the answer.

21       A.  No.  That's a safety issue, or I'm going to end

22   up hurting my back, picking somebody up probably -- I

23   don't think I'd get in trouble -- we'd get in trouble

24   for declining to pick somebody -- helping them put

25   somebody on a gurney.

                                                        134

1    Q.  Of course.  If you had a good reason.

2         If the paramedic told you to shoot somebody,

3    you'd probably get in trouble if that was the only

4    reason you shot them, right?  I'm not saying that --

5    A.  I would hope they would know I'd never say that.

6    Q.  Yeah, I agree.

7         But my point, obviously, you don't -- I'm not

8    saying that there's a requirement that you do what they

9    tell you to do, but generally speaking, if it's within

10   the course of your -- what you perceive of as your

11   duties, you're going to do it, right?

12        MR. FINE:  Asked and answered.  Same objections

13   as before.

14        MR. KANTER:  Join.

15        THE WITNESS:  Yes.

16   BY MR. NISENBAUM:

17   Q.  Okay.  Thank you.

18        All right.  Continuing.  Hopefully, I have

19   five minutes left.

20        All right.  Pausing at 8:21.

21        Mr. Gutzalenko has been put basically on the

22   gurney.

23        Did you feel like -- was his body dead weight at

24   that time?  Did it feel like he was resisting?  What did

25   it feel like?

                                              135

1       A.  I didn't put him on the gurney.

2       Q.  Okay.  Did it seem to you like he was moving or

3   even alive?

4       A.  He -- he wasn't moving.  But I didn't know if he

5   was alive.

6       Q.  Okay.

7           MR. FINE:  Objection.

8           (Reporter clarification.)

9           MR. FINE:  Calls for speculation.  Calls for

10  expert opinion.  Thank you.

11  BY MR. NISENBAUM:

12      Q.  The movement that you saw was movement that would

13  have been consistent with his body being jostled by

14  other people moving him, correct?

15          MR. FINE:  Same objections.

16          THE WITNESS:  I was off behind them, so I just

17  saw them put him on the -- they were putting him on the

18  gurney, so I didn't see if he was breathing or he was

19  talking anymore.  I -- I'm not in this gurney placement,

20  to my knowledge.

21  BY MR. NISENBAUM:

22      Q.  All right.  Continuing at 8:21.

23          Were you there when you heard someone said,

24  "Ivan, can you breathe, buddy?"

25      A.  Yeah.  I need -- I need to hear the voice again,

                                                      136

1  but what I recall is I asked, "Is he breathing?"

2       And I think Officer Tagorda said he's turning

3  blue.

4    Q.  That is exactly what happened.  He's blue in the

5  face, I think is what's said.

6       Continuing 8:32.

7       That's at 8:50.  You just heard Officer Tagorda

8  say, "He's blue in the face"?

9    A.  Yes.

10   Q.  Okay.  And looking at him, what we just saw, and

11 he doesn't look alive, just based on looking at him,

12 right?

13      MR. FINE:  Calls for speculation.  Calls for

14 expert opinion.

15 BY MR. NISENBAUM:

16   Q.  All right.  8:54 is where I'm paused at.  Axon

17 time stamp 18:53:38, I believe.  Kind of hard to read.

18      Do you have -- did you see this part?

19   A.  Because I asked if he was breathing and coughs,

20 coughs, coughs and -- but I can't -- I can't see him

21 because of the paramedics blocking my view.

22   Q.  Okay.

23   A.  So Officer Tran's the one removing handcuffs, I

24 believe.

25   Q.  Right.  And --

                                                    137

1    A.  I was going to remove them, but I had my handcuff

2  key in my hand.  But Officer Tran went ahead and looks

3  like jumped in.

4    Q.  Okay.  Do you know what a LUCAS device is?

5    A.  LUCAS, is that the chest compression machine?

6    Q.  That's exactly what it is.

7    A.  Okay.  I vaguely remember it, but yes.

8    Q.  Okay.  It's obvious that there's CPR.  I'll just

9  play it.  But I'll forward to 9:14.

10        9:26, someone was asking for a LUCAS.  I heard it

11  from two different people.  Do you know whose voices

12  those were?

13    A.  Probably somebody from medical because it's not

14  us.

15    Q.  Right.

16        And it looks like they're about to start doing

17  CPR, right?

18    A.  Yes.

19    Q.  Okay.  So obviously, at that point, you know that

20  he's not breathing and doesn't have a pulse, correct?

21        MR. FINE:  Objection.  Lacks foundation.  Calls

22  for speculation.

23        MR. KANTER:  Join.

24  BY MR. NISENBAUM:

25    Q.  He had certainly gone unresponsive.

138

1           (Reporter clarification.)

2           THE WITNESS:  I said yes it -- appears to be that

3    they're going to start CPR.  That usually happens when

4    they don't have a pulse -- pulse or heartbeat.

5    BY MR. NISENBAUM:

6      Q.  Right.

7           And so it was -- I mean, I'm basically done, so

8    let me just ask you a couple of final questions.  I've

9    read the review of -- the internal review.  It's pretty

10   clear from looking at the video that Officer Tran did

11   have a knee in -- against Mr. Gutzalenko's back, you

12   agree with that, right, during some points in time?

13          MR. FINE:  Vague and ambiguous.

14          THE WITNESS:  What is this review you're talking

15   about?

16   BY MR. NISENBAUM:

17     Q.  I'm talking about -- well, I assume that you've

18   read the officer involved protocol incident that was

19   basically the internal review?

20          MR. FINE:  Vague as to internal review.

21          THE WITNESS:  Is this from OPA or the Civilian

22   Police Commission?

23   BY MR. NISENBAUM:

24     Q.  I believe this is the Richmond police officer --

25   the Richmond Police Department report.  It's the officer

                                                        139

1   involved protocol incident, OPA 2021-006.

2         What is OPA?

3      A.   Office of Professional Standards.

4      Q.   Right.

5         So that's the internal police department report,

6   correct?

7      A.   Like, we are not -- but again, I haven't -- I

8   haven't read that.

9      Q.   Okay.  Do you know what the results were?

10     A.   I was -- I -- we were cleared, I know that, by

11  the grand jury and the district attorney's office.

12     Q.   It's not a grand jury.  It's a coroner's inquest.

13     A.   Well --

14     Q.   That's not a grand jury.

15     A.   Well, we were cleared by the coroner's inquest,

16  and we were also cleared by the district attorney's

17  office.

18     Q.   Right.

19        Did any of those reports identify either the

20  injection of Versed -- to your knowledge, did any of

21  those reports identify the injection of Versed or

22  Officer Tran's knee in Mr. Gutzalenko's back as

23  contributing to his death?

24        MR. FINE:  Calls for speculation.  Overbroad.

25        MR. KANTER:  Join.  And also documents will speak

                                              140

1    for themselves.

2           MR. FINE:  Join.

3           MR. NISENBAUM:  You want to join him?  Trust me.

4           THE WITNESS:  I never reviewed these documents

5    from the coroner's inquest.  So I don't know what -- I

6    don't know what it said.  I -- so I -- I -- I don't

7    know.  I can't speak on what it says.

8    BY MR. NISENBAUM:

9       Q.  You would agree that if the document -- if the

10   review said that there was never -- that Officer Tran's

11   knee was never in his back, on Mr. Gutzalenko's back, or

12   pressing against Mr. Gutzalenko's back, that would be

13   inaccurate compared to the video that we just watched,

14   correct?

15          MR. FINE:  Overbroad.  Vague and ambiguous.

16          THE WITNESS:  I -- still looks like it was

17   controlling movement.  And I still say it's in the

18   shoulder region and not on his entire back.  Lower back,

19   upper shoulder is what I see, and that's my perception.

20   BY MR. NISENBAUM:

21      Q.  Okay.  Final question.

22          If you were to have observed, first of all --

23   well, final question.

24          If you were to have observed his knee in

25   Mr. Gutzalenko's back applying downward pressure, I

                                                        141

1 think you testified earlier that you would have been

2 obligated under Richmond Police Department policy to

3 correct that; is that correct?

4          MR. FINE:  Misstates testimony.

5          THE WITNESS:  We -- we would -- if we see

6 anything that's going to cause danger to a member of the

7 public, we have to intercede.

8 BY MR. NISENBAUM:

9     Q.  Okay.  And that includes a person like

10 Mr. Gutzalenko who you're arresting and using force

11 against, correct?

12          MR. FINE:  Incomplete hypothetical.  Same

13 objections.

14          THE WITNESS:  If I see the force and it appears

15 to be reasonable and not causing any danger, you know,

16 that I see he's breathing after he gets handcuffed.  As

17 soon as we handcuff, we roll him on the side and he's

18 breathing, I'm not understanding why it's a factor

19 anyway.

20          MR. NISENBAUM:  Okay.  I don't have any other

21 questions.  Thank you.

22          MR. FINE:  Scott, do you have any?

23          MR. KANTER:  I just have a few follow-up

24 questions.  If you want to take a break first, that's

25 fine.

                                            142

1          MR. FINE:  I'd really appreciate that.  Just

2     five minutes, if that's okay?

3          MR. KANTER:  Sure.

4          MR. FINE:  Thanks so much.

5          (Off the record.)

6                         EXAMINATION

7     BY MR. KANTER:

8          Q.  Officer Hall, I just have a few questions, just

9     some follow-up.

10         Was it your understanding that the paramedics

11    were called to the scene because Mr. Gutzalenko had a

12    head bruise, bloody hands, possible injuries that needed

13    medical treatment?

14         A.  Yes.

15         Q.  They weren't called for any other reason,

16    correct?

17         A.  Not at the time, no.

18         Q.  And it's not the police's role to provide medical

19    care, correct?

20         A.  Correct.

21         Q.  Mr. Gutzalenko wasn't formally placed on a 5150

22    hold in this case, correct?

23         A.  Correct.

24         Q.  That was just something that was under

25    consideration?

                                                      143

1    A.  Yes.

2    Q.  And Mr. Gutzalenko was being placed in police

3  custody with handcuffs in order to be detained while

4  investigating the claim to vandalism that had gone on,

5  correct?

6         MR. NISENBAUM:  Objection.  These are all leading

7  questions.

8         MR. KANTER:  Well, he's not my witness.

9  BY MR. KANTER:

10    Q.  You can answer.  Is that correct?

11    A.  Yes.

12         MR. NISENBAUM:  I'm sorry.  Fine.  That's fine.

13  You're right.

14  BY MR. KANTER:

15    Q.  And there would also be consideration about 5150

16  hold, right?

17    A.  Yes.

18    Q.  And you didn't direct the paramedic to use a

19  sedative in this case, correct?

20    A.  No.

21    Q.  None of the police officers did, right?

22    A.  No.

23    Q.  Use of the sedative was a decision the paramedic

24  made for his own purposes in providing medical care,

25  correct?

144

1    A.  Yes.

2    Q.  Those are all my questions.  Thank you.

3        MR. FINE:  I just have a few, unless, Ben, you

4  want to do some follow-up on that first?

5        MR. NISENBAUM:  No.

6        MR. FINE:  Okay.

7                 EXAMINATION

8  BY MR. FINE:

9    Q.  Officer Hall, at the time of this incident, did

10  the Richmond Police Department have a policy that said

11  that officers were at no time, under any circumstances,

12  allowed to make contact with a subject's back?

13    A.  There was no policy in place, no.

14    Q.  Well, was there any policy in place along those

15  lines with respect to any specific area of the back that

16  you're not allowed to make contact with under any

17  circumstances?

18    A.  No.  No part of -- there's no restrictions on

19  back.

20    Q.  Okay.  At the time of this incident, was it your

21  understanding that under RPD policy, officers were

22  permitted to make contact with a subject's back if the

23  circumstances called for, such as if they were

24  resisting?

25    A.  Yes.

145

1    Q.  Okay.  And in your career, had you ever had

2  occasion up to that point, where it was necessary under

3  the circumstances and you believed it to be reasonable,

4  to make contact with the subject's back or center back

5  as part of taking that -- strike that -- as part of

6  detaining that individual?

7    A.  Yes.

8    Q.  That's all I got.

9        MR. NISENBAUM:  Perfect.

10        How long do we have for lunch?

11        THE REPORTER:  Would anybody like to order a copy

12  of the transcript?

13        MR. FINE:  Absolutely.

14        MR. KANTER:  Yes.  Electronic copy.

15            (Deposition concluded at 1:13 p.m.)

16

17                    --o0o--

18

19

20

21

22

23

24

25

                                                146

```
1       STATE OF CALIFORNIA )
                            )
2       COUNTY OF FRESNO    )

3

4            I, LILIANA RODRIGUEZ, Certified Shorthand Reporter,

5       in and for the State of California, do hereby certify:

6            That the foregoing proceedings were taken before me

7       remotely at the time and place herein set forth; that

8       any witnesses in the foregoing proceedings, prior to

9       testifying, were duly sworn; that a record of the

10      proceedings was made by me using machine shorthand which

11      was thereafter transcribed under my direction; that the

12      foregoing is a true record of the testimony given.

13           Pursuant to Federal Rule 30(e), transcript review

14      was requested.

15           I further certify that I am neither financially

16      interested in the action, nor a relative or employee of

17      any attorney or party to this action.

18           IN WITNESS WHEREOF, I have this date subscribed my

19      name.

20

21      DATED:  _9_/_19_/_24_

22           Fresno, California

23

24           __/s/Liliana Rodriguez_____
             LILIANA RODRIGUEZ, CSR No. 13783
25
```

148

# EXHIBIT 5

## BODY-WORN VIDEO PROPOSED TO BE FILED UNDER SEAL

**EXHIBIT 5** to the Declaration of Nicholas Fine.  A true and correct copy of the video from Officer Tom Tran's body-worn camera for the subject incident.

Please click on the following link:

# EXHIBIT 6

# BODY-WORN VIDEO PROPOSED TO BE FILED UNDER SEAL

**EXHIBIT 6** to the Declaration of Nicholas Fine. A true and correct copy of the video from Officer Cedric Tagorda's body-worn camera for the subject incident.

Please click on the following link:

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--o0o--

IVAN GUTZALENKO, Deceased,      )
through his Co-Successors in    )
Interest, N.G. and N.I.G.,      )
minors through their mother     )
and Next Friend, Honey          )
Gutzalenko, individually        )   **CERTIFIED COPY**
and as Co-Successors in         )
Interest for IVAN GUTZALENKO,   )
Deceased,                       )
                                )
            Plaintiffs,         )
                                )   Case No.:
            vs.                 )   3:22-cv-02130-EMC
                                )
CITY OF RICHMOND, et al.,       )
                                )
                                )
            Defendants.         )   CERTIFIED COPY
_____ )


VIDEOCONFERENCE

DEPOSITION OF EMT DAMON RICHARDSON

WEDNESDAY, November 20, 2024

9:59 a.m. - 3:20 p.m.


REPORTED BY:  DEBRA J. SKAGGS, CSR NO. 7857

1

```
1                    INDEX OF EXAMINATION
2                                               PAGE
3    PROCEEDINGS:                                5
4    EXAMINATION BY
5         Attorney Nisenbaum                     6
6    AFTERNOON SESSION
7         Attorney Nisenbaum (Resumed)          109
8         Attorney Fine                         168
9
10                      --o0o--
11
12   Appearance Page                             3
13   Exhibit Page                                4
14   Location                                    5
15   Reporter's Certificate                    173
16   Disposition                               174
17   Attorney's Notes                          175
18
19                      --o0o--
20
21
22
23
24
25
                                                   2
```

```
 1                    REMOTE APPEARANCES

 2

 3   FOR PLAINTIFFS:

 4        LAW OFFICES OF JOHN L. BURRIS
          BY: BENJAMIN NISENBAUM, ATTORNEY AT LAW
 5            KRITHI BASU, ASSOCIATE ATTORNEY
          Airport Corporate Centre
 6        7677 Oakport Street, Suite 1120
          Oakland, California 94621
 7        (510) 839-5200  Fax: (510) 839-3882
          bnisenbaum@gmail.com
 8

 9   FOR DEFENDANT AMERICAN MEDICAL RESPONSE WEST and EMT
          DAMON RICHARDSON:
10
          BY: SCOTT R. KANTER, ATTORNEY AT LAW
11        HINSHAW, MARSH, STILL & HINSHAW, LLP
          12901 Saratoga Avenue
12        Saratoga, California 95070
          (408) 861-6500 Fax (408) 257-6645
13        skanter@hinshaw-law.com

14

15   FOR DEFENDANTS CITY OF RICHMOND and OFFICERS HALL, TRAN
          and TAGORDA:

16        BY: NICHOLAS FINE, ATTORNEY AT LAW
          ORBACH, HUFF & HENDERSON LLP
17        6200 Stoneridge Mall Road, Suite 225
          Pleasanton, CA 94588
18        (510) 999-7908  Fax:  (510) 999-7918
          nfine@ohhlegal.com
19

20                       --o0o--

21

22

23

24

25
```

3

1                        INDEX TO EXHIBITS

2                   EMT DAMON RICHARDSON

3              WEDNESDAY, NOVEMBER 20, 2024

4

                         --o0o--

5

6                       EXHIBITS

7

PLAINTIFF'S EXHIBITS:                          PAGE

8

Exhibit 1  - 89 pages - Group exhibit of the     20
             documents production by Defendant AMR
             West

Exhibit 2  - 5 pages - DailyMed - MIDAZOLAM      31
             injection, solution label printout

Exhibit 3  - 1 MP3 audio file - Designated as "Damon  44
             Richardson Interview (Conf City_1209)
             copy.MP3"

Exhibit 4  - 1 MP3 audio file - Designated as "Damon  48
             Richardson Continued (Conf City_1208)
             copy.MP3"

Exhibit 5  - 1 video file - Officer Tagorda's body    56
             cam footage designated as "Tagorda
             (City_839) Confidential.MP4"

Exhibit 6  - 20 pages - Pfizer Midazolam Injection    95
             Warning

19

20                         --o0o--

21

22

23

24

25

                                     4

1          BE IT REMEMBERED that, pursuant to Notice on

2   Wednesday, November 20, 2024, commencing at the hour of

3   9:59 A.M., thereof; in their respective locations via

4   Zoom, as noticed by the attorneys for the Plaintiffs,

5   LAW OFFICES OF JOHN L. BURRIS, Airport Corporate Center,

6   7677 Oakport Street, Suite 1120, Oakland, California, was

7   before me, DEBRA J. SKAGGS, CSR No. 7857, a Certified

8   Shorthand Reporter, State of California, remotely

9   appeared.

10                   EMT DAMON RICHARDSON,

11  sworn as a witness herein, appearing remotely; who, being

12  by me duly sworn or having affirmed, was examined and

13  testified as is hereinafter set forth.

14                        --o0o--

15                      PROCEEDINGS

16                (Witness duly sworn.)

17          THE REPORTER:  Will you please state -- you can

18  put your hand down.

19          Will you please state the city and state where

20  you're located taking your deposition today, please.

21          THE WITNESS:  I am in the city of San Francisco,

22  county of San Francisco in California.

23          THE REPORTER:  Thank you.

24          Will the attorneys state their appearances, who

25  they represent, and anyone else in the room with them that's

                                                          5

1  a party to the case, please.

2          ATTORNEY NISENBAUM:  Yes.  Ben Nisenbaum for the

3  Plaintiff.  Also -- Plaintiffs -- also in the room is Krithi

4  Basu, an associate attorney with was.

5          ATTORNEY KANTER:  Scott Kanter on behalf of

6  Defendants American Medical Response West and Damon

7  Richardson.

8          ATTORNEY FINE:  Nick Fine on behalf of the City of

9  Richmond defendants.

10          THE REPORTER:  Okay.  You can begin.

11          ATTORNEY NISENBAUM:  Thank you.

12                  EXAMINATION

13  BY ATTORNEY NISENBAUM:

14  Q.      Can you please state and spell your name.

15  A.      Damon Richardson.  Spelled D-a-m-o-n; last name is

16  R-i-c-h-a-r-d-s-o-n.

17  Q.      Okay.  And what is your current occupation?

18  A.      I am a Fire and EMS Specialist with Tesla.

19  Q.      The car company?

20  A.      Yes.

21  Q.      What do you do there?

22  A.      I put out fires and I assist our employees who get

23  ill or injured.

24  Q.      But you're not -- are you traveling out in the

25  field, like on the streets to do that, or...

6

1   A.         No.  It's strictly within the confines of Tesla
2   property.
3   Q.         Okay.  And when did you start working for Tesla?
4   A.         April of 2022.
5   Q.         Prior to that, how were you employed?
6   A.         I was working with American Medical Response in
7   Contra Costa County full-time, and as a Per Diem Paramedic
8   for the City and County of San Francisco Fire Department.
9   Q.         And was the San Francisco Fire Department part
10  time?  You said Per --
11  A.         Yes, it was.
12  Q.         Okay.  And how long did you work for AMR as a
13  paramedic -- or as an -- what was your role there?  An
14  EM- --
15  A.         I was a paramedic for AMR, and I started in 2005,
16  and I quit in 2022.  So 17 years, I guess.
17  Q.         Okay.  And can I ask you why you left AMR?
18  A.         Just getting too dangerous to work on the streets
19  anymore.
20  Q.         Okay.  And to be a paramedic, do you have some
21  qualifications?
22  A.         Yeah.  I have a State Paramedic License that I've
23  had since 2005.
24  Q.         And what's the difference between an EMT and a
25  paramedic?

7

1    A.        There is different levels of EMT.

2              A lot of people think that an EMT and a paramedic

3    are the same, but an EMT Basic is the first step of becoming

4    an EMT.  And then in the Federal system you have an

5    Intermediate, which is some more training; you're allowed to

6    do more interventions.

7              And then in California -- or nationwide, we also

8    have a Paramedic, which is more training; you're allowed to

9    do more interventions; work with more drugs.

10             California doesn't recognize the Intermediate

11   unless it's -- you're a Federal paramedic with a Federal

12   agency.

13   Q.        Okay.  And what type of a -- it sounds like you

14   have a State Paramedic license; is that right?

15   A.        That is correct.

16   Q.        And are you -- with respect to the categories of

17   EMT you described, are you an EMT Basic?

18   A.        I am an EMT Paramedic.

19   Q.        EMT Paramedic.  Okay.

20             Does that give you any authority with respect to

21   the Federal -- or any additional abilities to do things with

22   respect to the Federal things you just mentioned?

23   A.        No.  As a paramedic, you work under the scope that

24   you're allowed by the county or the city that you're working

25   under.

8

1  Q.        Okay.  And did you go to school to become a

2  paramedic?

3  A.        Yes.  I went to City College of San Francisco.

4  Q.        When did you graduate CCSF?

5  A.        I believe 2004 as a paramedic -- from the

6  paramedic program.

7  Q.        And was your first job as a paramedic with AMR?

8  A.        Yes, it was.

9  Q.        When you were at the -- at CCSF, did you receive

10  training -- well, actually.  Let me just give you a couple

11  admonitions -- or ask you a couple questions.

12            Have you ever had your deposition taken before?

13  A.        Yes.

14  Q.        Okay.  How many times would you estimate?

15  A.        I think two or three.

16  Q.        Have you ever been a defendant in a civil lawsuit

17  before?

18  A.        No.

19  Q.        When your deposition was taken previously, was it

20  as a witness?

21  A.        Yes.

22  Q.        And I take it you've had a chance to talk with

23  your counsel to prepare for this deposition?

24  A.        Yes.

25  Q.        What documents have you reviewed in preparation?

9

1  A.          I reviewed my PCR; my Patient Care Report.  I

2  reviewed the transcripts from the coroner's hearing; the

3  part that I spoke about during that.  And my resum .

4  Q.          Okay.  And the PC- -- let me ask you this.

5            Did you review the interview that you gave after

6  the incident that was recorded?

7  A.          To the police officer at the hospital?  Is that

8  what you're talking about?

9  Q.          Correct.

10  A.          Maybe a long time ago.  I don't remember much of

11  it from that.

12  Q.          All right.  Is it fair to say that when you gave

13  that interview, events were freshest in your mind?

14  A.          Yes.

15  Q.          Okay.  And when you reviewed the coroner's inquest

16  testimony, did you see anything in it that you thought was

17  inaccurate or that you might have misremembered?

18  A.          No.

19  Q.          You're familiar with the term "chemical

20  restraints"?

21  A.          Yes.

22  Q.          All right.  And what are those?

23  A.          It's a way of calming down a person with a

24  medication.

25  Q.          Okay.  Were you trained in the use of chemical

                                                              10

1    restraints at CCSF?

2    A.        Not so much at CCSF, but at AMR.

3    Q.        Okay.  What kind of licensing was required in

4    order to be able to administer chemical restraints based on

5    your understanding?

6    A.        I'm sorry?  Repeat your question?

7    Q.        What kind of licensing -- okay.  I didn't give you

8    any real admonitions.

9              One of them is let me finish the question before

10   you start to answer.  Another is, you know, try not to talk

11   over each other.  I find it helpful to allow a pause between

12   my question and your answer.  Easier for the court reporter;

13   it allows your lawyer to object, if he wants to; and, you

14   know, we don't step over each other.

15             When the deposition is completed, you'll have a

16   chance to review it.  You can make changes to it.  If you

17   make changes that are substantive in nature, then that can

18   be used to call your credibility into question.

19             Do you understand that?

20   A.        Understood.

21   Q.        Okay.  All right.  And -- obviously -- you didn't

22   receive any training in how to provide courtroom testimony

23   in any job you've been in or any school you've attended;

24   right?

25   A.        I have not had any training.

                                                          11

1  Q.      Okay.  So my question.

2      With respect to administering chemical restraints,

3  are there different types of chemical restraints that you've

4  been trained to use?

5  A.      I've only been trained to use Versed as a chemical

6  restraint.

7  Q.      And Versed is also -- the generic of Versed is

8  midazolam; is that right?

9  A.      Correct.

10  Q.      And the rules that apply to administering Versed

11  are the same rules that apply to administering midazolam;

12  correct?

13  A.      Yes, it's the same medication.

14  Q.      Okay.  All right.  So as you sit here, it's fair

15  to say that you received no training at the school that you

16  went to and be- -- to become an EMT in administering

17  chemical restraints; correct?

18  A.      Not that I remember.

19  Q.      Did you receive any training in the side effects

20  of sedatives like Versed/midazolam?

21  A.      Yes.

22  Q.      You received that training at the City and County

23  of San Francisco, or afterwards?

24  A.      Well, the side effects I learned in school at City

25  College of San Francisco, and also from AMR, and also from

                                                        12

1   San Francisco Fire Department.

2   Q.       And what were you trained in terms of the

3   potential side effects of Versed?

4   A.       Mainly the possibility of interacting with other

5   drugs and causing respiratory depression.

6   Q.       Were you trained that it had to -- that midazolam

7   could only cause respiratory depression if it interacted

8   with other drugs, or that it could cause respiratory

9   depression on its own?

10   A.       We were taught that it could cause respiratory

11   depression on its own if it was administered in too high of

12   a dose.

13   Q.       All right.  And you were taught that at City and

14   County of San Francisco?

15   A.       City and County of San Francisco, AMR, and City

16   College of San Francisco.

17   Q.       Okay.  So you've known this your entire career.

18   A.       Yes.

19   Q.       Okay.  And you said if given in too high of a

20   dose.

21           What is your training with respect to what a

22   proper dose of midazolam is?

23   A.       It depends on what we are using it for.  For

24   chemical restraints, it's a 5-milligram muscular injection.

25   If we have to start an IV, it's at a lower dose.

13

1    Q.        Okay.  What's the difference between a muscular

2    injection and starting an IV?

3    A.        The IV is directly into the vein, and a muscular

4    injection is just basically an old-fashioned shot in the

5    muscle of an upper arm or thigh.

6    Q.        Okay.  Well, why does it make a difference if it's

7    administered in the vein as opposed to the muscle?

8    A.        In the vein, it has a higher potential effect.  In

9    the muscle, it takes time to get into the system.

10   Q.        That means if it -- if mi- -- if Versed is

11   administered intravenously, then it would take a smaller

12   amount of Versed to achieve the same effect as an

13   intramuscular shot; is that right?

14   A.        Correct -- correct.

15   Q.        Is it also fair to say that if Versed is

16   administered intravenously, it acts faster than it would if

17   it's administered intramuscularly?

18   A.        Correct.

19   Q.        Okay.  Are you trained to administer Versed either

20   intramuscularly or intravenously?

21   A.        Yes.

22   Q.        So you know how to do both of these; right?

23   A.        Yes, I do.

24   Q.        And you've known how to do that for how long,

25   would you estimate?

14

1    A.        Since I graduated the paramedic program.

2    Q.        And I assume you have in fact administered Versed

3    in the field -- apart from this incident involving

4    Mr. Gutzalenko -- since you graduated the paramedics

5    program?

6    A.        Yes, I've administered it numerous times.

7    Q.        Can you estimate how many times?

8    A.        I don't -- I -- no, I can't estimate.  Probably --

9    it's not going to be very accurate, but I would guess maybe

10   100 times.

11   Q.        Okay.  And it's fair to say that's just a range.

12   It's somewhere in a range that it could be more, it could be

13   less.  And you can't really say how much more, how much

14   less; you just know it's a lot of times.  Right?

15   A.        Correct.

16   Q.        Okay.  All right.  Have you been trained that if

17   you administer Versed -- too much Versed, that it can be

18   lethal?

19   A.        I have.

20   Q.        What is your training in that regard?

21   A.        Through the City College of San Francisco, the San

22   Francisco Fire Department, and also AMR reiterating, during

23   our quarterly classes, the use of Versed.

24   Q.        Okay.  I understand that, but how much Versed is

25   too much?

                                                          15

1    ATTORNEY KANTER:  I'll object that it calls for

2  expert opinion; incomplete hypothetical.

3    You can answer if you've been trained.

4    ATTORNEY NISENBAUM: Q.  Based on your training.

5  A.    (To Attorney Kanter.)  Should I answer the

6  question?

7    ATTORNEY KANTER:  You can if you're able.

8    THE WITNESS:  Can you repeat the question, please?

9    ATTORNEY NISENBAUM: Q.  How much Versed is too

10  much?

11    ATTORNEY KANTER:  Same objections.

12    THE WITNESS:  Anything above our protocol is too

13  much Versed based on what we're using it for.

14    ATTORNEY NISENBAUM: Q.  And you said your protocol

15  is -- well, your training is you can administer 5 milligrams

16  muscularly -- intramuscularly.  Correct?

17  A.    Correct, as the first dose.

18  Q.    Okay.  And then the maximum you can give a person

19  as a chemical restraint is 10 milligrams?

20  A.    Depending on the situation, yes.

21  Q.    And how do you know whether or not when you put --

22  when you stick a needle in a person, that it's going

23  intramuscularly as opposed to a vein?

24  A.    Usually the veins that we start IVs on are a lot

25  closer to the surface of the skin.  And when we give

16

1    intramuscular injections, we try to go to a more larger
2    muscle.   So.
3    Q.        Okay.  Well, are you trained to do anything to
4    determine whether or not you've hit a vein?
5    A.        Back in the old days, we were supposed to kind of
6    like do an aspiration so you don't get any blood back.  But
7    I think that's a practice that's kind of gone away for quite
8    some time.
9    Q.        Well, what's the purpose of doing an aspiration?
10              First, what is an aspiration?
11   A.        An aspiration is when you inject the needle into a
12   person; you pull back on the plunger to see if any blood
13   comes back.
14   Q.        Okay.  So is it fair to say that in the process of
15   aspiration -- pulling back on the plunger -- if blood comes
16   back -- if blood back- -- I guess backflows into the
17   syringe, then you know you've hit a vein?
18   A.        Yeah, I guess so.  I've never hit a vein before
19   when I've -- did IM injections and aspirated.
20   Q.        Okay.  Well -- but of course you've been trained
21   that that's a possibility every time you inject someone
22   intramuscularly.  It's possible that you hit a vein; right?
23   A.        Yeah, it's possible.
24   Q.        Okay.  All right.  And you said in the old days
25   you were trained to do aspirations.  So what time period is

17

1    the old days?

2    A.         When I first started school.  2000- -- or when I

3    graduated, 2004.

4    Q.         And was there some time period when this idea that

5    you no longer check to see whether you've hit a vein -- was

6    there some time period that that stopped -- that you were

7    trained that you should no longer do that?

8    A.         When --

9               ATTORNEY KANTER:  Hold on.

10              Object; vague and ambiguous.

11              Are you asking when he was trained to no longer

12   aspirate?

13              ATTORNEY NISENBAUM:  Yes.

14              ATTORNEY KANTER:  Okay.

15              ATTORNEY NISENBAUM: Q.  When giving an

16   intermuscular injection of a sedative like Versed.

17   A.         I can't give an exact time period, but it does

18   correspond with the use of medications to chemically

19   restrain patients.

20   Q.         Okay.  Well, can you give me an approximate time

21   period?

22   A.         I'd say probably 10, 15 years.

23   Q.         Okay.  So in the past 10, 15 -- so starting about

24   10 to 15 years ago, you were trained -- strike that.  I

25   don't think I asked you this question.

18

1          Were you ever trained that you should stop
2    aspirating the syringe when you administer a sedative
3    intramuscularly?
4    A.          I remember taking a few classes that depending on
5    the situation, aspiration could cause more damage to the
6    patient if we aspirate.   And those situations were mainly
7    when we have violent subjects we're trying to chemically
8    restrain.
9    Q.          Is that when the person is acting violently at the
10   moment?
11   A.          Correct.
12   Q.          Okay.   And is that because -- what was your
13   understanding as to why?
14   A.          Because when somebody is thrashing around, the
15   needle can cause more damage underneath the skin that we
16   cannot see.
17   Q.          Okay.   And you understood that if you hit a
18   vein -- well, actually, let me pull up the chart.
19               ATTORNEY NISENBAUM:   We'll make this the first
20   exhibit.
21               THE REPORTER:   Exhibit 1.
22               ATTORNEY NISENBAUM:   Yep.
23               It's an 89-page document.   It is the
24   Defendant's -- Defendant American Medical Response West's
25   Responses to Plaintiffs' Request for Production of

19

1   Documents, and I'm going to share the screen.

2                        (Plaintiffs' Exhibit 1 marked

3                        for identification.)

4            ATTORNEY NISENBAUM:  This is the Treatment

5   Guideline A03, Adult Behavioral, Contra Costa County

6   Emergency Medical Services.

7            (Pause.)

8            I'm not sure why it is showing only the toolbar.

9            THE REPORTER:  It looks expanded.  Like, a really

10  large font or something.

11           ATTORNEY NISENBAUM:  Okay.  That's crazy.

12           (Pause.)

13           It's showing the wrong thing.  Maybe I can hide

14  this.

15           THE REPORTER:  Maybe stop sharing and try again?

16           ATTORNEY NISENBAUM:  Yeah.

17           Go back to this.

18           (Pause.)

19           I'm going to exit out; restart.

20           (Pause.)

21           Okay.  Now let's see.

22           (Pause.)

23           Okay.  We're there now?

24           THE REPORTER:  Looks like it.

25           ATTORNEY NISENBAUM: Q.  Okay.  Can you see the

                                                        20

1    document?

2    A.        Yes.  It's a little small.

3    Q.        Okay.  Well --

4    A.        There we go.  Thank you.

5    Q.        All right.  Are you familiar with this document?

6    A.        Yes, I am.

7    Q.        What is it?

8    A.        This is the protocol on how to administer Versed

9    for a chemical restraint.

10   Q.        Okay.  Now, you said that you're allowed to -- you

11   administer 5 milligrams intramuscularly, and you can

12   administer up to 10 milligrams; correct?

13   A.        Correct.

14   Q.        All right.  So looking at this document.  Is this

15   document -- do you know if this was in effect at the time --

16   it says "Effective January 2020."

17             This document was in effect at the time of the

18   incident with Mr. Gutzalenko; correct?

19   A.        I believe so.

20   Q.        Okay.  So looking at it -- it's a flowchart;

21   correct?

22   A.        Yes.

23   Q.        And this is for the flowchart that controls the

24   administration of Versed as a chemical restraint in the

25   field by paramedics like you; correct?

                                                           21

1    A.        Correct.

2    Q.        So there is three boxes right below Adult

3    Behavioral.  One is History, the other is Signs and

4    Symptoms, and the other is Differential.

5              What do those boxes mean?

6    A.        The History is if you have a -- certain situations

7    that you could possibly use the drug for.

8              Signs and Symptoms are what you look for to -- for

9    an adult behavior crisis.

10             And the Differential are the other aspects that

11   could cause an adult behavior crisis.

12   Q.        Okay.  How does that affect whether or not you

13   administer Versed?

14   A.        It -- it -- I'm not really sure I understand your

15   question.  I mean, the -- we look for certain signs and

16   symptoms and/or history, if the person is able to give us

17   any type of history.

18             The Differential are the other things we have to

19   be aware of and can also define to give the Versed -- repeat

20   your question again?

21   Q.        So those boxes -- the three boxes at the top --

22   they're considerations in whether or not to give a person

23   Versed?

24   A.        Yeah.  They are.

25   Q.        Okay.  All right.  And then there is -- right

                                                              22

1    below it, there is a stop-sign-shaped box around a sentence

2    that says "Aggressive or agitated, possible psychosis,

3    possible danger to self or others."

4              And to the right is a box -- the same shape box

5    that's got a yellow background and is bold, and says

6    "Excited Delirium Syndrome."  Underneath that it says

7    "Paranoia, disorientation, extremely aggressive or violent,

8    hallucinations, tachycardia, increased strength,

9    hyperthermia, and clearly a danger to self or others."

10             What is the difference between these two boxes?

11   Why are they there, if you know?

12   A.        The one on the left -- the white stop sign -- is

13   for a person who is not as violent and aggressive, as

14   opposed to the yellow one for the excited delirium.  Excited

15   delirium -- those patients tend to be more aggressive and

16   dangerous to themselves and others.

17   Q.        So the heading on that in bold is called "Excited

18   Delirium Syndrome."  Is that something you've been trained

19   in?

20   A.        Yes.

21   Q.        In your training, when you've been trained on

22   excited delirium, one of the things you've been trained is

23   that the person who alleges -- who allegedly exhibits

24   symptoms of excited delirium exhibits signs of hyperthermia;

25   correct?

                                                            23

1   A.        Yes.

2   Q.        What is hyperthermia?

3   A.        It's a temperature.  A high body temperature.

4   Q.        It's a very high body temperature; correct?

5   A.        I don't know what the readings would have to be

6   for it to be hyperthermic.

7   Q.        Okay.  Your understanding is that hyperthermia is

8   itself a medical emergency; correct?

9   A.        It can be, yes.

10  Q.        Hyperthermia is not just a low-grade fever, is it?

11  A.        I don't know what the -- like I said -- what the

12  temperature readings would be for anybody to be considered

13  hyperthermic or to have a fever.  As far as I'm concerned,

14  anybody that has a temperature above 98.6 is hyperthermic.

15  Q.        I see.  Okay.  Well, let me ask you this.

16            Have you watched any videos in training that

17  purport to show people exhibiting signs of excited delirium?

18  A.        I haven't seen any videos in training.

19  Q.        Okay.  So you've never been trained that in trying

20  to identify whether or not a person is suffering from

21  excited delirium, that you should look to see whether or not

22  they're drenched in sweat?

23  A.        I haven't seen any videos in training for this,

24  but we have discussed it during our training sessions.

25  Q.        Okay.  You've discussed that what you're looking

                                                              24

1    for when you're -- if you're trying to identify excited

2    delirium, one of the physical things you're looking for is

3    whether or not there is, what they call, profuse sweating;

4    correct?

5    A.       Okay.  Or we call it diaphoresis, yes.

6    Q.       "Diaphoresis."  Okay.  That's a term I haven't --

7    I was not familiar with.

8            But that's -- that means profuse sweating?

9    A.       Yes.

10   Q.       And that's something that would indicate a highly

11   elevated internal body temperature; correct?

12   A.       Not all the time.

13   Q.       Okay.  Well, what causes diaphoresis other than

14   that?

15   A.       Somebody could be having a cardiac event.

16   Somebody could be having a diabetic issue.  There is

17   numerous things that could cause somebody to be diaphoretic.

18   Q.       Right.

19           So excited delirium is -- well, let me ask you

20   this.

21           Are you still trained to use excited delirium?

22           ATTORNEY KANTER:  Objection; vague and ambiguous;

23   overly broad.

24           I don't know what -- I'm not even sure I

25   understand the question.

25

1           ATTORNEY FINE:  Join.

2           THE WITNESS:  I don't understand the question

3    either.  Repeat it?

4           ATTORNEY NISENBAUM: Q.  Well, are you -- are you

5    trained to still use the term "excited delirium" or "excited

6    delirium syndrome"?

7           ATTORNEY KANTER:  I'm going to object that it

8    misstates testimony.

9           He's just -- he was referring to this document;

10   not something he was -- anyways, you can answer.

11          THE WITNESS:  As far as our training at Tesla, no.

12   But as a paramedic for the State of California, yes.

13          ATTORNEY NISENBAUM: Q.  Okay.  I see.  Wow,

14   that's -- wow.

15          All right.  So looking at this box -- looking at

16   these -- the flowchart, rather.

17          It says on the first, if they're aggressive or

18   agitated, possible psychosis, possible danger to self or

19   others, you can use midazolam, 5 milligrams, IM/IN.

20          That means -- does that mean intramuscular?

21   What's the IN?

22   A.         Intranasal.

23   Q.         Intranasal.  Okay.

24          Or midazolam, 1 to 3 milligrams IV, in 1-milligram

25   increments.

                                                    26

1        Is it your understanding that the midazolam IV

2   being 1 to 3 milligrams -- increments -- is because -- is to

3   make sure that you don't accidentally overdose the person

4   you're giving it to?

5   A.        That's one reason.  And it takes a -- it's more

6   potent when you give it via IV, like we discussed earlier.

7   Q.        And if it's given -- let's see.

8        "May repeat every five minutes to effect.  Maximum

9   of 5 milligrams."

10       So if the person is not exhibiting signs of

11  so-called excited delirium, the maximum you're allowed to

12  give is 5 milligrams; is that correct?

13  A.        For that particular flowchart, yes.

14  Q.        Well, what other flowchart controlled your -- how

15  much midazolam you could give people?

16  A.        The excited delirium side.

17  Q.        Well, it's part of the same flowchart; it's just

18  on the right side.  Right?

19  A.        It is the same flowchart, but it starts off with

20  either aggressive or agitated, and/or excited delirium.

21  Q.        I understand.

22       Aggressive or agitated.  I mean, that -- I take it

23  that means what it says: the person is acting aggressively

24  and agitated, exhibiting signs of possible psychosis, and is

25  possibly a danger to self or others.

27

1             Pretty self-explanatory; right?

2    A.        Mm-hmm.  Yes.

3    Q.        Okay.  Whereas excited delirium -- the yellow

4    one -- says paranoia, disorientation, extremely aggressive

5    or violent, hallucinations, tachycardia, increased strength,

6    hyperthermia, and clearly a danger to self or others.

7             So the difference, it seems like, is the person

8    should be exhibiting -- well, strike that.

9             Do they have to exhibit all of those signs, or

10   just some of them?

11   A.        Just some of them.

12   Q.        So paranoia, disorientation, extremely aggressive

13   or violent -- so it sounds like -- if I'm looking at this

14   correctly, the chart -- the box for excited delirium; that

15   side would be followed when you have a more extreme version

16   of the one on the left.

17            Is that fair to say?

18   A.        That would be fair to say, yes.  But the initial

19   dose of medication is the same for both boxes.

20   Q.        Well, it's the same if it's being given

21   intramuscularly; correct?

22   A.        Mm-hmm.  Intramuscularly, yes.

23   Q.        Right.

24            And you would agree that if you were to give a

25   person 5 milligrams intravenously, the effect, you would

                                                          28

1    expect, to be quite different than if it were intramuscular;

2    correct?

3    A.         Correct.

4    Q.         And the effect will be -- it would be far more

5    dangerous to give them 5 milligrams intravenously than it

6    would be to give it to them intramuscularly; correct?

7              ATTORNEY KANTER:  I'm going to object it calls for

8    expert opinion the way you phrased it; it's vague and

9    ambiguous; and it's overly broad.

10             ATTORNEY NISENBAUM: Q.  Based on your training.

11             ATTORNEY KANTER:  Same objections.

12             ATTORNEY NISENBAUM: Q.  Go ahead.

13   A.         Say the question again, please?

14   Q.         You would expect the effect of giving a person

15   5 milligrams intravenously of Versed would be more

16   dangerous for the person who you're giving it to, if

17   given intravenously, based on your training; correct?

18             ATTORNEY KANTER:  I'll object -- object it's vague

19   and ambiguous; overly broad; it's an incomplete

20   hypothetical; and it calls for retrospective expert opinion.

21             ATTORNEY NISENBAUM: Q.  Go ahead.

22   A.         Correct.

23   Q.         Okay.  And one of those dangers that you've been

24   trained in, is that it would be -- it could affect -- it

25   could have the effect of depressing their respiration;

29

1    correct?

2    A.        Correct.

3    Q.        And it could depress it to a dangerous degree;

4    correct?

5    A.        Correct.

6    Q.        Okay.  So I assume midazolam, when you get it, it

7    comes, like, in a little bottle or something?

8    A.        It comes in a vial of 5 milligrams.

9    Q.        Okay.  Is there a warning label on this vial?

10   A.        I don't remember seeing a warning label on the

11   vial because the vial is so small.

12   Q.        I see.

13             Are you required to be familiar with the warning

14   labels on the drugs that you use in the field on other

15   people?

16             ATTORNEY KANTER:  I'm going to object.  The

17   question is vague.

18             Required by whom?

19             ATTORNEY NISENBAUM:  Q.  Classified -- your

20   policy -- by your employer's policy at AMR.  AMR West.

21             ATTORNEY FINE:  I'm just going to add it lacks

22   foundation.

23             THE WITNESS:  We are required to know our -- the

24   hazards -- yes -- the warnings of the medications we use.

25             ATTORNEY NISENBAUM:  Q.  Okay.  I'm going to stop

                                                              30

```
 1   this share.
 2             (Pause.)
 3             Okay.  Are you familiar with the National
 4   Institute of Health?
 5   A.        No.
 6   Q.        Okay.  Well...
 7             I'm going to show you a document.  We'll make this
 8   Exhibit B.
 9             THE REPORTER:  Sorry, B or 2?  You started with 1.
10             ATTORNEY NISENBAUM:  2.  Sorry.  Sorry.  Make it
11   2.  I always use letters, but.
12                       (Plaintiffs' Exhibit 2 marked
13                        for identification.)
14             ATTORNEY NISENBAUM:  Q.  So this is "DailyMed
15   MIDAZOLAM injection, solution."
16             "NDC Code" -- do you know what that is?
17   A.        No, I do not.
18   Q.        Okay.  "Category: Human Prescription Label."
19             You know what "DEA Schedule" is, I assume?
20   A.        Yeah.  The Drug Enforcement Agency Schedule,
21   classification of drugs.
22   Q.        And what is "CIV" within that classification, if
23   you know?
24   A.        I do not know.
25   Q.        Actually, it has a link here.  Let me make sure
```

1   that I have the right one.

2          (Pause.)

3          Do you know what a "Boxed Warning" is?

4   A.     We don't see the boxed warnings because we don't

5   get these drugs in boxes.  They come in a secured box

6   delivered to us by our supervisors, so we don't get to see

7   the box warnings.

8   Q.     Does your company hand out the flyer that shows

9   the box warning?

10  A.     They do not.

11  Q.     Okay.  Do they train you on the contents of the

12  box warning?

13  A.     They train us on the contraindications and the

14  possible side effects of the drugs.

15  Q.     Okay.  So to your knowledge, do the contra- -- and

16  when I say "your company," I'm referring to AMR West.

17  A.     Right.

18  Q.     Do you understand that?

19         I'm sorry.  I didn't catch the answer.

20  A.     Yes, AMR West.

21  Q.     Okay.  All right.

22         So this box warning for midazolam: "Personnel and

23  Equipment for Monitoring and Resuscitation."

24         "Adults and pediatrics: intravenous midazolam has

25  been associated with respiratory depression and respiratory

                                                            32

1    arrest, especially when used for sedation in noncritical

2    care settings."

3           What does that sentence mean, in English?

4           ATTORNEY KANTER:  Well, wait a second.

5           I'm going to object.  He's never reviewed this

6    before.  He's not here to be your expert.  I'm going to

7    instruct him not to answer.

8           It calls for his opinions --

9           ATTORNEY NISENBAUM:  He can say he doesn't know

10   it, but how is that a basis for him not to answer?

11          ATTORNEY KANTER:  Because the document speaks for

12   itself.  He didn't prepare this boxed warning.  He's never

13   reviewed it before.  That's why.

14          ATTORNEY NISENBAUM:  That's not a basis for him

15   not to answer.

16          ATTORNEY KANTER:  If you -- you're asking for

17   expert opinion testimony about what this document says.

18          ATTORNEY NISENBAUM:  No, I'm asking his

19   understanding of what this warning label says.

20          ATTORNEY KANTER:  Well, you haven't established

21   that he had an understanding at the time of the care and

22   treatment involved in this case, and now you're just asking

23   him to interpret a document that speaks for itself.

24          ATTORNEY NISENBAUM:  I'm not asking him to

25   interpret anything.

                                                          33

1          ATTORNEY NISENBAUM: Q.  What is a "noncritical

2   care setting"?  How about that?  Can you tell me what that

3   is?

4          ATTORNEY KANTER:  Outside of this document?

5          ATTORNEY NISENBAUM: Q.  Tell me what that means to

6   you.  That term.

7          ATTORNEY KANTER:  You can answer.

8          THE WITNESS:  A "noncritical care setting"?  I

9   assume that "critical care" means inside of a hospital;

10  inside of an ICU.

11         ATTORNEY NISENBAUM: Q.  Okay.  All right.

12         Mr. Gutzalenko, when you injected him with

13  midazolam, was not in a hospital; not in an ICU.  Correct?

14  A.      Correct.

15  Q.      Okay.  And you gave Mr. Gutzalenko midazolam for

16  the purposes of sedation; correct?

17  A.      For a chemical restraint.

18  Q.      As a chemical restraint.

19         But the manner of the restraint was to cause

20  sedation; correct?

21  A.      No, it was for a chemical restraint.

22         I had given midazolam numerous times to people to

23  where it helps restrain them but it doesn't sedate them.

24  Q.      I see.

25         So you didn't -- so there was no purpose -- there

                                                            34

1  was no sedative purpose to giving Mr. Gutzalenko midazolam;

2  is that correct?

3  A.        That was not my intention.

4  Q.        Okay.  You were simply trying to chemically

5  restrain him; correct?

6  A.        Correct.

7  Q.        And Mr. Gutzalenko -- was he being 5150ed at the

8  time?

9            ATTORNEY KANTER:  Objection; lacks foundation;

10  calls for speculation.

11            ATTORNEY FINE:  Join.

12            ATTORNEY NISENBAUM: Q.  I'm sorry.  What's the

13  answer?

14  A.        I don't know.

15  Q.        You don't know if he was being 5150ed?

16  A.        I don't think it had been established yet.

17  Q.        Okay.  Was he being detained by police at the time

18  that you gave him this injection?

19            ATTORNEY KANTER:  Objection; calls for

20  speculation; lacks foundation.

21            ATTORNEY FINE:  Join.

22            THE WITNESS:  I didn't know what the purpose of

23  the police officer's intent with Mr. Gutzalenko was.

24            ATTORNEY NISENBAUM: Q.  So are you saying that you

25  did not know he was handcuffed when you injected him?

                                                      35

1  A.        I knew that he was --

2            ATTORNEY KANTER:  Objection -- hold on.  Hold on.

3            Objection; argumentative.

4            Go ahead.

5            THE WITNESS:  I knew he was handcuffed.

6            ATTORNEY NISENBAUM: Q.  And when you first

7  encountered him, the handcuffing had not been completed;

8  correct?

9  A.        Correct.

10  Q.        Okay.  So you knew he hadn't handcuffed himself;

11  correct?

12  A.        I assumed that the police officer handcuffed him

13  when I was in the ambulance.

14  Q.        Okay.  And you understood, then, based on your

15  understanding -- and you've responded to police events many,

16  many times; correct?

17  A.        Correct.

18  Q.        Okay.  And you have participated in restraining

19  subjects with the police; correct?

20            ATTORNEY FINE:  Vague.

21            ATTORNEY KANTER:  I'll join.

22            It's overly broad; incomplete hypothetical.

23            THE WITNESS:  We have -- I have had the assistance

24  of police officers and Richmond Fire Department whenever

25  I've needed to restrain people to my gurney.

                                                        36

1           ATTORNEY NISENBAUM: Q.  Okay.  And you have

2   assisted the police in restraining people as well; correct?

3           ATTORNEY FINE:  Objection --

4           ATTORNEY KANTER:  Vague -- vague and ambiguous;

5   overly broad; incomplete hypothetical.

6           ATTORNEY FINE:  Join.

7           THE WITNESS:  I have only had the assistance of

8   Richmond PD to assist me in getting patients on my gurney.

9           ATTORNEY NISENBAUM: Q.  Okay.  And had they been

10  in custody when they were on your gurney when Richmond

11  Police assisted you?

12  A.      Some have; some have not been.

13  Q.      Okay.  Is it fair to say, in your experience, the

14  officers tell you whether or not the person is being

15  detained or is in custody?

16          ATTORNEY KANTER:  Objection; vague and ambiguous;

17  overly broad; incomplete hypothetical.

18          ATTORNEY FINE:  Join.

19          THE WITNESS:  Sometimes they do; sometimes they

20  don't.

21          ATTORNEY NISENBAUM: Q.  Now, you heard that -- the

22  officers talking about putting Mr. Gutzalenko on a 5150;

23  correct?

24  A.      Correct.

25          ATTORNEY KANTER:  Objection --

                                                        37

1          THE WITNESS:  Okay.  Go ahead.

2          ATTORNEY KANTER:  Allow me to object in between

3    the question and your answer, please.

4          THE WITNESS:  Sorry.

5          ATTORNEY KANTER:  I would just say it lacks

6    foundation and calls for speculation.

7          ATTORNEY FINE:  Join.

8          Hey, Ben?  Do you need the box warning up still?

9          ATTORNEY NISENBAUM:  I'm going to come back to it,

10   but I'll --

11         ATTORNEY FINE:  Got it.

12         ATTORNEY NISENBAUM:  -- but I can take it off for

13   the -- I mean -- I'll come back to it.

14         ATTORNEY NISENBAUM: Q.  Okay.  You heard the

15   officers talking about putting Mr. Gutzalenko on a 5150 when

16   you were at the scene before he was handcuffed; correct?

17         ATTORNEY KANTER:  Objection; calls for

18   speculation; lacks foundation.

19         ATTORNEY FINE:  Join.

20         THE WITNESS:  Correct.

21         ATTORNEY NISENBAUM: Q.  You still have to answer.

22   A.        I thought I did.

23         Correct.

24   Q.        Okay.  Thank you.

25         And what is a 5150, based on your understanding?

                                                          38

1   A.       It's a 72-hour psychological hold.

2   Q.       Okay. Is it, like, a voluntary thing that a

3 person can just walk away from?

4   A.       No, it is not.

5   Q.       Okay. Are you licensed to do a 5150 yourself?

6   A.       No.

7   Q.       Okay. So to your understanding, who performs a

8 5150?

9           ATTORNEY KANTER: Objection; lacks foundation;

10 calls for speculation.

11           ATTORNEY FINE: Join.

12           It's also vague.

13           THE WITNESS: Law enforcement and certain

14 psychological clinicians.

15           ATTORNEY NISENBAUM: Q. Okay. And you've

16 responded many times to law enforcement performing a 5150;

17 correct?

18   A.       Correct.

19   Q.       All right. And when a person is 5150ed, they get

20 detained by police and transported to a hospital or a

21 psychiatric facility; correct?

22   A.       Correct.

23   Q.       The ambulance is called; the ambulance is the one

24 that does the transporting to the facility. Correct?

25           ATTORNEY KANTER: Well, I'm going to object it's

39

1  an incomplete hypothetical; it's vague.

2          You can answer if you're able.

3          ATTORNEY FINE:  Join.

4          ATTORNEY NISENBAUM: Q.  For a 5150.

5  A.        In Contra Costa County, yes.

6  Q.        Okay.  All right.  Does an officer typically ride

7  with the person in the ambulance who is being 5150ed?

8  A.        Not in Contra Costa County.

9  Q.        So who -- so the person is in custody while

10 they're in the back of the ambulance on the 5150; correct?

11 A.        I don't know the legal jargon.  I don't know if

12 they're technically in custody or if they're just on a 5150

13 hold.

14 Q.        So you don't know whether a 5150 -- I take it --

15 strike that.

16         I take it you don't know whether a 5150 hold is

17 actually a detention for law enforcement purposes; is that

18 right?

19 A.        Correct.

20         ATTORNEY KANTER:  Objection; vague and ambiguous;

21 overly broad.

22         You can answer.

23         ATTORNEY NISENBAUM: Q.  But you do know it is a

24 forcible thing that the officer compels the person to do;

25 correct?

                                                        40

1        ATTORNEY FINE:  It's vague and overbroad.

2        ATTORNEY KANTER:  I'll join.

3        Argumentative.

4        You can answer.

5        THE WITNESS:  Say the question again?

6        ATTORNEY NISENBAUM: Q.  You do know that the 5150

7   is something that the officer compels the person to do?

8   They force it to happen; correct?

9        ATTORNEY FINE:  Same objections.

10        THE WITNESS:  Correct.

11        ATTORNEY NISENBAUM: Q.  Okay.  And you as a

12   paramedic in the back of the ambulance -- if the person told

13   you "Oh, can you just let me go?" while they're being

14   transported on a 5150, you couldn't do that, could you?

15   A.        No, I could not.

16   Q.        Okay.  Part of your job is to make sure that that

17   person doesn't leave the ambulance; correct?

18   A.        Correct.

19   Q.        Okay.  So you play a role in the 5150 detention of

20   subjects that you transport to a hospital; correct?

21   A.        I don't -- say that I would detain them.  I am

22   just the middle person to get them from Point A to Point B

23   safely.

24   Q.        Well, I understand.  But if the person got up and

25   said "let me go," you would -- your job would be that you

                                                              41

1    could not do that; correct?

2            ATTORNEY KANTER:  I'll object it lacks foundation;

3    it's an incomplete hypothetical.

4            ATTORNEY FINE:  I join.

5            THE WITNESS:  If they want to stand up and get off

6    the gurney and leave the ambulance, I have to do whatever I

7    can to make sure that they are as safe as possible.

8            If we have to pull over, which I've done in the

9    past, I pull over, I let the person out, and then call back

10   the police department.  They come back, get the person, put

11   them back in my ambulance, and then we go.

12           ATTORNEY NISENBAUM:  Q.  Okay.  To your knowledge,

13   does a person have a right to refuse to -- a 5150?

14           ATTORNEY FINE:  It's vague and ambiguous and

15   overbroad.

16           ATTORNEY KANTER:  I'll join.

17           It's an incomplete hypothetical; it lacks

18   foundation; it calls for expert opinion testimony.

19           ATTORNEY FINE:  Join.

20           ATTORNEY NISENBAUM:  Q.  Based on your experience?

21           ATTORNEY KANTER:  Same objections.

22           THE WITNESS:  The question again?

23           ATTORNEY NISENBAUM:  Q.  Does a person have a right

24   to refuse the 5150?

25           ATTORNEY KANTER:  Same objections.

                                                        42

1    If you know, you can answer it.  If you don't, let

2  him know.

3    ATTORNEY FINE:  Same objections.

4    THE WITNESS:  They don't have -- no, they can't

5  refuse the 5150.

6    ATTORNEY NISENBAUM: Q.  Okay.  In this case, is it

7  fair that you sedated Mr. Gutzalenko for the purpose of

8  transporting him to a hospital -- you were planning on

9  transporting him -- the purpose intended was to transport

10  him safely to a hospital pursuant to a 5150?

11    ATTORNEY FINE:  Misstates prior testimony.

12    ATTORNEY KANTER:  Join.

13    And it lacks foundation.

14    It's -- you're misstating the evidence.

15    ATTORNEY FINE:  Join.

16    ATTORNEY NISENBAUM:  I'm not.

17    ATTORNEY KANTER:  You are.

18    So you can answer as best you can.

19    It's also compound.

20    But go ahead.

21    THE WITNESS:  I don't think Richmond PD had an

22  idea of -- if they were going to put this person on a 5150

23  or not.

24    ATTORNEY NISENBAUM: Q.  Okay.  What I'm going to

25  do next -- I think, if I recall correctly, you said you did

43

1    not review your interview with the police?

2    A.        It's been a while, but I can't really remember it.

3    Yeah.

4    Q.        Okay.  Right.

5              I mean, not within the last few weeks.

6    A.        Correct.

7    Q.        All right.  Let me -- this is "Damon Richardson

8    Interview," in parentheses, "(Confidential City_1209)."

9    It's a copy of it that I made for this, so the file says

10   "copy.MP3."

11             (Playing the audio file of the designated Damon

12             Richardson Interview.)

13             ATTORNEY NISENBAUM:  Okay.  We just played five

14   seconds of it, and we'll make this the next exhibit.

15             3?

16             THE REPORTER:  Exhibit 3.

17             ATTORNEY NISENBAUM:  I almost said C.

18                      (Plaintiffs' Exhibit 3 marked

19                      for identification.)

20             ATTORNEY NISENBAUM: Q.  All right.  Do you

21   recognize your voice?

22   A.        Yes.

23   Q.        Okay.  And like you said, it's been a long time

24   since you heard this; right?

25   A.        Yes.

44

1    Q.        All right.  But this was -- you recognize this as

2    the interview that you gave at the hospital following this

3    incident involving Mr. Gutzalenko; correct?

4    A.        From the brief sound bite that I heard, yes.

5    Q.        Okay.  All right.  Do you recall Mr. Gutzalenko at

6    the scene, before you gave him Versed, saying that he

7    couldn't breathe?

8    A.        I do remember that.

9    Q.        Okay.  And he said that more than once; correct?

10   A.        I don't remember how many times he said it.

11   Q.        But you knew, before you gave him Versed, that he

12   had indicated that he was having breathing problems;

13   correct?

14   A.        I remember him telling me when I first got there

15   that he couldn't breathe.

16   Q.        Okay.  All right.  And when a person can't breathe

17   or has breathing difficulties, that indicates that they

18   might have a respiratory problem that's already existing;

19   correct?

20   A.        Or a cardiac issue that's causing them to have

21   respiratory problems.

22   Q.        Now, you're not a doctor sufficient to diagnose

23   between the two, are you?

24   A.        Not with the little information I had at hand.

25   Q.        But you were aware when you gave Mr. Gutzalenko

                                                              45

1    Versed, that he had said he, quote, "couldn't breathe,"

2    close quote; correct?

3              ATTORNEY FINE:  Asked and answered.

4              THE WITNESS:  Yes.

5              ATTORNEY NISENBAUM:  Q.  Okay.  And at the same

6    time, you were aware that one of the side effects of Versed

7    was that it could cause respiratory depression; correct?

8    A.         Correct.

9    Q.         Meaning, if a person had an existing respiratory

10   problem, administration of Versed could exacerbate that

11   respiratory problem, based on your training; correct?

12   A.         Correct.

13   Q.         Okay.  So what consideration did you give that

14   when you gave Mr. Gutzalenko Versed?  When you injected him

15   with it?

16   A.         When I first got to his side, I tried to ask him

17   the questions.  He didn't answer my questions, but when

18   Richmond PD made some statements, he was able to speak in

19   some full sentences.  His respiratory effort was elevated,

20   but it didn't look like it was compromised.

21   Q.         So you're saying you evaluated it.  You evaluated

22   the respiratory problem that he complained of, and you

23   decided, in your medical opinion, that whatever respiratory

24   problem he said he had, it wasn't sufficient that you should

25   reconsider the use of Versed; is that right?

46

1    A.        No, I saw his respiratory rate and quality.

2    Q.        All right.  Explain that.

3    A.        In order for me to assess his respiratory

4    complaint, he would have had to have been compliant and let

5    me do an assessment on him.

6              Without -- with the way he was acting, the only

7    thing I could do is count his respirations and look at his

8    quality of breathing.

9    Q.        Okay.  And is that -- the way that you describe

10   it, you make it seem, like, doing a respiratory assessment

11   would be more comprehensive.  Is that correct?

12   A.        If the patient allows.

13   Q.        Okay.  What is involved in a respiratory

14   assessment?

15   A.        Asking more questions about the respiratory

16   complaints; listening to the lung sounds; oxygen saturation;

17   capnography.

18   Q.        What's capnography?

19   A.        It's a measure of the gas exchange in the lungs

20   between the oxygen and the CO.

21   Q.        Okay.  So I'm going to go forward in your

22   interview.  I'll start it at about 40 seconds or so.

23             I'm at 0:38, because that's where the cursor

24   landed.  So I'll pause it and I'll ask you questions, all

25   right?

47

1   A.        Okay.

2             (Playing designated audio file, Exhibit 3.)

3             ATTORNEY NISENBAUM:  Sorry.  That's actually, I

4   think, the wrong one.  This is a minute long -- there are

5   two files, and I pulled up the wrong file.

6             My apologies.

7             (Pause.)

8             (Started to play the other designated audio file.)

9             ATTORNEY NISENBAUM:  Okay.  For the record, I am

10  playing from -- so there were two recording files.  The

11  first one lasted a very short time, and then it restarted

12  with the second file.  Your interview did.

13            So I'm playing now -- I think I'm playing now from

14  "Damon Richardson Continued," in parentheses, "(Confidential

15  City_1208) copy.MP3."

16            ATTORNEY FINE:  Are these both Exhibit 3, or is

17  this one Exhibit 4?

18            ATTORNEY NISENBAUM:  We'll make this the next

19  exhibit.  Might as well.  Just to have a complete record.

20                      (Plaintiffs' Exhibit 4 marked

21                      for identification.)

22            ATTORNEY NISENBAUM:  I'm at 39 seconds.  I'll hit

23  Play.

24            (Playing designated audio file, Exhibit 4.)

25            ATTORNEY NISENBAUM:  Q.  Okay.  Does that refresh

48

1    your recollection that you heard the officers talk about

2    placing him -- Mr. Gutzalenko -- on a 5150?

3    A.        I remember hearing one of the police officers

4    threaten to put him on a 5150, but I don't think there was

5    any discussion between the officers about placing him on a

6    5150.

7    Q.        Okay.  I paused it at 55 seconds -- I need to

8    check one other thing here.

9              (Pause.)

10             Okay.  All right.  This is part of the request for

11   production of documents.  I think -- was that Exhibit A

12   [sic]?

13             THE REPORTER:  No.

14             ATTORNEY NISENBAUM:  B [sic]?

15             THE REPORTER:  The request for production of

16   documents wasn't produced yet.

17             ATTORNEY NISENBAUM:  Okay.  I thought I did, but

18   maybe not.

19             We'll make this -- it's an 89-page document --

20             THE REPORTER:  Oh, was that the -- the thing you

21   showed was the --

22             ATTORNEY NISENBAUM:  Yes --

23             THE REPORTER:  -- "Behavioral Science" --

24             ATTORNEY NISENBAUM:  -- right.

25             THE REPORTER:  Okay.  So that is Exhibit 1.

                                                          49

1          ATTORNEY NISENBAUM:  That whole document -- that
2   whole document was 89 pages, and I just want the whole thing
3   as that exhibit.
4          Was that number 1?
5          THE REPORTER:  That's correct.  You're right.
6          ATTORNEY NISENBAUM:  Okay.  I thought so.
7          Let me share the screen.
8          ATTORNEY NISENBAUM: Q.  Okay.  Are you able to
9   read the document?
10  A.      Yes.
11  Q.      Okay.  This is your patient care report; correct?
12  A.      I believe so.
13  Q.      Okay.  There is a Narrative section?
14  A.      Yes.
15  Q.      Okay.  And looking in the Narrative section --
16  this is on page 22 of the document; it's page 1 of the
17  report.  It says "Patient did state he could not breathe and
18  also stated 'I don't want to be on a 5150' after he heard
19  one of the Richmond PD officers state he was going to place
20  him on a 5150."
21          So that's what you said in the document that you
22  wrote; correct?
23  A.      Correct.
24  Q.      And when did you prepare this document?
25  A.      After I cleared for -- cleared from the hospital.

                                                              50

1  Q.        Okay.  So events were very fresh in your mind?

2  A.        Yes.

3  Q.        All right.  So you actually heard the officers say

4  that they were going to put Mr. Gutzalenko on a 5150;

5  correct?

6            ATTORNEY KANTER:  Objection; misstates his prior

7  testimony.

8            ATTORNEY FINE:  Join.

9            THE WITNESS:  I heard one officer threaten to put

10 Mr. Gutzalenko on a hold.

11           ATTORNEY NISENBAUM: Q.  Okay.  Well, what I've --

12 reading this, it says, quote, "'I don't want to be on a

13 5150' after he heard one of the Richmond PD officers state

14 he was going to place him on a 5150."

15           Correct?

16           ATTORNEY KANTER:  Are you asking if that's what it

17 says in his report?

18           ATTORNEY NISENBAUM: Q.  Yes.  That's what it says

19 in your report.

20           ATTORNEY KANTER:  The document speaks for itself,

21 but you can answer.

22           ATTORNEY FINE:  Join.

23           Asked and answered.

24           THE WITNESS:  I heard one of the Richmond police

25 officers threaten to put Mr. Gutzalenko on a hold.  That's

                                                            51

1   why this is in my report.
2           ATTORNEY NISENBAUM: Q.  You don't use the word
3   "threaten."  You say that "he was going to place him."
4   A.      Yes.
5   Q.      Correct?
6   A.      That's what the officer said.
7   Q.      Right.
8           He said "I'm going to place you on a 5150";
9   correct?
10  A.      Correct.
11  Q.      Okay.  So he told him he was putting him on a
12  5150; right?
13          ATTORNEY KANTER:  Objection; misstates testimony.
14          ATTORNEY FINE:  Join.
15          ATTORNEY KANTER:  Argumentative.
16          ATTORNEY FINE:  Join.
17          THE WITNESS:  He stated he was going to put him on
18  a 5150, but I don't know what pur- -- why he was going to do
19  that.
20          ATTORNEY NISENBAUM: Q.  Okay.  You were called to
21  the scene; correct?
22  A.      Yes.
23  Q.      All right.  And does it say in your report why you
24  were called?
25  A.      I don't believe so, no.

                                                          52

1   Q.        Normally is that included?

2   A.        Not in this report, but it's included in our

3   dispatch notes.

4   Q.        Dispatch notes would be --

5   A.        The dispatch notes would not be on a PCR.  That's

6   going to be on our computer that lives in the ambulance,

7   called our MDT.

8           THE REPORTER:  MBT [sic]?

9           THE WITNESS:  M, as in "Mary"; D, as in "David";

10  T, as in "Tom."

11          THE REPORTER:  Thank you.

12          ATTORNEY NISENBAUM:  Q.  Is that a part of the fire

13  department records?

14  A.        I believe so, yes.

15  Q.        Okay.  Let me put up the fire department report.

16          This is Incident 2021-2100002763-000.

17          Do you recognize this document?

18  A.        No, I do not.  I don't have access to those

19  documents because that's with Richmond Fire Department.

20  Contra Costa County Fire Department dispatches AMR in Contra

21  Costa County.

22  Q.        Okay.  So -- so I would need Contra Costa Fire

23  Department; is that right?

24  A.        Correct.

25  Q.        Okay.

                                                    53

1          THE REPORTER:  That box just gets smaller and
2    smaller.
3          ATTORNEY NISENBAUM:  It's kind of frustrating.
4          ATTORNEY NISENBAUM: Q.  Okay.  Let me get back to
5    where I was at.
6          What was your understanding of what you were
7    responding to?
8    A.        I can't remember.  I do remember that we were told
9    to stage, but I can't remember what the dispatch note said
10   it was for.
11   Q.        Did you talk to officers at the scene?
12   A.        Some of them, yes.
13   Q.        And what did they tell you?
14         ATTORNEY KANTER:  Objection; vague as to time.
15         ATTORNEY FINE:  Join.
16         ATTORNEY NISENBAUM: Q.  As to why they had called
17   you to be there?
18         ATTORNEY KANTER:  I'll just also object that it
19   lacks foundation.
20         You can answer.
21         ATTORNEY FINE:  Join.
22         THE WITNESS:  When I first got on scene, one of
23   the officers came to the ambulance and told us that
24   Mr. Gutzalenko had been going up and down San Pablo Avenue
25   and vandalizing stores.  He told us that he was bleeding

                                                        54

1    from the hand, had a bruise on his head, and possibly had

2    been vomiting, and he wasn't -- he wasn't acting

3    appropriate, so to speak.

4              I can't remember the exact words.  The exact

5    conversation.  That's pretty much what it was.

6              ATTORNEY NISENBAUM: Q.  Were they telling you that

7    they were arresting him?

8    A.        No.

9    Q.        Were they telling you that they thought that he

10   was having some sort of psychiatric problem that he needed

11   help with?

12   A.        No.

13   Q.        Did they tell you he thought -- that they thought

14   he was having a medical emergency?

15   A.        No.

16   Q.        Okay.  You were the paramedic with the highest

17   medical authority at the scene; correct?

18   A.        Correct.

19   Q.        Okay.  Let me stop that Share.  I'm going to go to

20   one of the body cameras next.

21             This is Officer Tagorda.

22             ATTORNEY NISENBAUM:  Did that make it to you?

23             THE REPORTER:  I think so.

24             ATTORNEY NISENBAUM:  Okay.  Great.

25             So this is "Officer Tagorda Confidential

                                                                   55

1    City_839.Confidential Copy."

2              Okay.  Let me share the screen.

3              THE REPORTER:  Oh, and -- sorry -- that's

4    Exhibit 5, for the record.

5              ATTORNEY NISENBAUM:  Thank you.

6                   (Plaintiffs' Exhibit 5 marked

7                    for identification.)

8              ATTORNEY NISENBAUM: Q.  I take it you don't have a

9    body cam on your person; correct?

10   A.        Correct.

11   Q.        All right.  So this is from Officer Tagorda's body

12   cam.  And as before, I'll pause it at certain points and ask

13   you questions.

14             (Playing designated video file, Exhibit 5.)

15             ATTORNEY NISENBAUM: Q.  Okay.  Pausing it at 1:51.

16             That was you getting out of the -- is that an

17   ambulance?

18   A.        Yes.

19   Q.        Okay.  All right.  And you have a surgical mask

20   over your face; correct?

21   A.        It's an N95 mask.

22   Q.        Okay.  And was this back when COVID was in effect?

23   A.        Correct.

24   Q.        COVID protocols?

25             And that's why you have the mask on?

                                                        56

1    A.        Yes.

2    Q.        And the officer -- did you recognize him?  Do you

3    know who he is?

4    A.        I -- yes, I recognize him as being a Richmond

5    police officer, but I didn't know his name.

6    Q.        Okay.  And he was telling you that he was

7    spitting; you might want to get a spit hood.  Correct?

8    A.        Yes.

9    Q.        All right.  And now, is it important to find out,

10   you know, the basics of what happened and why you were

11   called?

12             ATTORNEY KANTER:  I'll object it's calling for

13   expert opinion testimony, the way you've asked it.

14             ATTORNEY NISENBAUM:  Q.  Based on your training.

15             ATTORNEY KANTER:  Same objection.

16             Because this is relating to a particular incident.

17             ATTORNEY NISENBAUM:  Q.  In general, are you

18   trained that you should -- when you come to a scene that the

19   police have called you to, that you should try to get a

20   summary of -- a summation -- a short synopsis of what

21   happened while you were called?

22             ATTORNEY KANTER:  Same objections.

23             But you can answer if you're able.

24             THE WITNESS:  Yes, we get a brief synopsis of what

25   happened -- what took place before we got there.

                                                        57

1          ATTORNEY NISENBAUM: Q.  And does that typically

2    include why you were called?

3          ATTORNEY KANTER:  I'll object it's an incomplete

4    hypothetical; vague; ambiguous; and overly broad.

5          You can answer if you're able.

6          THE WITNESS:  No, not all the time.

7          ATTORNEY NISENBAUM: Q.  Okay.  Well, let's go

8    to...

9          (Pause.)

10         Okay.  What does the term "5-1-5-0" mean?

11         ATTORNEY KANTER:  Objection; lacks foundation;

12   calls for speculation; incomplete hypothetical.

13         ATTORNEY FINE:  Join.

14         Asked and answered.

15         THE WITNESS:  "5150" is a term for the

16   psychological hold.

17         ATTORNEY NISENBAUM: Q.  So 5-1-5-0 -- do you use

18   that terminology sometimes in the field when you talk about

19   doing a 5150 on someone?

20         ATTORNEY KANTER:  Objection; lacks foundation.

21         He doesn't do 5150s.  He doesn't place them, as he

22   already testified.

23         ATTORNEY NISENBAUM: Q.  When you're having a

24   conversation or a discussion with someone about whether a

25   5150 is being effected.

                                                        58

1   A.         Richmond Police and other law enforcement agencies

2   will tell me that they will or will not be placing a subject

3   on a 5150.

4   Q.         Okay.  I asked, though, specifically.  When you

5   talk out in the field, do you sometimes refer to a 5150 as

6   "5-1-5-0"?

7   A.         Not me personally.

8   Q.         Okay.  All right.  I'm going to start -- continue

9   playing at 1:51.

10             (Playing designated video file, Exhibit 5.)

11             ATTORNEY NISENBAUM:  Q.  All right.  We're at 2:00

12   minutes that I just paused at.

13             That was you who asked why did you guys get called

14   out; correct?

15   A.         Correct.

16   Q.         And the officer was responding to that; correct?

17   A.         Correct.

18   Q.         Okay.  Continuing at 2:00 minutes.

19             (Playing designated video file, Exhibit 5.)

20             ATTORNEY NISENBAUM:  Q.  Go back.  I'm not sure if

21   I heard everything there.

22             I'll go to 1:56; hit Play.

23             (Playing designated video file, Exhibit 5.)

24             ATTORNEY NISENBAUM:  Q.  Okay.  Pausing at 2:03.

25             He said he's "obviously intoxicated"; correct?

                                                              59

1      ATTORNEY FINE:  Misstates the video.

2      ATTORNEY KANTER:  I'll join.

3      THE WITNESS:  I did not state that.

4      ATTORNEY NISENBAUM:  Q.  Not you.  The officer said

5  he's "obviously intoxicated"; correct?

6      ATTORNEY FINE:  Same ob- -- same ob- --

7      ATTORNEY KANTER:  Calls -- yeah, same objections.

8      And, I mean, the video speaks for itself.  If

9  you're asking him if it refreshes his memory, that's one

10  thing.  But you're just asking him to testify as to what

11  this video is audibly referencing.

12      ATTORNEY FINE:  Join.

13      ATTORNEY NISENBAUM:  All right, I can't tell

14  you -- I had a trial with Judge Patel where a lawyer kept

15  making that objection, and she went through the roof.

16      In any event.

17      ATTORNEY NISENBAUM:  Q.  That's what the officer

18  told you; correct?

19      ATTORNEY FINE:  Same objections.

20      ATTORNEY KANTER:  Yeah, same objections; and the

21  question is vague as it's been asked now.

22      You can answer if you're able.

23      ATTORNEY NISENBAUM:  Q.  "Obviously intoxicated."

24  The officer told you that; correct?

25      ATTORNEY FINE:  Same objections.

                                                    60

1       ATTORNEY KANTER:  Join.

2       THE WITNESS:  Correct, that's what the officer

3  said.

4       ATTORNEY NISENBAUM: Q.  Okay.  All right.  And

5  that's important information to have when you're treating a

6  person; correct?

7  A.       Yes.

8  Q.       Okay.  All right.  Continuing at 2:03.

9       (Playing designated video file, Exhibit 5.)

10       ATTORNEY NISENBAUM: Q.  Pausing at 2:20.

11       Do you know who the paramedic is that the officer

12  is talking to now?

13  A.       That is Dan Burnett, and at the time he was not a

14  paramedic.

15  Q.       Okay.  What was he?

16  A.       He was an EMT Basic.

17  Q.       I see.

18       All right.  Continuing at 2:20.

19       (Playing designated video file, Exhibit 5.)

20       ATTORNEY NISENBAUM: Q.  Pausing at 3:36.

21       Is that Burnett who's got the stretcher?

22  A.       Yes.

23  Q.       Okay.  Continuing at 3:36.

24       Well, let me ask you this.

25       Do you know why the stretcher is being brought to

                                                            61

1  where the -- to where Mr. Gutzalenko is located?

2  A.        In case we needed to take the individual to the

3  hospital.

4  Q.        So is he being taken only as a precaution at this

5  point?

6          ATTORNEY KANTER:  Objection; it's vague and

7  ambiguous; it's overly broad.

8          I'm not sure I understand the question myself.

9  But if you understand it, feel free.

10         ATTORNEY NISENBAUM: Q.  Let me ask you a different

11 question.

12         Had the decision already been made to take

13 Mr. Gutzalenko to the hospital at this point when the

14 stretcher is being brought to him?

15 A.        No.

16 Q.        Okay.  All right.  Did you stay with

17 Mr. Gutzalenko during this time period?

18         ATTORNEY FINE:  Vague.

19         ATTORNEY NISENBAUM: Q.  Do you know where you

20 were?

21 A.        In the video shot here?  I believe I was in front

22 of Dan Burnett.

23 Q.        Okay.  All right.  And do you oftentimes take the

24 stretcher -- remove the stretcher merely as a precaution

25 just in case a person might have to go to a hospital?

                                                          62

1   A.      Yes.

2   Q.      Okay.  Continuing at 3:36.

3           (Playing designated video file, Exhibit 5.)

4           ATTORNEY NISENBAUM: Q.  4:33.

5           Whose voice was that saying, I think, "Seems to be

6   a 5150"?

7           ATTORNEY FINE:  Calls for speculation.

8           ATTORNEY KANTER:  Calls for -- yeah.  Join.

9           Lacks foundation.

10          THE WITNESS:  I don't know who said that.

11          ATTORNEY NISENBAUM: Q.  It's not you?

12  A.      No.

13  Q.      Play it again at 4:10.

14          (Playing designated video file, Exhibit 5.)

15          ATTORNEY NISENBAUM: Q.  Okay.  Did you hear

16  that -- do you recall hearing them say that at the scene now

17  that you've watched it?

18  A.      I do not -- no, I don't remember hearing that

19  particular part.

20  Q.      You understood that the terminology used there,

21  "5-1-5-0," referred to a 5150.  You understand that now,

22  watching it; correct?

23  A.      Correct.

24  Q.      Okay.

25          (Playing designated video file, Exhibit 5.)

63

1          ATTORNEY NISENBAUM: Q.  Okay.  Now, by the way,

2     Mr. Gutzalenko was able to tell you his name; correct?

3     A.        I don't remember him telling me anything other

4     than "I'm short of breath."  And he might have told me his

5     first name, but not his last name.

6     Q.        Well, looking at your -- let me pull up your

7     report.

8               (Pause.)

9               Do you recall referring to him as "Mr. Ivan"?

10    A.        I do not remember that.

11    Q.        Okay.

12              All right.  And I'm just going to read from it as

13    opposed to change what's on the screen.

14              But this is from page 66 of your coroner's inquest

15    testimony, starting at line 15.

16              "Answer.  So after that, I came up.  I tried to

17    establish his alert and oriented status by asking him his

18    name, city, person, place, time, and event, basically, and

19    he didn't really answer me.  I believe he might have told me

20    that his name was Ivan."

21              Does that refresh your recollection that he told

22    you his name was Ivan?

23    A.        It does not refresh my recollection at this time.

24    Q.        Okay.  All right.  I'll play from your interview,

25    then.

                                                              64

1        I tried to do it the shorter way.

2        So this is -- I forget the exhibit number, but

3    your interview ending in the numbers _1208.

4        I'm going to go to -- call it 50 seconds.

5        52 seconds.

6        Play it.

7        (Playing designated audio file, Exhibit 4.)

8        ATTORNEY NISENBAUM: Q.  Let me actually go back a

9    little more at 43 seconds.

10       (Playing designated audio file, Exhibit 4.)

11       ATTORNEY NISENBAUM: Q.  You know what?  I played

12   from the wrong file again.

13       Let me go -- this is the other file; the shorter

14   one; the one ending _1209.  I apologize for that.

15       (Started to play audio file, Exhibit 3.)

16       ATTORNEY NISENBAUM: Q.  Start at 53 seconds.

17       (Playing designated audio file, Exhibit 3.)

18       ATTORNEY NISENBAUM: Q.  Okay.  Pausing at 1:13.

19       That was your voice that said "He was able to tell

20   me his name, but he didn't really want to answer any

21   questions" -- "any other questions after that."

22       Correct?

23   A.       Correct.

24   Q.       Okay.  Does that refresh your recollection that

25   Mr. Gutzalenko was able to tell you his name?

                                                         65

1 A.         Yeah, but I'm still fuzzy on the events because

2 they happened four years ago.

3 Q.         I get that.  I understand.

4           But my question to you is when you gave this

5 interview, it wasn't four years ago; it was right after.

6 Right?

7 A.         Correct.

8 Q.         Okay.  So it's fair to say that if that's what you

9 said then, then that's what happened.

10           ATTORNEY KANTER:  Well, I'll object it's

11 argumentative.

12           You can answer.

13           THE WITNESS:  Correct.

14           ATTORNEY NISENBAUM:  Q.  All right.  So he was able

15 to tell you his name, but he didn't appear to want to have

16 any further discussion than that; correct?

17 A.         With me.

18 Q.         With you.

19           All right.  Go back to the body cam.

20           We're at 4:47.  Let me just hit Play.

21           (Playing designated video file, Exhibit 5.)

22           ATTORNEY NISENBAUM:  Q.  5:09.

23           It sounded like the officers were telling Ivan --

24 and they were using his name -- "You're going to get tased,

25 Ivan" -- saying things like that; and he was responding as

                                                          66

1    if he knew what they were saying.  Correct?

2              ATTORNEY KANTER:  I'll just object it lacks

3    foundation; calls for speculation.

4              But you can answer.

5              ATTORNEY FINE:  Join.

6              THE WITNESS:  Correct.

7              ATTORNEY NISENBAUM: Q.  He was saying "No,"

8    fearful that he was going to be tased; right?  That's what

9    it appeared to be.

10             ATTORNEY KANTER:  Same objections.

11             ATTORNEY FINE:  Join.

12             THE WITNESS:  Correct.

13             ATTORNEY NISENBAUM: Q.  Thank you.

14             5:09; continuing.

15             (Started to play video file, Exhibit 5.)

16             ATTORNEY NISENBAUM: Q.  I take it you don't know

17   which officer's shin is across a portion of Mr. Gutzalenko's

18   torso, do you?

19   A.        I do not know his name.

20   Q.        Okay.  And I take it you weren't taking notes

21   about how the officers were positioned with respect to

22   Mr. Gutzalenko?

23   A.        No, not while I was wrapping his hand.

24   Q.        Right.

25             And you weren't really paying attention to that, I

                                                            67

1  take it?

2  A.      Not to what the officers were currently doing

3  then.

4  Q.      Okay.  At 5:11; continue.

5          (Playing designated video file, Exhibit 5.)

6          ATTORNEY NISENBAUM:  Q.  All right.  5:38.

7          There was a voice that said "What's the best way

8  we can do this, guys?"  And then your voice that said "I'm

9  going to get some Versed drawn up."

10          Did you hear that?

11  A.      Yes.

12  Q.      Okay.  It sounds -- if I am interpreting this

13  correctly, it sounds like there is some, basically, teamwork

14  going on between you and the officers; correct?

15          ATTORNEY KANTER:  Objection; argumentative; calls

16  for speculation; lacks foundation.

17          ATTORNEY FINE:  Vague and ambiguous; overbroad.

18          Join.

19          ATTORNEY KANTER:  Join.

20          THE WITNESS:  They were going to help assist me to

21  get him on the gurney.

22          ATTORNEY NISENBAUM:  Q.  Okay.  Let's go back.

23          5:26.

24          (Playing designated video file, Exhibit 5.)

25          ATTORNEY NISENBAUM:  Q.  I'm trying to figure out

                                                          68

1  what he said.

2          "What's the best way we can do this?"  Do you know

3  what he said?

4  A.        Um --

5          ATTORNEY KANTER:  Are you asking him what his

6  recollection was, or are you asking what this video is now

7  saying?

8          ATTORNEY NISENBAUM: Q.  Like, what your

9  recollection is based after, hopefully, having your

10  recollection jogged by the video.

11  A.        I don't remember hearing that aspect -- that

12  statement.

13  Q.        All right.  Do you know what he said as we sit

14  here and listen to it?

15  A.        It's kind of not a very good quality audio on my

16  end, so I can't really answer that.

17  Q.        But it was your voice that said you're going to

18  go -- you're going to get some Versed drawn up; correct?

19  A.        Correct.

20  Q.        Okay.  And why were you drawing up Versed?

21  A.        For my safety, basically.

22  Q.        I see.

23          Now, he hadn't been handcuffed yet; right?

24  A.        Not that I remember at that point, no.

25  Q.        Okay.  Continuing at 5:37.

                                                           69

1    (Playing designated video file, Exhibit 5.)

2    ATTORNEY NISENBAUM: Q.  Pausing at 6:28.

3    Do the police sometimes help you facilitate an

4    injection -- a sedative when you use a -- I'm sorry -- when

5    you use a chemical restraint in the field?

6    ATTORNEY KANTER:  I'll object it's vague and

7    ambiguous; it's an incomplete hypothetical.

8    ATTORNEY FINE:  Overbroad.

9    Join.

10    ATTORNEY KANTER:  Join.

11    THE WITNESS:  No, the decision is always mine.

12    They do not assist with that unless it's restraining this

13    person so I can inject him.

14    ATTORNEY NISENBAUM: Q.  Okay.  So they will assist

15    to the extent that they'll hold a person down or otherwise

16    restrain a person for you to give them the injection; is

17    that right?

18    ATTORNEY FINE:  Incomplete hypothetical.

19    ATTORNEY KANTER:  Join.

20    And the same objections as before.

21    ATTORNEY FINE:  Join.

22    THE WITNESS:  Correct.

23    ATTORNEY NISENBAUM: Q.  I want to go back.

24    We're here -- go back to 5:20.  I'm going to hit

25    Play.

70

1          (Playing designated video file, Exhibit 5.)

2          ATTORNEY NISENBAUM: Q.  "What's the best way we're

3 going to do this?"  That was one of the officers at the

4 scene who said it?

5          ATTORNEY FINE:  Calls for speculation.

6          ATTORNEY KANTER:  Join.

7          THE WITNESS:  I can't remember.

8          ATTORNEY NISENBAUM: Q.  Okay.  Your response was

9 you're going to get Versed drawn up; correct?

10          ATTORNEY FINE:  Lacks foundation.

11          ATTORNEY NISENBAUM: Q.  In that part; right?

12          ATTORNEY FINE:  My apologies.

13          Lacks foundation.

14          THE WITNESS:  Correct.

15          ATTORNEY NISENBAUM: Q.  Okay.

16          (Started to play video file, Exhibit 5.)

17          ATTORNEY NISENBAUM: Q.  At that time you were

18 discussing -- you understood that that was a discussion:

19          "What's the best way we're going to do this?"

20          You know.

21          "Well, we're going to give him some Versed."

22          You were talking about transporting him -- how to

23 get him transported; correct?

24          ATTORNEY KANTER:  Objection; argumentative.

25          ATTORNEY NISENBAUM: Q.  The officer said "What's

71

1    the best way we're going to do this?"

2            The "this" that he was referring to was getting

3    Mr. Gutzalenko transported, to your understanding; correct?

4            ATTORNEY FINE:  Calls for speculation.

5            He testified he doesn't remember anyone saying

6    that.

7            THE WITNESS:  Based on the video, I think it was

8    not the transport but getting Gutzalenko on the gurney.

9            ATTORNEY NISENBAUM: Q.  Okay.

10           Okay.  I'm going to go back to your report.

11           ATTORNEY NISENBAUM:  And I forget what exhibit

12   number this was.

13           THE REPORTER:  Well, is that part of Exhibit 1?

14           ATTORNEY NISENBAUM:  Yes.  It is.

15           THE REPORTER:  Then it's Exhibit 1.

16           ATTORNEY NISENBAUM:  Okay.  Great.

17           ATTORNEY NISENBAUM: Q.  We're on page 23 -- I'm

18   sorry -- page 22 of your -- of Exhibit 1.

19           And I'm reading from your narrative.

20           "PT" -- it's okay if I use the word patient

21   instead of PT; right?

22   A.      Are you asking me or the other counsel?

23   Q.      I'm asking you.

24           We know that "PT" means patient; right?

25   A.      Correct.

                                                        72

1  Q.        Okay.  "Patient did state he could not breathe,

2  and also stated 'I don't want to be on a 5150' after he

3  heard one of the Richmond PD officers state he was going to

4  place him on a 5150.  While attempting to place a sterile

5  dressing on the patient's right hand, the patient kept

6  trying to keep his hand away from EMS and also grab at the

7  dressing and grab the hand of Medic Richardson, who was

8  attempting to place the dressing."

9          Is that you writing about yourself in the third

10 person?

11 A.        Yes.

12 Q.        Okay.  It continues.

13          "It was determined that patient was too combative

14 to safely be placed on the gurney by first responders

15 without being chemically restrained."

16          He was going to be placed on the gurney to be

17 transported; correct?

18          ATTORNEY KANTER:  I'll just object it lacks

19 foundation.

20          ATTORNEY FINE:  Join.

21          ATTORNEY KANTER:  You can answer it.

22          THE WITNESS:  I'm sorry?

23          ATTORNEY KANTER:  You can answer, if you can.

24          THE WITNESS:  Yes.

25          ATTORNEY NISENBAUM: Q.  The answer was "yes"?

73

1  A.        The answer was "yes."

2  Q.        Okay.  And he was going to be transported for

3  purposes of a 5150; correct?

4          ATTORNEY KANTER:  Objection; that -- it misstates

5  prior testimony; lacks foundation; calls for speculation.

6          ATTORNEY FINE:  Join.

7          THE WITNESS:  I don't think the 5150 had been

8  established at this time.

9          ATTORNEY NISENBAUM: Q.  Okay.  So why was he going

10  to be transported?

11  A.        In my opinion he was -- needed medical attention.

12  Q.        What medical attention did he need?

13  A.        I can't really answer that because I couldn't get

14  a full assessment.

15  Q.        Okay.  Well, a person with a cut on their hand

16  doesn't typically require transport by an ambulance, do

17  they?  Unless it's, you know, severe, severe bleeding.

18          ATTORNEY FINE:  Incomplete hypothetical.

19          ATTORNEY KANTER:  And I'll join.

20          You've got a lot more going on than that, and --

21  anyway, you can answer.

22          THE WITNESS:  Correct, a minor laceration doesn't

23  need an ambulance.

24          ATTORNEY NISENBAUM: Q.  Okay.  One of the -- one

25  of the reasons he was being -- that you were going to

                                                      74

1   transport him was for purposes of a 5150; correct?

2         ATTORNEY KANTER:  Objection; misstates prior

3   testimony; lacks foundation; calls for speculation.

4         ATTORNEY FINE:  Join.

5         THE WITNESS:  I was not going to -- I was going to

6   transport him to get medical attention.

7         ATTORNEY NISENBAUM: Q.  That medical attention

8   included evaluation for a 5150; correct?

9         ATTORNEY KANTER:  Objection; misstates prior

10  testimony; vague and ambiguous; overly broad; incomplete

11  hypothetical.

12        He's already testified he doesn't place patients

13  on a 5150.

14        You can answer.

15        ATTORNEY FINE:  Join.

16        ATTORNEY NISENBAUM: Q.  I understand, but you

17  transport people for -- who have been 5150ed, or for further

18  evaluation for a 5150.

19        You do do that; correct?

20  A.      I transport people who have been already placed on

21  a 5150.

22  Q.      Okay.

23        ATTORNEY FINE:  Hey, Ben?  Can I persuade you to

24  take a five-minute break?  Like, at most, five minutes?

25        ATTORNEY NISENBAUM:  Sure.

                                                        75

1          And I do, actually, have to hurry it up, though.

2     I've got to get my daughter.  I have to leave in about an

3     hour.  So.

4               ATTORNEY FINE:  Okay.

5               ATTORNEY NISENBAUM:  I thought this would go

6     faster, but.

7               ATTORNEY FINE:  So back at 11:55, yeah?

8               ATTORNEY NISENBAUM:  Sure.

9               ATTORNEY FINE:  Thank you very much.  I appreciate

10    it.

11              (Recess:  11:51 A.M. to 11:56 A.M.)

12              ATTORNEY NISENBAUM:  Q.  I'm going to share my

13    screen, and I'm sharing from the coroner's inquest

14    transcript, a section of the testimony from Officer Tran.

15              And this is from page 46, line 15.

16              "Question.  Did you indicate at some point, you

17              or Officer Hall, that you would 5150 him?

18              "Answer.  During that point, no.  When AMR got

19              there and he -- I thought he was being

20              cooperative.  So there is no point to place

21              him on a mandatory psychiatric hold if he's

22              willing to get the help that he needs.

23              "Question.  All right.

24              "Answer.  Once AMR got there and he was

25              uncooperative, and it was very obvious

                                                              76

1    that he was not cooperative with receiving

2    the aid that he needed, I was not

3    comfortable with letting Mr. Ivan just

4    walk away in the condition that he is.  In

5    my belief, when your skin is blue and

6    purple, when your eyes are bloodshot red,

7    when you have cuts on your body and you're

8    bleeding profusely, you need medical help.

9    And if you are unable to care for

10   yourself, my duty is to care for you.  At

11   that point when Mr. Ivan decided not to

12   cooperate with AMR, I agreed with Officer

13   Hall that we needed to place Mr. Ivan on a

14   psychiatric hold."

15       Now, did the officers tell you that they were

16   putting him on a psychiatric hold?

17       ATTORNEY KANTER:  Objection; it's been asked and

18   answered many times.

19       You can answer him again.

20       ATTORNEY FINE:  Join.

21       THE WITNESS:  They did not tell me he was going to

22   be placed on a hold.

23       ATTORNEY NISENBAUM:  Q.  Okay.

24       Okay.  I'm going to stop the Share.

25       When you heard the words "5-1-5-0," you didn't

1  think that that was telling you that they were -- that he

2  was being put on a 5150?

3          ATTORNEY KANTER:  Objection; lacks foundation;

4  it's argumentative.

5          ATTORNEY FINE:  Join.

6          Asked and answered.

7          ATTORNEY KANTER:  Join.

8          THE WITNESS:  I didn't know what their purposes

9  were at that point.

10          ATTORNEY NISENBAUM:  Q.  So when you heard the

11  words "5-1-5-0," you thought maybe it's just in jest or

12  maybe it's a ruse?

13          ATTORNEY KANTER:  Objection; this -- it's an

14  argumentative -- we -- we're -- lacks foundation.

15          ATTORNEY FINE:  Join.

16          And argumentative.

17          THE WITNESS:  Say the question again?

18          ATTORNEY NISENBAUM:  Q.  When you heard them say

19  "5-1-5-0," and you responded saying you were going to draw

20  up some Versed -- it was all for the purpose of sedating him

21  to transport him while he was under a 5150, wasn't it?

22          ATTORNEY KANTER:  Misstates testimony; misstates

23  the evidence.

24          You're just being argumentative at this point.

25          It lacks foundation.

                                                        78

1          You're asking about a situation that didn't occur

2     to his knowledge.

3               ATTORNEY NISENBAUM:  It occurred because we saw it

4     on video.  He said "5-1-5-0," and you responded by saying

5     you're going to draw up some Versed.

6               ATTORNEY KANTER:  No, that's --

7               ATTORNEY NISENBAUM: Q.  That's correct, isn't it?

8               ATTORNEY KANTER:  -- that's not what we just

9     heard; that's not what the video depicts.  So I'll just

10    object it lacks foundation.

11              You can answer.

12              ATTORNEY FINE:  Join.

13              THE WITNESS:  The reason why I wanted to draw up

14    some Versed and give it to Ivan was for my own safety

15    once -- to get him on the gurney and into the back of the

16    ambulance.

17              ATTORNEY NISENBAUM: Q.  Okay.  During transport.

18              And he was being transported, again, on a 5150;

19    correct?

20              ATTORNEY KANTER:  No -- objection; argumentative;

21    lacks foundation; it's been asked and answered; and it

22    misstates his prior testimony.

23              ATTORNEY FINE:  Join.

24              THE WITNESS:  Not correct.  He has not been placed

25    on a hold.

                                                           79

1            ATTORNEY NISENBAUM: Q. So when Officer Tran

2  testified at the coroner's inquest that he was going to put

3  him on a 5150; that he had decided -- he agreed with Officer

4  Hall that they needed to place Mr. Ivan on a psychiatric

5  hold -- are you saying that was never communicated to you?

6            ATTORNEY FINE: Asked and answered.

7            ATTORNEY KANTER: Join.

8            THE WITNESS: I remember hearing the officers

9  discuss placing him on a hold, but they were discussing it

10  among themselves; not with me.

11           ATTORNEY NISENBAUM: Q. Well, you knew that he was

12  in custody when you -- when you plunged the syringe into --

13  what was it, his deltoid?

14  A.      Yes, I believe so.

15  Q.      When you plunged the syringe into Mr. Gutzalenko's

16  deltoid, you knew that he was in custody; correct?

17           ATTORNEY KANTER: Objection; lacks foundation;

18  calls for speculation.

19           Are you asking whether he knew that he was

20  handcuffed?

21           ATTORNEY NISENBAUM: Q. You knew that he was being

22  detained; correct?

23           ATTORNEY KANTER: Same objections. It's vague and

24  ambiguous; lacks foundation; it calls for speculation.

25           ATTORNEY FINE: Join.

80

1    THE WITNESS:  I knew that he was in handcuffs
2    because he was being uncooperative and combative.
3    ATTORNEY NISENBAUM: Q.  Okay.  And you knew that
4    your job was to transport him to the hospital while he was
5    being -- while he was in custody; correct?
6    ATTORNEY KANTER:  Lacks foundation; calls for
7    speculation; it's an incomplete hypothetical because it
8    didn't happen that way.
9    ATTORNEY FINE:  And join.
10   THE WITNESS:  I didn't know what the intention of
11   the officers were at that point.
12   ATTORNEY NISENBAUM: Q.  So even when they said
13   5150, you didn't know that their intention was to 5150 him?
14   ATTORNEY KANTER:  Objection; argumentative; calls
15   for speculation.
16   ATTORNEY NISENBAUM:  Sorry.  You're right.  I
17   actually misspoke.
18   ATTORNEY NISENBAUM: Q.  When the officers said
19   "5-1-5-0," you didn't understand that their intention was to
20   5150 him?
21   ATTORNEY KANTER:  Objection; calls for
22   speculation; lacks foundation.
23   THE WITNESS:  Police officers discuss 5150ing
24   people all the time.  Sometimes it happens and sometimes it
25   doesn't.

81

1    ATTORNEY NISENBAUM: Q.  Well, could you just give

2    a person Versed and then not transport them?

3    A.    No, I cannot.

4    Q.    Okay.  So -- he's in handcuffs, so you know that

5    he's not free to leave -- I take it you understood that?

6    ATTORNEY KANTER:  I'll object it calls for

7    speculation, but you can answer.

8    THE WITNESS:  I don't think he had the capacity to

9    leave under his own will even if he was [sic] handcuffed.

10   ATTORNEY NISENBAUM: Q.  Even if he wasn't

11   handcuffed?

12   A.    Correct.

13   Q.    Okay.  Again, you've interacted with police and

14   subjects they have arrested that you've provided some form

15   of treatment for; correct?  Many, many times.

16   A.    Yes.

17   Q.    Okay.  And this was one of those times; correct?

18   A.    Yes.

19   Q.    So you have an understanding that when a person is

20   in handcuffs and the police are -- appear to be in the

21   process of detaining him -- in this case -- well, strike

22   that.

23   In this case, the police didn't just handcuff

24   Mr. Gutzalenko; they restrained him on the ground for a

25   significant period of time.  Correct?

82

1         ATTORNEY KANTER:  Objection; argumentative; calls

2    for speculation; lacks foundation.

3         ATTORNEY FINE:  Join.

4         Misstates the video.

5         ATTORNEY NISENBAUM: Q.  In your presence they did

6    that; correct?

7         ATTORNEY KANTER:  Same objections.

8         You can answer.

9         ATTORNEY FINE:  Join.

10        THE WITNESS:  Yes.

11        ATTORNEY NISENBAUM: Q.  Okay.  So you -- you know

12   that that doesn't happen unless a person is being forcibly

13   detained in some manner; correct?

14        ATTORNEY KANTER:  Objection; calls for

15   speculation; lacks foundation; it's argumentative.

16        You can answer if you're able.

17        ATTORNEY FINE:  Join.

18        THE WITNESS:  I'm not a police officer, and I

19   don't know what it constitutes for a police officer to put

20   somebody in handcuffs.

21        ATTORNEY NISENBAUM: Q.  Okay.  But you know that

22   that person is not free to leave.

23        ATTORNEY KANTER:  Same objections.

24        ATTORNEY FINE:  Join.

25        THE WITNESS:  Until the police officer finishes

                                                          83

1  their investigation, yes.

2          ATTORNEY NISENBAUM: Q.  Okay.  And that includes

3  when the person is in your -- is in handcuffs in the back of

4  your paramedic -- in the back of your ambulance, and you're

5  transporting them to the hospital, and you're told that

6  they're in custody, then you know that they're not free to

7  leave then either.

8          We talked about that; right?

9          ATTORNEY KANTER:  Objection; vague and ambiguous;

10  incomplete hypothetical; calls for a legal conclusion; calls

11  for speculation; lacks foundation.

12          THE WITNESS:  In the back of the ambulance

13  patients aren't allowed to be handcuffed.

14          ATTORNEY NISENBAUM: Q.  Okay.

15  A.      We have to use our own Velcro restraints.

16  Q.      Okay.  But they're -- you understand that they are

17  in custody of the police when that -- when they are;

18  correct?

19          ATTORNEY KANTER:  Objection; incomplete

20  hypothetical; vague and ambiguous; overly broad; calls for

21  speculation; lacks foundation.

22          You can answer.

23          ATTORNEY FINE:  Join.

24          THE WITNESS:  So if the police officers tell me

25  that this person is in custody, sometimes yes -- if a person

                                                        84

 1   is in custody, the police officers usually tell me that.

 2           ATTORNEY NISENBAUM: Q.  Okay.  All right.

 3           In this case, Mr. Gutzalenko never made it into

 4   the ambulance; correct?

 5           ATTORNEY KANTER:  Objection; lacks foundation.

 6           ATTORNEY NISENBAUM: Q.  Well, he never made it

 7   into your ambulance; correct?

 8           ATTORNEY KANTER:  Same objection.

 9           ATTORNEY FINE:  Join.

10           THE WITNESS:  He did make it in my ambulance, and

11   I transported him to the hospital.

12           ATTORNEY NISENBAUM: Q.  I'm sorry.  That is

13   correct.

14           That was after CPR was being done on him; correct?

15   A.      Correct.

16   Q.      All right.  Now, reading your coroner's inquest

17   testimony, you testified at the coroner's inquest that you

18   didn't notice that Mr. Gutzalenko had stopped breathing

19   until after you got him onto the gurney.

20           Do you recall testifying to that?

21   A.      Yes.

22   Q.      In reality, that's inaccurate; correct?

23           ATTORNEY KANTER:  Objection; argumentative; lacks

24   foundation; calls for speculation.

25           ATTORNEY FINE:  Join.

                                                          85

1         THE WITNESS:  I can't remember.

2         ATTORNEY NISENBAUM:  Q.  Okay.  Well, you

3   remembered at the time you gave your interview -- I'll go

4   back to your interview.

5         (Pause.)

6         Again, I forget the exhibit number, but it ends in

7   the numbers _1208.

8         THE REPORTER:  That could be the first one -- I

9   think _12- -- oh, wait.  _1208 is the second file.

10        ATTORNEY NISENBAUM:  Right.  Okay.

11        Okay.  I'm going to go forward to 4:15 or so.

12   4:14.

13        (Playing designated audio file, Exhibit 4.)

14        ATTORNEY NISENBAUM:  Q.  Pausing at 5:45.

15        Does that refresh your recollection as to when it

16   was that you noticed that Mr. Gutzalenko had stopped

17   breathing and had no pulses?

18   A.        Yes.

19   Q.        Okay.  It was almost immediately after giving him

20   the Versed; correct?

21        ATTORNEY KANTER:  Objection; argumentative.

22        ATTORNEY FINE:  Join.

23        THE WITNESS:  It was after I gave him Versed.

24        ATTORNEY NISENBAUM:  Q.  Right.

25        And before he was put on the gurney; correct?

                                                    86

1     ATTORNEY KANTER:  I'll just object it calls for
2  speculation; lacks foundation, but you can answer.
3     ATTORNEY FINE:  Join.
4     THE WITNESS:  According to what I said there, yes.
5     ATTORNEY NISENBAUM: Q.  Okay.  Well, we also have
6  video of it, so let me go back to Officer Tagorda and his
7  body cam.
8     And again, I apologize.  I don't recall the
9  exhibit.
10    THE REPORTER:  Exhibit 5.
11    ATTORNEY NISENBAUM:  Okay.  So we're back to
12 Exhibit 5.
13    Share.
14    (Pause.)
15    So we're at 5:38; let me go to 7:30 or so.
16    7:22, because that's where the cursor fell.
17    (Playing designated video file, Exhibit 5.)
18    ATTORNEY NISENBAUM: Q.  Okay.  Pausing now at
19 7:38.
20    That's you that's coming to view of the camera?
21 A.     On the left side, yes.
22 Q.     Okay.  And you had gone to the ambulance and
23 gotten a syringe of Versed; correct?
24 A.     Correct.
25 Q.     All right.  Now, before you injected

87

1  Mr. Gutzalenko with Versed, what did you do to make sure

2  that you didn't accidentally hit a vein?

3  A.        Nothing.

4  Q.        Okay.

5  A.        Made sure that I had a -- I chose a larger-type

6  muscle of the delt.

7            (Reporter clarification.)

8            THE WITNESS:  -- a large muscle.

9            ATTORNEY NISENBAUM: Q.  Do veins run through

10 muscle?

11 A.        Yes.

12 Q.        Okay.  And of course I know you're wearing

13 glasses, but they're not, like, specially enhanced with any

14 sort of X-ray vision or other thing that would allow you to

15 see where veins are and where they're not; right?

16 A.        Not yet, no, they are not special.

17 Q.        Maybe eventually.

18           But right now, the only technique that you know of

19 to avoid actually accidentally injecting into a vein, is to

20 aspirate the syringe; correct?

21           ATTORNEY KANTER:  Objection; misstates prior

22 testimony.

23           THE WITNESS:  Correct.

24           ATTORNEY NISENBAUM: Q.  Okay.  Continuing at 7:38.

25           (Playing designated video file, Exhibit 5.)

88

1          ATTORNEY NISENBAUM: Q.  Okay.  We're pausing now

2     at 7:42.

3          I take it, again, you don't know the officer's

4     name whose hand your hand is close to?

5     A.        I do not know his name.

6     Q.        Okay.  But that officer pulled Mr. Gutzalenko's --

7     the collar of his shirt back to open up the area where you

8     were going to inject him; correct?

9     A.        Yes --

10         ATTORNEY KANTER:  Are you asking if that's what

11    the video shows, or what he remembers?

12         ATTORNEY NISENBAUM: Q.  I asked you what happened.

13         Is that what happened?

14         ATTORNEY KANTER:  Based upon this video or what he

15    remembers?

16         ATTORNEY NISENBAUM:  Either way.

17         ATTORNEY KANTER:  Well, then, ask one of them

18    because it's compound.

19         ATTORNEY NISENBAUM: Q.  I'm asking you what

20    happened.  If you don't know, then I'll ask you a different

21    question.

22    A.        As I was getting ready to inject Gutzalenko with

23    the Versed, I grabbed the collar of his shirt, pulled it

24    down, then it popped back up over the side that I was going

25    to inject him.  That's when this particular officer reached

                                                        89

1    for the collar and pulled it down; holding it down.

2    Q.        Okay.  And that was to facilitate the injection of

3    the Versed; correct?

4              ATTORNEY FINE:  Vague and ambiguous; overbroad;

5    calls for speculation.

6              ATTORNEY KANTER:  Join.

7              THE WITNESS:  Correct.

8              ATTORNEY NISENBAUM: Q.  Okay.  All right.  And are

9    you right or left handed?

10   A.        Right handed.

11   Q.        And the syringe is in your right hand?

12   A.        Yes.

13   Q.        Now, at this point Mr. Gutzalenko was alive;

14   correct?

15   A.        Yes.

16   Q.        And he didn't appear to be violently resisting at

17   this point; correct?

18   A.        Correct.

19   Q.        Okay.  So why did you give him Versed at all at

20   this time?

21   A.        Because when you transfer a patient onto a gurney,

22   you have to take off the handcuffs, and that's one of the

23   most dangerous parts when you have a combative patient.

24             So if you have Versed on board, it can calm the

25   patient down, making it safer for everybody involved in that

                                                              90

1   situation.

2   Q.        If you accidentally give them too much Versed, you

3   could also kill the patient; right?

4             ATTORNEY KANTER:   Well, objection; incomplete

5   hypothetical; calls for speculation; calls for expert

6   opinion testimony.

7             ATTORNEY FINE:   Join.

8             THE WITNESS:   Correct.

9             ATTORNEY NISENBAUM: Q.  Okay.  So --

10            ATTORNEY NISENBAUM:  All right.  I have about a

11  half an hour before I have to leave and get my daughter.  I

12  can come back here, and we can finish this.  We'll have to

13  take about an hour or so break in between, if you guys are

14  okay with that.  It's like a lunch break.

15            But I've got a half an hour before I have to

16  leave.  I just want to tell you guys that.

17            ATTORNEY FINE:  How much more time do you think

18  you have?

19            ATTORNEY NISENBAUM:  Well -- I have more than half

20  an hour.  I mean, I don't have that much longer, but I can't

21  leave my daughter at school.

22            ATTORNEY FINE:  I've probably got ten minutes as

23  well.  So I guess it's up to Scott and his client.

24            ATTORNEY KANTER:  So you want to take a break now,

25  or you want to take a break in a half hour?  What are you

                                                              91

1   suggesting?

2           ATTORNEY NISENBAUM:  Take a break in half an hour.

3           ATTORNEY KANTER:  Okay.  And how long of a break

4   do you need to take?

5           ATTORNEY NISENBAUM:  I don't know.  Maybe less,

6   but.  You know, school is 25 minutes away.

7           ATTORNEY KANTER:  That's fine by me.

8           Damon, is that all right with you?  Do you --

9           THE WITNESS:  Yeah, that's fine.

10          ATTORNEY KANTER:  Okay.

11          ATTORNEY NISENBAUM:  Thank you.

12          ATTORNEY NISENBAUM: Q.  All right.  So we're at

13  7:42.  Hit Play.

14          (Playing designated video file, Exhibit 5.)

15          ATTORNEY NISENBAUM: Q.  Okay.  Pausing at 7:48.

16          Someone said "Never mind, you got that.  That's

17  the good stuff."  Do you know whose voice that is?

18          ATTORNEY FINE:  Calls for speculation.

19          ATTORNEY NISENBAUM: Q.  If you know.

20  A.      One of the police officers, I think.

21  Q.      Okay.  And the video just showed you injecting

22  Mr. Gutzalenko with the midazolam or Versed in the left

23  deltoid without checking to see whether or not you hit a

24  vein; correct?

25          ATTORNEY KANTER:  Well, objection; it's vague and

                                                          92

1   ambiguous and it's overly broad.

2           You mean besides the fact that he's injecting it

3   in the deltoid?

4           ATTORNEY NISENBAUM:  I mean what I said.

5           ATTORNEY KANTER:  All right.  Those are my

6   objections.

7           You can answer.

8           THE WITNESS:  Correct.

9           ATTORNEY NISENBAUM: Q.  Thank you.

10          We're at 7:48.  I'm going to hit Play.

11          (Playing designated video file, Exhibit 5.)

12          ATTORNEY NISENBAUM: Q.  Someone said -- pausing at

13  7:51.

14          Someone said "Ah, we're doing great.  He's

15  unconscious, so that's good."

16          Do you know who said that?

17          ATTORNEY FINE:  Calls for speculation.

18          ATTORNEY KANTER:  Join.

19          THE WITNESS:  I don't know.

20          ATTORNEY NISENBAUM: Q.  Was it you?

21  A.      No, it was not.

22  Q.      Okay.

23          (Playing designated video file, Exhibit 5.)

24          ATTORNEY NISENBAUM: Q.  Okay.  So we're at 8:07.

25          After you injected Mr. Gutzalenko, what did you do

                                                              93

1  to make sure that you had, for example, breathing equipment

2  or other equipment in case he had a reaction to the Versed?

3  A.        I had my entire ambulance fully stocked.

4  Q.        Okay.  And were you paying attention to him?

5  A.        Yes.

6          ATTORNEY KANTER:  Objection; vague; ambiguous;

7  overly broad.

8          ATTORNEY NISENBAUM: Q.  Were you monitoring his

9  breathing; for example, counting how many breaths per every

10 ten seconds or something like that?

11         ATTORNEY KANTER:  Same objections; lacks

12 foundation.

13         THE WITNESS:  I was not counting them, but I was

14 watching him breathe.

15         ATTORNEY NISENBAUM: Q.  Okay.  Were you keeping

16 your hand on his pulse?

17 A.        Not at that point.

18 Q.        Was anyone monitoring his pulse?

19         ATTORNEY FINE:  Calls for speculation.

20         THE WITNESS:  Not that I remember.

21         ATTORNEY NISENBAUM: Q.  Okay.  I'm going to pull

22 up the next exhibit.

23         And this will be -- I don't think I made this an

24 exhibit yet.  This is the Pfizer midazolam injection

25 warning.

                                                        94

1                    (Plaintiffs' Exhibit 6 marked

2                    for identification.)

3          ATTORNEY NISENBAUM:  Stop the Share there.

4          Start the Share again.

5          ATTORNEY NISENBAUM: Q.  Okay.  I assume you've

6    never seen this warning label for midazolam before?

7    A.        I have not.

8    Q.        Do you know if the warning labels for the same

9    drugs are the same for each brand?  Even though it's a

10   different brand, it's the same drug -- is it the same

11   warning label, in your experience?

12         ATTORNEY KANTER:  Objection; calls for

13   speculation; lacks foundation.

14         You can answer.

15         ATTORNEY FINE:  Join.

16         THE WITNESS:  I don't know.  I don't see the

17   warning labels, like I said earlier.

18         ATTORNEY NISENBAUM: Q.  Have you ever asked to see

19   the warning labels of the drugs that you use in emergency

20   care?

21   A.        No.

22   Q.        Do you simply rely on your -- on the company you

23   work for -- in this case AMR West -- to provide you the

24   proper training?

25         ATTORNEY KANTER:  Objection; I think it misstates

                                                      95

 1    testimony.  He's also relying upon the County guidelines.

 2            You can answer.

 3            THE WITNESS:  Yeah, I rely on AMR and the County.

 4            ATTORNEY NISENBAUM: Q.  Okay.  Is there -- do you

 5    do, like, an independent study?

 6            ATTORNEY KANTER:  Objection; vague and ambiguous;

 7    overly broad.

 8            ATTORNEY NISENBAUM: Q.  Well, as lawyers we have

 9    something called CLE.  We're required to take ongoing

10    classes to stay up to date.

11            Do you have to do the same thing?

12    A.      Yes.

13    Q.      Okay.  And does any of that include warning labels

14    on drugs?

15    A.      No.

16    Q.      Okay.  Does any of that include warnings in the

17    use of certain drugs?

18    A.      Depending on what class we take, sometimes they

19    do; sometimes they don't.

20    Q.      Have you ever taken a class where Versed or

21    midazolam was discussed?

22    A.      Yes.

23    Q.      Okay.  And in what context?

24    A.      During our quarterly trainings and our -- if there

25    is any changes to the protocol on the amount -- the dosage

                                                              96

1    of a drug that we give, our AMR will put on a class before

2    that policy takes -- changes.

3    Q.         So looking at this -- sorry, I just did

4    something -- okay.   There we go.

5              So I just highlighted a section in the warnings

6    of -- this is for the Pfizer midazolam injection warning.

7              Under "Individualization of Dosage," it says

8    "Midazolam must never be used without individualization of

9    dosage.   The initial intravenous dose for sedation in adult

10   patients may be as little as 1 milligram, but should not

11   exceed 2.5 milligrams in a normal healthy adult."

12             So obviously 2.5 milligrams is half the dosage of

13   a -- of what the County recommendations are at 5 milligrams;

14   correct?

15   A.         For intravenous.   I gave it intramuscular.

16   Q.         I see.   Intravenous.

17             Well, you thought you gave it intramuscular, but

18   you don't know whether it was intravenous or intramuscular;

19   correct?

20             ATTORNEY KANTER:   Objection; argumentative; lacks

21   foundation.

22             THE WITNESS:   Correct.

23             ATTORNEY NISENBAUM:   Okay.

24             ATTORNEY KANTER:   I'd like to take a break.

25             ATTORNEY NISENBAUM:   Okay.   I'm --

97

1          ATTORNEY KANTER:  I'm going to take a break.

2          ATTORNEY NISENBAUM:  Five minutes?

3          ATTORNEY KANTER:  Yeah.

4          ATTORNEY NISENBAUM:  All right.  Five minutes.

5          (Recess:  12:26 P.M. to 12:28 P.M.)

6          ATTORNEY NISENBAUM: Q.  I --

7          ATTORNEY KANTER:  Oh, one second.  I think -- I

8    think Mr. Richardson would like to clarify his last answer.

9          ATTORNEY NISENBAUM:  I'm sorry.  Was there a --

10   was there a private consultation during the break?

11         ATTORNEY KANTER:  I'm just telling you that he'd

12   like to clarify his last answer.

13         ATTORNEY NISENBAUM:  Well, if there was private

14   consultation during the break, that is improper.  That

15   should not happen during a deposition.  Unless it's to

16   assess a privilege; that's the only reason there should be

17   private consultation during a deposition.

18         ATTORNEY KANTER:  I talked with him during the

19   break, and that's what he told me: he wanted to make a

20   clarification about his answer, and that's why I'm telling

21   you that.

22         ATTORNEY NISENBAUM:  Okay.  I mean, my point

23   remains.

24         ATTORNEY KANTER:  So does mine.

25         ATTORNEY NISENBAUM: Q.  What clarification are you

                                                         98

1  trying to make?

2  A.      I believe I said "correct" to the administration

3  of Versed via intravenous, when in fact you can see on the

4  video I gave it intramuscularly.

5  Q.      Oh.

6  A.      Giving it intramuscularly, I still cannot be sure

7  if it actually hit a vein or not.  But I did give this

8  medication intramuscularly.

9  Q.      Well, you gave it, and you didn't do anything to

10  check whether you had hit a vein; correct?

11          ATTORNEY KANTER:  I'll object it misstates his

12  prior testimony; it's argumentative in the sense he's

13  already also testified he intramuscularly administered it in

14  the deltoid.

15          You can answer.

16          THE WITNESS:  Correct.  And like I said before,

17  it's been -- gone out of practice to draw back on a syringe

18  in these types of situations.

19          ATTORNEY NISENBAUM: Q.  Well, that's -- I thought

20  you said it was because the person was so aggressive; they

21  were moving; they were thrashing; they were flailing when

22  you gave it to them, that it made it impractical to do.

23  Impractical to aspirate the syringe.

24          ATTORNEY KANTER:  Objection; misstates testimony.

25          THE WITNESS:  I think I said it could cause more

99

1    damage.

2            ATTORNEY NISENBAUM: Q.  It could cause more damage

3    because they were thrashing, moving violently, jerking --

4    you know -- doing things like that.

5            Correct?

6    A.      Correct.

7    Q.      That was not the case with Mr. Gutzalenko when you

8    injected him, though, was it?

9    A.      Not at that time.

10   Q.      Okay.  So you had the time -- had you chosen to

11   take it, you had the time and the opportunity to aspirate

12   the syringe; correct?

13   A.      Yes.

14   Q.      Okay.  Thank you.

15           All right.  We were at 8:07.  I'm going to

16   continue.

17           (Playing designated video file, Exhibit 5.)

18           THE WITNESS:  Is this a video that we're watching?

19           ATTORNEY NISENBAUM: Q.  This is the video -- oh,

20   I'm sorry.  Let me go back.  I forgot to change the Share.

21           So I've gone back a little bit.  We're at 8:52

22   [sic].  I'm going to hit Play.

23           (Playing designated video file, Exhibit 5.)

24           ATTORNEY NISENBAUM: Q.  Go forward.

25           (Playing designated video file, Exhibit 5.)

                                                    100

1    ATTORNEY NISENBAUM: Q.  All right.  Pausing at

2  7:58.

3    Someone said "Ivan, can you breathe?"  Was that

4  you?

5  A.    I don't think so.

6    I didn't hear that.  Can you replay that?

7  Q.    I think it was "Ivan?  Can you breathe, buddy?"

8    I'm at 7:42.

9    (Playing designated video file, Exhibit 5.)

10    ATTORNEY NISENBAUM: Q.  Did you hear it there?

11  "Ivan?  Can you breathe, buddy?"

12  A.    Yes.

13  Q.    Okay.  Was that you?

14  A.    No.

15  Q.    Okay.  Someone said "He's unconscious, so that's

16  good," or words to that effect.  Do you know who that was?

17    ATTORNEY FINE:  Calls for speculation.

18    ATTORNEY KANTER:  Join.

19    THE WITNESS:  I do not.

20    ATTORNEY NISENBAUM: Q.  Okay.  Do you know if it

21  was you?

22  A.    It was not me.

23  Q.    Okay.  Continuing, 7:56.

24    (Playing designated video file, Exhibit 5.)

25    ATTORNEY NISENBAUM: Q.  Pausing at 8:03.

101

BARBARA J. BUTLER & ASSOCIATES - Certified Court Reporters
(510) 83-BUTLER (28853) or (408) 248-BUTLER (2885) - bbreporter.courtreporting@gmail.com

1          Let me ask you.  What is your best recollection

2  of what the last volitional movement Mr. Gutzalenko made

3  was?

4          ATTORNEY FINE:  Calls for speculation.

5          ATTORNEY KANTER:  Yeah, join.

6          Lacks foundation.

7          ATTORNEY FINE:  Join.

8          Calls for expert opinion.

9          ATTORNEY KANTER:  Again, I'll join with that as

10  well.

11          THE WITNESS:  I'm not sure.

12          ATTORNEY NISENBAUM: Q.  Okay.  Well, as you think

13  about it in your own personal recollection, can you recall a

14  time that he -- that Mr. Gutzalenko was making volitional

15  movements?

16          ATTORNEY FINE:  Same objections.

17          ATTORNEY KANTER:  Yeah.  Join.

18          If you remember, you can answer.

19          THE WITNESS:  Before I went to get the ambi- -- or

20  the Versed drawn up in the ambulance.

21          ATTORNEY NISENBAUM: Q.  Right.

22          It's fair to say that when you came back with the

23  Versed, you don't have a recollection of Mr. Gutzalenko

24  making volitional movements; correct?

25          ATTORNEY FINE:  Same objections.

                                                        102

 1          ATTORNEY KANTER:  Vague and ambiguous; lacks
 2   foundation; calls for speculation.
 3          ATTORNEY FINE:  Join.
 4          THE WITNESS:  Correct.
 5          ATTORNEY NISENBAUM: Q.  Okay.  I'll continue.
 6   We're at 8:03.
 7          (Playing designated video file, Exhibit 5.)
 8          ATTORNEY NISENBAUM: Q.  Okay.  We're at 8:46.
 9          And that's you -- are we looking at your back
10   here?
11   A.      Yes.
12   Q.      Okay.  All right.  And it looks like you're trying
13   to revive Mr. Gutzalenko?
14   A.      I was trying to see his alert and oriented -- or
15   see how alert he was.  I wasn't trying to revive him; I was
16   trying to see how alert he was.
17   Q.      Okay.  You're saying -- did you say, I think --
18   "Ivan, can you breathe?  Are you there?  Wake up, buddy?"
19          Play it again.  Go to 8:31.
20          (Playing designated video file, Exhibit 5.)
21          ATTORNEY NISENBAUM: Q.  "Ivan?  Can you breathe,
22   buddy?"  That was your voice; right?
23   A.      I don't know.  I don't remember saying that.
24   Q.      Okay.  Do you recognize your voice?
25   A.      I do -- I --

                                                      103

1    ATTORNEY KANTER:  Asked and answered, but you can

2    answer again.

3    THE WITNESS:  I do recognize my voice, but I don't

4    think that that sounded like me at that time.

5    (Playing designated video file, Exhibit 5.)

6    ATTORNEY NISENBAUM: Q.  So is it the officer

7    saying "Wake up, buddy?  Are you there?"

8    ATTORNEY FINE:  Calls for speculation.

9    ATTORNEY KANTER:  Join.

10    THE WITNESS:  I think so.

11    ATTORNEY NISENBAUM: Q.  Okay.  And he's turned

12    blue in the face; correct?

13    A.    Correct.

14    ATTORNEY KANTER:  Objection; vague and ambiguous;

15    overly broad.

16    You can answer.

17    ATTORNEY FINE:  Join.

18    THE WITNESS:  Correct.

19    ATTORNEY NISENBAUM: Q.  Well, someone actually

20    noticed it and they say it.  I'll play it.

21    (Playing designated video file, Exhibit 5.)

22    ATTORNEY NISENBAUM: Q.  Pausing at 8:53.

23    So someone said "Hey, he's getting blue in the

24    face."

25    What does that mean medically, as far as you know?

104

1     ATTORNEY KANTER:  Objection; lacks foundation; it

2  calls for speculation.

3     ATTORNEY FINE:  Join.

4     THE WITNESS:  Usually there has been a compromise

5  in the cardiovascular system or in the respiratory system.

6     ATTORNEY NISENBAUM: Q.  Okay.  It means -- as far

7  as you're aware, it means that there is not -- well, the

8  blue is called cyanosis; right?

9  A.     Correct.

10  Q.     And cyanosis is a lack of oxygenation of the

11  blood; correct?

12  A.     Correct.

13  Q.     Okay.  And when you see a person you're treating

14  medically after you've given them Versed, and they turn

15  cyanotic -- isn't there a reversal -- a reversal drug that's

16  to be used?

17     ATTORNEY KANTER:  Objection; calls for expert

18  opinion testimony; incomplete hypothetical.

19     THE WITNESS:  Yes, there is, but Contra Costa AMR

20  does not supply us with that.

21     ATTORNEY NISENBAUM: Q.  So they supply you with

22  the drug -- with the drug that can be lethal, but they don't

23  give you the reversal agent for it?

24     ATTORNEY KANTER:  Objection; argumentative.

25     ATTORNEY NISENBAUM: Q.  Is that right?

105

1    A.         Correct.

2    Q.         Okay.  Well, what about AMR?

3    A.         I thought we were talking about AMR.  AMR, who I

4    was working --

5    Q.         You were talking about the County.  You said

6    Contra Costa County, but we're talking about AMR West.

7               AMR West supplies you with the drug -- the

8    midazolam that you use on people that you know can be

9    lethal, but they do not give you the reversal agent for an

10   overdose when it occurs.  Of midazolam.

11              Is that correct?

12              ATTORNEY KANTER:  Objection; argumentative.

13              THE WITNESS:  That is correct because Contra Costa

14   County does not let us use that drug, so AMR cannot let us

15   use that drug.

16              ATTORNEY NISENBAUM: Q.  Okay.  Do you know why

17   Contra Costa County -- what's it called, the name of that

18   drug?

19   A.         I can't remember the name.

20   Q.         Okay.  Well, I actually have it.  If you'll give

21   me a moment.

22              Is it Flumazenil?

23   A.         Say it one more time?

24   Q.         I'm not sure if I'm pronouncing it correctly, but

25   Flumazenil?

1    A.       "Flumazenil."

2    Q.       Yeah.  Is that it?

3    A.       Yes.

4    Q.       Did you consider that Mr. Gutzalenko had suffered

5    an overdose of midazolam?

6    A.       It was one of the considerations.

7    Q.       Okay.  So did you tell anyone -- ask anyone -- did

8    you tell that to anyone?

9    A.       No, because it wouldn't matter to the rest of the

10    people on the scene because they didn't have the medical

11    authority that I had.

12    Q.       Could you have gotten Flumazenil there to the

13    scene?

14    A.       No.

15    Q.       Is it just not allowed anywhere in Contra Costa

16    County?

17    A.       Not for use on an ambulance.

18    Q.       Okay.  Is it used -- is it allowed to be used in a

19    hospital?

20    A.       Yes.

21    Q.       Okay.  I've got a couple more minutes before I

22    have to leave.  We're at 8:53.

23           (Playing designated video file, Exhibit 5.)

24           ATTORNEY NISENBAUM:  Q.  We're at 9:01.

25           Someone said, I think, "Is he coding?"  But I'm

107

1  not positive.  And I think you responded "Yeah, pretty

2  much."

3          Do you know what was said there?

4  A.      I think that you -- what you just said was what

5  was stated.

6  Q.      Okay.  "Coding" means a person is dying; right?

7  A.      Yes, going into cardiac and/or respiratory arrest.

8  Q.      We're at 9:01; continuing.

9          (Playing designated video file, Exhibit 5.)

10         ATTORNEY NISENBAUM: Q.  Pausing at 9:33.

11         The LUCAS device is the automated chest pumper?

12  A.      Correct.

13         ATTORNEY NISENBAUM:  Okay.  I think I have to go.

14         All right.  So let's take that break -- hour

15  break.  We'll start again at 1:45.  I really don't have a

16  huge amount longer, but -- you know, maybe a half an hour,

17  I'm guessing.

18         ATTORNEY KANTER:  Okay.  We'll see you back then.

19         ATTORNEY NISENBAUM:  Okay.

20         ATTORNEY FINE:  So 1:45.  Okay.

21         (Lunch recess:  12:44 P.M. to 1:46 P.M.)

22                      --o0o--

23

24

25

                                                        108

1                    AFTERNOON SESSION

2                  EXAMINATION (RESUMED)

3    BY ATTORNEY NISENBAUM:

4    Q.        I'm going to go back to sharing the screen.  Back

5    to the video.

6              All right.  I'm going to continue.  We're at 9:29.

7    I'll hit Play.

8              (Playing designated video file, Exhibit 5.)

9              ATTORNEY NISENBAUM:  Q.  I'll pause it at 9:41.

10             The person performing CPR is who?

11   A.        It looks like Dan Burnett.

12   Q.        Okay.  Continuing at 9:41.

13             (Playing designated video file, Exhibit 5.)

14             ATTORNEY NISENBAUM:  Q.  Pausing at 9:46.

15             They're asking about -- the officers are asking

16   about Narcan.  Do you recall that?

17   A.        I don't remember it at that time, but the video

18   says otherwise.

19   Q.        Okay.  So -- and you don't mention anything about

20   a possible reaction to the Versed or midazolam; correct?

21   A.        Correct.

22   Q.        Continuing at 9:46.

23             (Playing designated video file, Exhibit 5.)

24             ATTORNEY NISENBAUM:  Q.  I'm pausing at 10:03.

25             You mentioned -- you've testified that the

                                                          109

1  practice of aspirating a syringe when you inject

2  intramuscularly is no longer practiced in your experience.

3         Is there -- do you have any documentation to back

4  that up that you can point me to?

5  A.       No documentation.  It's what we've been discussing

6  in our person -- in-person classes.

7  Q.       Okay.  Well, since this happened, have you taken

8  in-person classes?  Or Zoom classes?  Either/or?

9  A.       Yeah, I've taken in-person classes, but nothing

10 regarding administration of Versed unless it was with our

11 quarterly updates at AMR.

12 Q.       No, I meant -- I'm just talking about -- I assume

13 other drugs get administered intramuscularly as well; right?

14 A.       Some.

15 Q.       So for any of them, have you had classes where --

16 well, strike that.

17        What classes have you discussed not -- not

18 aspirating the plunger?  Or the syringe?

19 A.       Mainly during the classes where we go over the use

20 of Versed and/or epinephrine or IN injections.

21 Q.       Does epinephrine carry the same type of overdose

22 risk as Versed?

23 A.       No, it has a -- it's a different type of

24 medication.

25 Q.       Okay.  So the issue, obviously, with Versed is you

                                                          110

1   can overdose and die from it.

2           Can you overdose and die from epinephrine?

3           ATTORNEY KANTER:  Objection; lacks foundation;

4   calls for speculation; calls for an expert opinion.

5           You can answer.

6           ATTORNEY FINE:  Join.

7           ATTORNEY NISENBAUM: Q.  Based on your training.

8           ATTORNEY KANTER:  Same objections.

9           You can answer.

10          THE WITNESS:  It can have harmful effects.

11          ATTORNEY NISENBAUM: Q.  Okay.  Lethal effects?

12          ATTORNEY KANTER:  Same objections.

13          THE WITNESS:  Yes.

14          ATTORNEY NISENBAUM: Q.  And is that dependent on

15  whether you deliver it intramuscularly as opposed to

16  intravenously?

17          ATTORNEY KANTER:  Same objections, and also an

18  incomplete hypothetical.

19          THE WITNESS:  Yes.

20          ATTORNEY NISENBAUM: Q.  Okay.  So the same type of

21  risk applies for epinephrine as Versed if you're intending

22  to administer intramuscularly but accidentally hit a vein.

23          ATTORNEY KANTER:  Objection; vague and ambiguous;

24  overly broad; lacks foundation; incomplete hypothetical.

25          THE WITNESS:  Yes.

                                                        111

1          ATTORNEY NISENBAUM: Q.  Okay.  So what -- in the

2    classes that you had where this has been discussed -- well,

3    let me ask you.

4          Can you tell me a specific -- the name of a

5    specific class where it's been discussed?

6    A.        These have been all of the update classes that

7    we're required to take by American Medical Response in

8    Contra Costa County.  Every quarter we have our quarterly

9    trainings, and they discuss different aspects of our job

10   during these trainings.

11         The Versed is also discussed -- like I said

12   earlier -- whenever there is a change to the protocol.

13   Q.        Okay.  Is it presented in a PowerPoint-type

14   format?  Do you have handouts?  How -- what documents

15   accompany the presentation?

16   A.        It's usually an in-person class with -- well,

17   during COVID it was via Zoom.  But it's usually a person

18   speaking at a podium with a PowerPoint.

19   Q.        On any of the PowerPoint slides, do you recall

20   whether anything -- there was any discussion about

21   aspiration of a syringe when administering either Versed or

22   epinephrine?

23   A.        I don't remember.

24   Q.        Okay.  Is there anything that says not to do it?

25   A.        I don't recall.

                                                              112

1           ATTORNEY KANTER:  Belated objection; it's vague

2    and ambiguous, and it's overly broad.

3           Are you talking about these PowerPoint

4    presentations?

5           ATTORNEY NISENBAUM: Q.  Well, whether at a

6    PowerPoint presentation or some other training.

7           ATTORNEY KANTER:  All right.  I'll just object,

8    but you -- you can answer it again if you like, or maybe

9    you've already answered.

10          THE WITNESS:  Okay.

11          I don't recall.

12          ATTORNEY NISENBAUM: Q.  Okay.  I think you told

13   me, if I understood correctly, there could be some damage if

14   the person is jerking or, you know, still thrashing around.

15          What type of damage would occur by aspirating the

16   syringe if a person were jerking or moving around?

17          ATTORNEY KANTER:  Objection; vague and ambiguous;

18   overly broad; lacks foundation; incomplete hypothetical;

19   calls for expert opinion.

20          You can answer if you're able.

21          THE WITNESS:  It's not the aspiration that can

22   cause the damage; it's the needle inside the arm when the

23   person is thrashing around that causes the damage.

24          ATTORNEY NISENBAUM: Q.  Okay.  Like, the needle

25   could break off?

113

1    A.        It could bend; it could break off; it can damage

2    tissue underneath the skin.

3    Q.        Okay.  All right.  But when a person is not

4    thrashing around, is there -- is it your understanding that

5    the change around aspiration of the syringe applies even if

6    the person is not thrashing around or not moving

7    significantly?

8              ATTORNEY KANTER:  Objection; incomplete

9    hypothetical; vague and ambiguous.

10             THE WITNESS:  Historically, no.  It's a practice

11   that hasn't really been practiced in EMS for quite some

12   time.

13             And also it's based on the location that we give

14   the injections.  You know, the deltoid or the thigh are

15   specifically chosen because you're less likely to cause

16   damage to any significant vascular structure.

17             ATTORNEY NISENBAUM:  Q.  So I'm trying to

18   understand this because I don't see it anywhere.

19             There is a pretty distinct -- on the adult

20   behavioral chart, a pretty -- I would say substantial

21   difference in how much midazolam you're supposed to give

22   depending on whether it's intravenous or intramuscular.

23             And so without knowing whether you're in a vein,

24   it sounds like it's a crapshoot.

25             ATTORNEY KANTER:  Objection -- go ahead.  Are you

                                                      114

1    finished with your question?

2              ATTORNEY NISENBAUM:  (Inaudible.)

3              ATTORNEY KANTER:  Are you finished with your

4    question?

5              ATTORNEY NISENBAUM:  Yes.

6              ATTORNEY KANTER:  I object it's argumentative;

7    it's -- lacks foundation.

8              Do you understand the question?

9              THE WITNESS:  Not really.  Can you ask it again?

10             ATTORNEY NISENBAUM: Q.  Well, you wouldn't know

11   whether you hit a vein or not unless you checked by

12   aspiration; right?

13             ATTORNEY KANTER:  Well, I'll object it's vague and

14   ambiguous and overbroad in the sense that the question

15   doesn't make clear whether you're administering it

16   intramuscularly or intravenously.  But --

17             ATTORNEY NISENBAUM: Q.  Well, assuming that

18   you're -- okay, I'll rephrase it.

19             You know the term "crapshoot"; right?

20             ATTORNEY KANTER:  Objection; calls for

21   speculation; lacks foundation; argumentative.

22             THE WITNESS:  Yes.

23             ATTORNEY NISENBAUM: Q.  It means you're leaving it

24   up to chance; right?

25             ATTORNEY KANTER:  Same objections.

1          THE WITNESS:  Yes.

2          ATTORNEY NISENBAUM:  Q.  Okay.  And so if I

3    understand you correctly.  You knew at the time of this

4    incident with Mr. Gutzalenko, that if you injected him in a

5    manner that caused an intravenous injection of midazolam,

6    that it would be far more dangerous for him than if it were

7    given to him intramuscularly, whether you intended the

8    intravenous or not; correct?

9          ATTORNEY KANTER:  I'll just object that it lacks

10   foundation and it misstates testimony.

11         You can answer.

12         THE WITNESS:  I gave him the injection in the

13   deltoid, like I said earlier, because that's one of the

14   places that has been determined to have less vascular

15   structure and less likely to administer it into a vein that

16   way.

17         ATTORNEY NISENBAUM:  Q.  I understand, but that

18   doesn't mean that there is no veins.  So it's still a

19   crapshoot unless you check; right?

20         ATTORNEY KANTER:  I'll object it misstates his

21   testimony; it's very argumentative.

22         You can answer.

23         THE WITNESS:  It's possible, but I doubt if I

24   would even get drawback even if I did hit a vein.

25         ATTORNEY NISENBAUM:  Q.  Why wouldn't you get

116

1    drawback if you did --

2    A.        Numerous reasons.  The structure of the vein; the

3    size of the vein; how the patient would be positioned when

4    aspirating.

5    Q.        Okay.  All right.  So if it were a smaller vein,

6    you would be less likely to get drawback?

7    A.        Correct.

8    Q.        And what about the body positioning of the person

9    would change how likely you are to get drawback of blood?

10   A.        If an arm was farther back behind the patient, you

11   might alter the position of some veins when you stick the

12   needle in.

13   Q.        Okay.  But the needle would still be where it was;

14   right?

15             ATTORNEY KANTER:  Objection; misstates testimony.

16             ATTORNEY NISENBAUM:  Q.  Go ahead.

17   A.        The needle would still be in the deltoid.

18   Q.        It would be in the deltoid, and I'm only asking

19   what is the harm -- in the situation that Mr. Gutzalenko was

20   in, what is the harm in aspiration?  He's not resisting at

21   that time.  What's the harm?

22             ATTORNEY KANTER:  Objection; vague and ambiguous;

23   overly broad; argumentative.

24             You can answer.

25             THE WITNESS:  No harm, I guess.

                                                              117

1      ATTORNEY NISENBAUM: Q. So there was no reason not

2  to aspirate at that time; correct?

3      ATTORNEY KANTER: Objection; misstates testimony;

4  it's argumentative; vague and ambiguous; incomplete

5  hypothetical.

6      You can go ahead.

7      THE WITNESS: Like I said before, it's been a

8  practice that hasn't been very common.

9      ATTORNEY NISENBAUM: Q. Well, you say that; my

10 information is different.

11      But my question to you is there is no harm that

12 that -- given that Mr. Gutzalenko -- at the time you came

13 back with the syringe -- that Mr. Gutzalenko was handcuffed;

14 he was conscious -- well, strike that.

15      Was he conscious?

16      ATTORNEY KANTER: Objection; lacks foundation;

17 calls for speculation; calls for an expert opinion.

18      ATTORNEY FINE: Join.

19      ATTORNEY KANTER: You can answer.

20      THE WITNESS: I'm sorry? What was that last part?

21      ATTORNEY KANTER: You can ans- -- you can answer.

22      ATTORNEY NISENBAUM: Q. Was Mr. Gutzalenko

23 conscious when you injected him?

24      ATTORNEY KANTER: Same objections.

25      You can answer.

118

1    ATTORNEY FINE:   Join.

2    THE WITNESS:   At the time, I thought so.

3    ATTORNEY NISENBAUM: Q.   You thought so because his

4    eyes were open; correct?

5    A.    And he was breathing.

6    Q.    His eyes were open; he was breathing; he had

7    calmed down a lot.   Correct?

8    A.    Correct.

9    Q.    Okay.  And then you just went ahead and injected

10   him with the Versed; right?

11   ATTORNEY KANTER:  Objection --

12   THE WITNESS:  Right.

13   ATTORNEY KANTER:  -- argumentative.

14   You can answer.

15   THE WITNESS:  Correct.

16   ATTORNEY NISENBAUM: Q.  Okay.  So at that point,

17   he was not in a state of excited delirium, was he?

18   ATTORNEY KANTER:  Objection; calls for an expert

19   opinion; lacks foundation; calls for speculation.

20   ATTORNEY FINE:  Join.

21   ATTORNEY NISENBAUM: Q.  Based on your training.

22   ATTORNEY KANTER:  Same objections.

23   ATTORNEY FINE:  Join.

24   THE WITNESS:  I don't know if he was in excited

25   delirium or if he was still agitated.

119

1          ATTORNEY NISENBAUM: Q.  Well, when you injected

2    him at that time -- strike that.

3          After you came back from the ambulance with the

4    shot of Versed and you observed Mr. Gutzalenko, he was no

5    longer exhibiting extreme aggression or violence; correct?

6    A.        Correct, at that time.

7    Q.        He did not appear to be, at that time, exhibiting

8    increased strength; correct?

9    A.        Correct.

10   Q.        And from what you could tell, he was not

11   hyperthermic; correct?

12   A.        Correct.

13   Q.        In fact, you noted in the medical -- in the

14   medical records that his skin was warm.  W-a-r-m, warm.

15             Correct?

16   A.        I believe so, if that's what my PCR says.

17   Q.        Well, it does say that.

18             Nowhere does it say that he was hot.

19             So at the time that you injected Mr. Gutzalenko,

20   you could have injected 1 millimeter -- 1 milliliter of --

21   I'm sorry -- 1 milligram of midazolam; correct?

22   A.        That's not what our protocol states.

23   Q.        Well, the protocol on the left side for aggressive

24   or agitated, possible psychosis, possible danger to self or

25   others: midazolam 5 milligrams, or midazolam 1- to

                                                    120

1    3-milligram IV -- oh, I see.  That's IV.

2           So that protocol would say 5 milligrams, period.

3    Maximum of 5 milligrams.  Correct?

4    A.        Correct.

5           ATTORNEY KANTER:  Well, it says maximum 10

6    milligrams.

7           ATTORNEY NISENBAUM: Q.  That's on the right side.

8    That's under the Excited Delirium Syndrome chart.

9           On the left side it says maximum 5 milligrams for

10   the aggressive or agitated, possible psychosis, possible

11   danger to self or others.

12          I can pull it up, but -- am I right,

13   Mr. Richardson?

14   A.        I believe so, without looking at it, yes.

15   Q.        Okay.  You also had the option to not give

16   Mr. Gutzalenko Versed at all when you returned with it --

17   (Audio interruption.)

18          THE REPORTER:  I'm sorry.  I didn't hear the very

19   end.  Sorry.

20          ATTORNEY NISENBAUM: Q.  -- and noted that he was

21   apparently unconscious; correct?

22          ATTORNEY KANTER:  I'll object that misstates the

23   testimony; it's argumentative.

24          ATTORNEY FINE:  Join.

25          ATTORNEY KANTER:  Lacks foundation.

                                                          121

1           You can answer.

2           ATTORNEY FINE:  Join.

3           THE WITNESS:  I didn't think he was unconscious at

4  the time because I saw his eyes were open and he was still

5  breathing.

6           ATTORNEY NISENBAUM: Q.  Okay.  I see.

7           But again, he wasn't moving aggressively at that

8  time; he wasn't moving significantly at that time.  Correct?

9  A.        Correct.

10  Q.        Did you think he was suffering a medical

11  emergency?

12  A.        I thought he was suffering a medical emergency,

13  but I wasn't sure what kind.

14  Q.        And did you know what drugs he had taken?

15  A.        No.

16  Q.        So how would you know whether or not -- whether or

17  not midazolam would interfere with whatever drugs he may

18  have taken?

19  A.        We don't have the luxury of having a lab to be

20  able to do blood samples before we give these medications,

21  so it's got to be a best guess scenario based on the limited

22  information that we have.

23  Q.        Well, when the person has calmed down in a manner

24  that he had when you came back -- you know, a person that,

25  you know, was hardly moving -- don't you have an -- aren't

1  you supposed to reevaluate the situation?

2          ATTORNEY KANTER:  I'm going to object.  You're --

3  the question is asking for an expert opinion at this point.

4          ATTORNEY NISENBAUM: Q.  Based on your training,

5  aren't you supposed to reevaluate the situation?

6          ATTORNEY KANTER:  Yeah, same objections.

7          The way you've -- the way you have asked the

8  question, you're asking for him to retrospectively determine

9  whether or not he should have done something else, and

10 that's asking for expert opinion testimony.  I'm directing

11 him not to answer.

12         ATTORNEY NISENBAUM:  That's totally inappropriate.

13 There is no grounds to not answer that question.

14         ATTORNEY KANTER:  When you're calling for

15 retrospective expert opinion testimony, it's totally

16 appropriate.

17         ATTORNEY NISENBAUM: Q.  I'm not calling for

18 retrospective expert opinion testimony; I'm asking you based

19 on your training -- based on your training, right?  You have

20 been trained, and you were trained, for 20 years as an EMT

21 paramedic; right?

22 A.        At that time, I think it was 17 years.

23 Q.        Okay.  Right, that -- currently it's 20; at that

24 time 17.

25         That training tells you that before you give a

123

1   medication -- a sedative like Versed -- you should

2   reevaluate the subject to see if it's still appropriate to

3   give the Versed; correct?

4           ATTORNEY KANTER:  I'll object it's an incomplete

5   hypothetical; I think it does call for expert opinion.

6           You can answer about your training.

7           THE WITNESS:  We have been trained to reevaluate

8   patients multiple times.

9           ATTORNEY NISENBAUM: Q.  Okay.  Including after

10  some period of time has passed.  Because you went to go draw

11  up the Versed, you come back, and there appears to be a

12  change in the person's alertness or orientation -- their

13  medical status -- correct?

14  A.      There did appear to be a change.

15  Q.      Okay.

16          ATTORNEY KANTER:  Well, he's not asking about --

17  you're not asking about this particular situation; you're

18  asking about his training.  Correct?

19          ATTORNEY NISENBAUM: Q.  I'm asking about your

20  training.  But again, when there is a change in the person's

21  medical status in between the time you go get a medication

22  to where the medication is for the purpose of remedying the

23  person's status, you're supposed to reevaluate them before

24  you give it; correct?

25          ATTORNEY KANTER:  And this is, again, based upon

124

1    when he was trained?

2              ATTORNEY NISENBAUM:   Yes.

3              ATTORNEY KANTER:   I'll object that it's an

4    incomplete hypothetical; vague and ambiguous; and it calls

5    for expert opinion.

6              But I'll let you answer it based on your training.

7              THE WITNESS:   Yes, I have been trained to

8    reevaluate patients during changes in their appearance.

9              ATTORNEY NISENBAUM: Q.   Okay.   And

10   Mr. Gutzalenko's appearance had changed between the time you

11   left to get the Versed to when you came back with the

12   Versed; correct?

13             ATTORNEY KANTER:   I'll object it's vague and

14   ambiguous and overly broad -- overly broad.

15             You can answer.

16             THE WITNESS:   Correct.

17             ATTORNEY NISENBAUM: Q.   And it had changed with

18   respect to his level of aggression and his physical

19   resistance; correct?

20   A.        Correct.

21   Q.        It had reduced -- the level of aggression and

22   physical resistance had reduced to, essentially, zero;

23   correct?

24             ATTORNEY KANTER:   Objection; vague and ambiguous;

25   overly broad; calls for speculation; lacks foundation.

125

1    You can answer.

2    THE WITNESS: Correct. His activity level was a

3    lot less because he was in handcuffs.

4    ATTORNEY NISENBAUM: Q. Sure. He was in

5    handcuffs, but he wasn't -- he wasn't kicking his feet, he

6    wasn't thrashing around when you came back with the Versed;

7    correct?

8    A.    Correct.

9    Q.    Okay. I assume that you're trained to consider --

10   we heard the officers talk about -- you know, mentioned, I

11   guess, the anti-narcotic thing.

12   You're trained to consider that the people that

13   you respond to, who are suffering medical emergencies, may

14   be under the influence of certain types of drugs; correct?

15   A.    Correct.

16   Q.    And you're trained to take that into consideration

17   when you give them a drug -- correct? -- that might

18   interfere with whatever they've taken.

19   A.    Correct.

20   Q.    Okay. So what are you -- how are you trained to

21   identify a person who appears to be under the influence of

22   either cocaine or methamphetamine? Stimulants.

23   A.    A lot of times they'll have rapid breathing. A

24   lot of times they will have a rapid pulse. A lot of times

25   they will be altered. Sometimes they're going to be

126

1  agitated; excited.  A bunch of different signs and symptoms

2  associated with that.

3  Q.        Did you check Mr. Gutzalenko's pulse before you

4  gave him Versed?

5  A.        No.

6  Q.        At any time before?

7  A.        Yes, I did.  I felt a radial pulse when I was at

8  his left hand.

9  Q.        Okay.  And were you able to tell if it was fast?

10 A.        It was fast.

11 Q.        And what does "fast" mean?

12 A.        Anything above 100.

13 Q.        Okay.  What did it feel like it was to you?

14 A.        I believe on the PCR I said it was 110.

15 Q.        I think that's correct.

16           So does that -- did you have a -- (Audio

17 interruption.)

18           (Reporter clarification.)

19           ATTORNEY NISENBAUM:  -- a belief.

20           ATTORNEY NISENBAUM: Q.  Did you have a belief that

21 Mr. Gutzalenko was under the influence of a stimulant drug

22 like cocaine or methamphetamine?

23 A.        Yes, it appeared that he was under the influence

24 of some drug, but I couldn't tell you what it -- I wasn't

25 sure what he was on.

127

1   Q.        What type of drugs would the use of Versed be

2   contraindicated with?

3            ATTORNEY KANTER:  I'll just object it -- I'll just

4   object it calls for expert opinion testimony; it calls for

5   speculation.

6            You can answer.

7            ATTORNEY NISENBAUM:  Q.  From your training.

8   A.        The fentanyls.  The heroins.  The -- any other

9   type of opioid.

10  Q.        Okay.  Opioids but not stimulants?

11           ATTORNEY KANTER:  Same objections.

12           THE WITNESS:  Correct.

13           ATTORNEY NISENBAUM:  Q.  Let me ask you this.

14           "Pulseless electrical activity."  What is that?

15  A.        That is a rhythm on our monitor where we have

16  organized electrical activity of the heart but it's not

17  producing a pulse.

18  Q.        Do you know whether or not the main cause of

19  pulseless electrical activity is hypoxia?

20           ATTORNEY KANTER:  Objection; lacks foundation;

21  calls for speculation; calls for expert opinion testimony --

22  I'll leave it at that.

23           You can answer if you're able.

24           THE WITNESS:  I'm going to call it PEA for short.

25           ATTORNEY NISENBAUM:  Q.  Sure.

                                                          128

1   A.        PEA can be caused by multiple issues: cardiac,

2   respiratory, metabolic.  A bunch of different things can

3   cause it.

4   Q.        At some point you were able to get a heartbeat

5   back for Mr. Gutzalenko; correct?

6   A.        Correct.

7   Q.        And that happened in the ambulance?

8   A.        Yes.

9   Q.        And how long was he without a heartbeat?

10            ATTORNEY KANTER:  Objection; calls for

11  speculation; lacks foundation.

12            ATTORNEY FINE:  Join.

13            ATTORNEY KANTER:  If you can answer that, go

14  ahead.  I don't want you to guess.

15            THE WITNESS:  Without taking a look at the PCR,

16  that's all it's going to be is a guess.

17            ATTORNEY NISENBAUM: Q.  Well, I'll pull the PCR

18  up.

19            (Pause.)

20            Okay.  Hopefully I have the PCR on the screen?

21  A.        Yes.

22  Q.        Okay.  All right.  Where would I find that?

23  A.        The treatment response area.  So slide down?

24            Farther?

25            Okay, this is the beginning of the treatment

                                                        129

1    response.

2    Q.        Where it says "Vital Signs"?

3    A.        Yeah, you see -- exactly.

4    Q.        Okay.

5    A.        So you see at 10:47 is when I documented that he

6    had a pulse and he was breathing, and his Glasgow Coma

7    Scale.

8              And then I believe at 10:50, was when -- or I'm

9    sorry.

10   Q.        I see it there.  10:50?

11   A.        Yeah.

12             So he still had a Glasgow Coma Scale of 13.

13             And then continue down?

14   Q.        Hold on.

15             At 10:47 it's 13, but at 10:50 it's 3.

16   A.        Oh, okay.  Yes, I see that.

17   Q.        Right?

18             So 3 is the lowest score possible; right?

19   A.        Correct.

20   Q.        That means no pulse, no breath -- and I forget the

21   other one.

22   A.        No, it has -- the Glasgow Coma Scale doesn't

23   correspond with the pulse and the respiratory rate; it's

24   just the spontaneous eye movement, the verbal commands, and

25   the motor function.

                                                          130

 1    Q.        Okay.  So when you have 3, that's -- is that full
 2    Coma?
 3    A.        Or they're just not responding.
 4    Q.        Okay.
 5              Then at 10:52 -- so these are scores automatically
 6    entered by -- by the machine?
 7    A.        The Glasgow Coma Scale -- I have to put in.
 8    Q.        Okay.  Do you put in the 4 -- the 4 and the 5?
 9    The E, V, and the M?
10    A.        Yes.  So.
11    Q.        Okay.  So at 10:50, you put in the 1, 1, 1; right?
12    A.        Mm-hmm.
13    Q.        Okay.  Then at 10:50- -- the same entry at 10:52.
14              At 10:53, there is "Pulseless Electrical
15    Activity."
16              Did you put in the -- did you put that in, or was
17    that automatically entered?
18    A.        I believe I put that in.
19    Q.        And then at 10:54: 1, 1, 2 on the Glasgow Coma
20    Scale.
21              So what was the 2?
22    A.        I think that might have been just a typo.
23    Q.        Okay.  Your best recollection is that it should
24    have been 1, 1, 1 for 3; correct?
25    A.        Correct.

                                                        131

1  Q.        Okay.  All right.  Then at 10:56, Pulseless

2  Electrical Activity again; and the Glasgow Coma score stays

3  the same for all the rest of them.

4            Correct?

5  A.        That is correct.

6  Q.        And "sinus tachycardia."  What is that?

7  A.        That is the change in his electrical rhythm.

8  Q.        Is that when he got a heartbeat back?

9  A.        Yes.

10           Slide up to that one?  You can see just above that

11  one, at 11:02, he had a heart rate of 130.

12 Q.        Right.

13           Okay.  And what caused the heartbeat to come back,

14 if you know?  Was it the CPR?

15 A.        I believe it was the epinephrine that I gave.

16 Q.        Okay.  And when did you give the epinephrine?

17 A.        It should be documented here.

18 Q.        On this page, or...

19 A.        It should be in the treatment and response also.

20           So slide down?

21 Q.        Tell me when to stop.

22 A.        Okay.  I'll let you know.

23           Keep going?

24           Right there.  So -- that's the administration of

25 Versed.

                                                          132

1          Keep going?

2          ATTORNEY KANTER:  I thought we passed it.

3          THE WITNESS:  Right here.

4          ATTORNEY NISENBAUM: Q.  10:56.

5          How many rounds of epinephrine did you do?

6    A.    I believe two.  There is a second one.

7    Q.    Here it is, at 11:00 A.M.

8          I'm going to go back here.

9          I'm going to shop the Share.

10         The fact that you were able to get the heartbeat

11   back.  Does that tell you anything about whether

12   Mr. Gutzalenko would have survived this event absent the

13   midazolam?

14         ATTORNEY KANTER:  I'll object it calls for

15   expert -- retrospective expert opinion as phrased; I'm going

16   to direct him not to answer that question.

17         ATTORNEY NISENBAUM: Q.  Okay.  The fact that

18   Mr. Gutzalenko -- well, strike that.

19         Were you able to get the heartbeat back in a -- in

20   a pretty quick manner?  I don't know how long these things

21   take.

22         ATTORNEY KANTER:  Vague and ambiguous; overly

23   broad.

24         You can answer if you're able.

25         THE WITNESS:  Yeah, I believe I was able to get

                                                      133

1    it -- on the PCR it says I got it back after two rounds of

2    epinephrine.

3              ATTORNEY NISENBAUM: Q.  Okay.  And that's normally

4    pretty quick, in your experience?

5    A.        Sometimes it is and sometimes it's not.

6    Q.        So you've revived people from cardiac arrest in

7    the past how many times, would you estimate?

8    A.        I can't answer that accurately because of -- I

9    don't keep track of that stuff.

10   Q.        Sure.

11             I'm just thinking is it more than 50?  Is it more

12   than 100?  I'm sure it's less than a thousand, but I could

13   be wrong there too.

14   A.        I wish I was that good.

15             Cardiac arrests -- we get pulses back on cardiac

16   arrests probably half the time; 50 percent of the time.  But

17   that still doesn't mean the outcome is going to be very good

18   for the person.

19   Q.        Right.

20             And a lot of that depends on -- in your

21   experience -- it depends on how long they were without

22   pulses?

23             ATTORNEY KANTER:  Well, object it's an incomplete

24   hypothetical; vague and ambiguous; overly broad; calls for

25   expert opinion.

                                                              134

1          You can answer.

2          THE WITNESS:  Correct.

3          ATTORNEY NISENBAUM: Q.  Okay.  That's because the

4   longer a person doesn't have a pulse, the less blood -- you

5   know, the longer a time period is that there is not fresh

6   blood going to the brain, causing massive brain damage;

7   correct?

8          ATTORNEY KANTER:  Same objections.

9          What are you -- I don't even know what you're

10  asking.  Are you asking in this situation if that happened?

11         ATTORNEY NISENBAUM:  I'm asking in his experience.

12  That's how this works.

13         ATTORNEY KANTER:  Yeah, same objections.  It's

14  calling for expert opinion testimony the way you're phrasing

15  it.

16         ATTORNEY NISENBAUM: Q.  Go ahead.  If you know.

17  A.       I don't know the outcomes of most of these

18  patients because once I drop them off, there is not really

19  any way for me to follow up.

20  Q.       I see.

21         So when a person dies, they don't normally tell

22  you?

23         ATTORNEY KANTER:  Objection; argumentative.

24         There is no point in answering that question.

25         ATTORNEY NISENBAUM: Q.  Yes, there is.

                                                      135

1        ATTORNEY KANTER:  What's the question?  He's dead,

2   and you're asking if he's told them he's dead?

3        ATTORNEY NISENBAUM: Q.  Yeah, do they tell you

4   when a person dies?

5        ATTORNEY KANTER:  The hospital?

6        ATTORNEY NISENBAUM: Q.  Whoever.  Whether it's the

7   hospital; whether it's someone at your job.  I don't know.

8        ATTORNEY KANTER:  Incomplete hypothetical.

9        You can answer as best you can.

10       THE WITNESS:  No.  A lot of times we don't find

11  out the answers to -- the outcomes to a lot of these

12  patients.

13       ATTORNEY NISENBAUM: Q.  Okay.  Is it your

14  understanding that the reason you found out the outcome in

15  this case is because the police were involved?

16       ATTORNEY KANTER:  Objection; calls for

17  speculation; lacks foundation.

18       Answer if you're able.

19       THE WITNESS:  I found out in this case because I

20  stayed at the hospital and I watched the emergency room team

21  working on Ivan call the code.

22       ATTORNEY NISENBAUM: Q.  Why did you stay at the

23  hospital?

24  A.       Because I had to get some signatures of a nurse, I

25  had to finish doing some PCRs, I had to get face sheets.

                                                        136

1    There is multiple reasons why we stayed at the hospital.

2    Q.       Okay.  That would normally be true of other people

3    who you've dealt with who were in cardiac arrest and you got

4    a pulse back and they get treated: you would have to do

5    paperwork for them too; right?  And you would have hung

6    around and found out, sometimes, what would have happened?

7            ATTORNEY KANTER:  Objection; vague and ambiguous;

8    overly broad; incomplete hypothetical.

9            ATTORNEY NISENBAUM: Q.  I'm trying to understand

10   was there something different here?

11           ATTORNEY KANTER:  Than what?  The hundreds of

12   other times?

13           ATTORNEY NISENBAUM:  Yes.

14           ATTORNEY KANTER:  It's an incomplete hypothetical;

15   it's overly broad and vague and ambiguous.

16           You can answer if you're able.

17           THE WITNESS:  No.  The only reason why I stayed

18   longer at the hospital is because one of the Richmond PD

19   officers requested to interview me.

20           ATTORNEY NISENBAUM: Q.  Okay.  All right.  That's

21   my question.

22           They asked you to stay to be interviewed; correct?

23   A.       Correct.

24   Q.       Okay.  I thought that's what I asked before.

25           Although it's on the video, so I know the answer;

                                                          137

1    I do need a record of it.

2            Mr. Gutzalenko never consented to the injection;

3    correct?

4    A.        No.

5    Q.        No he did not?

6    A.        No he did not.

7    Q.        Okay.  And you did not ask him to consent;

8    correct?

9    A.        Correct.  I didn't think he had decision-making

10   capacity to begin with.

11   Q.        Okay.  Is it fair to say that if he said no, you

12   would have still injected him?

13            ATTORNEY KANTER:  Objection; calls for

14   speculation; lacks foundation.

15            THE WITNESS:  Most likely, yes.

16            ATTORNEY NISENBAUM: Q.  Okay.  And the purpose of

17   the injection was to facilitate his transport -- well,

18   strike that.

19            He did not need -- to your knowledge, he wasn't

20   necessarily in acute danger of dying prior to the injection;

21   correct?

22            ATTORNEY KANTER:  Objection; calls for

23   speculation; lacks foundation; calls for expert opinion

24   testimony; vague and ambiguous; overly broad.

25            If you know, you can answer.

138

1          THE WITNESS:  I didn't know what his outcome was

2     going to be.

3          ATTORNEY NISENBAUM: Q.  Okay.  I guess my question

4     is more that when -- prior to the injection, it seemed --

5     did it seem to you like this was more of a psychiatric

6     problem?

7          ATTORNEY KANTER:  Objection; asked and answered;

8     vague and ambiguous; overly broad.

9          You can answer.

10         THE WITNESS:  I wasn't sure what was going on with

11    him.  I wasn't sure if it was a psychological issue.  I

12    wasn't sure if it was an illegal substance abuse issue.  I

13    wasn't sure if it was a -- another medical issue causing him

14    to be this way.

15         ATTORNEY NISENBAUM: Q.  Okay.  Do you know how the

16    officers were restraining Mr. Gutzalenko while you were at

17    the ambulance?

18         ATTORNEY KANTER:  Objection; lacks foundation;

19    calls for speculation.

20         THE WITNESS:  No, I --

21         ATTORNEY KANTER:  You can't guess; you weren't

22    there, but you can answer as best you can.

23         THE WITNESS:  Okay.

24         I don't know because I wasn't there.

25         ATTORNEY NISENBAUM: Q.  Well, you say you weren't

                                                      139

1    there, but the ambulance wasn't that far away.  You would

2    have still had eyesight of them; right?

3            ATTORNEY KANTER:  Objection; lacks foundation;

4    calls for speculation.

5            THE WITNESS:  Negative.  I was in the back of the

6    ambulance, and there was a -- I wasn't paying attention out

7    in one of the small windows that we had; I was paying

8    attention to the medication I was drawing up.

9            ATTORNEY NISENBAUM: Q.  Okay.  So during the --

10   while you were gone, Mr. Gutzalenko went from violently

11   resisting to hardly moving by the time you got back.

12           That's fair to say; correct?

13   A.      Correct.

14   Q.      Okay.  Did you ask the officers "Is he calmed down

15   now?"  "What happened while I was gone?"  Anything like

16   that?

17   A.      I don't recall asking that.

18   Q.      Okay.  Do you know what Epocrates is?

19   A.      I believe -- "Epocrates"?

20   Q.      Sure.  "Epocrates."

21   A.      Are you talking about the application?  The phone

22   application for the medical drugs?

23   Q.      Yeah, I think so.

24           Or is it a brand name for a drug?

25   A.      I have never heard of a medication called that.

                                                        140

1    Q.        Well, is it a brand name that sells medication --

2    different types of medications?

3    A.        I don't know.

4    Q.        Okay.  Well, if I understand correctly, AMR West

5    does not require you to be familiar with the product warning

6    labels on the medications you prescribe; correct?

7    A.        Correct.

8    Q.        Do you know what the term "CNS depressed" means?

9    A.        Yes.

10   Q.        What does that mean?

11   A.        Central nervous system depressed.

12   Q.        Does that mean a person is unconscious?

13   A.        Or altered.

14   Q.        In a depressed way as opposed to a stimulated way?

15   A.        Yes.

16   Q.        Okay.  Do you agree that Mr. Gutzalenko was CNS

17   depressed when you injected him with midazolam?

18             ATTORNEY KANTER:  Objection; calls for

19   speculation; lacks foundation.

20             You can answer.

21             THE WITNESS:  I can't answer that honestly because

22   I have no idea if he was -- if his CNS system was depressed

23   or not.

24             ATTORNEY NISENBAUM:  Q.  Well, what would you do to

25   find out?

                                                              141

1   A.          Probably do an assessment.  Throw him on the

2   monitor -- all the other things that I did in the back of

3   the ambulance.

4   Q.          When you say "throw him on the monitor," are you

5   talking about, like an EEG or EKG?

6   A.          Yeah.  Do a -- you know -- initially do a

7   four-lead EKG to see what his cardiac rhythm is, and get a

8   pulse oximetry, and capnography, blood sugar -- there is a

9   whole host of things that we do to try to figure out what's

10  causing a person to be -- that are CNS depressed.

11  Q.          Is CNS depression a caution for midazolam?

12  A.          I believe so.

13  Q.          Okay.  Is a person complaining of shortness of

14  breath also a caution for midazolam?

15  A.          It is a caution; not a contraindication.

16  Q.          What does a "caution" mean?

17  A.          To give the medication cautiously, and be prepared

18  for changes.

19  Q.          Okay.  And giving the medication cautiously --

20  that means giving it more slowly over time, or giving less

21  of it, or both?

22  A.          If I -- if you have an IV established, then yes,

23  you give the medication at a slower rate.

24          In an IM injection, there is not really a safe way

25  to do that over time because the longer the needle stays in

                                                        142

1 the patient, the more damage can be done to the structures

2 underneath the puncture.

3 Q.        Okay.  But you can give them less; correct?

4 A.        For an IV injection, yes.

5 Q.        For an intramuscular injection, you can -- you can

6 give less than the 5 milligrams; correct?

7 A.        I think it clearly states on our protocols we're

8 supposed to give 5 milligrams IM.

9 Q.        And that's assuming that it's only intramuscular;

10 correct?

11 A.        Correct.

12 Q.        Was Mr. Gutzalenko agitated when you administered

13 the midazolam?

14 A.        He did not appear to be.

15 Q.        Okay.  Is it fair to say that the reason why --

16 the reason -- well, strike that.

17          If I understand you correctly, your testimony is

18 that you wanted to administer the midazolam to sedate

19 Mr. Gutzalenko -- well, strike that -- to restrain

20 Mr. Gutzalenko chemically while he was transported; correct?

21          ATTORNEY KANTER:  Objection; misstates testimony.

22          He told you about putting him on the gurney.

23          You can answer.

24          ATTORNEY NISENBAUM: Q.  Put him on the gurney;

25 correct?

143

1  A.          Correct.  My intentions were to make it as safe as

2  possible for everybody involved while we get him on the

3  gurney, take off the handcuffs, get him on my restraints,

4  and then get him in the back of the ambulance.

5          After 17 years of experience doing this, I -- as

6  soon as we take off the handcuffs for patients who, for

7  whatever reason, they start becoming more and more agitated,

8  and then it becomes a lot more dangerous for everybody

9  involved to try to restrain them on the gurney.  So that was

10  the reason I gave him the Versed, was for all of our safety.

11  Q.          Was your intention to get him on the gurney and

12  then take off the handcuffs?

13          ATTORNEY KANTER:  Objection; lacks foundation that

14  he would have anything to do with the handcuffs.

15          But you can answer.

16          THE WITNESS:  My intention was get him on the

17  gurney, restrain his legs to my gurney, and then have the

18  Richmond police officers take off their handcuffs.

19          As paramedics, we don't carry handcuffs keys.  And

20  it's their equipment -- we're not familiar with their

21  equipment, and so they have to be in charge of that.

22          So take off the handcuffs and then restrain both

23  of his arms into my restraints.

24          ATTORNEY NISENBAUM: Q.  Okay.  "Excessive single

25  doses or rapid intravenous administration may result in

                                                      144

1    respiratory depression, airway obstruction, and/or arrest."

2            I was reading that from the manufacturer of

3    midazolam; the prescribing information.

4            Do you agree with that?

5            ATTORNEY KANTER:  Objection; it's an incomplete

6    hypothetical; vague and ambiguous; overly broad; and calls

7    for expert opinion testimony.

8            You can answer the best you can.

9            THE WITNESS:  I'm sure that this medication has

10   been known to do that in certain people -- certain

11   percentage of the population.

12           ATTORNEY NISENBAUM: Q.  Well, it depends on how

13   it's administered; correct?

14           ATTORNEY KANTER:  Objection; incomplete

15   hypothetical; vague and ambiguous; and overly broad.

16           I'm not sure what the -- anyway.

17           You can answer if you're able to answer that.

18           THE WITNESS:  Say it again, please?

19           ATTORNEY NISENBAUM: Q.  It depends on how the

20   midazolam is administered.

21           ATTORNEY KANTER:  Same objections.

22           And what's the "it" you're referring to?  I think

23   that's the problem.

24           But go ahead.

25           THE WITNESS:  If you rapidly push midazolam

                                                    145

1    intravenously, it can have negative side effects.

2            ATTORNEY NISENBAUM: Q.  Right.

3            Including all of the ones we talked about; right?

4            ATTORNEY KANTER:  Objection; vague and ambiguous;

5    overly broad.

6            You can answer.

7            THE WITNESS:  I suppose so.

8            ATTORNEY NISENBAUM: Q.  Respiratory depression, up

9    to and including death; correct?

10   A.       I suppose so.

11   Q.       Okay.  And so again, you knew that at the time

12   when this incident happened.  We've talked about that.  This

13   was a person who was complaining -- who you heard say that

14   he was having breathing problems.

15           Are there other alternatives to midazolam for

16   chemical restraints?

17   A.       Not that Contra Costa County EMS agency provides

18   us -- or provides AMR --

19   Q.       So --

20           (Reporter clarification.)

21           THE WITNESS:  "Provides."

22           Not that Contra Costa County EMS agency allows AMR

23   to use.

24           ATTORNEY NISENBAUM: Q.  Is there a particular

25   weighing when you decide to give a person midazolam with

                                                        146

1   respect to the risk of it and the benefit of it?  How do you

2   make the determination?

3          ATTORNEY KANTER:  Objection; vague and ambiguous;

4   lacks foundation; calls for expert opinion; overly broad.

5          If you under- -- I'm not sure I understand the

6   question, but if you do, go ahead.

7          THE WITNESS:  I don't really understand the

8   question.

9          ATTORNEY NISENBAUM: Q.  Well, is it true that the

10  medical standard of care requires that the benefits of a

11  medical intervention outweigh the risk?

12         ATTORNEY KANTER:  No, he's not going to answer

13  that question.  That's calling for retrospective expert

14  opinion testimony.

15         ATTORNEY NISENBAUM: Q.  Based on his training --

16         ATTORNEY KANTER:  No --

17         ATTORNEY NISENBAUM: Q.  -- when you make a -- when

18  you make a decision, based on your training, to administer a

19  medicine, are you trained to consider the benefit of the

20  medical intervention and the risk carried by the medical

21  intervention?

22  A.         Yes.

23  Q.         Okay.  And how do you make that decision?

24  A.         It's all based on the specific situation that

25  whatever medication we choose to administer calls for.

                                                        147

1     Q.       Okay. It's fair to say that some medications

2 carry risk; right?

3     A.       Yes.

4     Q.       Midazolam is one of them; correct?

5     A.       Correct.

6     Q.       Okay. So when you administer midazolam, are you

7 trained to consider the risk of the midazolam itself

8 compared to the benefit of what you're trying to achieve

9 with it?

10         ATTORNEY KANTER: Objection; asked and answered.

11         He just answered that same question. You're just

12 repeating yourself now.

13         ATTORNEY NISENBAUM: He didn't.

14         ATTORNEY KANTER: You can answer it again.

15         ATTORNEY NISENBAUM: Q. Go ahead.

16     A.       Yes.

17     Q.       Okay.

18         So the question, then, is how do you -- how do you

19 make that assessment?

20         ATTORNEY KANTER: It's an incomplete hypothetical;

21 it's vague and ambiguous; overly broad.

22         I feel like you just answered that question, but

23 you can --

24         ATTORNEY NISENBAUM: I did not -- that was not an

25 answer.

1           ATTORNEY KANTER:  Go ahead and answer the question

2    again.

3           THE WITNESS:  Like I said before, it's based on

4    each situation, and each call we go out on is different from

5    the one before.

6           With that being said, 95 percent of the patients I

7    have had that have been in handcuffs -- when we get them on

8    a gurney, like I said -- as soon as we take off those

9    handcuffs, they tend to start fighting us again, making it

10   dangerous for everybody involved.

11          ATTORNEY NISENBAUM:  Q.  95 percent?

12   A.       Yes.  Ninety -- 95.

13          Most of the patients I've had in handcuffs, when

14   the handcuffs have been taken off, they have started

15   fighting the first responders trying to restrain them to the

16   gurney.

17   Q.       Okay.  And how many of these people have calmed

18   down very, very substantially to the point where they were

19   no longer aggressive before the handcuffs came off?

20          ATTORNEY KANTER:  Objection; argumentative; vague

21   and ambiguous; incomplete hypothetical.

22          You can answer if you can.

23          THE WITNESS:  I would say most of my patients for

24   these particular situations.

25          ATTORNEY NISENBAUM:  Q.  So most of them, they're

                                                        149

1   calm, and then you get the cuffs off and then they start

2   fighting; right?

3   A.        Correct.

4   Q.        So the -- of course, you've got several officers

5   that are with you.  You're not alone; right?

6           ATTORNEY KANTER:  Well, objection; vague as to

7   time.

8           Are we talking about now or these prior

9   situations?

10          ATTORNEY NISENBAUM:  Q.  In this incident involving

11  Mr. Gutzalenko, you had several officers with you; correct?

12  A.        Correct.  I can't remember how many, though.

13  Q.        Okay.  But you had several there.

14          So if he did become combative, then you would have

15  dealt with that with the officers; correct?

16          ATTORNEY KANTER:  Objection; vague as to where

17  you're talking about.  It's on the street, or in the

18  paramedic ambulance?

19          ATTORNEY NISENBAUM:  Q.  Wherever.

20          After you put him on the gurney and you take off

21  the cuffs, you had enough officers to deal with him;

22  correct?

23          ATTORNEY KANTER:  I think you mis- -- anyway.

24          Go ahead and answer.

25          THE WITNESS:  It's hard to tell.  Sometimes the

150

 1   amount of officers and the fire department personnel we have

 2   on scene is enough, and sometimes it's not.

 3              ATTORNEY NISENBAUM:  Q.  If Mr. Gutzalenko was

 4   actually unconscious, would you have been able to inject him

 5   with midazolam?

 6              ATTORNEY KANTER:  Objection; vague and ambiguous;

 7   may call for speculation.

 8              I'm not even sure -- are you asking if he had --

 9   anyways.

10              Calls for expert opinion testimony.

11              If you understand the question, you can go ahead

12   and answer it.

13              THE WITNESS:  If he was unconscious, he's not

14   going to be physically or mentally able to do anything.

15              ATTORNEY NISENBAUM:  Q.  Okay.  And so there would

16   have been no reason to inject him with midazolam if he were

17   unconscious; is that right?

18   A.       If he was truly unconscious, yes.

19   Q.       Okay.  Well, what if he was only very close to

20   unconscious?

21              ATTORNEY KANTER:  Objection; vague and ambiguous;

22   overly broad --

23              ATTORNEY NISENBAUM:  Q.  Or -- (simultaneous

24   talking; inaudible.)

25              ATTORNEY KANTER:  -- (Simultaneous talking;

                                                            151

1   inaudible.)

2          THE REPORTER:  I'm sorry.  I'm sorry.  I'm sorry.

3          I think -- yeah, go ahead.

4          Let's everyone talk one at a time, please.

5          ATTORNEY KANTER:  Well, I was.

6          ATTORNEY NISENBAUM: Q.  Assume he is a 4 or a 5 on

7   the Glasgow Coma Scale -- would you then be able to inject

8   him?

9   A.      Yes.

10         ATTORNEY KANTER:  Incomplete hypothetical.

11         Go ahead.

12         THE WITNESS:  Yes.

13         ATTORNEY NISENBAUM: Q.  All right.  Is there a

14  cutoff of when you can inject someone with midazolam, as you

15  understand it?

16         ATTORNEY KANTER:  I don't know -- vague and

17  ambiguous as to what you mean by "cutoff."

18         ATTORNEY FINE:  Join.

19         ATTORNEY KANTER:  Calls for expert opinion

20  testimony.

21         If you understand, you can answer.

22         THE WITNESS:  It's been a long time since I

23  studied those protocols, so I can't give you an honest

24  answer.

25         I believe it's with a GCS of less than 13, I

                                                      152

1    think, but I'm not 100 percent sure.

2              ATTORNEY NISENBAUM: Q.  So no midazolam -- your

3    best recollection is no midazolam if it's a Glasgow Coma

4    Scale of less than 13?

5    A.        I believe so.

6    Q.        Okay.  And 13 -- what is the clinical presentation

7    of 13?

8    A.        Still alert.  Not necessarily able to verbally

9    express themselves.  Still have some motor function.  Might

10   have less than normal motor function.

11             It depends on what the numbers fall on the -- the

12   AVPU Scale and the GCS.

13   Q.        Are you familiar with the American College of

14   Emergency Physicians?

15   A.        I'm familiar with them.

16   Q.        ACEP or something like that?

17   A.        I'm not sure of who they are, but I...

18   Q.        Okay.  Looking at the treatment guideline that I

19   showed you -- it's not signed.  It's not signed by a doctor.

20             Have you seen treatment guidelines that are signed

21   by doctors?

22   A.        Not in our protocol book.

23   Q.        Do you agree that it is important to know when not

24   to give a medication?

25   A.        Yes.

153

```
 1   Q.        Okay.  When is midazolam contraindicated?
 2             ATTORNEY KANTER:  Objection; calls for expert
 3   opinion testimony.
 4             ATTORNEY NISENBAUM: Q.  Based on your training.
 5             ATTORNEY FINE:  It's also asked and answered.
 6             ATTORNEY KANTER:  I'll join.
 7             ATTORNEY NISENBAUM: Q.  Go ahead.
 8   A.        (To Attorney Kanter.) Can I answer?
 9   Q.        Yeah.
10             ATTORNEY KANTER:  If you can.
11             THE WITNESS:  When somebody is not breathing; when
12   somebody doesn't have a pulse; if suspected opioids are
13   onboard...
14             ATTORNEY NISENBAUM: Q.  Anything else?
15   A.        There is a bunch of different reasons.  I can't
16   list them all here.
17   Q.        Okay.  You've told me as much as you can remember?
18   A.        For the most part, yes.
19   Q.        Is there a reason why you didn't sterilize the
20   area with alcohol where you injected Mr. Gutzalenko?
21   A.        I don't remember.
22   Q.        Normally that's something you're supposed to do;
23   right?
24   A.        For the most part, yes.
25   Q.        Okay.
```

154

```
 1   A.          I don't remember if I did or did not.

 2   Q.          Well, I don't -- and I know you do, but I can show

 3   you.

 4               Share my screen.

 5               I'm going to hit Play.  We're at, I think, 7:27.

 6               (Playing designated video file, Exhibit 5.)

 7               ATTORNEY NISENBAUM:  Q.  Pausing at 7:48, just at

 8   the end of the injection.

 9               It's fair to say you did not sterilize the area

10   where you injected him?

11   A.          Correct.

12   Q.          Okay.  Why not?

13               ATTORNEY KANTER:  Objection; asked and answered.

14               You can answer it again.

15               THE WITNESS:  Because a lot of times in these

16   emergent situations it's just an extra step and it takes

17   away time.

18               ATTORNEY NISENBAUM:  Q.  Okay.  Well, I take it

19   it's just a quick swab; right?

20   A.          Mm-hmm.  For the most part --

21               ATTORNEY KANTER:  Objection; argumentative.

22               You can answer.

23               THE WITNESS:  For the most part, yes.

24               ATTORNEY NISENBAUM:  Q.  And you have those swabs

25   stored in your ambulance somewhere; right?
```

155

1    A.        Yes.

2    Q.        Are they pretty soaked in alcohol?

3    A.        Yes.

4    Q.        Okay.  So how hard is it?

5              ATTORNEY KANTER:  Objection; argumentative --

6              THE WITNESS:  It's not hard.

7              ATTORNEY KANTER:  -- vague and ambiguous.

8              You can answer.

9              THE WITNESS:  Not hard.

10             ATTORNEY NISENBAUM: Q.  How much time does it

11   take?

12             ATTORNEY KANTER:  Incomplete hypothetical.

13             You can answer.

14             THE WITNESS:  Thirty seconds.

15             ATTORNEY NISENBAUM: Q.  Thirty seconds to grab a

16   swab?

17   A.        No.  Longer than that because -- well, yeah.

18   Thirty seconds.

19   Q.        Okay.  Given that you're going back to the

20   ambulance already to get the -- get the syringe and draw out

21   the midazolam, what do you have to do in order to get the

22   swab?

23   A.        Just get it from where we store it in the

24   ambulance.

25   Q.        Okay.  And where is it stored in the ambulance?

156

1  Is it easily accessible?

2  A.          Yes.

3  Q.          So is it fair to say it would take you, like, 5 or

4  10 seconds maybe?

5  A.          Yes, depending on where it is in the ambulance.

6  Q.          Okay.  Well, where was it in this ambulance?

7  A.          They're stored in multiple locations.

8  Q.          Are they stored in multiple locations in the same

9  ambulance?

10  A.          Paramedics set up the back of their ambulance how

11  they want to.  But generally speaking, the medications and

12  equipment are stored in specific cabinets so each ambulance

13  is supposedly set up the same way.

14              Sometimes the alcohol swabs and some other

15  often-used items get moved around to make them more or less

16  accessible.

17  Q.          Okay.  Was this your regular ambulance?

18  A.          Yes.

19  Q.          All right.  Where did you keep it?

20  A.          Like I said, multiple locations.  We had them in

21  our equipment bag; we had them in our glucometer; we had

22  them on our bench seat; we had them in our cabinets.

23  Q.          But all at the same time; right?  You didn't

24  just -- they didn't move here or there and the other; you

25  had -- do you keep them in bags or jars?

157

1   A.          No, they're only -- they're individually wrapped

2   and they usually come in a box.

3   Q.          Okay.  So -- like, those little boxes, then.

4   A.          Yeah.

5   Q.          I'm thinking of, like, little boxes of wipes that

6   are, like, individually packaged in foil.

7               Is that how they're packaged?

8   A.          For the most part, yes.

9   Q.          Okay.  All right.  So while you were getting the

10  midazolam, you would have just reached for one of those

11  packages and grabbed out one of the foil packs; right?

12  A.          I could have.

13  Q.          Okay.  Again, you would have to think about it,

14  but in this case you didn't think about it; right?

15              ATTORNEY KANTER:  Objection; misstates prior

16  testimony; argumentative.

17              THE WITNESS:  Correct.

18              ATTORNEY NISENBAUM: Q.  Okay.  The same way you

19  didn't think about aspirating the plunger; right?

20              ATTORNEY KANTER:  Objection; misstates prior

21  testimony; argumentative.

22              THE WITNESS:  I didn't aspirate the plunger

23  because, like I said, it's been a practice that has been

24  so -- not practiced for quite some time.

25              ATTORNEY NISENBAUM: Q.  So is there anywhere that

1    I could look that would say that?  For example, the AMR

2    West.  Do they have -- or AMR itself; either one.

3            Do they have some publication or some written

4    document where I would see that?  How do I verify that?

5            ATTORNEY FINE:  Asked and answered.

6            ATTORNEY KANTER:  Join.

7            ATTORNEY NISENBAUM:  I didn't.

8            ATTORNEY NISENBAUM: Q.  And the answer

9    was --

10           ATTORNEY KANTER:  Speculation as well.

11           ATTORNEY NISENBAUM: Q.  -- the answer was no, but

12   it strikes me that it's a significant change in policy and

13   there ought to be something that's written about it

14   somewhere.

15           ATTORNEY KANTER:  What is your question?

16           ATTORNEY NISENBAUM: Q.  My question is where do I

17   find that, if you know?

18           ATTORNEY KANTER:  Same objections.

19           You can answer if you're able.

20           ATTORNEY FINE:  Join.

21           THE WITNESS:  I believe I already answered that

22   when you asked that same question earlier today.

23           It's nothing that was in a publication; it's what

24   is discussed person-to-person in a classroom setting.

25           ATTORNEY NISENBAUM: Q.  So it is, to your

                                                        159

```
 1    knowledge, practice and training but nothing that's written

 2    down?

 3              ATTORNEY FINE:  Asked and answered.

 4              ATTORNEY KANTER:  And join.

 5              THE WITNESS:  Yes.

 6              ATTORNEY NISENBAUM: Q.  I didn't get the answer.

 7    A.        Yes.

 8    Q.        Okay.  If I understood correctly when you

 9    initially -- when this initially happened, you actually

10    thought it could have been the midazolam; right?

11              ATTORNEY KANTER:  Objection; vague and ambiguous.

12              I don't have any idea what you're asking him.

13    What's the "it"?

14              ATTORNEY NISENBAUM:  It doesn't matter what you

15    think; it --

16              ATTORNEY KANTER:  It does, because you're asking

17    if, basically -- it matters.

18              Do you understand the question?

19              THE WITNESS:  I don't understand the que- -- can

20    you ask it again?

21              ATTORNEY NISENBAUM: Q.  Okay.

22              On the day of this incident, after Mr. Gutzalenko

23    became essentially pulseless, breathless, unresponsive, a 3

24    on the Glasgow Coma Scale -- you thought one possibility was

25    that he had had an adverse reaction or overdose of the
```

160

1    midazolam; is that right?

2              ATTORNEY KANTER:  I'll object it lacks foundation

3    that he even had such a thought.  Speculation.

4              ATTORNEY NISENBAUM:  He already testified that he

5    did.

6              ATTORNEY KANTER:  I disagree.

7              You can answer if you're able.

8              THE WITNESS:  I wasn't 100 percent sure what

9    caused him to go into cardiac arrest.

10             ATTORNEY NISENBAUM: Q.  Right.  I understand that.

11   But one thought that you had was that it could have been the

12   midazolam you gave him; right?

13   A.        It could have been the midazolam I gave him.  It

14   could have been the illegal substances that he had in his

15   system.  It could have been a heart attack.  It could have

16   been a bunch of different things that caused him to go into

17   arrest.

18   Q.        Right.  Okay.

19             But again, you had -- you did have a specific

20   thought that it could have been the midazolam, but at no

21   point did you communicate that to anyone, until today;

22   right?

23   A.        I don't see what the point of communicating that

24   to anybody would matter.

25   Q.        So it could be looked into, perhaps?

161

1    A.          But --

2    Q.          Why wouldn't it matter?

3    A.          I didn't hide the fact that I gave midazolam.  It

4    was all in my PCR.

5    Q.          I know.  Look, I've been doing this too long.

6    I've seen way too much nonsense from people that, you know,

7    do things that are inexplicable.

8               Your job, at the end of the day, is to provide the

9    information -- I know you provided the information about the

10   midazolam.  I don't know whether or not you had a duty to

11   tell people that you thought maybe that was the issue, but I

12   do know that none of -- you know, the coroner didn't

13   consider it.  I don't see, you know, a lot of other -- well,

14   my question is -- well -- and you testified at the coroner's

15   inquest; right?

16              Do you remember that?

17   A.          I remember testifying there.

18   Q.          Okay.  And you listened to the coroner who gave

19   his analysis; correct?

20   A.          Correct.  But I can't remember exactly what he --

21   everything he said.

22   Q.          I understand.

23              But I do know that you talked about the Versed and

24   you said as described -- you gave the drug that was

25   described by the coroner.

1          That was your testimony.  I know you listened to
2      it, so let me...
3          Was it your decision as to where Mr. Gutzalenko
4      would be going -- assuming that he didn't die, was it your
5      decision as to where he would be going?
6      A.          Yes.
7      Q.          Okay.  Explain that to me.
8      A.          As a paramedic and the only paramedic with the
9      highest medical authority -- so based on how patients
10     present and what I think is going on with them -- I make the
11     decision of which hospital they go to.
12     Q.          Okay.  So you make the -- he was going to be going
13     to the hospital no matter what, after you arrived; is that
14     fair to say?
15          ATTORNEY KANTER:  Objection; calls for
16     speculation; lacks foundation; it's an incomplete
17     hypothetical.
18          You can answer.
19          ATTORNEY FINE:  Join.
20          THE WITNESS:  I felt like he needed to go to a
21     hospital.  He appeared to look like he needed to go to a
22     hospital.
23          ATTORNEY NISENBAUM: Q.  Okay.  Do you know if he
24     was going to the hospital at the direction of the police?
25          ATTORNEY FINE:  Calls for speculation; lacks

163

1    foundation.

2              THE WITNESS:  The police officers do not make the

3    decision on where a patient -- which hospital patients go

4    to.

5              ATTORNEY NISENBAUM: Q.  I understand they don't

6    make the decision on which hospital, but the fact that he

7    was going to go to a hospital -- was that at the direction

8    of the police?

9              ATTORNEY FINE:  Same objection; it misstates prior

10   testimony.

11             THE WITNESS:  No, they didn't tell me where to

12   take him.

13             ATTORNEY NISENBAUM: Q.  Was the -- all right.

14             Was it your understanding that he was to be taken

15   to a hospital regardless of which hospital?

16             ATTORNEY KANTER:  Objection; misstates testimony;

17   it's been asked and answered.

18             He decided.

19             ATTORNEY FINE:  Join.

20             ATTORNEY NISENBAUM: Q.  Okay, you decided?  So it

21   was solely your choice to take Mr. Gutzalenko to the

22   hospital?

23             ATTORNEY KANTER:  Asked and answered.

24             ATTORNEY FINE:  Join.

25             ATTORNEY KANTER:  Answer it again.

164

1      THE WITNESS: Yeah, he appeared to need medical

2   care further than what I could provide for him on scene.

3      ATTORNEY NISENBAUM: Q. Okay. A 5150 -- he would

4   be going to the hospital for that; correct?

5      ATTORNEY KANTER: Objection; incomplete

6   hypothetical.

7      ATTORNEY FINE: Lacks foundation.

8      ATTORNEY KANTER: Yeah. Join.

9      THE WITNESS: It depends on if -- what else is

10  going on with a person at the time.

11     ATTORNEY NISENBAUM: Q. Okay. Well, how so?

12  A.      Some 5150s, if they're not -- don't have any other

13  medical issues going on, they can go straight to the

14  psychiatric emergency services at Contra Costa County

15  Hospital.

16     If they have another underlying medical issue that

17  needs addressed, then we take them to an emergency room.

18  Q.      Okay. You were asked at the coroner's inquest:

19     "Question. Did you in any way assist in

20     restraining, or attempting to restrain, or are

21     you just doing the best you can with his hand?

22     "Answer. Yes. So I just addressed the right

23     hand first, and like I said, he was becoming

24     more and more agitated and aggressive. And

25     when he knocked off the police officer's body

165

1          cam, that's when I decided to go back to my

2          ambulance, draw up my medication to Versed --

3          or to help calm him down, so to speak."

4          So when you said yes, what were you answering

5    "yes" to?

6    A.        I believe it was the question to me -- the reason

7    why -- one of the reasons why I chose to go get Versed; that

8    I chose to restrain him chemically.

9    Q.        Okay.  All right.  So when you arrived, the police

10   were in the process of restraining Mr. Gutzalenko; correct?

11   A.        Yes.

12             ATTORNEY FINE:  Belatedly, vague and ambiguous.

13             ATTORNEY NISENBAUM: Q.  And you went to go -- and

14   that restraint continued until you administered the Versed;

15   correct?

16             ATTORNEY FINE:  Vague and ambiguous; overbroad.

17             THE WITNESS:  Correct.

18             ATTORNEY NISENBAUM: Q.  Okay.  And then he was

19   chemically restrained; correct?

20   A.        Yes, I chemically restrained him.

21   Q.        Okay.  And again, when you -- well, let me ask you

22   this.

23             When you arrived, were the police trying to

24   handcuff him, if you could tell?

25   A.        When I first got on scene?

                                                        166

1    Q.       Yes.

2    A.        No.  They did not handcuff him until after I went

3    back to the ambulance.

4    Q.        Okay.  When you left, were they trying to handcuff

5    him?  When you left to go to the ambulance, were they trying

6    to put handcuffs on?

7    A.        At the time that I left, they were not putting

8    handcuffs on him.

9    Q.        Okay.

10           ATTORNEY NISENBAUM:  All right.  Give me five

11   minutes.  I'm going to shop my Share -- or stop my video and

12   audio.

13           ATTORNEY FINE:  So a five-minute break?  3:15?

14           ATTORNEY KANTER:  Yeah, sounds right.

15           ATTORNEY FINE:  Okay.

16           ATTORNEY NISENBAUM:  Correct.

17           (Recess:  3:10 P.M. to 3:14 P.M.)

18           ATTORNEY NISENBAUM:  All right.  I'm ready when

19   you guys are.

20           THE REPORTER:  I'm back on the record.

21           ATTORNEY NISENBAUM:  Although I have a lot more

22   questions, most of them probably would be legitimately

23   objectionable, as opposed to any of the questions I've asked

24   today.  So I'm done today.  Thank you.

25           ATTORNEY FINE:  I've got a few, if you don't mind.

                                                        167

1          ATTORNEY KANTER:  Go ahead.

2          ATTORNEY FINE:  All right.  Thank you.

3                    EXAMINATION

4    BY ATTORNEY FINE:

5    Q.        Mr. Richardson, thank you for your time today.  I

6    know it's been a long day, so I'll try to be brief.

7              You said, I believe, that it was your sole

8    decision to administer the Versed to Mr. Gutzalenko.

9              Am I correct about that?

10   A.        Correct.

11   Q.        Okay.  And so none of the police officers at the

12   scene told you to administer Versed to Mr. Gutzalenko; is

13   that correct?

14   A.        Nobody at the scene ordered me to give the Versed.

15   Q.        And none of the police officers suggested that you

16   administer Versed to Mr. Gutzalenko; is that correct?

17   A.        I don't remember any officers suggesting that to

18   me.

19   Q.        Thank you.

20             And where is the Versed kept in the ambulance?

21   Where specifically?

22   A.        It's kept in a secured box.  It has to be in a

23   double-locked vault, so to speak.

24   Q.        Okay.  And how is that lock opened?

25   A.        By two separate keys that I carry.

168

1    Q.        And you -- okay.

2              And at the scene of the incident, to your

3    knowledge, were you the only one there that had keys to that

4    vault?  That locked vault?

5    A.        Yes, I was.

6    Q.        Okay.

7    A.        I would probably call it a cabinet instead of a

8    vault because it's not very secure.  Other than just the two

9    locks on it.

10   Q.        Okay.  And the keys are the only way -- the two

11   keys are the only way to open that container; is that

12   correct?

13   A.        Correct.

14   Q.        Okay.  When you were -- let's go back to the time

15   that you were bandaging Mr. Gutzalenko's right hand.

16             I believe you said he was not handcuffed yet;

17   correct?

18   A.        Correct.

19   Q.        Did you perceive that at that time he began to

20   resist what you were doing: your attempt to bandage his

21   hand?

22   A.        Yes, he did.

23   Q.        Can you describe to me what he was doing?  What

24   resistance did you perceive?

25   A.        Sometimes he would pull -- try to pull his hand

169

1  away.  Sometimes he would try to grab my hand to prevent me

2  from wrapping his.  Sometimes he would grab at the bandaging

3  material that I had there to wrap his hand.

4  Q.       And was he also sort of thrashing around his

5  limbs?

6  A.       He appeared to be, yes.

7  Q.       And would you agree that this was -- this was sort

8  of violent resistance?  He was exerting a lot of energy?

9           ATTORNEY NISENBAUM:  I'm going to object to this

10  as leading.  Although I know he's not your client --

11           ATTORNEY FINE:  Yeah, he's not my witness.

12           ATTORNEY NISENBAUM:  I get that, but you are

13  aligned.  You are aligned.

14           ATTORNEY FINE:  That's your opinion.  That's fine.

15           ATTORNEY NISENBAUM:  You know.

16           Anyway, objection; leading.

17           ATTORNEY FINE: Q.  Okay.  Go ahead and answer.

18  A.       Yeah, he did appear to be, you know, violent and

19  not following commands.

20  Q.       Okay.  And did you perceive how the officers

21  responded to that resistance at all while you were bandaging

22  his hand?

23  A.       Can you clarify, please?

24  Q.       Sure.

25           Did it appear to you as you were bandaging the

170

1  hands, that the officers were also being aggressive with

2  Mr. Gutzalenko?

3  A.        I don't think that they were being overly

4  aggressive with him.  I think they were applying enough

5  restraint to keep everybody protected at that time.

6  Q.        Okay.  So just enough restraint without going

7  overboard?  Is that fair to say?

8  A.        Yes.

9  Q.        And you actually saw Mr. Gutzalenko thrash so hard

10  at one point that he knocked one of the body-worn cameras

11  off one of the officers; is that correct?

12  A.        That is correct.

13            ATTORNEY NISENBAUM:  Objection; mischaracterizes

14  the evidence.

15            ATTORNEY FINE:  Q.  And it was at that point that

16  you saw Mr. Gutzalenko actually thrash so hard that he

17  knocked off one of the officer's body-worn cameras, that you

18  decided it was going to be unsafe to try to get him on a

19  gurney without a chemical restraint; is that correct?

20  A.        Yes, that's one of the actions that made my

21  decision.

22  Q.        That's all I've got.

23            Thank you very much for your time today.  I really

24  appreciate it.

25  A.        You're welcome.

171

1          THE REPORTER:  Anyone else?

2          ATTORNEY KANTER:  Okay.  We're all done.

3          ATTORNEY NISENBAUM:  All right.  Fantastic.

4          THE REPORTER:  Can I get orders for the transcript

5   on the record, please, from the attorneys, starting with

6   Mr. Kanter?

7          ATTORNEY KANTER:  Yes, I'll take an electronic

8   copy.

9          ATTORNEY FINE:  Mr. Fine.  Yes, please.

10         THE REPORTER:  Thank you.  I'm off the record.

11         (Whereupon, the deposition concluded at

12         3:20 P.M.)

13                      --o0o--

14

15

16

17

18

19

20

21

22

23

24

25

172

1          REPORTER'S CERTIFICATE

2

3          I, Debra J. Skaggs, Certified Shorthand

4    Reporter in and for the State of California, do hereby

5    certify:

6          That the foregoing witness was by me duly

7    sworn; that the deposition was then taken remotely

8    before me at the time and place herein set forth; that

9    the testimony and proceedings were reported

10   stenographically by me and later transcribed into

11   typewriting under my direction; that the foregoing is a

12   true record of the testimony and proceedings taken at

13   that time.

14       I further certify that pursuant to FRCP Rule

15   30(e)(1), before completion of the deposition, review of

16   the transcript [ ] was [X] was not requested.

17       I further certify I am neither financially

18   interested in the action nor a relative or employee of

19   any attorney or party to this action.

20       IN WITNESS WHEREOF, I have subscribed my name on

21   this 9th day of December, 2024.

22

          ___/s/Debra J. Skaggs_____
23        DEBRA J. SKAGGS, CSR No. 7857

24

25

                                                      173

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--OOo--

IVAN GUTZALENKO, Deceased,    )
through his Co-Successors in  )
Interest, N.G. and N.I.G.,    )
minors through their mother   )   **CERTIFIED COPY**
and Next Friend, Honey        )
Gutzalenko, individually      )
and as Co-Successors in       )
Interest for IVAN GUTZALENKO, )
Deceased,                     )  Case No.:
                              )  3:22-cv-02130-EMC
              Plaintiffs,     )
                              )
         vs.                  )
                              )
CITY OF RICHMOND, et al.,     )
                              )
                              )
             Defendants.      )  CERTIFIED COPY
_____)

VIDEOCONFERENCE

DEPOSITION OF LIEUTENANT DANIEL REINA - PMK

WEDNESDAY, SEPTEMBER 11, 2024

1:31 p.m. - 3:24 p.m.

REPORTED BY:  DEBRA J. SKAGGS, CSR NO. 7857

1

1                          INDEX OF EXAMINATION

2                                                      PAGE

3     PROCEEDINGS:                                     6

4     EXAMINATION BY

5          Attorney Cook                               7

6          Attorney Fine                               78

7                              --o0o--

8

9     Appearance Page                                  3

10    Exhibit Page                                     4

11    Location                                         5

12    Reporter's Certificate                           80

13    Disposition                                      81

14    Attorney's Notes                                 82

15

16                             --o0o--

17

18

19

20

21

22

23

24

25

                                                          2

```
 1                    REMOTE APPEARANCES

 2

 3   FOR PLAINTIFF:

 4       LAW OFFICES OF JOHN L. BURRIS
         BY: JAMES COOK, ATTORNEY AT LAW
 5       Airport Corporate Centre
         7677 Oakport Street, Suite 1120
 6       Oakland, California 94621
         (510) 839-5200  Fax: (510) 839-3882
 7       James.Cook@johnburrislaw.com

 8

     FOR DEFENDANTS CITY OF RICHMOND and OFFICERS HALL AND
 9       TRAN and TAGORDA; ALSO PMK WITNESS REINA:

10       BY: NICHOLAS FINE, ATTORNEY AT LAW
         ORBACH, HUFF & HENDERSON LLP
11       6200 Stoneridge Mall Road, Suite 225
         Pleasanton, CA 94588
12       (510) 999-7908  Fax:  (510) 999-7918
         nfine@ohhlegal.com

13

14   FOR DEFENDANT AMERICAN MEDICAL RESPONSE:

15       BY: JACKIE CHING, ATTORNEY AT LAW
         HINSHAW, MARSH, STILL & HINSHAW, LLP
16       12901 Saratoga Avenue
         Saratoga, California 95070
17       (408) 861-6500 Fax (408) 257-6645
         jching@hinshaw-law.com

18

19   ALSO PRESENT:

20       CRYSTAL MACKEY, Law Clerk,
         LAW OFFICES OF JOHN L. BURRIS
21

22
                      --o0o--
23

24

25
                                                    3
```

1                      INDEX TO EXHIBITS

2                    LIEUTENANT DANIEL REINA

3                WEDNESDAY, SEPTEMBER 11, 2024

4
                           --o0o--
5

6                          EXHIBITS

7
   PLAINTIFF'S EXHIBITS:                          PAGE
8
   Exhibit 1      6 pages - Notice of Taking Deposition   16
9                 of Defendant PMK for the City of
                  Richmond
10

11                         --o0o--

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                      4

1           BE IT REMEMBERED that, pursuant to Notice on

2    Wednesday, September 11, 2024, commencing at the hour of

3    1:31 P.M., thereof; in their respective locations via

4    Zoom, as noticed by the attorneys for the Plaintiffs,

5    LAW OFFICES OF JOHN L. BURRIS, Airport Corporate Center,

6    7677 Oakport Street, Suite 1120, Oakland, California, was

7    before me, DEBRA J. SKAGGS, CSR No. 7857, a Certified

8    Shorthand Reporter, State of California, remotely

9    appeared.

10              LIEUTENANT DANIEL REINA,

11   sworn as a witness herein, appearing remotely; who, being

12   by me duly sworn or having affirmed, was examined and

13   testified as is hereinafter set forth.

14              --o0o--

15

16

17

18

19

20

21

22

23

24

25

5

```
 1                        PROCEEDINGS
 2                  (Witness duly sworn.)
 3            THE WITNESS:  (Inaudible.)
 4            THE REPORTER:  I'm sorry?
 5            THE WITNESS:  I do.
 6            Can you hear me?
 7            ATTORNEY FINE:  Yeah, I think the volume is kind
 8       of...
 9            THE WITNESS:  Can you hear me now?
10            ATTORNEY FINE:  It might just be your proximity to
11       the microphone.
12            THE WITNESS:  Okay.  Let me try one other thing.
13       Hold on.
14            ATTORNEY FINE:  That's way better right there.
15            THE WITNESS:  Right here?
16            ATTORNEY COOK:  Yeah.  Just move --
17            ATTORNEY FINE:  Yeah.
18            THE WITNESS:  Okay.
19            And for the record, yes, I do.
20            THE REPORTER:  Will the witness state the city and
21       state where you're located taking your deposition, please.
22            THE WITNESS:  City of Richmond, State of
23       California.
24            THE REPORTER:  Thank you.
25            Will the attorneys state their appearances, who
```

6

1    they represent, and anyone else in the room with them as a

2    party to the case, please.

3            ATTORNEY COOK:  James Cook and Crystal Mackey for

4    the Plaintiff.  James Cook is in Minneapolis, Minnesota.  We

5    represent the Plaintiffs.  Crystal is our law clerk for

6    Burris's office.

7            ATTORNEY FINE:  Nick Fine for the City of

8    Richmond; Officers Mark Hall, Tom Tran, and Cedric Tagorda;

9    as well as the deponent, Lieutenant Daniel Reina.  And there

10   are no other parties in the room with me.

11           ATTORNEY CHING:  Jackie Ching on behalf of

12   Defendant AMR.  No one else is present in this room.

13           THE REPORTER:  Okay.  You can begin.

14           ATTORNEY COOK:  Okay.  Excellent.

15                         EXAMINATION

16   BY ATTORNEY COOK:

17   Q.      Okay.  So -- let me see -- let me get started

18   here.

19           Lieutenant Reina, if you can state your name for

20   the record and spell your last name.

21   A.      Yes.  Daniel Reina.  Last name is spelled

22   R-e-i-n-a.

23   Q.      Okay.  Where are you currently employed?

24   A.      For the Richmond Police Department.

25   Q.      And what's your current position and rank?

7

1  A.          Currently I'm the Lieutenant in charge of the

2  Administrative Bureau.

3  Q.          Just a moment.  Let me just move some things

4  around here.

5              Have you ever been deposed before?

6  A.          No.

7  Q.          Okay.  So I'm going to give you some admonitions

8  for you to -- just to sort of remember before we get going

9  on the deposition.  But -- so, you know, you just took an

10 oath to -- and basically, even though we're not in a

11 courtroom -- you know -- you took an oath to tell the truth,

12 and it carries the same kind of, you know, weight as if you

13 were testifying -- the only difference is we just don't have

14 a judge here today.

15             Does that make sense to you?

16 A.          Yes.

17 Q.          Okay.  So you understand your obligation to tell

18 the truth?

19 A.          Yes.

20 Q.          Is there any reason why you can't testify

21 truthfully today?  For instance, are you under the influence

22 of any drugs, or alcohol, or prescription drugs that would

23 keep you from testifying?

24 A.          No, I'm not.

25 Q.          Okay.  And -- okay.  So I think I sort of said

8

1    this, but there is nothing that would keep you from

2    testifying truthfully today; is that correct?

3    A.        Correct.

4    Q.        Okay.  Do you intend to tell the truth?

5    A.        Yes.

6    Q.        Okay.  So -- again, even though we're not in a

7    courtroom, the reporter is taking down everything that we

8    say.  And so it's important for you to answer audibly and

9    speak clearly and slowly -- we don't want to talk over each

10   other -- so that we can create a clean record.

11            Does all of that make sense to you?

12   A.        Yes.

13   Q.        Okay.  So you have two attorneys here, so from

14   time to time they're going to object, just like you see on

15   TV, like on Law & Order or something, where they stand up

16   and object.  I mean, they're not going to stand here, but

17   they'll object.  And that's so that they can, you know, make

18   the objection to my question on the record.  Regardless, I'm

19   entitled to your answer unless your attorney instructs you

20   not to answer.

21            Does that make sense to you?

22   A.        Yes.

23   Q.        Okay.  At some point you're going to receive a

24   transcript of the deposition of your testimony today, and

25   you can make changes to it.  Okay?  But if you do, and this

                                                                  9

1   case goes to trial, I can use this to do what's called

2   impeach you, you know, if you change something that's

3   opposite to what you said when you testified.

4           Does that make sense to you?

5   A.      Yes.

6   Q.      All right.  So -- you know -- I don't want you to

7   guess on anything.  You can make estimates.  And the

8   difference between a guess and an estimate is you can -- you

9   can, you know, guess the size of the table, you know, or

10  estimate the size of the table that you're sitting at right

11  now, but you can only guess the size of the table that I'm

12  sitting at right now.

13          Does that make sense?

14  A.      Yes.

15  Q.      Yeah, it's based on what you, you know, know

16  personally.  Okay?  So, you know, you don't want to guess if

17  you don't have personal knowledge of it.

18          Does that make sense?

19  A.      Yes.

20  Q.      Okay.  You can take a break at any time, but what

21  I ask is that if there is a question pending, that you

22  answer the question before you take a break.  Okay?

23  A.      Okay.

24  Q.      Does that make sense?

25  A.      Yes.

                                                              10

1    Q.        All right.  And, you know, you can't ask for

2    coaching if you take a break.  I mean, I can ask you if you

3    were coached; I can't ask you about the substance of your

4    conversation with the attorney, but you're not supposed to

5    be coached.

6              Does that make sense?

7    A.        Yes.

8    Q.        Okay.  So you're being -- you understand that I'm

9    asking you questions, you're being deposed, so I can ask you

10   questions about the case of Gutzalenko versus Richmond?

11   A.        Correct.  Yes.

12   Q.        Okay.  And you understand that the date giving

13   rise to this incident was approximately March 10, 2021, at

14   approximately 10:35 A.M.?

15   A.        Yes.

16   Q.        And this incident involved the death of Ivan

17   Gutzalenko.  Is that your understanding?

18   A.        Yes.

19   Q.        The location of this incident was approximately --

20   well, there was an address -- but the Richmond Furniture

21   Store, which is located at 1260- -- 12669 San Pablo Avenue

22   in Richmond.

23             Does that ring a bell?

24   A.        I don't know if that's the exact address, but yes,

25   I know it's on San Pablo Avenue.  In or about that area.

                                                              11

```
1   Q.        Okay.  Of Richmond; right?

2   A.        Correct.

3   Q.        All right.  And the officers that were --

4   responded, you know, in the incident included Officer Tom

5   Tran, Officer Cedric Tagorda, and Mark Hall.

6             Is that your understanding?

7   A.        Yes.

8   Q.        Okay.  So throughout the deposition -- throughout

9   this deposition, I'm going to refer to the incident, and

10  basically I'm talking about the events giving rise to this

11  particular lawsuit.

12            Does that make sense to you?

13  A.        Yes.

14  Q.        What's your -- let's talk a little bit about your

15  credentials and so on.

16            What's your highest level of education?

17  A.        A bachelor's degree.

18  Q.        A bachelor's degree in what?

19  A.        Interdisciplinary studies.

20  Q.        And did you -- I mean, I'm assuming that you

21  completed the police academy?

22  A.        Yes.

23  Q.        Okay.  So you became POST-certified, and you're

24  sworn and all that, right?

25  A.        Yes.
```

12

1  Q.        And then did you -- you're a lieutenant.  Did you

2  take -- do any special training for this particular

3  position?

4  A.        Are you --

5  Q.        Aside from regular police department training?

6  A.        Are you referring to for the rank of lieutenant?

7  Q.        Yes.

8  A.        Yeah.  I mean, I attended a POST management course

9  once I was promoted to the rank of lieutenant.  I've taken

10 several courses throughout my career.  Were they directly

11 related?  No.  But they were part of the POST curriculum.

12 Q.        Okay.  Any other special training for this

13 particular position today?

14           ATTORNEY FINE:  It's vague as to "special

15 training."

16           ATTORNEY COOK:  Q.  Yeah.  I mean, I'm just

17 wondering have you -- you know -- you were identified as the

18 PMK, so is there any other education or -- that's relevant

19 to this?

20 A.        I --

21           ATTORNEY FINE:  Vague.

22           Go ahead.

23           THE WITNESS:  I think you want me to kind of

24 expound upon my career and what I've done?  Is that --

25           ATTORNEY COOK:  Q.  Yes.  Yes.

                                                    13

```
 1   A.          Okay.  If that's the case, I started in the police

 2   department back in 2006 as a police officer attending a

 3   police academy.

 4              Graduated from that --

 5   Q.          I can't hear you.  You're kind of breaking up.

 6   A.          Yeah, this connection seems to be bad.

 7              Can you hear me now?

 8              ATTORNEY FINE:  So James, I hate to say it.  I

 9   think it might be on your end.  I think Lieutenant Reina --

10              ATTORNEY COOK:  Oh, it's my end?

11              ATTORNEY FINE:  Yeah.  Unless someone else

12   disagrees -- (Simultaneous talking; inaudible.)

13              ATTORNEY COOK:  I'm going to turn off my video --

14              ATTORNEY FINE:  (Simultaneous talking; inaudible.)

15              ATTORNEY COOK:  No, I'm going to turn off my

16   video.  It's probably me.  I'll turn off my video.

17              ATTORNEY COOK:  Q.  All right.  Go ahead.

18              That usually does the trick.

19   A.          I attended a police academy and graduated from

20   that in 2006.  From there I worked the streets.  I went to

21   FTO training; graduated FTO.  Went on to working patrol; did

22   that for about a year and a half on the streets of Richmond.

23   I then became a GATE detective for about four years.  Then

24   transferred over to a narcotics detective for three years.

25   Then was a K-9 handler for a number of years; about three
```

14

1   years, three and a half years.  Became an FTO instructor at
2   that time.  In 2014 I became a Use of Force instructor for
3   the department.  In 2017 I became a Firearms instructor for
4   the department.  In about 2010 I became a SWAT team member
5   for the department.  Part of that included being part of
6   their designated marksman unit.  Promoted to the rank of
7   Sergeant in 2018.  Attended POST-required supervisory
8   school.  From there I became a SWAT team leader; still part
9   of the K-9 program as far as the K-9 coordinator.
10          I went on to get promoted -- and during that time
11  I was still a Use of Force instructor teaching the
12  department.  I'm still a Firearms instructor teaching the
13  department.  That never changed.
14          I went on to get promoted to the rank of
15  Lieutenant, and again, still oversee different collateral
16  assignments within the department.
17          And we can go into that if you'd like, or --
18  (Internet connection issue.)
19          THE REPORTER:  Sorry, the screen froze on the
20  witness.
21          THE WITNESS:  -- different collateral assignments
22  throughout my rank as Lieutenant, ranging from Use of Force
23  Review Board, Manager, Training Manager.  So I've held
24  different, and currently hold different, collateral
25  assignments within the department.

15

1    ATTORNEY COOK: Q.  Okay.  Understood.  Thank you.

2    I'm going to show you the deposition notice.

3    We'll mark this as Exhibit, what do we say, 1?  Or however

4    you suggest we mark it.

5    THE REPORTER:  1 is good.

6    (Plaintiffs' Exhibit 1 marked

7    for identification.)

8    ATTORNEY COOK: Q.  So you saw this deposition

9    notice today?

10   A.       I see it, yes.

11   Q.       Yeah, you've seen it -- okay.  So you've seen

12   this.

13   So we sent this on, and then they -- you know, we

14   kind of -- the process is to go back and forth with the

15   attorneys, and then they say okay, we're going to identify a

16   person to answer, you know, these questions.

17   So you saw these categories -- these matters on

18   which you're going to be questioned; right?

19   A.       Correct.

20   Q.       Okay.  And you've read through these?  The use of

21   sedatives regarding, you know, sedatives as a restraint;

22   policies and procedures; statistical information; and then

23   we have some stuff about use of force at the bottom.  And

24   you -- it sounds like you have extensive experience with the

25   use of force.

16

1              Just some questions about this.

2              So you understand -- I mean, you -- based on these

3    categories that you're looking at -- I mean, you -- you were

4    selected as the person most qualified or person most

5    knowledgeable; right?  I mean, that's your understanding?

6    A.        Yes.

7    Q.        Okay.  And is there any reason why you don't think

8    you can discuss any of these topics as the PMK today?

9    A.        Yes, there is.

10   Q.        Okay.  What reason is that?

11   A.        Well, as it relates to sedatives -- we have no

12   policy on sedatives; we don't administrate that; we have

13   no -- nothing to do with that type of stuff.  So we have

14   no -- I am no expert in the administration of sedatives.  We

15   have no policy on sedatives.  So anything related to

16   sedatives, I would not be a person most knowledgeable in

17   that area.  My guess is it would be some type of doctor;

18   medical professional.

19   Q.        Okay.  So basically for the first three, really,

20   and then also for 5 and -- well, let's talk about the first

21   three.  You're saying that the department has no policy

22   regarding the use of sedatives as a restraint; is that

23   correct?

24   A.        Correct.

25   Q.        And then what about even -- is there any policy

                                                              17

1    with respect to assisting -- assisting, say, you know,

2    emergency technicians or emergency personnel -- emergency

3    medical personnel with administering sedatives?

4    A.        Again, no policy on -- (Simultaneous talking;

5    inaudible.)

6              ATTORNEY FINE:  (Simultaneous talking; inaudible.)

7              THE REPORTER:  I'm sorry.  Hold on.

8              The objection?

9              ATTORNEY FINE:  Objection; vague as to

10   "assisting."

11             ATTORNEY CHING:  And I'll join in that objection

12   as well.  Jackie Ching.

13             ATTORNEY COOK: Q.  Okay.  Go ahead, Lieutenant.

14   A.        Again, no policy.

15   Q.        Okay.  And then again, the same thing in terms of

16   statistical information about sedatives, using sedatives as

17   a restraint, and also information related to deaths or

18   injuries, you know, from sedatives.

19             Is there no -- there is no policy or statistical

20   information that's been gathered; is that what you're

21   saying?

22   A.        Correct.

23   Q.        Okay.  Is there ever a situation when an officer

24   from the City of Richmond Police Department can request that

25   sedatives be used on an arrest subject?

                                                              18

1    ATTORNEY FINE:  Incomplete hypothetical; vague and
2    ambiguous.
3    ATTORNEY COOK: Q.  Go ahead, Lieutenant.
4    A.    We don't -- we have no oversight on that.  We
5    don't recommend that.  That's all medical personnel's
6    responsibility.  We don't have any role in that.
7    Q.    Okay.  Let me say -- when I say "assist" -- you
8    know -- let me kind of be more specific about that.
9          Is there -- are officers trained in any situation
10   where they would assist emergency medical personnel in
11   administering a sedative as a restraint?
12         And what I mean by that is, you know, where they
13   would, you know, help the EMT remove clothing or -- well,
14   let's start with that: help the EMT remove clothing.
15   ATTORNEY FINE:  Vague and ambiguous; incomplete
16   hypothetical.
17   ATTORNEY CHING:  Join.
18   ATTORNEY COOK: Q.  Lieutenant?
19   A.    We have no policy as it relates to sedatives or
20   administration of it.
21   Q.    Okay.  And again, to follow up on that same
22   question.
23         Any situation where -- you know, any policy or
24   procedure where a police officer would assist an EMT in
25   administering a sedative by restraining the arrest subject?

                                                      19

1           ATTORNEY FINE:  Vague and ambiguous; incomplete

2    hypothetical; overbroad.

3           ATTORNEY CHING:  I'll join the objection as well.

4           THE WITNESS:  Again --

5           ATTORNEY COOK: Q.  Go ahead, Lieutenant.

6    A.         -- we have no procedures, no SOPs, no policy as it

7    relates to administering sedatives at all.

8    Q.         Okay.  So in a situation if a Richmond police

9    officer was to assist an EMT in the administration of a

10   sedative by either, you know, removing clothing or, you

11   know, some type of a physical restraint -- would this be

12   outside of, I guess, their training or department policy?

13          ATTORNEY FINE:  Same objections.

14          ATTORNEY CHING:  I'll join that objection.

15          THE WITNESS:  Yeah, we have no procedures or no

16   policy on it, so yes.

17          ATTORNEY COOK: Q.  Okay.  Is there anyone in the

18   department that would be -- in your department, that you can

19   think of, that would be more knowledgeable on the topic of

20   the use of sedatives as a restraint or statistical

21   information about sedatives?

22          ATTORNEY FINE:  Mischaracterizes prior testimony;

23   and asked and answered to a certain extent.

24          Go ahead.

25          THE WITNESS:  Yeah.  Again, we have no policy or

                                                          20

1  procedures on the use of sedatives.   That would be for

2  medical personnel to determine that information, or a

3  doctor.

4          ATTORNEY COOK: Q.  Okay.  In terms of the other

5  categories when we're talking about use of force, and use of

6  force on subjects experiencing a mental health crisis, and

7  de-escalation techniques regarding use of force -- you're

8  prepared to answer questions regarding those categories; is

9  that correct?

10 A.      Yes.

11 Q.      And you understand as a PMK, you have to testify

12 to any information that's, you know, I guess, readily

13 available or reasonably available to you; is that correct?

14 A.      Yes.

15 Q.      Did you bring any documentation with you today,

16 you know, to -- as far as on those remaining three

17 categories, 7 through 9?

18 A.      Did I bring --

19         ATTORNEY FINE:  Vague --

20         ATTORNEY COOK: Q.  Regarding --

21         ATTORNEY COOK:  Okay.  Go ahead.  Sorry -- sorry,

22 Counsel.  Go ahead.

23         ATTORNEY FINE:  No, I'll just -- I don't recall

24 there being any document requests in the PMK deposition

25 notice.  I don't think he was required to bring anything

                                                         21

1    today.

2              ATTORNEY COOK:  No, not that he was required; I'm

3    wondering if he did.

4              ATTORNEY FINE:  Oh.

5              ATTORNEY COOK:  If he -- on his own accord.

6              ATTORNEY FINE:  Got you.

7              ATTORNEY COOK: Q.  Did you bring any documents

8    with you today?

9    A.        All I have is a notepad that I'm going to scratch

10   notes down with, and that's it.

11             ATTORNEY FINE:  My apologies, James.

12             ATTORNEY COOK:  Yeah.  No problem.  We'll work it

13   out.

14             ATTORNEY COOK: Q.  Let's see.

15             Did you review any documents in preparation for

16   this deposition today?

17   A.        Yes.

18   Q.        Okay.  What did you review?

19   A.        Reviewed Policy 300, our Use of Force policy.

20   Reviewed the video of the incident.

21   Q.        Anything else --

22   A.        No.

23   Q.        -- that you can think of?  Okay.

24             Which video of the incident did you review?

25   A.        Officer Tran's video.

                                                           22

1              No.  Sorry.  Officer Tagorda's.

2    Q.        Okay.  There were some reports that were

3    completed -- Internal Affairs reports -- or I guess I should

4    just say -- let me just say reports that were completed, and

5    other documents.  Did you review any of those documents?

6    A.        I did not review it.  I know that there is a

7    report because I testified in that.  Or I gave my statement

8    of expertise in that one.

9    Q.        So you didn't review any of those reports in

10   preparation for the deposition today?

11   A.        Not -- not the IA one, no.

12   Q.        Okay.  There was a -- did you review the coroner's

13   report?

14   A.        Yes, I did.  Sorry.

15   Q.        There was a protocol report, Protocol -- maybe OPP

16   or something like that, or Protocol Report with interviews,

17   like with Tran and Hall.  Did you review those today -- or

18   before today in preparation?

19   A.        No.  I'm not familiar with that.

20   Q.        Okay.  What about -- there was a public summary.

21   Did you review that?

22   A.        No.

23   Q.        You're familiar with Learning Domain 33, though.

24   I mean, as a Use of Force expert; is that correct?

25   A.        Yes.  Correct.

                                                              23

1    Q.        Okay.  And just -- and I think in terms of Policy

2    300, and really the Learning -- like, Policy 300 is Use of

3    Force, and also the learning domain, Learning Domain 33.  I

4    mean, really, the use of -- let me just...

5            The Section 300 is -- it kind of tracks Learning

6    Domain 33 in terms of the content and what is taught in the

7    department regarding the use of force; is that correct?

8            ATTORNEY FINE:  Vague and overbroad.

9            THE WITNESS:  Yes.

10            ATTORNEY COOK: Q.  But that was a "yes"; right,

11   Lieutenant?

12   A.        Yes.

13   Q.        Okay.  Like, for instance -- I mean, use of

14   force -- it has to be reasonable; is that correct?

15   A.        Yes.

16   Q.        All right.  And then, if there is -- if it's

17   reasonably -- and we're talking about Learning Domain 33 and

18   some of the similarities with Section 300.

19            The idea is that if officers want to, you know,

20   attempt to de-escalate, they've got to use their best

21   efforts to de-escalate when reasonable and safe to do so; is

22   that correct?

23            ATTORNEY FINE:  Incomplete hypothetical; vague and

24   overbroad.

25            ATTORNEY COOK: Q.  Lieutenant?

                                                          24

1    A.         Can you repeat the question?  Sorry.

2    Q.         Yeah.

3            When -- you know -- if there is an opportunity,

4    officers should use their best efforts to de-escalate the

5    situation with an arrest subject if it's reasonable and it's

6    reasonably safe to do so; is that correct?

7            ATTORNEY FINE:  Same objections.

8            Go ahead.

9            THE WITNESS:  Yes.

10            ATTORNEY COOK: Q.  Okay.  And sometimes with

11   confrontations -- and really, this is Learning Domain 33.

12            Confrontations where police officers -- peace

13   officers have to go hands-on -- there are certain areas of

14   the body which require, you know, maximum protection where

15   reasonable; is that correct?

16            ATTORNEY FINE:  Incomplete hypothetical; vague and

17   overbroad.

18            THE WITNESS:  I don't understand your question.

19            ATTORNEY COOK: Q.  Yeah.  For instance, if an

20   officer has to go hands-on -- you know -- there are certain

21   areas that they want to avoid.  I guess, you know, attacking

22   or -- you know -- they want to avoid -- in general -- want

23   to avoid injury to, such as the head, the neck, the spine,

24   and the back.  Is that correct?

25            ATTORNEY FINE:  Same objections.

                                                           25

1          THE WITNESS:  I think it depends on the situation

2    and what's occurring.  If that's the only place available to

3    apply physical force, then that's what they're going to use.

4    I mean --

5          ATTORNEY COOK: Q.  Right.

6    A.        -- obviously we're not going to strike someone in

7    a head with a flashlight -- obviously it could be deadly

8    force -- but it depends on the situation.  So I need it to

9    be a little bit more specific to kind of answer that.

10   Q.        Okay.  But generally the learning domain -- I

11   guess I'm just asking you, just based on your knowledge as

12   an instructor, there are areas that officers want to

13   avoid -- unless they avoid striking -- during the course of

14   an arrest, and those areas include the head, neck, back, and

15   spine.  Is that correct?

16         ATTORNEY FINE:  Same objections.

17         THE WITNESS:  There is areas where we try to

18   avoid, yes.  But, I mean, just given the situation, it just

19   depends.  And I think --

20         ATTORNEY COOK: Q.  Okay -- go ahead.

21   A.        I think learning domain talks about officers'

22   protection where they should be protecting themselves from

23   attacks.

24   Q.        Okay.  But also -- during the arrest, you also

25   want to avoid -- if you can; when reasonable.  Again, note

                                                          26

1    that I'm saying "when reasonable."

2            You want to avoid those areas on an arrest subject

3    during the course of an arrest; is that correct?

4            ATTORNEY FINE:  Same objections.

5            THE WITNESS:  Yes.

6            ATTORNEY COOK: Q.  Okay.  Similarly, those are --

7    some officers -- I mean, those are also the body parts where

8    officers need to -- they just generally need to be aware, I

9    mean, for their own safety as well; is that correct?

10           ATTORNEY FINE:  Vague and ambiguous; overbroad;

11   incomplete hypothetical.

12           THE WITNESS:  Yeah, there is spots that would make

13   the officer vulnerable, so yes.

14           ATTORNEY COOK: Q.  All right.  So I'm showing

15   you -- I mean, you're familiar with this, right?  This is

16   Learning Domain 33.

17   A.      Yes.  It appears so.  I mean, I can't see a

18   header, but yes, it looks familiar.  Yes.

19   Q.      Okay.  And then -- you know -- it talks about

20   areas of the body which require maximum protection.  Right.

21   During confrontations.  Right.

22   A.      Yes.

23   Q.      Okay.  And then there is -- my understanding is

24   that there are certain positions that officers can use --

25   well, first of all, let me just ask you.  Do you personally

27

1    have any martial arts training?

2              ATTORNEY FINE:  Relevance; outside the scope of

3    the PMK depo notice.

4              Go ahead and answer.

5              THE WITNESS:  Limited.  As a child, I had some

6    martial arts training.  Most recently in the last eight

7    months, yes.

8              ATTORNEY COOK: Q.  Okay.  So -- and what is it?

9    And I'm asking -- just for context, Counsel -- maybe --

10   well, I don't think it's outside of the scope.

11             But just for context, what is that training that

12   you have?

13             ATTORNEY FINE:  Same objections.

14             THE WITNESS:  As a child, as a juvenile, I did

15   some Taekwondo training.  Recently in the last eight months,

16   beginner jujitsu.  Brazilian jujitsu.

17             ATTORNEY COOK: Q.  Okay.  So -- and that's what I

18   was getting at.

19             Okay.  So you're familiar -- this is Learning

20   Domain 33, and we're talking about -- and they're talking

21   about ground positions for controlling an arrest subject.

22             So you're familiar with the concept of back mount,

23   top mount -- as I'm showing you on the screen -- side

24   control, and then guard; is that correct?

25             ATTORNEY FINE:  Compound.

28

1          THE WITNESS:  Yes.

2          ATTORNEY COOK:  Q.  Okay.  And these are all

3    positions that are taught in the police academy and also you

4    learn as a beginning jujitsu practitioner; is that correct?

5          ATTORNEY FINE:  Compound; vague and ambiguous.

6          THE WITNESS:  I've learned some in my experience

7    with jujitsu, yes.  In --

8          ATTORNEY COOK:  Q.  Okay.

9    A.        And in the academy, I don't recall learning all of

10   these techniques.  It could be something new that they're

11   training.

12   Q.        Okay.  But this is taught -- these positions are

13   taught in the learning domain, is your understanding, at

14   least, currently.  Right?  Within the last several years?  I

15   mean, we're looking at Learning Domain 33: Chapter 7, and

16   that's Ground Control.

17   A.        Yes, it is.  I don't know what version this is,

18   but yes.

19   Q.        Okay.

20         ATTORNEY FINE:  Would it be possible to show the

21   witness, like, the cover page and --

22         ATTORNEY COOK:  Yeah, yeah, yeah.  Let me --

23         ATTORNEY FINE:  -- just to give him some context?

24   I appreciate it.

25         ATTORNEY COOK:  Q.  Version 5.1 -- so I'm just

                                                              29

1    showing you the cover page of this learning domain.

2    A.        Is there a revision date?  I don't see that.

3              ATTORNEY FINE:  It might be on page 2.

4              Copyright 2005 -- there you go.

5              ATTORNEY COOK: Q.  2005.  Yeah.  "Revised

6    February 2022."

7    A.        Okay.

8              ATTORNEY FINE:  Thank you, Counsel.

9              ATTORNEY COOK:  We have it, yeah.  So, I mean, the

10   most recent revisions are 2020, and then 2022.  I'm just

11   going to make note of it, yeah.  July 2020.  It kind of

12   coincides with -- okay, I'll just leave it at that.  But,

13   okay, those are the revision dates.

14             ATTORNEY COOK: Q.  Okay.  So I wanted to show you

15   that.

16             Stop sharing.  Actually, let me just go back there

17   real quick.  Let's...

18             So this side control position -- first of all, you

19   probably learned this as a beginning practitioner, is that

20   correct, and so you're familiar with it?

21             ATTORNEY FINE:  Vague.

22             THE WITNESS:  I'm still learning it.  I'm not

23   the -- in no way any expert.  Like I said, I just started

24   in the jujitsu -- Brazilian jujitsu art.  I don't know

25   much about it.

                                                          30

1          ATTORNEY COOK: Q.  Okay.  But you've learned about

2    side control, and this is a technique that they also teach

3    in the learning domain, clearly; is that correct?

4          ATTORNEY FINE:  Vague.

5          THE WITNESS:  It's in the learning domain.  I

6    don't know when it was taught.  Like I said, I don't recall

7    this being taught when I went through the academy.  If it

8    was revised in 2020 and then taught moving forward -- I

9    don't know.

10          ATTORNEY COOK: Q.  Okay.  I'm sorry, when did you

11    finish the academy again?

12    A.        2006.

13    Q.        Okay.  Okay.  So well -- probably well before any

14    of this.  Okay.

15          But in terms of side control -- that can be -- for

16    police officers -- that can be accomplished with, you know,

17    going chest to chest; or you can put your knee, for

18    instance, on the person's body as well to accomplish that;

19    is that correct?

20    A.        On side control?

21          ATTORNEY FINE:  (Simultaneous talking; inaudible.)

22          THE REPORTER:  I'm sorry.  Hold on.

23          ATTORNEY FINE:  Incomplete hypothetical; vague and

24    ambiguous; overbroad.

25          Sorry.  Go ahead.

31

1      ATTORNEY COOK: Q. Go ahead, Lieutenant.

2  A.      I don't know if that's -- I guess I'm trying to

3  picture what you're trying to describe to me.

4          So what the picture depicts is someone, it looks

5  like, chest to chest. I don't see a knee on them at all.

6  So I can't say if that's an accurate side control position,

7  but -- I don't know that.

8  Q.      Yeah, the picture shows chest on chest, but side

9  control can also be accomplished by using your knee; is that

10 correct?

11         ATTORNEY FINE: Vague and ambiguous; overbroad;

12 lacks foundation; incomplete hypothetical.

13         THE WITNESS: Yeah, I don't know. Again, my

14 experience with side control is the knees are on the ground,

15 maybe up against the body. But not on top, if that's what

16 you're implying -- or asking.

17         ATTORNEY COOK: Q. You agree that side control can

18 also be accomplished with placing your knees on the body?

19         ATTORNEY FINE: Same objections.

20         THE WITNESS: I don't -- I don't agree with that.

21 I don't -- I think there is a specific technique to it in my

22 understanding and in my experience. But again, my limited

23 experience with Brazilian jujitsu is very limited.

24         ATTORNEY COOK: Q. Got you.

25         And in terms of the general orders for the

                                                        32

1    Richmond Police Department in Section 300, which you

2    reviewed today.  When we're talking about the use of force,

3    the idea is that an officer should only use the amount of

4    force that's reasonably necessary given the facts and the

5    totality of the circumstances; is that correct?

6    A.        Yes.

7    Q.        And generally, the use of force should be, you

8    know, reasonably proportional to the suspected seriousness

9    of the offense and the perceived level of -- or -- of the

10   threat; is that correct?

11             ATTORNEY FINE:  Vague and ambiguous; overbroad;

12   incomplete hypothetical.

13             THE WITNESS:  Yes.

14             ATTORNEY COOK: Q.  And objectively, force can be

15   used to effectuate an arrest, or prevent escape, or overcome

16   resistance.  Is that something that's also taught in the

17   Policies and Procedure Section 300?

18             ATTORNEY FINE:  Same objections.

19             THE WITNESS:  Yes.

20             ATTORNEY COOK: Q.  Okay.  And then, you know, when

21   the use of force is analyzed -- you know -- I guess at a

22   later date or -- you know -- there is factors that are

23   considered; is that correct?

24             ATTORNEY FINE:  Same objections.

25             THE WITNESS:  Correct.

33

1          ATTORNEY COOK: Q.  Okay.  And some of those

2    factors that are considered as to whether or not the use of

3    force is justified can be, like, you know, the immediacy and

4    severity of the threat to officers or others, or the -- and

5    the conduct of the subject; is that correct?

6          ATTORNEY FINE:  Same objections; calls for legal

7    conclusion.

8          ATTORNEY COOK: Q.  But again, I'm asking you

9    questions related to Section 300.  So -- and you actually --

10   actually train people on use of force; is that correct?

11   A.        Yes.

12   Q.        So other factors that are considered in whether or

13   not the use of force is justified is, for instance -- I'm

14   just giving you some for instances -- conduct of the suspect

15   leading up to the arrest?  Is that another factor?

16   A.        Yes.

17   Q.        Okay.  And then another factor might be the mental

18   state or mental capacity of the arrest subject; is that

19   correct?

20   A.        Yes.

21   Q.        And then yet another factor is the subject's

22   ability to understand and comply with the officer's

23   commands.  Is that a factor that's considered?

24   A.        Yes, it is.  I think it's one in the same, but

25   yes.

                                                            34

1    Q.        Another factor that might be considered is the

2    availability of other reasonable and feasible options

3    besides the use of force; is that correct?

4              ATTORNEY FINE:  Objection --

5              THE WITNESS:  De-escalation?

6              THE REPORTER:  I'm sorry.  Hold on.

7              "Objection..." --

8              ATTORNEY FINE:  Just vague and overbroad.

9              You can answer.

10             THE WITNESS:  Like, de-escalation?  Is that what

11   you're asking?

12             ATTORNEY COOK:  Q.  Sure.  TASERs; de-escalation.

13   A.        Yes.

14   Q.        Yeah.  To be honest, I just took the language

15   right out of Section 300.  But, okay.

16             Another factor to determine the reasonableness of

17   force is the seriousness of the suspected offense; is that

18   correct?

19             ATTORNEY FINE:  Asked and answered.

20             THE WITNESS:  Yes.

21             ATTORNEY COOK:  Q.  Another factor is whether the

22   subject appears to be resisting, attempting to evade arrest

23   by flight, or is attacking the officer.  Is that -- that's

24   another factor; correct?

25   A.        Yes.

                                                           35

1    Q.        So you reviewed the videos, and I just want to

2    ask.  You saw when the officers arrived on the scene?  For

3    instance, when Tran arrived on the scene?  Is that correct?

4              ATTORNEY FINE:  Asked and answered.  I believe he

5    said he only watched Tagorda's video.

6              ATTORNEY COOK:  Q.  Okay.  Okay.  So you watched

7    Tagorda's video.  Is that correct?

8    A.        Yes.

9    Q.        Okay.  And then, at any point in Tagorda's video,

10   did you see the arrest subject -- and we're talking about

11   Ivan Gutzalenko, the decedent.  Did you ever see him in the

12   process of engaging in, like, a violent crime?  Like an

13   assault, or a rape, or robbery, or murder?

14   A.        No.

15   Q.        Okay.  Did you ever -- at any point on Tagorda's

16   video that you reviewed, did you see Mr. Gutzalenko -- did

17   you hear him verbally threaten the officer?  Such as "Hey,

18   I'm going to kill you," or "I'm going to do violence against

19   you"?  Did you ever hear him say that?

20   A.        No.

21   Q.        At any point did the subject -- the arrest

22   subject -- and we're talking about Mr. Gutzalenko -- did he

23   verbalize any intent to harm any of the officers or any

24   members of the public?

25   A.        No.

36

1  Q.          Okay.  And then based on your review of Tagorda's

2  body cam of the subject, he was intoxicated.  Is that

3  correct?  Or he appeared to be intoxicated?

4  A.          He appeared to be under some type of influence of

5  something.

6  Q.          Okay.  Did he appear to be -- there was a

7  reference by one of the officers that maybe he should be a

8  5150.  Do you remember that?

9  A.          Yes.

10  Q.          Okay.  And the "5150" implies that he could have

11  also been experiencing a mental health crisis; isn't that

12  correct?

13  A.          Yes.

14  Q.          Some of the de-escalation techniques that are

15  outlined in Section 300 of Richmond Police Department's --

16  you know, the general orders -- are they outline tactics

17  for -- or I guess -- yeah -- alternative tactics, meaning

18  de-escalation.  Is that correct?  That's in Section 300.3.2;

19  is that correct?

20          THE REPORTER:  "Section 300-..."

21          ATTORNEY COOK:  -.3.2.

22          THE WITNESS:  Again, I don't have it in front of

23  me, but can you say it again?  What does it outline?

24          ATTORNEY COOK:  Q.  Yeah.

25          Section 300 outlines de-escalation techniques; is

37

1    that correct?

2              ATTORNEY FINE:  Vague and ambiguous.

3              THE WITNESS:  It sounds right.  I don't have the

4    number in front of me, but yes.

5              ATTORNEY COOK: Q.  Okay.  I'll submit to you that

6    it's 300.3.2.  Does that sound right?

7    A.        Yes.

8    Q.        Okay.  And some of those -- the tactics -- the

9    basic idea is that you should -- that officers should try to

10   de-escalate if -- you know -- if time and circumstances

11   reasonably permit; is that correct?

12   A.        Yes.

13   Q.        Okay.  And de-escalation is warranted when, you

14   know, the community and the officer -- officers wouldn't be

15   harmed; is that correct?

16             ATTORNEY FINE:  Vague and ambiguous; overbroad;

17   incomplete hypothetical.

18             THE WITNESS:  I don't understand the question,

19   sorry.  It's to change -- one more time?

20             ATTORNEY COOK: Q.  Yeah.

21             In terms of whether or not attempting to

22   de-escalate is feasible, the time to do it would be -- it

23   would be reasonable to try to de-escalate if the safety of

24   the community or officers would not be compromised; is that

25   correct?

38

1    A.        Yes.

2              ATTORNEY FINE:  Same objections.

3              THE WITNESS:  Sorry.

4              ATTORNEY FINE:  Also, James -- just for the

5    record, 300.3.2 -- is that what you said?

6              ATTORNEY COOK:  Yeah.  And I'll show it to you

7    guys.

8              ATTORNEY FINE:  Okay.  I'm looking at the policy

9    manual that was produced from 2018 -- 300.3.2 says "Factors

10   used to determine the reasonableness of force."

11             ATTORNEY COOK:  Oh, I got the wrong one.  Sorry.

12   Okay, yeah.  Hold on.  And I'll find the de-escalation.

13             ATTORNEY FINE:  Okay.

14             ATTORNEY COOK:  Okay.  So in the -- I think I'm

15   really looking at 418.3.  So sorry about that, folks.  It's

16   in a couple places, but...

17             ATTORNEY COOK: Q.  So -- and just some more

18   questions about de-escalation.  I mean, do you teach

19   de-escalation tactics as part of the use of force training?

20             ATTORNEY FINE:  Vague and overbroad.

21             THE WITNESS:  Yes.

22             ATTORNEY COOK: Q.  And some other general tactics

23   for de-escalation include the use of time, distance,

24   tactical repositioning, and also just tactical

25   communication; is that correct?

39

1          ATTORNEY FINE:  Incomplete hypothetical; vague and

2     overbroad.

3          THE WITNESS:  Yes.

4          ATTORNEY COOK: Q.  Okay.  And again, these tactics

5     are things that you use -- or an officer is supposed to

6     consider when they encounter, you know, someone who is

7     experiencing a mental health crisis; is that correct?

8          ATTORNEY FINE:  Same objections.

9          THE WITNESS:  I mean, not just a mental health

10    crisis.  I mean...

11         ATTORNEY COOK: Q.  Okay.  But not -- but that's

12    included as part of it; is that correct?

13         ATTORNEY FINE:  Same objections.

14         THE WITNESS:  Yeah, we teach de-escalation to kind

15    of change the subject's behavior without going hands-on and

16    applying force.  So yes, if we can do that during a mental

17    health crisis, we would de-escalate.  If we have to use that

18    with a nonmental health, we will use that de-escalation

19    tactic.

20         ATTORNEY COOK: Q.  Okay.  This would have been --

21    now -- just based on what you know about the situation after

22    having read [sic] the video; you said you read some

23    reports -- would you agree that this was a situation where

24    Mr. Gutzalenko was experiencing a mental health crisis --

25    you know, whether it be, you know, through intoxication or

                                                              40

1  otherwise -- would you agree to that?

2        ATTORNEY FINE:  Calls for speculation; vague and

3  ambiguous; overbroad.

4        THE WITNESS:  Yeah, he definitely was having some

5  kind of -- some kind of mental situation occurring.

6        ATTORNEY COOK: Q.  Okay.  And by the way, you

7  also -- I mean, you -- the coroner's inquest.  Right.  There

8  was a point where I think Tran was quoted saying once AMR

9  got there, he was not cooperative and the belief that he

10 needed to be a 5150 hold; something to that effect.  Right?

11 Like, basically the coroner's report pointed out that -- you

12 know -- at least Tran, or the officers, knew that -- or

13 considered that he might be a 5150 hold.  Is that your

14 understanding?

15 A.      Yes.

16       ATTORNEY FINE:  Objection; vague.  I'll just say

17 the coroner's report speaks for itself.

18       ATTORNEY COOK: Q.  And during Tran's

19 interviewers -- interviews, I should say -- I wrote

20 "interviewers."

21       During Tran's interviews, he said that -- and

22 these are the interviews that you read -- that he -- that --

23 again, during the interview, he stated that Gutzalenko --

24 that they were considering holding Gutzalenko pursuant to

25 5150.  Do you remember that?

41

1          ATTORNEY FINE:  Vague and overbroad.

2          THE WITNESS:  I remember it being said, in

3    addition to some type of misdemeanor crime also being said

4    on the video.

5          ATTORNEY COOK: Q.  Okay.  So just considering this

6    particular situation given that Mr. Gutzalenko -- I mean,

7    there was some consideration that he would be subject to a

8    5150 hold -- it would have been appropriate to use some of

9    these de-escalation tactics, such as time, distance,

10   tactical repositioning, and tactical communication; is that

11   correct?

12         ATTORNEY FINE:  In- -- my apologies.

13         ATTORNEY COOK:  Go ahead, Counsel.

14         ATTORNEY FINE:  Incomplete hypothetical; vague and

15   ambiguous; and overbroad.

16         Go ahead.

17         THE WITNESS:  Given the situation -- the totality

18   of the situation and how rapidly this evolved, I think they

19   used de-escalation tactics appropriately.  They're not going

20   to disconnect and go away.  They were rendering aid

21   initially, and then they were using, verbally, de-escalation

22   tactics to calm him down.  So they were using the

23   appropriate de-escalation tactics.

24         Now, are they required to distance themselves and

25   gain cover?  No.  Because now you create a potential flight

                                                          42

1 issue.  So given the totality of the circumstances, they

2 used the appropriate de-escalation tactics, which was to

3 talk to him calmly and try to get him to comply without

4 force.

5        ATTORNEY COOK:  Q.  Is there a department policy or

6 procedure -- well -- okay.  Let me ask it this way.

7        In the use of force training, is there a policy or

8 procedure regarding restraining an arrest subject in prone

9 position?

10        ATTORNEY FINE:  Vague.

11        THE WITNESS:  Oh -- (Internet connection issue.)

12        THE REPORTER:  Sorry, the witness's feed stopped.

13        THE WITNESS:  Sorry -- can you hear me?  Okay.

14        ATTORNEY COOK:  Q.  Yeah.  Go ahead, Lieutenant.

15 A.      We teach different handcuffing techniques --

16 standing, kneeling, prone -- if that's what the question is.

17 Q.      Yeah.  I mean, that's what I was getting at, yes.

18 Okay.

19        And are there any specific policies, like cautions

20 or times when you're not supposed to use handcuffs on

21 someone, for instance, in a prone position -- prone

22 restraint position?

23        ATTORNEY FINE:  Vague and overbroad.

24        THE WITNESS:  There is no specific policy, no.

25        ATTORNEY COOK:  Q.  Okay.  So when a person is

43

1    prone -- right? -- in a prone position on a hard surface --

2    right? -- for handcuffing.  Their -- is it your

3    understanding that their chest cavity is kind of compressed,

4    and in some cases their breathing can become difficult as

5    you're -- it can become difficult for them to breathe,

6    especially when, you know, their hands are being cuffed

7    behind their backs?

8            ATTORNEY FINE:  Calls for speculation; lacks

9    foundation; vague; overbroad; incomplete hypothetical.

10           THE WITNESS:  I think that's kind of a lot to

11   digest.  It depends.  Right?  It depends.  How -- I need

12   more -- I need a better clarification to answer that

13   question.  It's too -- it just depends on the situation.

14           ATTORNEY COOK: Q.  Okay.  Well, let's just start

15   off with if a person is lying on a hard surface face down,

16   their chest cavity is compressed; is that correct?

17           ATTORNEY FINE:  Same objections.

18           THE WITNESS:  I wouldn't say it's compressed if

19   they're lying down and there is no pressure.

20           ATTORNEY COOK: Q.  Okay.  But -- if --

21   A.       I don't --

22   Q.       Go ahead.  Sorry.

23   A.       No -- I mean, I'm trying to understand what you're

24   saying.  Is there another way you can question [sic] it?

25   Q.       Yeah.  Well, let's take what you said: if there is

                                                          44

1    no pressure.  How about if there is pressure?  Say they're
2    lying face down -- you know -- and there is pressure on
3    their back -- does that make it difficult for the arrest
4    subject to breathe?
5              ATTORNEY FINE:  Same objections.
6              THE WITNESS:  I'm not a doctor.  That's probably
7    more of a medical question.  It depends on the person's
8    health, I would assume.
9              ATTORNEY COOK: Q.  Okay.  So based on what you
10   just said -- same situation.  They're on a hard surface,
11   there is pressure on their back, and they're in bad health,
12   and even -- maybe even, you know, under the influence of
13   drugs.  Does that make it hard to breathe?
14             ATTORNEY FINE:  Same objections and calls for
15   expert testimony.
16             THE WITNESS:  Again, it depends on -- again, I'm
17   no doctor, but it depends.  How long were they on his back?
18   How long was there pressure?  You know.  It all depends.
19   Where was the pressure applied?
20             ATTORNEY COOK: Q.  What about -- I mean, what
21   about in this situation where, you know, the officers knew
22   that -- you know, had an idea that either Mr. Gutzalenko was
23   experiencing a mental health crisis or he was under the
24   influence of something.  So do you believe when he was lying
25   face down/prone -- face down on a hard surface, that it was

                                                        45

1  difficult for him to breathe in this situation?

2          ATTORNEY FINE:  Same objections.

3          THE WITNESS:  Yeah, I would -- I don't know what

4  the officers' perception was.  I don't know what they were

5  thinking or what they knew at the time.

6          Given what I saw in the video, they recognized

7  some type of medical issue was -- was there.  That's why

8  they had him in a recovery position, waiting for and after

9  requesting medical personnel to respond.  So --

10         ATTORNEY COOK:  Q.  Okay --

11 A.      -- again, I don't know what their perception was.

12 That's a question for them.

13 Q.      Okay.  But based on your -- after having watched

14 the video, did it look like to you, when Mr. Gutzalenko was

15 face down, that he was having difficulty breathing?

16         ATTORNEY FINE:  Same objections; outside the

17 scope.

18         THE WITNESS:  You know, he verbalized it at one

19 point in the video, but we -- we -- and throughout our

20 experience -- my experience -- people lie to us and they say

21 these ruses so we can get off -- get up -- and that allows

22 them to get up and flee.  So I don't know if he was

23 experiencing that.  I don't know.

24         ATTORNEY COOK:  Q.  Do you know if during use of

25 force or, like, just arresting a subject, has Richmond PD

46

1   warned against handcuffing people in the, you know, prone

2   restraint position?

3              ATTORNEY FINE:  Incomplete hypothetical; vague and

4   ambiguous; overbroad.

5              ATTORNEY COOK: Q.  Well, no, I'm ask- -- just to

6   be specific -- I want to make sure you understand.

7              I'm asking has there -- have there been any

8   warnings issued by Richmond Police Department in terms of

9   using the prone restraint position to effectuate an arrest?

10             ATTORNEY FINE:  Same objections.

11             THE WITNESS:  No.  We still -- we still teach

12  prone cuffing as a position.

13             ATTORNEY COOK: Q.  Sure.  But have there been any

14  warnings/cautions against using the technique?

15             ATTORNEY FINE:  Same objections.

16             THE WITNESS:  For prone -- for prone handcuffing,

17  no.  If you're applying, like -- again, I'm assuming you're

18  going to ask me about pressure on the back.

19             ATTORNEY COOK: Q.  Yes.

20  A.         Then I would say that, yeah, to limit that -- it

21  is a form of force, and to limit it.  Based on the totality

22  of the circumstances, we understand that it could be

23  necessary to overcome the resistance of a subject, but to

24  limit it as much as we can.

25  Q.         Okay.  So just to make sure I got that.  There has

                                                              47

1  been a warning -- or there has been some sort of caution

2  against putting pressure on the back while the person is

3  face down in a prone position, and the warning has been to

4  limit the use of that technique.  Is that correct?

5          ATTORNEY FINE:  Same objections; mischaracterizes

6  testimony.

7          THE WITNESS:  Yeah.  In recent -- in recent

8  cases -- yeah -- we've taught different tactics now to limit

9  applying pressure on the back when feasible.

10          ATTORNEY COOK: Q.  What are the alternative

11  tactics that you've taught as opposed to a prone position?

12  Is it as opposed to that?

13          ATTORNEY FINE:  Vague and overbroad.

14          THE WITNESS:  I don't understand your question.

15          Other than -- if the subject is in a prone

16  position, that's the only way we're going to handcuff them.

17  We're not going to have him stand back up; we're not going

18  to have him in a kneeling position.  We're going to leave

19  him in the position he's at.  It creates more of an officer

20  safety concern, and concern for the safety of the subject.

21          So we're going to handcuff him if he's in the

22  prone.  Once we're done handcuffing him, we're going to put

23  him in a recovery position or a seated position, depending

24  on the situation.

25          ATTORNEY COOK: Q.  You said you've taught

48

1  alternatives to handcuffing in the prone position while

2  pressure is on the back, and I wanted to know -- my

3  follow-up question was what are some of those alternative

4  techniques.  Or something to that effect.  I may be -- I'm

5  paraphrasing.

6          ATTORNEY FINE:  Mischaracterizes prior testimony.

7          Go ahead.

8          THE WITNESS:  I think you misunderstood.

9          There is different positions to handcuffing.

10 Right?  In a perfect textbook world -- yeah, we're going to

11 handcuff you kneeling, standing, or prone.  Sometimes that

12 doesn't work out.

13          The goal is to place the individual, and secure

14 him in custody and handcuffs in a restraint device, and then

15 put him in some type of seated or recovery position.  We

16 limit the amount of force that is reasonably necessary to

17 effect the arrest or to detain the individual.  That's what

18 we teach.

19          ATTORNEY COOK: Q.  Understood.

20          And again -- really -- you know, like, the focus

21 of this -- this segment is we're talking about prone

22 position and pressure on the back while the subject is in a

23 prone position.  So.  And what I was really trying to follow

24 up with -- you said you try to limit the use of pressure on

25 the back while the subject is in a prone position.  And I

49

1   thought -- and please correct me if I'm wrong -- you were

2   saying that we try to teach techniques -- alternative

3   techniques to putting pressure on the back while the person

4   is in a prone position.  Is that what I misinterpreted?

5   A.        It sounds like it, yes.

6             If we can place knees on the ground -- if we can

7   ask the subject to comply, and he complies, then there would

8   be no need for any force.  But if the subject is thrashing

9   around from left to right trying to twist his body, we're

10  going to need some type of control hold to prevent him from

11  moving around so we can handcuff that subject.

12            So the techniques that we teach are limit the

13  amount of pressure on the back.  And that's -- and that's

14  what we teach.  Like, we don't tell you to sit there and --

15  you know, pressure down until he's handcuffed, and then stay

16  there.  Limit it and try to avoid it, when necessary.

17  Q.        Do you teach officers that sometimes it may be

18  necessary to put their knee on the back when -- it may be

19  necessary sometimes, when the subject is in a prone

20  position, to use the knee to apply pressure to prevent

21  squirming?

22            ATTORNEY FINE:  Incomplete hypothetical; vague and

23  ambiguous; overbroad.

24            THE WITNESS:  Again, it depends on the situation.

25  We tell them you can use your hands.  You can use your

50

1   chest.  You can use your knee.  You can use your partner.

2   Whatever it is.  We don't just say you can only use X when

3   the person is in a prone position.

4          We do say try to limit the amount of pressure.

5   Only use the amount necessary to accomplish what you're

6   doing -- handcuffing -- and then you release it.

7          ATTORNEY COOK: Q.  Okay.  So it is taught that in

8   some cases you might have to use your knee to apply pressure

9   while the person is in a prone position in order to prevent

10   them -- in order to effectuate the handcuffing; is that

11   correct?

12          ATTORNEY FINE:  Same objections; asked and

13   answered.

14          THE WITNESS:  Yes.  And to limit it.

15          If you have to -- if that's your only alternative,

16   then you use it to effect the arrest, to detain the person,

17   and then you release it.  You don't stay there for a long

18   period of time; you immediately get that person in a

19   recovery position.

20          ATTORNEY COOK: Q.  And back to the question -- I

21   mean, let's talk about this specific situation.

22          What about -- there was a point at which Tran --

23   he was -- you know, he was restraining -- I'm talking about

24   when he was restraining Gutzalenko, and then he switched to

25   where he -- and I'm thinking of Tagorda's video where he was

51

1    sort of -- had his -- he switched to the front of Tagorda,

2    right?  I mean, not "Tagorda."  To the front of Gutzalenko,

3    where he had sort of his head or his chest near Gutzalenko's

4    head, and he was holding his arms.  Do you remember that

5    during the tape?

6    A.        Yes.

7    Q.        Or on the tape?

8    A.        Yes.

9    Q.        Okay.  And what's that position called?

10   A.        So that -- he was trying to do what we call a "360

11   Arm Wrap," and trying to pull it out from underneath the

12   subject.

13   Q.        360 Arm Wrap.  Okay.  Okay.

14             And the 360 Arm Wrap is a technique, and sometimes

15   you can use your head or you can use your chest to sort of

16   lay on top of them until you can -- and then you grab their

17   arms until they can be cuffed; is that correct?

18             ATTORNEY FINE:  Vague; ambiguous; overbroad.

19             THE WITNESS:  No, that's not -- you're trying to

20   remove the arm from underneath the subject.

21             ATTORNEY COOK: Q.  Okay.  Okay.

22   A.        So laying your chest -- your head on them will

23   kind of defeat the purpose.  Right?  It depends on where the

24   arm is.  If the arm is near the waistband, maybe you control

25   the head so it doesn't move.  Or the shoulder.  It just

52

1    depends.

2    Q.        Yeah.  But you -- you can use the chest or even

3    your head to control their head or their upper body, like

4    near the shoulders -- is that correct? -- in the 360 Arm

5    Wrap?

6             ATTORNEY FINE:  Calls for speculation; incomplete

7    hypothetical; asked and answered; vague and ambiguous.

8             THE WITNESS:  I mean, yeah, that could be a part

9    of -- that -- your body that you use to control it, and

10   apply that force.

11            ATTORNEY COOK: Q.  Okay.  And when you teach the

12   360 Arm Wrap, it's taught that you may need to use your

13   head, or your chest, or some other part of your body -- your

14   body -- the officer's body -- to control the head or the

15   shoulder area in order to -- in order to release the hands;

16   is that correct?

17            ATTORNEY FINE:  Same objections.

18            THE WITNESS:  Yes.

19            ATTORNEY COOK: Q.  Okay.  And -- just real quick.

20   In terms of -- and I'm going on your personal knowledge of

21   jujitsu.  Right?  Brazilian jujitsu.  That's also called --

22   referred to -- that 360 position is also referred to as

23   North-South; is that correct?  North-South position?

24            ATTORNEY FINE:  Relevance; outside the scope;

25   lacks foundation.

53

1    THE WITNESS:  And again, I'm a white belt with

2 eight months, and I go maybe once a week on a Friday on my

3 day off.  So my -- my expertise on -- (Internet connection

4 issue.)

5    THE REPORTER:  Sorry -- sorry.  Your sound went

6 out.

7    "So my expertise on..."

8    THE WITNESS:  -- jujitsu is not what you're

9 thinking.

10    ATTORNEY COOK:  Q.  So let me play Tagorda's body

11 cam video.  Let me bring that up for you.  I'm going to play

12 some portions of it, and I'll ask you some questions about

13 it.

14    So first of all, I just want to know if you can

15 see it on the screen there?

16 A.    Yes, I can see it.

17 Q.    Okay.  And you see the numbers at the top?  You

18 know, it gives you the Zulu time -- the Axon body cam time

19 is, I guess, the Zulu time, is what you guys call it.

20 A.    Yes.  Correct.

21 Q.    Do you see that at the top -- okay.

22    And then do you see down at the bottom where it

23 says "Officer Tagorda"?

24 A.    Yes.

25 Q.    Okay.  Is this the body cam footage that you

54

1    reviewed?

2    A.          It appears so, yes.

3    Q.          And right now I'm on the camera area.  You know,

4    in the picture you see -- I think it's probably Officer Tran

5    sort of leaning over, and Gutzalenko is lying face down.

6    And then to the left of them is an officer.  I believe

7    that's Officer Hall.  Is that correct?

8    A.          Yes.

9    Q.          Okay.  So let me move it forward a little bit

10   here.

11            ATTORNEY COOK:  Okay.  So Counsel, I'm moving to

12   3:50, and I'm going to start playing from there -- well --

13   let me go forward a little bit.

14            ATTORNEY COOK: Q.  I'm going to start playing at

15   3:50 on the body cam, and then we have T18:48:33Z -- oh,

16   actually, let me share the sound here.

17            Hold on.  Let me just get this going.  Let's see.

18            Hold on.  I'm trying to make sure I'm sharing the

19   sound.

20            Can -- okay.  Let me know if you can hear this.

21            (Playing Tagorda's body camera video file.)

22            ATTORNEY FINE:  (Indicating a thumbs-up.)

23            THE WITNESS:  I can hear it.

24            ATTORNEY COOK:  Okay.  So I'll just let it play a

25   little bit.

55

BARBARA J. BUTLER & ASSOCIATES - Certified Court Reporters
(510) 83-BUTLER (28853) or (408) 248-BUTLER (2885) - bbreporter.courtreporting@gmail.com

1          (Playing Tagorda video file.)

2          ATTORNEY COOK:  Q.  I'm sorry.  You can hear it

3    right now, right?

4    A.        It stopped playing, but yes, I was hearing it

5    okay.

6    Q.        Okay.

7          ATTORNEY FINE:  And James, just so -- just so you

8    know.  The sound is coming through okay; the video itself is

9    really, really choppy.  It's kind of --

10         ATTORNEY COOK:  Oh, really?

11         ATTORNEY FINE:  -- actually hard to see what's

12   happening in the video.  But if the questions are about the

13   sound, I think the sound is coming through okay.

14         ATTORNEY COOK:  Okay.  Let's see -- let's see what

15   we can do, okay?

16         ATTORNEY FINE:  Okay.

17         ATTORNEY COOK:  If not -- I mean, it's not that

18   important, but -- you know.

19         Okay.  Let's start from here.

20         (Playing Tagorda video file.)

21         ATTORNEY COOK: Q.  So I'm stopping right here.  I

22   mean, I know this video is kind of choppy, but I'll stop it.

23   I'm right here at 4:51.

24         Do you see Officer Tran's knee?  That's Officer

25   Tran holding him down.  He's got his left hand kind of in

56

1  his armpit, and he's got his knee on his back as far as I
2  can see.  Would you agree with that?
3         ATTORNEY FINE:  Vague and ambiguous.
4         THE WITNESS:  Yeah, I would say it's more of his
5  hip area because Mr. Gutzalenko's pants are pretty low
6  riding.  But yes.
7         ATTORNEY COOK:  Okay.  So it's 4:51, and I'll go
8  forward from here.
9         (Playing Tagorda video file.)
10        ATTORNEY COOK:  So I'm stopping again at 5:18.
11        ATTORNEY COOK: Q.  And you can kind of see
12 Mr. Tran -- can you see Officer Tran's legs and Gutzalenko
13 is kind of in a side position?  Can you see all of that,
14 sir -- Lieutenant?
15 A.      Yes.  I see Officer Tran's leg.  I see him
16 kneeling down on the ground, yes.
17 Q.      And you can see his left knee is on -- on
18 Gutzalenko's back; is that correct?
19        ATTORNEY FINE:  Vague and ambiguous.
20        THE WITNESS:  I would call --
21        ATTORNEY FINE:  One second.
22        THE WITNESS:   -- (Simultaneous talking;
23 inaudible.)
24        THE REPORTER:  I'm sorry.  You're all --
25        THE WITNESS:  Sorry.

                                                      57

1    ATTORNEY FINE:  Vague and ambiguous;
2  mischaracterizes the video.
3    Go ahead, sir.
4    THE WITNESS:  I would call it the hip area.
5    ATTORNEY COOK: Q.  But it's also -- I mean, it's
6  in the hip area, and it's also in his back; is that correct?
7    ATTORNEY FINE:  Argumentative; asked and answered;
8  same objections.
9    ATTORNEY COOK: Q.  Lieutenant?
10 A.    I would call it the hip, side; not the back.
11 But -- that's what I would describe it as.
12 Q.    Okay.  You're saying his knee is not on his back
13 here at 5:18?
14 A.    Based on my view of the camera at 5:18, it looks
15 like it's at his hip area.  The left hip, side.
16 Q.    Okay.  But in this -- also -- we can disagree
17 about where Tran's knee is, but Tran is restraining
18 Gutzalenko; right?  Using his body to restrain Gutzalenko;
19 is that correct?
20 A.    I would say he's using --
21    ATTORNEY FINE:  Vague and ambiguous.
22    THE WITNESS:  I would say he's using --
23    ATTORNEY COOK: Q.  Go ahead.
24 A.    -- force to keep him in a recovery side position.
25 Q.    Okay.

58

1    (Playing Tagorda video file.)

2    ATTORNEY COOK:  Sorry, I jumped around here.  Hold

3  on.  Let me get back to where we were.

4    Okay.  So I'm -- I was at 5:18; I'm at 5:17, and

5  I'm going to play from there.  Sorry about that.  Here we

6  go.

7    (Playing Tagorda video file.)

8    ATTORNEY COOK:  So I'm going to stop it right

9  there at 6:27.

10    ATTORNEY COOK: Q.  At any point during -- from

11  5:18 till now -- I mean, I know the picture is kind of

12  choppy -- were you able to tell whether or not Tran had his

13  knee on Mr. Gutz- -- or Gutzalenko's back?

14    ATTORNEY FINE:  Vague and ambiguous; overbroad.

15    THE WITNESS:  Yes.  In the picture right here at

16  6:27, it does appear he has it placed near the -- maybe

17  right shoulder blade area.

18    ATTORNEY COOK: Q.  Okay.  So you would agree that

19  he has his knee on his back at this point at 6:27; is that

20  correct?

21    ATTORNEY FINE:  Vague and ambiguous.

22    THE WITNESS:  It looks like he's -- sorry.

23    It looks like he's trying to prevent him from

24  rolling back over -- (Internet connection issue.)

25    ATTORNEY COOK: Q.  Okay.  My question is you agree

                                                        59

1  that he has his knee on his back right here in this part of

2  the frame; is that correct?

3          ATTORNEY FINE:  (Audio interruption.)

4          THE REPORTER:  I'm sorry.  Mr. Fine, say that

5  again?  I didn't hear.

6          ATTORNEY FINE:  I think Lieutenant Reina's video

7  froze after he said it looked like he was trying to prevent

8  him from rolling over.  I think he froze.  I just want to

9  make sure he had a chance to complete his answer.  And I

10  apologize for this; I'm just trying to keep the record

11  clear.

12          ATTORNEY COOK:  Yep.  And I'm with you.

13          THE WITNESS:  It just looks like he was trying to

14  keep him in that recovery side position, but -- because Mr.

15  Gutzalenko kept on rolling back and forth to, you know,

16  squirm away, that -- he placed that there as a barrier, if

17  you will.

18          ATTORNEY COOK: Q.  Okay.  But the question being

19  you agree that he has his knee on his back; is that correct?

20          ATTORNEY FINE:  Vague and ambiguous --

21          THE WITNESS:  The knee is --

22          ATTORNEY FINE:  -- asked and answered.

23          THE WITNESS:  Sorry.

24          The knee is placed at the -- what looks to me like

25  the right shoulder blade area.

60

1          ATTORNEY COOK: Q.  Which is his back.

2  Gutzalenko's back.  Correct?

3          ATTORNEY FINE:  Same objections.

4          THE WITNESS:  Yes, it would be in the back area of

5  the body.

6          ATTORNEY COOK:  Okay.  Let me play from here.

7          (Playing Tagorda video file.)

8          ATTORNEY COOK: Q.  Did you hear someone tell the

9  officer -- (Inaudible.)

10          THE REPORTER:  I'm sorry.  "...tell the

11  officer" what?

12          ATTORNEY COOK: Q.  Did you hear someone say

13  "pepper spray him" after Gutzalenko said he couldn't

14  breathe?

15  A.      Yes.

16  Q.      Okay.  And generally, if a person says that they

17  can't breathe, do you guys -- I mean, is it okay to pepper

18  spray the person?

19          ATTORNEY FINE:  Vague and ambiguous -- excuse

20  me -- incomplete hypothetical.

21          Go ahead.

22          THE WITNESS:  I think that on the totality of the

23  situation in looking at this video and watching it complete

24  and not stopping, you know, every few seconds --

25  Mr. Gutzalenko is still resisting the officers' efforts.

61

1    And the officer says "Spray him with pepper spray" as a ruse

2    to get him to comply, which is the form of a de-escalation

3    tactic to prevent him from resisting.  So it's a way for

4    them to de-escalate and overcome Mr. Gutzalenko's

5    resistance.

6              ATTORNEY COOK: Q.  You're speculating, though;

7    right?  You're speculating there; is that correct?

8    A.        I'm -- well, it's a training tactic that we see.

9    Q.        I'm just saying are you speculating that that's

10   why he said "pepper spray him"?

11   A.        Well, yes, because pepper spray was never used.

12   Q.        Okay.  But do you know for sure that the officer

13   didn't intend to use pepper spray when he said that?

14   A.        No, I don't know for sure.

15   Q.        Okay.  And then the officer -- at no point in this

16   video did the officer say "I'm saying that as a ruse"; is

17   that correct?

18   A.        That would defeat the purpose.

19   Q.        Okay.  But he didn't say that; right?

20   A.        No, it was not verbalized.

21   Q.        Okay.  And we started at 6:27, and it's 6:35.  Up

22   through 6:35, Mr. -- or Officer Tran still has his knee

23   on -- well, I say "back," but you say -- well, you

24   said you -- you said the back; right?  He still has his knee

25   on Mr. Gutzalenko's back; is that correct?

                                                            62

1          ATTORNEY FINE:  Vague and ambiguous; asked and

2    answered.  I think this is also a different part of the

3    video than you previously asked him about.

4          ATTORNEY COOK:  Q.  Lieutenant --

5    A.       Yes.

6    Q.       Okay.  I'm going to continue to play.

7          (Playing Tagorda video file.)

8          ATTORNEY COOK:  So I stopped it at 4:29 [sic].  I

9    played it from 6:27 to 4:29 [sic].

10          ATTORNEY COOK:  Q.  Officer Tran took his knee off

11    of Mr. Gutzalenko's back at 6:49, would you agree?

12    A.       Yes, the knee is off the area you indicated as the

13    back.

14    Q.       Okay.

15          ATTORNEY COOK:  I'm going to play from 6:49.

16          (Playing Tagorda video file.)

17          ATTORNEY COOK:  Q.  So even though the computer

18    cuts it off, this is where Officer Tran takes the 360

19    position; correct?

20    A.       Yes.

21    Q.       Okay.  And you know this -- this is where you're

22    going to soon learn that this is the North-South position,

23    but that's just commentary.

24          All right.  So let me play forward.

25          (Playing Tagorda video file.)

                                                        63

1           ATTORNEY COOK: Q.  Okay.  So in this frame -- I

2   stopped it at 7:38 -- you see Officer Tran has his left hand

3   on Gutzalenko's elbow and his right hand on his shoulder; is

4   that correct?

5   A.        Yes.

6   Q.        And Gutzalenko is in the side position; is that

7   correct?  Side recovery position?

8   A.        Yes.

9   Q.        All right.  And he's handcuffed; is that correct?

10  A.        Yes.

11          ATTORNEY COOK:  Okay.  Starting at 7:38.

12          (Playing Tagorda video file.)

13          ATTORNEY COOK: Q.  Okay.  Did you see from 7:38 to

14  7:43 where Officer Tran used his right hand to move

15  Gutzalenko's shirt back?

16          ATTORNEY FINE:  Vague and ambiguous.

17          THE WITNESS:  I don't know if it was --

18          ATTORNEY COOK: Q.  Go ahead.

19  A.        I couldn't tell if it was AMR or -- moving it.

20  The AMR medic, or -- the video was kind of choppy.

21  Q.        Okay.  Let me start from 7:29.  It might be kind

22  of choppy, but just -- if you can watch his right hand, and

23  my question is can you see Officer Tran move Gutzalenko's

24  shirt back.  If you can see him move his shirt.

25          Just a moment.

                                                              64

1           From 7:29.

2           (Playing Tagorda video file.)

3           ATTORNEY COOK:  Q.  Okay.  Did you -- were you able

4    to see that at that point?

5    A.        The video is still choppy.  I can't make it out.

6    I mean, I can -- I would be speculating.

7    Q.        Okay.  Did you see Officer Tran's hand move?

8    A.        Yeah, it looks like he's moving out of the way of

9    the medical personnel.

10   Q.        Okay.  And does it look to you like he's holding

11   his shirt?

12   A.        Again, I can't tell.  It does look like he's

13   holding near the bicep of the left arm with his right hand.

14   Q.        With his left hand, you mean.

15   A.        With his right arm.

16   Q.        Okay.  With his right hand -- in this still

17   picture, you can tell that Mr. -- or not "Mr." -- Officer

18   Tran is holding Mr. Gutzalenko's shirt with his right hand;

19   right?

20           ATTORNEY FINE:  Asked and answered; vague and

21   ambiguous; mischaracterizes his prior testimony.

22           THE WITNESS:  I can't tell from this picture, no.

23   It looks like his hand is up there, and based on this video,

24   no, I don't know.

25           ATTORNEY COOK:  Q.  I'm just going back ten

                                                              65

1   seconds.  Let's see if you can see it again.

2   A.        Okay.

3             (Playing Tagorda video file.)

4             ATTORNEY COOK: Q.  Right here.  I stopped it, and

5   Officer Tran is about to move his hand back.  Do you see

6   that?

7   A.        Yes.

8             (Playing Tagorda video file.)

9             ATTORNEY COOK: Q.  Were you able to see Officer

10  Tran grab his shirt?

11  A.        It appears like that, yes.

12  Q.        Okay.  And right now does it appear that Officer

13  Tran is going to move the shirt backwards?

14  A.        You would have to play it.

15  Q.        Okay.

16            (Playing Tagorda video file.)

17            ATTORNEY COOK: Q.  Right there.  Did you see

18  Officer Tran move the shirt backwards?

19  A.        It appears.

20  Q.        Okay.  You said it appears that he's moving the

21  shirt backwards?

22  A.        Yes.

23            ATTORNEY FINE:  I -- just one sec.

24            It's vague and ambiguous; lacks foundation.  I

25  think the witness said he can't tell.  But go ahead.

66

1          THE WITNESS:  I don't know what he's doing.  I

2     don't know -- it appears that way, but I don't know.

3          ATTORNEY COOK:  Okay.

4          (Playing Tagorda video file.)

5          ATTORNEY COOK: Q.  Okay.  Did you see Officer

6     Tran?  He kept his shirt in place while the injection was

7     being administered?

8     A.          Again, the video is choppy.  I can't tell from

9     this.

10    Q.          Did it look to you like Officer Tran held his

11    shirt while the injection was being administered?

12         ATTORNEY FINE:  Asked and answered.

13         THE WITNESS:  No.  It looked like AMR was holding

14    the shirt.

15         ATTORNEY COOK: Q.  Okay.

16         (Playing Tagorda video file.)

17         ATTORNEY COOK: Q.  You see the injection being

18    administered in this picture?

19    A.          It appears so, yes.

20    Q.          Yeah.  And does it look like -- I mean, to you,

21    based on this picture, would you agree that Officer Tran is

22    holding the shirt?

23    A.          No, I would not.

24    Q.          Okay.  So the reason why I'm showing you this is

25    I'm just asking if you can see it.  To me it looks like

                                                        67

1    Officer Tran is assisting the EMT with -- you know, kind of

2    holding the shirt while the EMT gives the injection.  That's

3    my take on it.  Is that not your -- your take on what's

4    happening here?

5            ATTORNEY FINE:  Asked and answered; vague and

6    ambiguous; calls for speculation; lacks foundation.

7            ATTORNEY CHING:  And I'll join that objection.

8            THE WITNESS:  No, it doesn't.  Not to me.  It

9    looks like the medical personnel is holding the shirt,

10   Officer Tran is controlling the arm from moving -- from

11   thrashing around, which obviously --

12           ATTORNEY COOK:  Q.  Okay --

13   A.        -- again, we're stopping and going on the video,

14   but that's what it appears.

15   Q.        Okay.  So he's holding the arm, keeping it from

16   thrashing around while the EMT administers the injection; is

17   that correct?

18   A.        Again, I would be speculating on what Officer Tran

19   is doing, but that's what it appears.  I would say that

20   maybe he's trying to keep him in that recovery position.

21   Also --

22   Q.        Yeah, go ahead.  I'm sorry.  I don't want to

23   interrupt.

24   A.        That looks like what he is doing by keeping him in

25   that side position.

                                                              68

1   Q.     So by keeping him in the side position, he's

2   assisting the EMT with giving the injection; is that

3   correct?

4        ATTORNEY FINE:  Asked and answered; vague and

5   ambiguous; overbroad; calls for speculation; lacks

6   foundation.

7        ATTORNEY CHING:  And I'll join.

8        THE WITNESS:  No.

9        ATTORNEY COOK: Q.  He's not.  Okay.  So -- all

10  right.  So based on this -- you stated that he's holding his

11  arm, right?  And he needs to hold his arm so that the EMT

12  can give him the injection; is that correct?

13       ATTORNEY FINE:  Same objections.

14       THE WITNESS:  No.  Not correct.

15       ATTORNEY COOK: Q.  Okay.  Why does he have to hold

16  his arm in this situation?

17       ATTORNEY FINE:  Same objections.

18       THE WITNESS:  To keep him from falling forward.

19  They're trying to keep him in a recovery position.

20       ATTORNEY COOK: Q.  Does it also have the effect of

21  assisting the EMT who is giving him the injection?

22       ATTORNEY FINE:  Same objections.

23       ATTORNEY CHING:  Join.

24       THE WITNESS:  I mean, I don't think so, no.  I

25  don't.

1           ATTORNEY COOK:  Okay.

2           ATTORNEY FINE:  Hey, James?  How would you feel

3    about a five-minute, just recovery break real quick?

4           ATTORNEY COOK:  Yeah.  I mean, I'm almost -- I

5    mean, we're almost done anyway.

6           ATTORNEY FINE:  Oh, never mind.  It's okay.  It's

7    up to you.

8           ATTORNEY COOK:  I've got a couple documents to

9    show him, but.  I mean, really -- you know, not -- here --

10   hold on.  Let me just look at this real quick.

11          ATTORNEY FINE:  Right on.  I'm not trying to rush

12   you.

13          ATTORNEY COOK:  This deposition is the video, you

14   know.

15          Let me...

16          ATTORNEY FINE:  I just had too much afternoon

17   coffee.  That's why I'm asking.

18          ATTORNEY COOK:  Yeah, yeah, yeah, yeah.

19          I mean, that's fine.  Maybe take a quick break.  I

20   don't anticipate us going that much longer here.  So --

21   yeah, that's fine.  I guess --

22          ATTORNEY FINE:  Come back at, like, 3:08?  Is that

23   okay?

24          ATTORNEY COOK:  Okay, yeah.  That works.

25          ATTORNEY FINE:  Perfect.  Thank you.

70

1              (Recess: 3:03 P.M. to 3:11 P.M.)

2              ATTORNEY COOK:  All right.  Back on the record.

3              ATTORNEY COOK: Q.  Lieutenant, did you have a

4    chance to watch [sic] Officer Tran's deposition?

5    A.        No.

6    Q.        Okay.  In his deposition -- I'm paraphrasing, but

7    I think he stated that he moved the shirt back to assist.

8    Would he be incorrect in saying that?

9              ATTORNEY FINE:  Mischaracterizes testimony.

10             ATTORNEY CHING:  I'll join that objection.

11             ATTORNEY FINE:  Hold on.  One sec.

12             Also calls for speculation and lacks foundation.

13             ATTORNEY CHING:  I'll join that objection.

14             THE WITNESS:  Yeah.  If he said he did it, I mean,

15   he was there.

16             ATTORNEY COOK: Q.  Okay.  So you also read the DA

17   report; is that correct?  Or -- I forgot what you said.

18   Whether or not you did.

19             ATTORNEY FINE:  Vague.

20             ATTORNEY COOK: Q.  Whether or not you've reviewed

21   it.

22   A.        No, I think just the coroner; not the DA.

23   Q.        I put a document on the screen.  I'll just ask you

24   if you read this report.

25   A.        No.

                                                          71

1  Q.        Okay.  Can you see that on the screen?

2  A.        Yes, I see it.

3  Q.        So this is sort of a summary of -- well, let me

4  just go back up, and I'll tell you what they wrote.

5            It says "Relevant body worn camera and footage and

6  surveillance video."  He said "Key portions of the incident

7  were captured."

8            Do you see that right there?

9  A.        Yes.

10 Q.        So basically they're summarizing a timeline based

11 on key portions of all surveillance and body worn camera

12 footage.

13           And so here is the thing.  The reason why I'm

14 showing you this is -- just a moment.  Let me just see.

15           Okay.  And, you know, I believe that this report

16 even says that at some point he -- you know, Tran placed his

17 knee on the back, and I'm wondering if you would agree with

18 that observation.  And I say that because it seemed like you

19 had -- you were hesitant to say anything about placing the

20 knee on the back.  Or maybe you weren't.  Maybe I'm

21 mischaracterizing that.  So --

22           ATTORNEY COOK:  Oh, go ahead.  Go ahead, Counsel.

23           ATTORNEY FINE:  Well, I don't know -- I mean, if

24 you're not done with your question, then by all means

25 continue.  My apologies.

                                                    72

1      ATTORNEY COOK:  Yeah, I haven't asked the question

2  yet.

3      ATTORNEY COOK: Q.  I was just going to say, do you

4  see right here, under this entry "10:48: Officer Tran places

5  his right hand between Gutzalenko's shoulder blades and his

6  knee in Gutzalenko's lower back as he's laying on his right

7  side"?  You see that entry; right?  Do you see that?

8  A.      Yes.

9  Q.      I outlined it.

10      Okay.  And do you disagree with that?

11      ATTORNEY FINE:  Vague and ambiguous; overbroad;

12  calls for speculation; asked and answered.

13      THE WITNESS:  And I would have to look at that

14  time frame to see where it was.  Because there was different

15  points in the video that showed different angles or

16  different positioning.  Because Mr. Gutzalenko was, you

17  know, moving around left to right, forward and backwards,

18  that you could tell that Officer Tran's knee position did

19  move, yes.

20      So --

21      ATTORNEY COOK: Q.  All right --

22  A.      -- you would have to look.  At 10:48:50, I don't

23  recall -- if we did see that, I don't know at what point.

24  Q.      Okay.  I mean, this is one where the observation

25  is kind of an amalgamation of all body cam footage.  But.

73

1   But you're -- so you're saying -- I mean -- again, I'm not

2   asking you about that specific statement.  You're saying

3   that you can't agree with that, or what?  I mean --

4           ATTORNEY FINE:  Asked and answered.  I mean, I

5   think what he said was he had to look at that particular

6   frame of the video.

7           ATTORNEY COOK:  Counsel, I've got to say you're

8   testifying.  I'm going to kind of let it slide, but you are

9   testifying.

10          ATTORNEY FINE:  I mean, sure.  I'll limit my

11  objection, then, to asked and answered; mischaracterizes

12  prior testimony; and argumentative.

13          ATTORNEY COOK: Q.  Okay.

14  A.       Yeah -- again, I don't know what 10:48:50 in the

15  video was.

16          There was a portion where his knee was on the

17  back, and I think we surmised that it was the upper back.  I

18  said "shoulder blade" -- "right shoulder blade"; we agreed

19  that it was still part of the back.

20          There was a part where it is at the hip area based

21  on the angle that you, Mr. Cook, stopped it at.  I don't

22  know what angle this is at, 10:48:50.  I know that when I

23  watched the video of Officer Tagorda's, Mr. Gutzalenko was

24  moving back and forth, and I did see Officer Tran's knee

25  move around in different positions to kind of balance

74

1    himself.

2    Q.        All right.  This -- and now I'm referring to the

3    interview with Officer Tran, going to page 15.

4             They're summarizing, I guess, what's happening

5    during the interview.

6             And again, on page 15, it says "Officer Tran

7    physically restrained Gutzalenko by placing his hand on his

8    left shoulder and his knee on his back as Gutzalenko was

9    laying on his side."

10            Do you disagree with that statement?

11            ATTORNEY FINE:  Vague and ambiguous; overbroad;

12   asked and answered.  And I'm going to object that we don't

13   know what particular point of the video, specifically, this

14   was referring to.

15            Counsel, I'm not trying to testify; I just -- I'm

16   having a hard time seeing how this is fair when we're asking

17   about someone's observations of the video, and we don't know

18   what particular part of the video they're looking at, and

19   then we're asking the witness if he agrees.  That's my issue

20   with it.  I'm actually not trying to testify; I just don't

21   see --

22            ATTORNEY COOK:  You're testifying.  You are,

23   though.  But -- so -- but let's -- we'll compromise by

24   just -- I can clarify my question.  How about that?

25            ATTORNEY FINE:  Sure.

75

1          ATTORNEY COOK:  I mean, I get it.

2          ATTORNEY COOK: Q.  Okay.  So all I'm saying is

3   this is -- again, at the top --

4          ATTORNEY COOK:  I'll work with you here, Counsel.

5          And Lieutenant, you don't have to call me

6   "Mr. Cook."  Like, that's my dad and my grandpa.

7          THE WITNESS:  I'm sorry.

8          ATTORNEY COOK:  I'm kidding.  It's okay.  But I

9   cringe when I'm referred to as "Mr. Cook."

10         ATTORNEY COOK: Q.  All right.  Interviews of the

11  officers involved.  The interview of -- right?  So, you

12  know, the interview.  Right?  And -- and then they say

13  "Officer Tran provided a statement, which is summarized

14  below."  And he's summarizing, but -- and then again, the

15  observation specifically.

16         And all I'm getting at is the observation that was

17  made in this summary of the interview, do you agree or

18  disagree with the statement based on what you saw -- whether

19  it's what you saw reviewing the video on your own, or with

20  me today -- that the statement that says "Officer" -- well,

21  it says "Officer Hall," but really -- I mean -- well, we can

22  say Officer Hall.

23         "Officer Hall placed his knee on Gutzalenko's back

24  and left hip while Officer Tran applied pressure to

25  Gutzalenko's right" -- "back shoulder blade from getting

                                                      76

1   up."

2          Do you agree with that statement?

3          ATTORNEY FINE:  Vague and ambiguous; overbroad.

4          Go ahead.

5          THE WITNESS:  Yes, there was a portion where

6   Officer Hall's knee was at the hip area.  Mr. -- or Officer

7   Tran did have something under -- I don't know if it was his

8   knee or his arm -- at the shoulder blade.  And I don't --

9          ATTORNEY COOK: Q.  Okay.  Good.

10  A.      Yes.  And I don't know what portion of the video.

11  I know that did occur, yes.

12  Q.      Okay.  And then the same thing.  I'm just asking

13  you if you agree with this statement made in this

14  observation regarding Tran's interview that -- it says

15  "Officer Tran physically restrained Gutzalenko by placing

16  his hand on his left shoulder and his knee against his back

17  as Gutzalenko was laying on his side."

18          ATTORNEY FINE:  Same objections.

19          THE WITNESS:  Yeah, there was a portion of the

20  video that did show that.  Again, I don't know what area of

21  this video that this investigator is writing, but that would

22  be correct.  There is a portion of the video that does show

23  that.

24          ATTORNEY COOK:  Okay.

25          Okay.  I have no further questions for now.

                                                    77

1      ATTORNEY FINE:  I guess I just have one, unless,

2  Mr. Ching, you have any that you would like to interpose

3  first.

4      ATTORNEY CHING:  No questions from me.  Thank you.

5      ATTORNEY FINE:  Okay.

6           EXAMINATION

7  BY ATTORNEY FINE:

8  Q.      Really, I think just one, Lieutenant Reina.

9          Assume for me that Mr. Cook is correct in what he

10  saw on the video when he said that he saw Officer Tran

11  lowering the shirt of Mr. Gutzalenko so that one of the

12  paramedics could administer an injection.  Just assume for

13  this question that Mr. Cook is correct that that's what

14  happened.

15          At the time of this incident, would that have been

16  a violation of any Richmond Police Department policy?

17  A.      No.

18  Q.      That's it.  That's all I've got.  Thank you.

19      ATTORNEY COOK:  No further questions here.  We can

20  go off the record.

21      THE REPORTER:  Before we do, can I get orders for

22  the transcript on the record, please.

23      Mr. Cook, you have the standard order with Butler.

24  The other attorneys, please, their order --

25      ATTORNEY COOK:  Oh, yeah.  And then I'm probably

                                                          78

1   going to go through all the exhibits today, I guess.

2           ATTORNEY FINE:  Nick Fine for the City of Richmond

3   Defendants.  Just a copy of the electronic transcript,

4   please.

5           ATTORNEY CHING:  Jackie Ching for Hinshaw Law

6   Firm.  Just an electronic copy is great.  Thank you.

7           ATTORNEY COOK:  Yeah.  And really, I only want an

8   electronic copy as well.

9           THE REPORTER:  Okay.  Thank you.  I'm off the

10  record.

11          (The deposition concluded at 3:24 P.M.)

12                          --o0o--

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          79

1                          REPORTER'S CERTIFICATE

2

3          I, Debra J. Skaggs, Certified Shorthand Reporter

4    in and for the State of California, do hereby certify:

5          That the foregoing witness was by me duly sworn;

6    that the deposition was then taken remotely before me at the

7    time and place herein set forth; that the testimony and

8    proceedings were reported stenographically by me and later

9    transcribed into typewriting under my direction; that the

10   foregoing is a true record of the testimony and proceedings

11   taken at that time.

12          I further certify that pursuant to FRCP Rule

13   30(e)(1), before completion of the deposition, review of the

14   transcript [ ] was [X] was not requested.

15          I further certify I am neither financially

16   interested in the action nor a relative or employee of any

17   attorney or party to this action.

18          IN WITNESS WHEREOF, I have subscribed my name on

19   this 25th day of September, 2024.

20

21          ____/s/Debra J. Skaggs_____

22                     DEBRA J. SKAGGS, CSR No. 7857

23

24

25

                                                              80

# EXHIBIT 9

# BODY-WORN VIDEO PROPOSED TO BE FILED UNDER SEAL

**EXHIBIT 9** to the Declaration of Nicholas Fine.  A true and correct copy of the video from Officer Mark Hall's body-worn camera for the subject incident.

Please click on the following link: